1          UNITED STATES DISTRICT COURT
                DISTRICT OF MINNESOTA
2
    ------------------------------------------------------------
3                                    )
    Dawn Brenner and Kathleen        )   File No. 18-cv-2383
4    Brenner, as co-trustees for     )          (NEB/ECW)
    the heirs and next of kin of     )
5    Dylan Brenner,                   )
                                      )   St. Paul, Minnesota
6           Plaintiffs,               )   February 4, 2019
                                      )   9:58 a.m.
7    vs.                              )
                                      )
8    Danielle Sue Asfeld, et al.,    )
                                      )
9           Defendants.               )
    ------------------------------------------------------------
10
               BEFORE THE HONORABLE NANCY E. BRASEL
11             UNITED STATES DISTRICT COURT JUDGE
                        **(MOTION HEARING)**
12

13

14

15

16

17

18

19

20

21

22

23

24
            Proceedings recorded by mechanical stenography;
25    transcript produced by computer.

```
1    APPEARANCES
      For the Plaintiffs:        SiebenCarey
2                                JEFFREY M. MONTPETIT, ESQ.
                                 Suite 500
3                                901 Marquette Avenue
                                 Minneapolis, Minnesota 55402
4
                                 Newmark Storms Dworak LLC
5                                JEFFREY STORMS, ESQ.
                                 100 South Fifth Street
6                                Suite 2100
                                 Minneapolis, Minnesota  55402
7
      For Defendant Sherburne    Iverson Reuvers Condon
8     County:                    STEPHANIE A. ANGOLKAR, ESQ.
                                 FRANCINE MARIE KUPLIC
9                                9321 Ensign Avenue South
                                 Bloomington, Minnesota  55438
10

11    For the Defendant MEnD     Larson King
      Correctional Care,         ANTHONY NOVAK, ESQ.
12    PLLC:                      BRADLEY PROWANT, ESQ.
                                 Suite 2800
13                               30 East Seventh Street
                                 St. Paul, Minnesota 55101
14
      Court Reporter:            ERIN D. DROST, RMR-CRR
15                               Suite 146
                                 316 North Robert Street
16                               St. Paul, Minnesota 55101

17

18

19

20

21

22

23

24

25
```

**P R O C E E D I N G S**

**IN OPEN COURT**

1
2
3          THE COURT:  We are on the record.  Madam Clerk,
4    would you call this case for us, please.
5          THE COURTROOM DEPUTY:  Dawn Brenner, et al., v.
6    Danielle Sue Asfeld, et al., Civil Case No. 18-cv-2383.
7          Counsel, would you please state your appearances
8    for the record.
9          MR. STORMS:  Your Honor, Jeff Storms on behalf of
10   the Plaintiff and Jeffrey Montpetit on behalf of the
11   Plaintiff as well.
12         THE COURT:  Good morning.
13         And for the Defendants from the Sherburne County?
14   Sorry.
15         MS. ANGOLKAR:  Good morning.  Stephanie Angolkar
16   and Francine Kuplic for Sherburne County Defendants.
17         THE COURT:  Thank you.
18         And for the MEnD Defendants?
19         MR. NOVAK:  Tony Novak and Bradley Prowant,
20   Your Honor.
21         THE COURT:  Good morning.
22         MR. PROWANT:  Good morning.
23         THE COURT:  We are here on both a motion to amend
24   and a motion to dismiss.  Have the parties discussed how
25   you'd like to handle oral argument in light of the opposing

1    motions here?

2              MR. STORMS:  We had not, Your Honor.

3              THE COURT:  All right.  Why don't we take the

4    motion to amend first.

5              Mr. Storms, are you going to argue that motion?

6              MR. STORMS:  I am, Your Honor.

7              THE COURT:  All right.  Thank you.  You may

8    proceed.

9              MR. STORM:  Good morning, Your Honor.  May it

10   please the Court.  In addressing the motion to amend the

11   complaint, the standard review here is really the lowest

12   possible standard in terms of a burden on the Plaintiffs to

13   amend their complaint.  No scheduling order has been issued

14   in this matter.  We are seeking leave, though, because we

15   had used our automatic right to amend the complaint, and we

16   set forth in detail why that was.  And I believe that the

17   procedural history shows there was a good reason; that this

18   happened very naturally in terms of how we got to a second

19   amended complaint.

20             The main thrust of the argument against our

21   amending the complaint is futility, and it's really the sole

22   argument from Sherburne County.  There's no allegation of

23   bad faith or prejudice by Sherburne.  The MEnD Defendants

24   primarily rest on arguments of futility, but they do make

25   some allegations of prejudice and there are some general

1    complaints about the length of the proposed second amended

2    complaint.

3           I'm going to just briefly start with the MEnD

4    motion or opposition and the MEnD Defendants.  So in the

5    initial complaint, we had -- or the first amended complaint,

6    we had named Danielle Sue Asfeld, Amanda Nowell and

7    Christina Leonard.  All three of them we alleged deliberate

8    indifference in addition to supplemental state law medical

9    malpractice claims.  They did not move to dismiss those

10   claims.  They answered.

11          In the second amended complaint that we propose,

12   we added claims against Dr. Todd Leonard, both for

13   individual violations, so deliberate indifference, and also

14   in his supervisory capacity also as an individual.  As I

15   read MEnD's paperwork, they did not lodge an objection to

16   Count One as it relates to Dr. Leonard, and I don't know if

17   that was inadvertence or they are conceding that we've

18   stated a claim against Dr. Leonard pursuant to Count One.

19          They did allege that our claims of supervisory

20   liability against Dr. Leonard are futile, and I'm going to

21   come back and address that along with the *Monell*, the

22   futility arguments.  There's sort of a broader brush that I

23   just wanted to touch upon.  Much of the MEnD complaint talks

24   about how long -- or the MEnD opposition talks about how

25   long the second amended complaint has become, and they are

basically saying, Why are you picking on us?  You know, it

was Sherburne County that's opposed your -- that moved to

dismiss your first amended complaint.  And the argument that

neither Defendant has really addressed, and they have almost

acted as if it doesn't exist, is that we've alleged that

Sherburne County is vicariously liable for all the acts of

MEnD and its employees, and that's as a result of their

nondelegable duty to provide healthcare at Sherburne County

to the inmates, detainees.  And Sherburne County has never

addressed that in either of their motions, and MEnD didn't

address it in its opposition either.  I shouldn't say

Sherburne County's motions, their motion and their

opposition.

THE COURT:  Uh-huh.

MR. STORMS:  But they have never addressed that

argument, and we have set forth case law that shows it is

nondelegable duty, which means that there's vicarious

liability.  So we needed to, in light of Sherburne County's

opposition, continue to set forward facts that showed that

we had stated claims against Sherburne County and those

include the claims against the individual MEnD Defendants.

And so for that reason, it's appropriate, in light of

Sherburne County moving to dismiss our complaint, to address

allegations against Sherburne County.

MEnD also says much about Mr. Dylan Brenner's 2016

incarceration, that it's immaterial or irrelevant.  I think
that couldn't be further from the truth, Your Honor.  We
have a continuity of care issue like we have in every
other -- with every other medical provider.  And in this
case, the core allegations are that -- or a key allegation
is that Sherburne County and MEnD had all this information
about how sick Mr. Brenner was back in 2016.  And they had a
score of medical records that showed he was sick and had
things like TBI and bipolar and PTSD and was suicidal, and
so for that reason, those allegations are material to this
case.  And, again, we stated them in detail because
Sherburne County came forward in response to our first
amended complaint and said, You didn't plead enough facts
about foreseeability and we believe all those facts go
towards foreseeability.

And with respect to the length of the complaint, I
would also say that the length of our complaint is not
outside the scope at all for these types of cases.  You
know, two of the cases that we've referenced within our --
our supporting memorandum, one is the *Baxter-Knutson* case,
which was a prior suicide case where MEnD had provided the
medical treatment or lack thereof, and also the *Lynas* case,
which involves both Sherburne County and MEnD.  The *Lynas*
complaint is approximately 33 pages.  The *Baxter-Knutson*
complaint is 37 pages.  These are -- and they've answered in

1    both of those cases, so it's well within the scope of the

2    length that we see because they are complicated cases.  You

3    have to allege deliberate indifference to each individual.

4    You have multiple entities.  So I really think that there's

5    little merit to the idea that the complaint is too long,

6    especially since I have sort of been put in a Goldilocks

7    conundrum.  I have Sherburne County saying it's too short,

8    and them saying it's too long.  We think we've pleaded just

9    the right amount of facts and the critical facts.

10           And I also just briefly wanted to touch upon

11    MEnD's allegations of scandalous allegations.  There's

12    nothing scandalous about stating something that's in the

13    public record.  Here we have a doctor who was disciplined by

14    the board and reprimanded by the board for his failure to

15    provide appropriate medical care.  And critical to this

16    case, you know, we have this -- in our second amended

17    complaint at paragraph 229, a review of Dr. Leonard's

18    practice revealed that on multiple occasions, Dr. Leonard

19    authorized narcotics but failed to document objective

20    clinical findings to support the need for ongoing

21    medications, failed to document an assessment for his

22    patient's risk of chemical dependency, toxicity, diversion,

23    or suicide, and his failure in the past has a direct link to

24    issues related to suicidality.

25           And when you look at a medical malpractice case,

1    you know, in Minnesota and state court, we have the standard

2    medical malpractice forms.  Whether or not you have ever

3    been disciplined by the board is one of the standard

4    questions because it is relevant to issues of care, so

5    there's really nothing scandalous about citing something

6    that is in the public record, and I would also note that an

7    allegation related to that discipline was in the

8    *Baxter-Knutson* case and it was not stricken from the public

9    record.

10              Just briefly to close out MEnD on this issue, so

11   the futile -- the claims of futility relate to supervisory

12   liability and *Monell* liability.  On the supervisory

13   liability and *Monell*, I think it's important that you take a

14   step back and look at everything in the cumulative whole and

15   ask yourself what's plausible.  And the facts that we've

16   pled here is we have a doctor who has a history of being

17   disciplined who then has created this correctional medical

18   providing facility or correctional medical care company

19   where we've alleged he's one, if not the only, medical

20   doctor overseeing over 30 different facilities in Minnesota.

21              In this particular case, we saw that all the

22   records, as we've alleged, are not time stamped, which is

23   baffling that you would not have that level of continuity of

24   care about when people are actually seeing patients.  Also

25   in this case, two of the nurses, Nurse Asfeld and Nowell,

did not even document seeing Dylan Brenner on the day they saw Dylan Brenner and received notice about his medications. They created chart notes days after Mr. Brenner committed suicide.

When -- We've also alleged that there were other instances of suicide that were directly related to the lack of proper medical care provided by MEnD. Taking all of those pleadings as a whole, we think we've met both supervisory liability, we have pled facts that Dr. Leonard was on notice of this pattern and practice and he was deliberately indifferent to it, similar to how he was deliberately indifferent individually towards Mr. Brenner as we set forth in the complaint; but similarly with respect to the *Monell* case, it's not critical at this point that we say here is the exact precise custom. That's not what you look at at this stage. And Judge Tunheim addressed that in the *Sagehorn* case. And we're not saying that there's a specific policy that's unconstitutional. We're saying there's a custom. And for those same reasons when you look at Dr. Leonard's history, the history of multiple suicides, the widespread deliberate indifference that we believe we've set forth in great detail related to this case, we've stated a plausible claim for both *Monell* and supervisory liability.

With respect to the Sherburne County opposition, so in our first amended complaint, we had had simply a

1    negligence case against Wes Graves and a vicarious liability

2    claim against Sherburne County, both under ordinary

3    negligence and under professional negligence.  We have added

4    Rebecca Lucar for both deliberate indifference and

5    negligence, Denny Russell for deliberate indifference and

6    negligence.  We added a deliberate indifference claim as to

7    Wes Graves and we added a deliberate indifference and

8    negligence claim with respect to James Rourke.

9         THE COURT:  And I'm right that the John Does are

10   now out of the complaint; correct?

11        MR. STORMS:  Correct, Your Honor.  We have removed

12   them from the second amended complaint and named

13   individuals.

14        With respect to James Rourke, there is no mention

15   in the opposition by the Sherburne County Defendants of him,

16   and so I'm not sure why they did not append -- oppose his

17   addition to the complaint, but I did not see it in their

18   memorandum.  Rebecca Lucar, Denny Russell, Wes Graves, these

19   are simple claims at the pleading stage.  We've alleged

20   facts that each of them knew about Mr. Brenner's serious

21   medical needs.  And it's not just suicidality, bipolar,

22   PTSD, suicidality, traumatic brain injury.  And each of them

23   had some of their own unique information and we've addressed

24   that in the facts.  Mr. Brenner had an objectively serious

25   medical need, and these individuals were deliberately

1    indifferent to that.

2              And when we look at the *Iqbal* and *Twombly*

3    standard, we've set forth more than sufficient facts; and

4    really if you look at what some of the Courts have said

5    recently within our district about amending the complaint,

6    the Courts don't even necessarily weigh it as heavily as you

7    might a Rule 12(b)(6) motion.  Really you are looking to see

8    is this frivolous.  And we cited some of the authority of

9    that as well.  And these are certainly not frivolous claims,

10   but we believe certainly they reach a 12(b)(6) standard and

11   we have stated plausible claims for each one of these

12   individuals, Your Honor.

13             THE COURT:  How do you address the *Williams* case

14   that is the recent Eighth Circuit case affirming a motion to

15   dismiss or the grant of a motion to dismiss on similar

16   facts?  I'm sorry.  Not *Williams*.  It's *Whitney*.

17             MR. STORMS:  *Whitney* out of the Eastern District

18   of Missouri, I believe, yeah.

19             THE COURT:  Correct.

20             MR. STORMS:  So I actually pulled a copy of the

21   complaint in that case, and I know Your Honor would have

22   access to it on PACER.  You are certainly welcome to my

23   copy.  But it's a seven-page complaint, and they literally

24   did not plead knowledge, the actual words.  They never said

25   you knew that this individual had a serious medical need.

1    It's -- Frankly, it's just not a very adequate complaint for

2    a Section 1983 deliberate indifference case.  And so here we

3    have pled that there is knowledge and we've pled facts to

4    support that, Your Honor, and so I think that that's

5    merely -- that case is merely a byproduct of -- of a

6    deficient complaint that didn't plead knowledge.  But we did

7    so here.  We pled notice and knowledge.

8             THE COURT:  Thank you.

9             MR. STORMS:  Thank you, Your Honor.

10             THE COURT:  For the Sherburne Defendants,

11    Ms. Angolkar.

12             MS. ANGOLKAR:  Thank you, Your Honor.  First of

13    all, James Rourke is not named in the proposed amended

14    complaint, so that's why Sherburne County hasn't addressed

15    him.  The first time I have heard that name is this morning.

16             THE COURT:  It's -- My understanding is or my

17    reading is it's in Exhibit B, which is the markup complaint.

18    It shows James Rourke in his individual capacity, at least

19    in the caption.

20             MS. ANGOLKAR:  I -- What I have in front of me

21    here doesn't have that.

22             MR. STORMS:  May I interject for a second?

23             THE COURT:  Please.

24             MR. STORMS:  I actually believe in looking at what

25    your pleading says is that you -- as part of a meet and

confer process, I handed over a draft complaint.  I was told

that there would not be an agreement; and then we had

probably another four or five days between the time we met

and conferred and I filed the complaint, and so I have

reason to believe that maybe the Sherburne County walked --

worked off of our meet and confer documents and not off of

what was actually filed.

MS. ANGOLKAR:  So I guess I would object that

there's been no meet and confer on the addition of James

Rourke because we should be able to work in good faith off

of what was sent to us to evaluate for an amended complaint.

If there's new allegations added to that proposed complaint

that then is filed, there hasn't been a meet and confer on

those allegations.

THE COURT:  Do you have reason to believe that you

would treat James Rourke any differently in terms of your

opposition to the amendment?

MS. ANGOLKAR:  It depends on what's his -- what's

his role?

MR. STORMS:  James Rourke did the mental health

assessment.  We wrote about this in the memorandum too.

THE COURT:  It's in the memorandum and the -- it's

in the memorandum.

MR. STORMS:  And so he was the one that did the

mental health assessment and we allege that he facilitated

1    the movement from BH-5 to the Gamma Unit.

2              THE COURT:  All right.  Thank you.

3              MS. ANGOLKAR:  Okay.  And I interpreted that for

4    Russell, so, yes, I would still incorporate the arguments.

5              MR. STORMS:  Sorry.  You are correct.

6              THE COURT:  All right.  Go ahead.

7              MS. ANGOLKAR:  That?

8              MR. STORMS:  I'm sorry.  You are correct.

9    Mr. Rourke was the individual who observed Mr. Brenner being

10   depressed once he was in the Gamma Unit, and we allege that

11   he took no action.

12             MS. ANGOLKAR:  All right.  Well, I -- I still

13   stand by the argument that there's been no meet and confer

14   with James Rourke, but I would still incorporate the same

15   arguments in our memo to oppose the addition of James Rourke

16   as a defendant based on the deliberate indifference and

17   negligence arguments that we've made.

18             THE COURT:  Okay.

19             MS. ANGOLKAR:  First of all, saying deliberate

20   indifference doesn't really get to the heart of what a Court

21   needs to look at to actually evaluate a deliberate

22   indifference claim.  There's really two steps to that, and

23   this Court has looked into that I think already in terms of

24   looking at the *Whitney* case, but also looking at this in the

25   context of qualified immunity as well.  And as Plaintiffs

acknowledge, it has to be looked at for each individual

defendant that's proposed, so what the separate rules are

here.

They have to show that there's actual knowledge.

And what's key here, it's not enough to just put a

conclusory allegation in a complaint to say Lucar -- that

they knew based on a guilty verdict and -- or prior

suicidality, because there's no allegation that any of these

individuals had contact with Brenner in the July 2016

detention or when he was at the jail.  And listing off the

factors or what was going on in his life when he then came

into the jail in October 2017, writing it in the complaint

as they knew he was suicidal based on these things, it

really is, looking at that sentencing, saying he should have

known.  They should have known this.  They should have known

based on his conviction and what happened in July 2016.

That should have known language or message that's taken from

reading that as a whole is not enough to support a

deliberate indifference standard.

And besides pleading actual knowledge, again, not

enough to just say conclusorily they knew, there also has to

be a second step there to show objectively -- so that's the

subjective component, was there actual knowledge --

objectively, did they fail to take reasonable measures to

abate that risk, again, going through each person of what

was done.  The allegations in the proposed complaint say
that Lucar, based on what she did, she did the initial
classification, and had -- there's nothing alleging that she
did anything wrong with her initial classification and where
she placed him that would go beyond objective reasonable --
objectively reasonable measures to abate any risk.  Again,
if this Court determined that, okay, they pled enough to say
she had actual knowledge, the next step is did she do enough
objectively assuming that were true.  For all her role was
was the initial classification.

Next is Russell, again, just with classification.
And, again, just simply saying that he knew isn't enough.
Reading the allegations and proposed allegations as a whole,
Plaintiffs are really saying that these individuals should
have known.  And what's important in the context of -- and I
would add that argument as well for Graves and for Rourke,
that once Brenner was then in his cell in the two different
locations, anybody that was performing a welfare check or
checking on him, there's nothing alleged in terms of actual
knowledge, facts to show actual knowledge.  When reading the
proposed allegations, they keep going back to really a
message of that they should have known.  Saying that Rourke
observed him in a depressed state is really saying should
have known based on that.

And that's key because the -- trying to

1    distinguish this case from *Whitney*, simply adding an

2    allegation to say that the jailer knew the person was -- had

3    a suicide risk based on these factors doesn't really

4    establish that subjective requirement, because for one

5    thing, there's nothing establishing that -- that subjective

6    knowledge from that person.  It would be different if in one

7    of the post-incident interviews, if somebody had made an

8    admission that -- you know, that they -- they knew he was

9    making comments, but in that context, we would expect to see

10    some different things done as well and those facts just

11    don't exist here in the complaint.  So what that means is

12    the continually alleging facts that really go to more of a

13    should have known standard, it's not enough for a deliberate

14    indifference standard.

15    THE COURT:  And let me just interrupt you there in

16    terms of your allegation that -- or the straw man you sort

17    of put up, which is it's different if they admit knowledge.

18    Is it your contention that that is what is required to meet

19    the standard to dismiss -- or motion to dismiss language and

20    standard?  In other words, is -- admission of knowledge,

21    that would clearly be sufficient.  Is there anything short

22    of admission of knowledge that would meet the standard from

23    your perspective?

24    MS. ANGOLKAR:  Well, in deliberate indifference

25    cases I guess in general, there's also just in terms of the

1    actual knowledge of the medical condition of an individual,

2    actual knowledge of a diagnosis or what they are

3    specifically treating for.  But in the context of a suicide

4    case, it's -- it can't be looked at with hindsight.  Suicide

5    cases are difficult cases.  It's difficult to predict

6    suicide in general, just even with the general population,

7    and demonstrating that simply somebody committed suicide

8    isn't enough in a deliberate indifference case.  They must

9    show that -- that there's subjective knowledge of the risk,

10   so it -- so to answer your question, they don't have to

11   know, yes, this person says I'm going to commit suicide.

12   There can be other circumstances that they have knowledge of

13   that can support that they have knowledge of a risk, so --

14           THE COURT:  So knowledge of symptoms is I think

15   what they are alleging or part of what they are alleging.

16           MS. ANGOLKAR:  Well, if every -- if the fact that

17   somebody is -- they conveniently leave out the felony

18   conviction for -- of what he was convicted of; but if every

19   individual that came into a jail with a felony conviction,

20   if that's the symptom for predicting suicide, that's not

21   enough.

22           THE COURT:  Sure.

23           MS. ANGOLKAR:  An attenuated record from somebody

24   being a suicide risk a year and a half before, it's too

25   attenuated to have this gap, and we've cited several cases

1    in our brief --

2              THE COURT:  Uh-huh.

3              MS. ANGOLKAR:  -- addressing that.  It's outside

4    of the scope of this, but, quite frankly, in terms of just

5    doing training on suicide risks, you know, Mr. Brenner falls

6    outside of a category of individuals that are at a higher

7    suicide risk when they first come into a jail.

8              So anyway, they also -- the Court also has to look

9    at what are the measures taken.  And in light of the

10   practical limitations on jailers, simply laying blame or

11   fault and pointing out what might have been done is not

12   sufficient.  And the question is not whether the jailers did

13   all they could have done, it's whether they did what the

14   Constitution requires.  And that's under *Luckert*.  So it's

15   important not to look at it with 20/20 hindsight.

16             It's also -- I think the key issue here is that

17   it's too attenuated to rely on what happened in July of 2016

18   from when he was in the jail.  There's also no allegation

19   that the individual defendants had personal knowledge about

20   that history.  Alleging that they have access to those

21   records doesn't really establish whether they read those

22   records and knew about them and then made the

23   classifications that they did or did welfare checks that

24   they did just based on -- on that.  And even adding that

25   with a felony conviction, again, you know, the jail is full

of people with felony convictions, yet not all of them have

attempted suicide, so that's not enough either. And a

prescription for medical cannabis for PTSD, even putting all

of those together doesn't really red flag it to make it that

obvious to establish that there's actual knowledge. This

really is a classic case of hindsight is 20/20.

In terms of negligence, to some extent our

argument really kind of merges in terms of the sufficiency

of a negligence claim from our initial motion to dismiss

focussed on Graves, although he was a jailer that did a

welfare check or welfare checks when he was in that unit --

when Brenner was in that unit. Lucar and Russell were

classification officers. And then Rourke, as well as a

jailer of simply based on the allegation, he observed him in

a depressed state, ultimately the decision to classify an

inmate as suicidal is a discretionary decision. And

classification decisions then are entitled to official

immunity, so that means even if the Court finds that

Plaintiffs have alleged enough for negligence against Lucar,

Russell, and Rourke, there's still -- they are still

protected by official immunity based on classification.

We didn't raise that argument for Graves because

he wasn't involved in classification, and we acknowledge the

issue with the welfare check. With regard to Graves, we

simply stand on the argument on the merits of negligence and

1    the lack of foreseeability that Brenner would commit suicide

2    based on that July 2016 record.  And if there's official

3    immunity granted, then there would also be vicarious

4    official immunity as well.

5            Also very briefly with regard to the *Monell*

6    argument, if the Court finds that the individuals are

7    entitled to qualified immunity and dismisses the deliberate

8    indifference claim, then there's no Section 1983 claim at

9    issue and the *Monell* claim would be dismissed.  But we also

10   join in MEnD's arguments regarding the *Monell* claim, and

11   also the general arguments in terms of the volume of

12   information added to the complaint.  And I anticipate that

13   will be an issue for Magistrate Cowan Wright in terms of

14   what will happen with discovery in this case.  Thank you.

15           THE COURT:  Let me just ask you briefly, as to the

16   motion to amend and the motion to dismiss, if I grant the

17   motion to amend, then the motion to dismiss becomes moot.

18   Am I right about that?

19           MS. ANGOLKAR:  Um, yes, it does become moot.  I

20   just -- I guess if the Court does not consider the motion to

21   dismiss, we just then incorporate our argument on negligence

22   with regard to Graves in that motion to amend, because we

23   didn't raise it in opposition to the motion to amend since

24   it had already been briefed.

25           THE COURT:  Right.

1          MS. ANGOLKAR:  And there wasn't -- it's not a new

2     claim.  It's -- Even though there are some new factual

3     allegations added, it's nothing new.  But just for

4     efficiency in terms so that we're not bringing another

5     motion to dismiss --

6          THE COURT:  Right.

7          MS. ANGOLKAR:  -- that we would ask that the Court

8     consider that argument within -- within that context.  And I

9     think that may be -- I appreciate that the Court coordinated

10    the motions together so we could kind of short-circuit that.

11         THE COURT:  Yeah, that was my thought as well,

12    sort of if the motion to -- if I grant the motion to amend,

13    I consider the futility arguments that you have made in

14    terms of all claims so that it could end up being a partial

15    grant; right?

16         MS. ANGOLKAR:  Yes.

17         THE COURT:  So I'm considering the futility and I

18    don't expect then a new motion to dismiss.  You are sort of

19    stuck with the claims, if any, that I allow to go forward.

20         The other question that I had then is as to

21    jurisdiction, which is if I were to grant a motion to

22    dismiss based on futility or deny the motion to amend based

23    on futility, either one, leaving only potentially the state

24    law claims, say those survive and the 1983 *Monell* claims do

25    not, does the Court have subject matter jurisdiction at that

1   point?

2           MS. ANGOLKAR:  That is at the discretion of the

3   Court whether it retains supplemental jurisdiction over

4   Sherburne County based on -- on the other claims, and that

5   depends on whether there's a sufficient common nucleus of

6   operative fact, so it -- to answer that, it really depends

7   on whether the -- it's really at the Court's discretion.

8           THE COURT:  Uh-huh.

9           MS. ANGOLKAR:  I think an argument can be made

10  either way.

11          THE COURT:  And you don't have a position at this

12  point?

13          MS. ANGOLKAR:  I think the count -- Yeah, we don't

14  have a position that we've set forth to the Court on that,

15  but it's well within the Court's discretion to dismiss the

16  negligence claims for lack of supplemental jurisdiction and

17  then Plaintiffs could pursue those in state court.

18          THE COURT:  All right.  Thank you.

19          MS. ANGOLKAR:  Thank you.

20          THE COURT:  Mr. Novak.

21          MR. NOVAK:  Thank you, Your Honor.  I will try and

22  focus on just the issues as it would relate to the MEnD

23  Defendants.  And we've called them M-E-N-D.  It's okay to

24  call them MEnD.

25          THE COURT:  Thank you.  All right.

1          MR. NOVAK:  It helps us shorthand things.

2          THE COURT:  All right.

3          MR. NOVAK:  So listening to counsel walk us

4    through all the moving parts, all the reasons, the timing,

5    how long things are, how it all intersects, it gives me a

6    little bit of a headache, almost as a side point

7    demonstrates just how unnecessary much of what they are

8    attempting to add is to this pleading.  The reason that we

9    focussed much of our briefing on the length of the pleading

10   is that there's whole sections of it, many, many, many

11   paragraphs that don't add anything new to the complaint.

12   They pled early on that due to a prior incarceration,

13   certain Defendants would have had access to knowledge about

14   Mr. Brenner's prior medical condition.  They've now fleshed

15   that out to the tune of -- I don't -- I have lost track at a

16   certain point -- 100 or something like that paragraphs

17   related to fleshing out that one allegation.

18          And when you look at it, and you take a step back

19   and look at this, the pleading standards are where we start

20   when we're looking at pleadings.  Short and plain statement

21   is one thing, but amendments also must be material to the

22   case, they must be done for nondilatory purposes, they must

23   be nonprejudicial, and there are problems on each of those

24   fronts if you look at them as to what they are trying to do

25   here.

1    The point was made that the MEnD Defendants simply

2   answered in this case.  I can tell you, I don't know the

3   answer to this yet, but you may have a subsequent motion to

4   dismiss.  You will certainly have a summary judgment motion

5   from us in this case.  We did not have the investigative

6   tome that the Plaintiffs had clearly when they drafted any

7   iteration of their complaint.  And when you look at how it's

8   been pled, it's pled very carefully in this case.

9   Mr. Brenner came in on October 6th, and his visits for

10  screenings, for booking, for mental health assessment were

11  all with county -- all with county staff, the folks that do

12  the booking.  One nurse is included in this initial pleading

13  because she picked up a urine sample to do a screen.

14  Dr. Leonard is now included because he's a supervisor to the

15  nurses that are involved.  One nurse is involved because she

16  met with the decedent's mother a few hours before he died to

17  obtain and inventory his medication.

18    This is not a case where there's a long path of

19  treatment at the operative time.  So what we have is a lot

20  of volume, both in terms of number and in terms of the

21  volume on the television nature of the word, in an attempt

22  to try and create a story here that implicates the MEnD

23  parties.  And the reason -- one of the main reasons we

24  oppose here is because of this argument, well, these are

25  always long complaints.  They always include this type of

1    inflammatory rhetoric in the allegations.  That doesn't mean

2    they are proper.  Just because someone else did it in

3    another suit and they have done it in other suits, doesn't

4    mean it's a proper way to amend a pleading.

5         Another item we have to talk about is is any of

6    this information new.  If this was so key and so pertinent

7    to their claims, why hasn't it been in the lawsuit since the

8    beginning?  So we're now stuck in this sort of tortured

9    procedural posture where the County has a motion to dismiss,

10   there's two sets of parties who they are seeking to amend

11   against, and the complaint is so unwieldy that you can't

12   figure out which way is up.  That is why there's a short and

13   plain requirement to the pleading standards.  So that -- I

14   know that's sort of a long windup, Judge, but when we look

15   at what they are trying to add, the main crux of it, if it

16   can be boiled down, is that in 2006 when Mr. Brenner, more

17   than a year before his death, was in jail, he treated with

18   other nurses for --

19         THE COURT:  2016, right?

20         MR. NOVAK:  2016.  I'm sorry.  I misspoke.

21         THE COURT:  Go ahead.  Other nurses.

22         MR. NOVAK:  When he's there in 2016, he treats

23   with other nurses for mental health issues, and there's I

24   don't believe any claim that any of that treatment was

25   improper.  So you've got page after page about treatment

1    that there's no allegation about being improper.

2          Now we have claims against new nurses.  There's no

3    allegation that these nurses saw him in 2016, and, frankly,

4    there's no allegation that they saw him in the day or so

5    that he was going through booking at Sherburne County.  What

6    they do to try and get there against the nurses who didn't

7    see him in the day or so that he was at Sherburne County in

8    October of 2017 is add page after page about 2017 when the

9    care -- or 2016 when the care was apparently proper, a 2011

10   board -- Minnesota medical practice board situation with

11   Dr. Leonard, 2011, not connected to this, he didn't get

12   investigated for this case, it's related to something

13   entirely different, related to documentation if you look at

14   it, and then they add all that together and say, there must

15   be enough here to proceed on especially these new claims.

16   Because we have no allegation of policy.  We have no

17   allegation of a specific custom.  I heard this is a custom

18   case.  I still don't know what the actual custom is because

19   they haven't pled it.  It's just here's a bunch of

20   information that we think will make the MEnD parties look

21   bad, and we think that that's enough to claim that there's a

22   custom here.  And if you look at the law on when a pleading

23   is allowed to be amended, you need to do more than that, and

24   the futility argument comes in particularly on the *Monell*

25   claim and on the supervisory liability claim.  Those claims

1    require more than conclusory allegations, which is what we

2    have here.

3           On the -- on the *Monell* claim -- let me grab my

4    notes on that.  So *Monell* liability only comes into play

5    when there's a municipal policy or a custom that violates

6    federal law, and we've heard there's no policy alleged and

7    we don't see that in the complaint, and it must be a custom.

8    But, again, we don't get to what that actual custom is.

9    It's some other inmates under completely different

10   circumstances have committed suicide, and Dr. Leonard, not

11   eight years ago, had a board finding and therefore there

12   must be a custom inside of MEnD.  That's the definition of a

13   conclusory allegation.  There's not enough pled for the

14   *Monell* claim to stand against the MEnD Defendants.

15          The same general analysis comes into play on the

16   supervisory liability claim.  The *Howard* case, the 1989

17   Eighth Circuit case, talks about supervisory liability

18   attaches where the supervisor received notice of a pattern

19   of unconstitutional acts.  In this case there's no

20   allegation about what that pattern of unconstitutional acts

21   is as it applies to Mr. Brenner, and that there's a single

22   incident -- sorry, quote, a single incident or a series of

23   isolated incidents usually prohibits an insufficient --

24   provides -- excuse me -- an insufficient basis on which to

25   assign supervisory liability.  You can't cherry-pick

1    individual incidents.  You can't say there's another lawsuit

2    that's ongoing where there's been absolutely no finding of

3    liability and cherry-pick these individual things and try

4    and create out of whole cloth a supervisory liability claim.

5            So that's the analysis as to futility as to *Monell*

6    and as to the supervisory liability.  The rest of it, I

7    suppose I could go on and on, but I think it would sort of

8    defeat the purpose when the main argument is that the second

9    amended complaint sort of goes on and on, but it doesn't

10    really get anywhere.  2016 care that we don't have any issue

11    with by individual nurses that aren't parties to this case

12    and no actual connection between any of that isn't a reason

13    to allow an amended pleading.

14            THE COURT:  Thank you.

15            MR. NOVAK:  Unless you have questions, Judge,

16    that's all I have.  Thank you.

17            THE COURT:  I don't.  Thank you.

18            Mr. Storms.

19            MR. STORMS:  Yes, Your Honor.  I think the link

20    between 2016 and 2017 is very clearly laid out in the second

21    amended complaint and the supplemental memorandum.

22    Mr. Brenner, when he was suicidal in 2016 at the Sherburne

23    County Jail and being treated by the MEnD Defendants, was

24    placed in administrative maximum security as a result of

25    that suicidality, and he was maintained in booking BH-5,

which is the special cell that they put them in to watch you

when you are suicidal, and he was in a Kevlar suit.

When he came back, he was -- he was never released

from that cell.  We cite the -- the administrative review of

that in our -- in our second amended complaint, and MEnD

recommended that Mr. Brenner move to general population and

that he just receive 30-minute watches.  The Sherburne

County administrator overruled that and said, We're not

letting this guy out of maximum administrative security.

So then when he came back in 2017, and we have

this allegation in our complaint, Lucar, when she screens

him, says he has to go back in max seg because that's how he

left and he has to stay there until he's reviewed on Monday

morning.  So you have that direct link, he was placed in max

seg because he was suicidal, and he had to stay in max seg

because that's what he left as, because he was suicidal.

And no one ever assessed whether or not -- in 2017 whether

or not Mr. Brenner could have been moved to a different

unit, and it was never approved.  And so we have those

allegations throughout the complaint.

So -- and we do allege knowledge.  What's

happening is that no one thinks any of our pleadings should

be believed and no one wants to give us an opportunity to

prove any of them.  Everyone is saying, well, you have to

look at the weight of the evidence and what it's really

saying is this, but they are wholly ignoring the Rule 12

standard, and we believe we have pleaded allegations that

were specific as to knowledge and as to *Monell*.  We didn't

just say there was one case, one somewhere else.  There are

multiple suicides involving MEnD, and we have pleaded those

in the case and we have an opportunity to prove that those

caused, in part, Mr. Brenner's suicide.

One thing I just briefly wanted to mention too,

Your Honor, was you were asking questions about knowledge,

and the suggestion is just, you know, unless they admit or

say we knew, then you can never have a deliberate

indifference case, and that's not how these cases are won.

You have to typically use circumstantial evidence to prove

knowledge, because no one ever admits to knowing anything.

Two very brief points.  On negligence, one of the

cases that they relied upon -- Sherburne County relied upon

in their opposition is this *Hott v. Hennepin County* case.

And this goes to Graves and negligence and foreseeability.

You know, we argued obviously that foreseeability is a

question down the line and that we pleaded enough facts on

foreseeability, but the *Hott v. Hennepin County* case at

page 908 and 909 makes it clear that just not doing your

welfare check is a violation of enough of a general duty

because suicidality is known.  You know, a more general duty

to protect the entire inmate population from the risk of

1    assault, suicide, or other injury appears to exist.  And

2    they analyze the Supreme Court *Sandborg* case and actually

3    reverse the trial court's dismissal of that case, so I think

4    *Hott v. Hennepin County* is worth looking to.

5            Finally, because I know we said much here and in

6    the papers, we do believe that -- that the Court should

7    exercise supplemental state law jurisdiction.  These clearly

8    all relate to the same set of facts.  There are federal

9    claims that exist and we'll continue to pursue no matter

10   what happens.

11           The one thing I would like to orally request

12   because it is important to our clients that I did not put in

13   the second amended complaint, which is if the Court allows

14   the *Monell* claim to proceed on policy, we would, in our

15   request for relief, ask that when we file the second amended

16   complaint, be able to ask for injunctive and other equitable

17   relief.  We did make the request for damages but forgot to

18   include the line I traditionally include at the end of these

19   cases.

20           THE COURT:  And so talk about the *Monell* claim for

21   a minute, and you said on policy, but you are really arguing

22   custom I think.

23           MR. STORMS:  Custom, I'm sorry.  Yes, Your Honor.

24           THE COURT:  And I think the Defendants are having

25   trouble identifying, and I am too, what that custom is.

1 Multiple instances of deliberate indifference is I think how

2 you might have phrased it earlier.

3          MR. STORMS:  Yeah.

4          THE COURT:  Is that enough for a custom and can

5 you talk about that?

6          MR. STORMS:  Yes.  And so -- and, again, the case

7 law really says that at this stage, you don't have to have a

8 defined custom.  Usually discovery helps define your custom.

9 But we alleged in our complaint, and I fleshed the customs

10 out on page 40, but Plaintiffs have plausibly alleged that

11 MEnD had customs of deliberate indifference towards the

12 supervision of lower-level MEnD employees and towards the

13 well-being of inmates at high risk for self-harm.  And we

14 believe that's supported by the other cases of suicidality

15 and the clear deviation from typical medical care standards

16 that we have in this case occurring at multiple instances

17 with respect to documentation.  We believe that supports it

18 as well.

19          So -- and then with respect to Sherburne County,

20 we allege Sherburne County knows that MEnD has this -- has

21 this history, and yet Sherburne County continued to employ

22 MEnD.  And what hasn't been said at all is that it's not --

23 it's not isolated here and there.  The *Lynas* case happened

24 within a month of Mr. Brenner's suicide, and it was at

25 Sherburne County and it was MEnD.  So within 30 days, two

1    inmates at Sherburne County who were supposed to be

2    receiving proper medical care by MEnD committed suicide in

3    the same facility.

4           And when you look at that cumulatively in addition

5    to some of the prior allegations that we've alleged, we

6    think that's sufficient to show that there is a custom of

7    indifference and a custom of a lack of supervision over the

8    staff, which really flows naturally from this telemedicine

9    concept where they are looking to provide this low-cost

10   medical care, but no one is actually seeing the inmates.

11   And Mr. Novak said it, no one ever saw Mr. Brenner.  Here's

12   a guy who has a history of suicidality at the facility, he's

13   in a booking cell, history of traumatic brain injury,

14   post-traumatic stress disorder, it's all in the records,

15   he's in the cell where you engage in close suicide

16   monitoring in the max seg unit, and no one thinks to see

17   this man at all?  And then when his mom shows up with a

18   cocktail of drugs, still nobody sees this individual?

19   That's part of a bigger pattern and practice and custom, and

20   we believe we've plausibly alleged that at this point,

21   Your Honor.

22          THE COURT:  Let me just ask you then procedurally,

23   I want to make sure I'm -- in hearing these together -- and

24   you heard me question counsel for Sherburne about this --

25   but in hearing these together, I'm trying to be more

1    efficient.  Technically if I were to grant your motion to

2    amend and rule on futility, I would -- I mean, it would moot

3    the motion to dismiss.  A new motion to dismiss could be

4    brought.  We could be back here on futility.  My intention

5    would be to take all of this briefing together and rule on

6    futility, and I want to make sure that you have put forward

7    all the arguments in terms of the second amended complaint

8    and futility that you intend to put forth.

9            MR. STORMS:  I -- at this point in time,

10   Your Honor, with respect to futility, I believe we did.  I

11   don't think -- You know, I feel like we addressed every

12   point.  We felt like there were numerous points that weren't

13   necessarily responded to.

14           THE COURT:  Yeah.

15           MR. STORMS:  And I feel like we addressed those,

16   but I don't think there's anything additional that we would

17   add on this motion.

18           THE COURT:  All right.  Given that, then it's my

19   intention to rule on the motion to amend and futility sort

20   of together so that when my ruling comes out, you are left

21   with a complaint or not that you are -- that you go forward

22   with, and motions to dismiss would be brought only on new

23   claims or information.  And I think that's a little bit

24   different for the MEnD Defendants because they haven't

25   brought a motion to dismiss here but have raised futility as

1    to two claims.

2            So that would be my intention.  I think that's the

3    most efficient way to go forward and how most Courts do it,

4    although there have been some instances where a Court would

5    rule on a motion to amend and allow full briefing on a

6    motion to dismiss in the instance where a Court didn't feel

7    that they had full briefing on the futility issues; but I

8    feel like I do and it sounds like you are all in agreement

9    on that.  Am I right?  I'm hearing no objections?

10           All right.  Fair enough.  Then I think I have

11   heard your oral arguments as to all.  Is there anything

12   further?  We started with the motion to amend and dealt with

13   futility.  But on the motion to dismiss, Ms. Angolkar,

14   anything further from the Sherburne Defendants?

15           MS. ANGOLKAR:  No, Your Honor.  We can rest on the

16   briefing on that.

17           THE COURT:  All right.  Thank you.

18           Mr. Storms, anything further on that motion to

19   dismiss from you?

20           MR. STORMS:  No, Your Honor, just to the extent

21   that I did reference the *Hott v. Hennepin County* case --

22           THE COURT:  Yes.

23           MR. STORMS:  -- that was not something that I

24   referenced in our briefing, but I believe it was something

25   that was raised by the Sherburne County Defendants in

1  opposition to our -- our motion, and I think that case is

2  worth considering with respect to foreseeability and the

3  existence of a duty.

4          THE COURT:  Fair enough.  All right.  Thank you.

5  Thank you, everyone.  I'll take these motions under

6  advisement and issue a ruling.  Thanks.

7          THE LAW CLERK:  All rise.

8      (Court adjourned at 10:52 a.m.)

9                          *    *    *

10

11

12      I, Erin D. Drost, certify that the foregoing is a

13  correct transcript from the record of proceedings in the

14  above-entitled matter.

15

16              Certified by:  *s/ Erin D. Drost*

17                             Erin D. Drost, RMR-CRR

18

19

20

21

22

23

24

25