UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

_____

Dawn Brenner and Kathy Brenner, as co-trustees
for the heirs and next of kin of Dylan Brenner,

        Plaintiffs,                         Case No. 18-cv-02383 (NEB/ECW)

      v.

Danielle Sue Asfeld, in her individual capacity,
Amanda Nowell, in her individual capacity,
Christina Leonard, in her individual capacity,
Janell Hussain, in her individual capacity,
Todd Leonard, in his individual and official capacities,
Rebecca Lucar, in her individual capacity,
Denny Russell, in his individual capacity,
Wes Graves, in his individual capacity,
James Rourke, in his individual capacity,
MEnD Correctional Care, PLLC, and Sherburne County,

        Defendants,

_____

**Memorandum of Law in Support of Plaintiffs' Motion to Compel Discovery and for Other Relief from MEnD Correctional Care, PLLC and Todd Leonard, M.D.**

_____

## <u>Introduction</u>

      Plaintiffs bring this third motion to compel because it is clear that MEnD

Correctional Care, PLLC ("MEnD") and Todd Leonard, M.D. ("Dr. Leonard") do not

take their discovery obligations seriously.  They will attempt to distract this Court from

the substantive discovery obligations they have failed to meet by attempting to litigate the

meet and confer process.  The record in this case and the growing public record reflect

that—be it due to a lack of diligence or deceit—their representations cannot be trusted.

Plaintiffs' motion to compel the forensic examination should be granted, and the sanction must be severe enough that MEnD meets its discovery obligations here and in its mounting pile of federal litigation.  Even if the Court determines that sanctions are not warranted, the showing here is strong enough to warrant forensic inspection to ensure compliance.

## Background

Plaintiffs have extensively briefed this matter before the Court on multiple occasions and will forego an extensive recitation of the substantive factual allegations.  In short, this matter involves Dylan Brenner ("Brenner"), a post-trial detainee, committing suicide while detained at the Sherburne County Jail on October 7, 2017.  MEnD was the private correctional medical company providing services at the Jail.  Dr. Leonard is MEnD's owner, and was at all material times the only medical doctor employed by MEnD throughout all of the 30+ Minnesota counties where MEnD provides correctional services.

**A.    MEnD's documented history discovery non-compliance**

MEnD's false representations regarding the discovery in its possession started over one year ago.  In response to Plaintiffs' First Set of Combined Requests for Production of Documents Request No. 1, on April 26, 2019 MEnD responded at follows:

> **REQUEST NO. 1.**  A complete, certified copy of all of Brenner's medical records and all electronically stored documents and communications regarding Brenner in your possession.
>
> **RESPONSE:** MEnD Defendants object to this Request to the extent it seeks confidential information protected by the attorney-client privilege and the work product doctrine.  Notwithstanding these objections and subject to

them, the MEnD medical records regarding Brenner, which are already in your possession, are the only documents in MEnD's possession relating to Brenner, outside of those documents provided by Plaintiffs and Sherburne County during this litigation.[1]

Plaintiffs have since demonstrated the falsity of this representation, as MEnD has produced—only after Court Order—emails and Brenner's electronic medical record from MEnD's eMDs electronic medical recordkeeping system that specifically address Brenner's detentions and suicidality.  There were far more documents than the handful of medical records Plaintiffs initially obtained prior to the start of this litigation.

When Plaintiffs served their First Set of Combined Requests for Production of Documents on February 22, 2019, Plaintiffs instructed the MEnD Defendants to identify any documents that had been destroyed.[2]  The MEnD Defendants identified no documents as having been destroyed.[3]

### 1. MEnD withheld Brenner's electronic medical record file and then failed to comply with this Court's January 24, 2020 Order.

Only after conducting the deposition of defendant Christina Leonard on September 24, 2019, Plaintiffs learned that MEnD maintained additional medical information on the eMDs system.  This resulted in Plaintiffs demanding that MEnD produce screenshots of Brenner's eMDs system, as called for by Request No. 1, to which MEnD's counsel represented that MEnD would produce the screenshots.[4]  On December 13, 2019, MEnD produced only one screenshot of Brenner's eMDs system, which was covered by an

---

[1] ECF Doc No. 87-1 at 55.

[2] Declaration of Jeffrey S. Storms Dec. (8/31/20) ("Storms Dec.") Ex. 1 at 2-3.

[3] *See* ECF Doc No. 87-1 at 55.

[4] Storms Dec. Ex. 2.

electronic "sticky note."[5]

MEnD refused to remove the sticky note and provide Plaintiffs with (what MEnD inaccurately represented was all of) Brenner's electronic medical record file until the Court issued its January 8, 2020 Order, which stated in part:

> e.    The MEnD Defendants must produce a high-quality, unobstructed screenshot of every page of Dylan Brenner's electronic medical record file or make the medical software available for inspection by Plaintiffs on or before **January 24, 2020**, or a date and time otherwise agreed by MEnD and Plaintiffs.[6]

Jan. 8, 2020 Order, ECF Doc. No. 100 at 2.  At hearing, MEnD had no plausible explanation as for why the one screenshot for the medical record was produced with the sticky note:

> THE COURT: So why is there a sticky note on this? Why is there a sticky note on Exhibit V? Why was it produced with a sticky note?
>
> MS. NEARING: I will concede that I don't have a full answer to that.[7]

MEnD produced 31 pages of eMDs screenshots on January 24, 2020.  It was Plaintiffs' understanding that MEnD had fully complied with the Court's Order.  Plaintiffs were wrong.

Notably, underneath the sticky note that obstructed the one page of medical records, it identified under Brenner's "Current Problems" that he was a "suicide risk."[8]  Plaintiffs brought a second motion to compel.  At oral argument, MEnD's counsel

---

[5] ECF Doc No. 87-2 at 293.
[6] Order (Jan. 8, 2020), ECF Doc. No. 100 at 2.
[7] Transcript (Jan. 7, 2020), ECF No. 106 at 22:11-15.
[8] ECF No. 128.

inferred that this information was added **after** Brenner committed suicide:

> I will point out for the Court, if you do look at Document 128, where Mr. Storms was asserting that we were – or MEnD was deliberately hiding information that shows that Mr. Brenner was a suicide risk, well, also the very first item on that Current Problems list is "Hanging self."

> And this goes to something that the director of nursing has represented, and she is scheduled to be deposed as well and will explain, like, often electronic medical records where things are blown in **after the fact**; and the e-mail that we were talking about, even she surmised way back then that that was the case.[9]

The inference that Brenner's identification in the eMDs system was "blown in after the fact" proved to be objectively false with respect to Brenner's "suicide risk."

Due to COVID concerns, Diana VanDerBeek's (director of nursing) deposition was re-scheduled for June 24, 2020.  Any reasonable person would have understood that an obvious area of inquiry at her deposition would address **when** the "suicide risk" designation was placed in Brenner's "Current Problems."  On June 22, 2020, five months after the Court's first discovery order and over a year after the discovery was requested and should have been produced pursuant to Request No. 1, Plaintiff received an additional eMDs screenshot from MEnD clearly reflecting that Brenner was first identified as a "Suicide Risk" on July 30, 2016, unlike the "Hanging self" entry that was entered after-the-fact on October 7, 2017.[10]

MEnD's counsel expressly represented to Plaintiffs that this was the only screenshot missing from the Court-ordered production: "This one was the only page

---

[9] Transcript (3/6/20), ECF No. 140 at 30:18-31:3.
[10] Storms Dec. Ex. 3.

missing."[11]   The timing of the "suicide risk" entry is critical because it goes to the core of

Plaintiffs' deliberate indifference allegations against the MEnD Defendant, i.e., MEnD

employees **knew** that Brenner had serious medical needs and was specifically at risk for

suicide.  Despite the critical nature of this previously undisclosed information, Plaintiffs

gave MEnD the benefit of the doubt, and did not seek Court action for this untimely

disclosure.  Surely, MEnD had now complied with the Court's January 8, 2020 Order.

But it did not.

Following the June 24, 2020 deposition of Diana VanDerBeek, Plaintiffs' counsel

grew concerned that the June 22, 2020 production was not the only screenshot from the

eMDs file that MEnD failed to produce.  On June 25, 2020, Plaintiffs informed MEnD

that it intended to conduct an in-person inspection of Brenner's eMDs file.[12]   The

inspection was eventually scheduled for August 14, 2020.  On August 12, 2020, Plaintiffs

received an email from MEnD's counsel stating, in relevant part: "I have become aware

of a few screen shots from certain links in Dylan Brenner's eMDs record that Diana

vanDerBeek will be able to show you during Friday's inspection of his file."[13]

Like the untimely produced June 22, 2020 screenshot, the screenshots produced on

August 12, 2020 contained highly significant information, expressly addressing

Brenner's serious medical needs.[14]   The most critical additional screenshots that MEnD

---

[11] *Id.*
[12] Storms Dec. ¶  6.
[13] *Id.*
[14] Storms Dec. Ex. 4.

previously failed to produce reflected as follows:[15]



[15] Storms Dec. ¶ 8.



These screenshots, which MEnD should have produced a year ago and certainly by January 24, 2020 after the Court's Order, identify "suicidal ideations" related to Brenner at least 12 times, and they were seemingly **only** produced because Plaintiffs noticed the inspection.

At the inspection, Plaintiffs' counsel were able to observe and document the opening of Plaintiffs' eMDs file. The inspection revealed that Brenner's eMDs file does not open with a sticky note obstructing the Health Summary screen, which reflected Brenner's current problem of a suicide risk.[16] That sticky note **had** to be intentionally

---

[16] Storms Dec. ¶ 9.

opened and placed there, as effectively admitted to by MEnD's counsel: "When we did a test run of the eMDs system on a laptop in advance of the inspection, the opening page did not have the sticky note on it.  Ms. Vanderbeek could not explain why, although she noted that eMDs can be inconsistent at times…"[17]

Frankly, it remains shocking that Plaintiffs were required to go through motion practice to reveal the contents under the sticky note, and then were forced to conduct an inspection in the face of repeated representations that MEnD satisfied its Court-ordered discovery obligations.

### 2. MEnD failed to disclose emails specifically related to Brenner's October 6 and 7, 2017 treatment (or lack thereof), suicidality, and MEnD's investigation into Brenner's suicide.

MEnD came before this Court on January 7, 2020 and represented that the **only** email account MEnD had searched was Diana VanDerBeek's ("VanDerBeek's").  *See, e.g.,* Transcript (1/7/20) at 26:23 – 27:4 ("I just was simply going to address the fact that Diana VanDerBeek did investigation and interviewed with employees, as well as the same employees who were deposed, to see if there were any e-mail correspondence specific to Dylan Brenner outside of the sort of e-mails that we've produced that are indicative of Diana VanDerBeek's correspondence to the various individuals.").

Despite MEnD's representations that VanDerBeek had conducted an investigation and that her emails had been searched, only after the Court's January 7, 2020 Order did MEnD disclose one of the most important documents in the case—an October 11, 2017

---

[17] Storms Dec. Ex. 5.

email from Diana VanDerBeek to Todd Leonard and Christa Marchessault.[18]  That email

discusses and attaches a screenshot depicting Brenner's current suicide flag from

Sherburne County's Pro-Phoenix system, and implicates at least two other MEnD

employees in Brenner's care, Brittany Bohn and Kristina Bauman.  Prior to that email,

neither of those MEnD employees had ever been disclosed previously as being involved

in Brenner's care, nor did MEnD previously disclose its employees' cognizance of

Brenner's current suicide flag on the Pro Phoenix system.  MEnD failed to disclose this

email despite the fact that it was obviously responsive to Request No. 1.

Had MEnD's initial representations about its search for emails prior to the Court's

January 7, 2020 Order been accurate, that critical October 11, 2017 email would have

been disclosed.  Diana VanDerBeek claimed that her initial email search included a

search for Brenner's initials, i.e., DB. [19] Yet, the October 11, 2017 email from

VanDerBeek included "DB" in the subject line.[20]  Still, that responsive and highly

relevant email was not disclosed until the Court's January 7, 2020 Order.

### 3.    MEnD misrepresented the existence of quarterly reports.

In addressing this motion, the Court should also be mindful of the fact that MEnD

previously misrepresented the existence of quarterly reports for the counties it serves

throughout Minnesota.  In a February 13, 2020 email, MEnD's counsel stated: "Quarterly

reports as previously produced are unique to Sherburne County; MEnD does not create

---

[18] ECF Doc. No. 126.
[19] Storms Dec. Ex. 6, VanDerBeek Dep. at 240:12 – 241:10.
[20] ECF Doc. No. 126 at 2.

the same type of reports (that is, reports that would contain information on inmate suicides) for other counties with which it contracts."[21]  It was only after Plaintiffs' counsel obtained third-party subpoenaed documents regarding MEnD's policies reflecting the existence of quarterly reports at other MEnD jails,[22] and very precise questioning from the Court, that MEnD conceded the existence of these documents, contrary to its express prior representations:

> THE COURT: Does MEnD have quarterly reports for jails other than Sherburne?
>
> MS. NEARING: Yes.
>
> THE COURT: Okay.  So some quarterly reports haven't been produced as well?
>
> MS. NEARING: Correct.[23]

### 4. MEnD failed to preserve the emails of former employees.

As part of the Court's January 7, 2020 Order, MEnD was required to produce emails of MEnD employees working at the Sherburne County Jail from October 6 and 7, 2017, and any emails specifically related to Brenner.  As discussed above, only after that Order did MEnD produce critical emails specifically related to Brenner.  Correspondence from MEnD's counsel reflects no search was made in earnest for such emails until the Court issued its Order, and that multiple responsive emails would have been deleted because no diligent search or preservation tactics were employed prior to the January 7,

---

[21] ECF Doc. No. 122.
[22] Transcript (3/6/20), ECF No. 140 at 30:18-31:3.
[23] *Id.* at 41:25 – 42:5.

2020 Order:

> With respect to emails, MEnD was able to access the current employees
> covered by the Order. MEnD no longer has access to emails of former
> employees. MEnD contacted its IT support company to determine whether
> it could access the emails from former employees. The IT vendor advised
> that once the email account for an employee is deactivated/deleted as a
> user, they can only reactive (sic) the account within 30 days, otherwise they
> are unable to recover or regain those emails.[24]

MEnD has not represented that it has made a forensic search in an effort to find any

destroyed emails.

**5.     Dr. Leonard, as MEnD's 30(b)(6) designee was unprepared to
provide competent testimony regarding MEnD's efforts to
search for emails and other responsive electronic information in
this litigation.**

Plaintiffs noticed, in part, the following categories of inquiry for the 30(b)(6)

deposition of MEnD:

> 30.    The steps, actions, and efforts MEnD took to preserver
> documents and other information relative to Dylan Brenner.

> 31.    The steps, actions, and efforts  MEnD took to search for and
> retrieve documents and other information responsive to
> discovery requests in this lawsuit.[25]

Dr. Leonard was woefully unprepared to provide this testimony.[26]  MEnD has admitted

that Dr. Leonard's testimony was insufficient, and its position with respect to this motion

is that Plaintiffs should simply depose Dr. Leonard again.  Dr. Leonard could not even

testify as to whether he ever personally searched **his own** emails for responsive emails

---

[24] Storms Dec. Ex. 7.
[25] Storms Dec. Ex. 8.
[26] Storms Dec. Ex. 9, T. Leonard Dep. at 80:10 – 93:17.

and information, despite being an individually named defendant.[27]  Dr. Leonard, for

example, could not testify if he had ever searched for the segregation notice he received

from Sherburne County Correctional Officer Rebecca Lucar[28] regarding Dylan Brenner

being placed in administrative segregation,[29] and it is Plaintiffs' understanding that Dr.

Leonard and the MEnD Defendants claim that email to have been deleted and destroyed.

**B.**   **The professional competence and veracity of MEnD and Dr. Leonard have and will be called into question in other proceedings, including specific concerns regarding recordkeeping.**

The Court should be mindful of other matters in weighing the instant discovery

dispute.  There are prior or current findings, admissions, and credible allegations that call

into question MEnD's professional competence and veracity.  The concerns about

professional competence and veracity start at the very top with Dr. Leonard, MEnD's

highest-ranking officer[30] and its only employed medical doctor (M.D.) at all times

material hereto.  *See Lynas v. Stang*, No. 18-2301 (JRT/KMM), 2020 WL 4816375, at

*13 (D. Minn. Aug. 19, 2020) ("MEnD's medical oversight consisted of one part-time

osteopath and one 10%-time medical doctor (Leonard) for the entire MEnD organization

across 30+ institutions in several states… Here, MEnD's understaffing and lack of

meaningful physician supervision, coupled with reliance on MEnD's proprietary forms,

colored every interaction Lynas had with the medical system and could allow a

reasonable jury too conclude that MEnD was deliberately indifferent to risk of Lynas's

---

[27] *Id.* at 80:15-20, 82:1-4.
[28] Storms Dec. Ex. 10.
[29] *Id.* at 80:15-20.
[30] T. Leonard Dep. at 22:11-13.

suicide.").

Here, Dr. Leonard was even reluctant to admit the objectively true fact that he was

the only M.D. employed by MEnD in Minnesota at all material times:

> Q. So in Minnesota from January 1, 2016, through December 31, 2017, you
> would have been the only medical doctor providing service on behalf of
> MEnD in Minnesota?
>
> A. I don't view it that way. I view it as we have a team of medical
> providers, all are independently licensed and able to provide care. So I
> guess I don't categorize it that
> way.
>
> Q. Well, medical doctor is a very distinct term, correct?
>
> A. It's an individual term of a medical provider, certainly.
>
> Q. Well, an MD is a degree you had to obtain?
>
> A. Correct.
>
> Q. And a nurse practitioner can't call herself an MD?
>
> A. No. She can call herself a nurse practitioner and she's able to
> independently provide care just as you would if you went to your local
> family medicine clinic. Most people often see nurse practitioners, physician
> assistants.
>
> Q. So I understand how you are answering my question, but I want to make
> sure I get an answer to my question. You were the only medical doctor
> providing service on behalf of MEnD in Minnesota from January 1, 2016,
> through December 31, 2017?
>
> A. With that particular title, correct.[31]

---

[31] T. Leonard Dep. at 23:23 – 25:2.

1.      **Dr. Leonard has been publicly reprimanded, in part, for his poor medical recordkeeping practices.**

In May 2011, Dr. Leonard stipulated to a public reprimand by the Minnesota Board of Medical Practice.[32]  Dr. Leonard stipulated, in part, to the following findings of fact:

c.      A review of Respondent's practice revealed that, on multiple occasions, Respondent authorized narcotics, but failed to document objective clinical findings to support the need for ongoing medications; failed to document an assessment for his patients' risk of chemical dependency, toxicity, diversion, or suicide; failed to document discussion regarding potential side effects of the drugs; failed to monitor the efficacy of the medications; failed to implement narcotic contracts or conduct biological fluid screens; and failed to recognize drug seeking behavior in his patients.  Respondent also failed to address collateral health concerns or routine health maintenance care.

d.      A review of Respondent's practice also revealed that Respondent failed to appropriately maintain and adequately document his clinic records.  Respondent's clinic notes were frequently cursory, incomplete, and illegible.  Respondent often failed to document a diagnosis, adequate patient history, or a rationale for prescribed medications.  On multiple occasions, Respondent prescribed controlled substances for his patients, but failed to adequately document the specific name of the medication, authorized quantity, or the strength of the medication in the clinic record.[33]

2.      **Dr. Leonard likely maintained an incredible volume of inaccurate records at the Sherburne County Jail regarding patient care and his supervision over staff.**

Multiple MEnD medical records for Brenner from October 6 and 7, 2017 reflect that Dr. Leonard signed those documents as supervisor, which Dr. Leonard admits.[34]

---

[32] ECF Doc. No. 87-1 at 33 et seq.
[33] *Id.* at 34.
[34] *See, e.g.,* T. Leonard Dep. at 114:24 – 115:18; 136:22 – 137:5.

However, Dr. Leonard claims that he did not actually sign those medical records.[35]

MEnD claims this is a systemic software problem,[36] referred to by other deponents as a

glitch.[37]  Despite the fact that this implicates potentially **thousands** of patient medical

records at the Sherburne County Jail, ███████████████████████, Dr.

Leonard testified that this issue still was not resolved as of the date of his July 8, 2020

deposition.[38]

### 3. There have been widescale publicly reports of an FBI investigation into MEnD and Dr. Leonard's care of a deceased inmate.

The Minnesota Department of Corrections has publicly called for an investigation

into the death of Beltrami County inmate Del Shea Perry, who died while he was

supposed to be receiving medical care from MEnD.  *See* "Corrections commissioner calls

for criminal investigation into Beltrami County jail inmate's 2018 death," StarTribune

(July 11, 2020), available at https://www.startribune.com/corrections-commissioner-

calls-for-criminal-investigation-into-beltrami-county-jail-inmate-s-2018-

death/571712012/ (last accessed Aug. 31, 2020); *see also* "Kare 11 Investigates: FBI to

open investigation into Beltrami County inmate's death," Kare11.com, (July 15, 2020),

available at https://www.kare11.com/article/news/investigations/beltrami-county-jail-

death/89-9b10af10-3472-41ec-878e-082d04b1a64b (last accessed Aug. 31, 2020); *Perry

v. Beltrami County et al*, No. 19-cv-02580 (ECT/LIB).

---

[35] *See id.*
[36] T. Leonard Dep. at 105:5-10.
[37] ECF Doc. No. 87-2 at 15.
[38] T. Leonard Dep. at 109:6 – 111:20.

Related to that death, a whistleblower wrote letters to the Department of Corrections Inspection Unit and Ramsey County Medical Examiner's Office detailing Dr. Leonard's failure to attend to the patient and silence the whistleblower's concerns:

> When Dr. Leonard got off the phone he told me that he was talking with this attorney.  He told me that he was sorry that he had forgotten to tell me Hardel had died on Sunday night.  He told me that Hardel had been medically cleared from the emergency room.  He told me that they did a thorough examination and a CT scan, which showed nothing.

> I told Dr. Leonard that I disagreed that there was nothing wrong.  I told him that vital signs and ECGs don't lie—both of which were consistently abnormal with Hardel.  I also told him that I am very confident when it comes to my clinical judgement and that something was very wrong with Hardel; he was very sick.  **Dr. Leonard then told me to not jump to conclusions.  He then said that jumping to conclusions could jeopardize his company.[39]**

"Read the complaint letters filed after Beltrami County Jail inmate's death," StarTribune (July 11, 2020), available at https://www.startribune.com/read-the-complaint-letters-filed-after-beltrami-county-jail-inmate-s-death/571728011/ (last accessed Aug. 31, 2020) (emphasis added).



---

[39] Storms Dec. Ex. 11.



**5.**

████████████████████████████

### **The Present Discovery Dispute**

Given MEnD's discovery conduct in this case, and the consistent, widespread, and substantial facts and allegations of deliberate indifference and professional incompetency, Plaintiffs made the determination that MEnD's representations about the documents in its possession could not be trusted.  There is no evidence that MEnD ever made a diligent attempt to preserve electronic evidence after Brenner's suicide, the outset of this litigation, or recover evidence that was not preserved. Plaintiffs now seek to conduct a forensic examination of MEnD's work-station hard drives, Dr. Leonard's work and personal computer (which he used for work),[43] and MEnD's servers at the Sherburne County Jail.  Plaintiffs are compelled to seek this discovery in order to ensure full compliance with Request No. 1, and to potentially recover documents that have been destroyed that are responsive to Request No 1.

Through the meet and confer process, Plaintiffs made the following proposal on August 5, 2020 after conferring with the Court (cleaned up from email to Defendants' counsel):

> 1. Our forensic company, Secure Data, Inc. would clone the MEnD server(s) for the Sherburne County jail, the MEnD work station hard drives, and Dr. Leonard's personal hard drives.
>
> 2. Secure Data would search for:

---

[42] ████████████████████████

[43] *Id.* at 73:8 – 76:9.

a. all MEnD to/from emails for October 6, 2017 and October 7, 2017

b. Documents and emails containing the following search terms: Brenner, Dylan Brenner, DB, Dylan James Brenner, 12157, ████ 1985

c. If possible, also a Boolean search for documents and emails for Dylan w/3 Brenner

d. Metadata reflecting the destruction of such emails/documents

3. Secure Data will provide all search-responsive documents and emails to Larson King for a privilege review

4. Larson King will provide all non-privileged documents to Plaintiffs with a privilege log, and provide the privileged documents to the Court for an in camera review, with plaintiff's ability to submit a letter brief challenging any privilege designation on the basis of the privilege log

5. Any additional non-privileged documents will be provided to Plaintiff's counsel

6. Plaintiff would ask that the Court require Defendants to pay for the searching if responsive documents are found but were not produced.

Secure Data has provided Plaintiffs' counsel with a letter of intent reflecting such a search has the ability to be productive.[44]

Despite claiming that MEnD and Dr. Leonard have fully complied with its discovery obligations and has nothing to hide, MEnD and Dr. Leonard refuse to agree to the forensic examination. Instead, MEnD proposes that Plaintiffs simply re-depose Dr. Leonard. Putting aside Plaintiffs' skepticism of Dr. Leonard and MEnD, Dr. Leonard's testimony on these topics would provide little utility given his professed lack of technical expertise. Plaintiffs do not believe this is a reasonable compromise in light of the body of evidence set forth above. To the

---

[44] Storms Dec. Ex. 12.

extent MEnD now offers a different opponent, this case has dragged on long enough due to MEnD's failure to comply with discovery obligations.  MEnD had ample opportunity to do the job right, and has proven time and again that it either cannot or will not do so.

## Argument

**A.    Plaintiffs seek relevant and proportional discovery.**

Federal Rule of Civil Procedure 26 governs the scope of discovery in civil cases. Parties are permitted to discover "any nonprivileged matter that is relevant to any party's claim or defense … Information within this scope of discovery need not be admissible in evidence to be discoverable."  Fed. R. Civ. P. 26(b)(1).  "Relevance is 'construed broadly to encompass any matter that bears on, or that reasonably could lead to other matters that could bear on, any issue that is or may be in the case.'"  *Regents of the University of Minnesota v. AT&T Mobility LLC*, Case Nos. 14-cv-4666, 4669, 4671, 4672 (JRT/TNL), 2016 WL 7972908, at *3 (D. Minn. Dec. 13, 2016) (citing *Oppenheimer Fund, Inc. v. Sanders*, 437 U.S. 340, 351 (1978)).

"Once a threshold showing of relevancy is established by the discovering party, the resisting party must show specifically how the discovery is not relevant or is overly broad, burdensome, or oppressive."  *University of Minnesota*, 2016 WL 7972908, at *3 (citing *St. Paul Reinsurance Co., Ltd. V. Commercial Fin. Corp.*, 198 F.R.D. 508, 511 (N.D. Iowa 2000)).  The Court has broad discretion to limit or otherwise handle discovery matters.  *See, e.g., U.S. ex rel. Kraxberger v. Kansas City Power and Light Co.*, 756 F.3d 1075, 1082 (8th Cir. 2014) (citations omitted).

Plaintiffs seek information that is relevant to the instant case, as they seek production of electronically maintained documents and communications specific to Brenner.  Where the information is relevant, the court has the discretion to order forensic searching where "there is a reasonable possibility amounting to more than conjecture" and it is "proportional."  *Peterson v. City of Minot*, Case No. 1:16-cv-271, 2018 WL 5045194, at *6-9 (D.N.D. Oct. 17, 2018) (analyzing relevant standards and compelling the forensic production).  As set forth in *Peterson* and as routinely recognized by other courts, and as stated by the Secure Data letter of intent, Plaintiffs' proposal presents more than mere speculation that it can obtain relevant information as a matter of technology. *See also Antioch Co. v. Scrapbook Borders, Inc.*, 210 F.R.D. 645, 652 (D. Minn. 2002) ("Moreover, it is a well accepted proposition that deleted computer files, whether they be e-mails or otherwise are discoverable.") (quoting *Rowe Entertainment, Inc. v. The William Morris Agency, Inc.*, 205 F.R.D. 421, 427, 431 (S.D.N.Y. 2002) ("stating that '[e]lectronic documents are no less subject to disclosure than paper records,' and only questioning who should bear the cost of such discovery, especially for back-up tapes or deleted emails").

From a litigation history standpoint, this forensic inspection also presents more than conjecture about its possibility to obtain relevant information.  MEnD has repeatedly failed to meet its discovery obligations for over a year.  It took Court orders for Plaintiffs to obtain the most basic relevant information, i.e., Brenner's electronic jail medical file and emails specifically addressing Brenner's suicide.  Even then, screenshots of the electronic medical jail file were produced after the Court-ordered deadline and it took

Plaintiffs noticing an inspection for MEnD to produce critical screenshots reflective of Brenner's suicidality and his serious medical needs.  Moreover, all of this should be viewed in the context of either established professional incompetence or highly specific and credible allegations of professional incompetence (and deliberate indifference).  MEnD and Dr. Leonard have exhibited repeated failures with respect to medical recordkeeping.  It is not conjecture for Plaintiffs to assert that MEnD and Dr. Leonard fail in their discovery and recordkeeping obligations.

The discovery Plaintiffs seek is proportional.  This case involves the wrongful and unlawful death of a human being.  Plaintiffs' claims are not only that individuals failed Brenner, but that MEnD has a custom and practice of failing to meet its constitutional duties towards its inmates.  Judge Tunheim has already ruled that MEnD's very structure raises fact issues  for trial of deliberate indifference with respect to MEnD's customs and practices.  *Lynas* , 2020 WL 4816375, at *13.  Thus, it is not only imperative that a diligent and honest production of documents be made for purposes of this case, but there are also larger and extremely serious public health concerns that cannot be ignored.  Searching MEnD's Sherburne County hard drives and servers and Dr. Leonard's work and home hard drives is proportional to the incredibly serious needs of this case.

**B.      Discovery sanctions are warranted.**

Federal Rule of Civ. P. 37(a)(5) permits a sanction for the granting of a motion to compel.  Rule 37(b) permits a sanction for failure to comply with a motion to compel.  Rule 37(e) permits a sanction for failure to preserve electronic evidence.  Given the record in this case, it would be within the Court's discretion to sanction MEnD and/or Dr.

Leonard for their conduct under some or all of these rules.  This is not the first time

MEnD has been sued for jail suicide, and it should have an understanding of its

preservation and discovery obligations.

Through Dr. Leonard's own testimony on behalf of MEnD, he admitted that

MEnD did not even diligently search for emails until **ORDERED** to do so:

> Q.    And when was the first time that you would have done this exhaustive
>       search for Dylan Brenner's emails?
>
> A.    I don't remember the exact day but it was whenever we were instructed  to
>       do so.
>
> Q.    After the court ordered you to do so?
>
> A.    To search for emails related to Dylan Brenner?
>
> Q.    Correct.
>
> A.    I believe so.[45]

This testimony buttresses Dr. Leonard's own testimony, as discussed above, that he

cannot even say he has personally looked through his own emails.  MEnD has also

provided Plaintiffs with no showing that it has made any diligent attempt to search for

deleted or destroyed data.  All of this information should have been searched for and

preserved immediately after Brenner's suicide.  "The duty to preserve evidence arises …

before litigation when a party reasonably should know that the evidence may be relevant

to anticipated litigation." *Wagoner v. Black & Decker (U.S.), Inc.*, 2006 WL 2289983 at 3

(D. Minn. 2006), *citing Silverstri v. Gen. Motors Corp.*, 271 F.3d 583, 591 (4th Cir.

---

[45] T. Leonard Dep. at 91:15-24.

2001).

While Plaintiffs were initially prepared to suggest that the Court should reserve ruling on which party is responsible for bearing the costs of this inspection pending the inspection's results, MEnD's failure to satisfy its obligations in light of prior court orders changes Plaintiffs' position. At the very least, MEnD's sanction should be to pay the costs associated with the forensic inspection Plaintiffs' seek here. Plaintiffs also urges the Court to also consider a more severe sanction to deter MEnD from failing to take its discovery obligations seriously.

### Conclusion

Plaintiffs ask the Court to find that Plaintiffs seek relevant and proportional discovery responsive to Request No. 1 and issue the following Order:

1.      MEnD shall make its Sherburne County work station hard drives and server hard drive(s) available for forensic copying by Secure Data within 14 days of this Order;

2.      Dr. Leonard shall make his own work and personal computer hard drives available for copying by Secure Data within 14 days of this Order;

3.      Secure Data shall be permitted to search those copies for documents and emails containing the following search terms: Brenner, Dylan Brenner, DB, Dylan James Brenner, 12157, ███/1985. Secure Data shall also be permitted to search for metadata reflecting the destruction of emails/documents regarding this information;

4.      Secure Data will provide all search-responsive documents and emails to MEnD's counsel for a privilege review;

5.      MEnD's counsel will provide all non-privileged documents to Plaintiffs

with a privilege log, and provide the privileged documents to the Court for an in camera review, and Plaintiffs shall be permitted to submit a letter brief challenging any privilege designation on the basis of the privilege log;

6.     Any additional non-privileged documents will be provided to Plaintiffs' counsel;

7.     MEnD, Dr. Leonard, and/or their insurer shall be required to pay the costs of the forensic copying and inspection; and

8.     For all other sanctions the Court deems just and appropriate within its discretion.

**Dated: August 31, 2020**

**NEWMARK STORMS DWORAK LLC**

/s/ Jeffrey S. Storms
Jeffrey S. Storms, #387240
Paul C. Dworak, #391070
100 South Fifth Street, Suite 2100
Minneapolis, MN 55402
Telephone: 612.455.7050
Fax: 612.455.7051
jeff@newmarkstorms.com
paul@newmarkstorms.com

**SIEBENCAREY, P.A.**

/s/ Jeffrey M. Montpetit
Jeffrey M. Montpetit, #291249
901 Marquette Avenue, Suite 500
Minneapolis, MN 55402
Telephone: 612.333.4500
Fax: 612.455.7051
jeffrey.montpetit@knowyourrights.com

*ATTORNEYS FOR PLAINTIFFS*