# EXHIBIT 1

UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

Dawn Brenner and Kathy Brenner, as co-trustees
for the heirs and next of kin of Dylan Brenner,

              Plaintiffs,

      v.

Danielle Sue Asfeld, Amanda Nowell,
Christina Leonard, in their individual capacities,
MEnD Correctional Care, PLLC, Wes Graves,
John Does 1 – 2, in their individual capacities,
and Sherburne County,

           Defendants,

Case No. 18-cv-02383 (NEB/ECW)

---

## First Set of Combined Requests for Production of Documents to the MEnD Defendants

TO:    The MEnD Defendants and their counsel of record.

Plaintiffs, by their undersigned attorneys, requests in accordance with Rule 34 of the Federal Rules of Civil Procedure, that the above-named Defendants produce and mail to Plaintiffs' attorneys or otherwise make available for inspection and copying, at a mutually convenient time and place within the State of Minnesota, the items requested herein within thirty (30) days hereof.

1.    A request for production of documents includes all originals and copies of documents within your possession, custody and control, or in the possession, custody and

control of your agents, employees, representatives, attorneys and accountants or any other person acting or purporting to act on your behalf.

2.  Should you refuse to produce any documents called for in this Request for Production on the grounds of privilege, state for each document:

   a.  The grounds on which the claim of privilege is based;

   b.  The type of document (e.g., letter, memorandum, contract);

   c.  The date of the document;

   d.  The general subject matter of the document;

   e.  The name, address and position of the author of the document and of any person who assisted in its preparation;

   f.  The name, address and position of each addressee or recipient of the document or any copies of it; and

   g.  The present location of the document and the name and address of the person having custody of it.

3.  Should you claim that any document has been lost, discarded or destroyed, state for each such document:

   a.  The identity of the document;

   b.  Its author;

   c.  Its date;

   d.  The date on which it was lost, discarded or destroyed;

   e.  The identity of all persons who lost, discarded or destroyed the document; and

f.  The identity of all persons having knowledge of its contents.

## DEFINITIONS

1.  "Person" means any person, firm, corporation, partnership, proprietorship, joint venture, organization, group of persons or other associations separately identifiable, whether or not such association has a separate legal existence in its own right and also, any agency, board commission or other governmental entity of any kind.

2.  "Document" for purposes of the requests herein shall include correspondence, notes, memoranda, contracts, agreements and any and all other writings, drawings, graphs, charts, photographs, phone records and other data compilations form which information can be obtained and translated, if necessary, through detection devices into reasonably usable form.

3.  "You," "your," or "defendant" means defendants MEnD Correctional Care, PLLC ("PLLC"), Danielle Sue Asfeld ("Asfeld"), Amanda Nowell ("Nowell"), Christina Leonard ("Leonard"), and their attorneys and any and all of their agents, business associates, employers, representatives, or any party acting or purporting to act on the defendants' behalves. The defendants identified in this paragraph are at times referred to herein as the MEnD Defendants.

4.  "Brenner" means Dylan Brenner.

5.  "Inmate" refers to inmates, prisoners, detainees, and the like.

6.  "Dr. Leonard" means Dr. Todd Leonard.

7.    "Health care" means "health care" as defined by Minn. Stat. § 145.6, subds. 2 and 4.

## Requests

1.    A complete, certified copy of all of Brenner's medical records and all electronically stored documents and communications regarding Brenner in your possession.

2.    Provide a current curriculum vitae or resume for Asfeld, Nowell, Leonard, Dr. Todd Leonard, and any other MEnD employee or contractor identified in response to Interrogatory Nos. 1, 5, or 9 to you.

3.    Copies of all employment or contractor agreements for Asfeld, Nowell, Leonard, Dr. Leonard, and any other MEnD employee or contractor identified in response to Interrogatory Nos. 1, 5, or 9 to you.

4.    Copies of the complete personnel file for Asfeld, Nowell, Leonard, Dr. Leonard, and any other MEnD employee or contractor identified in response to Interrogatory Nos. 1, 5, or 9 to you, including but not limited to any and all complaints from inmates regarding these individuals; any and all administrative complaints or notices of improper conduct or policy violations regarding these individuals; any documents regarding any civil lawsuits filed against these individuals; and any other separate files on or regarding these individuals.

4

5. Copies of all documents in your possession related to any discipline identified in response to Interrogatory No. 2 to you.

6. Copies of all MEnD policies, practices, and procedures in place from January 1, 2016 through January 1, 2018 at the Sherburne County Jail.

7. All training materials provided by MEnD to its employees and contractors from October 1, 2012 through the present related to assessing or monitoring mental health concerns, including but not limited to suicidality, amongst inmates.

8. All documents related to any investigations by any government entity related to MEnD's provision of medical services.

9. All time sheets, activity logs, and assignments for all MEnD personnel providing services to inmates at the Sherburne County Jail on October 6 or 7, 2017.

10. All time sheets, activity logs, and pay records for Asfeld, Nowell, Leonard, Dr. Leonard, and any other MEnD employee or contractor identified in response to Interrogatory Nos. 1, 5, or 9 to you from October 1, 2017 to November 1, 2017.

11. All documents referring or relating in any way to the death(s) of inmates in correctional facilities receiving health care services from MEnD.

12. A complete list of training provided by MEnD for Asfeld, Nowell, Leonard, Dr. Leonard, and any other MEnD employee or contractor identified in response to Interrogatory Nos. 1, 5, or 9.

13. All organizational charts and documents summarizing the organizational or supervisory structure/hierarchy that existed for MEnD in October 2017.

14.     All contracts and agreements between MEnD Correctional Care, PLLC ("MEnD") and Sherburne County from January 1, 2012 through the present, and all communications related to the negotiation and execution of those contracts/agreements.

15.     All operating documents reflecting the delegation of duties between MEnD and Sherburne County from January 1, 2012 through the present.

16.     All communications between MEnD and Sherburne County related to Brenner.

17.     All documents related to any legal proceeding MEnD has been a party to from January 1, 2010 to the present related to the suicide of an inmate.

18.     All documents supporting any of your affirmative defenses.

19.     All documents you intend to rely upon at trial.

20.     All documents which have not been specifically requested in the foregoing requests, but which you referenced, reviewed, or relied upon in drafting your answers to interrogatories or otherwise intend to rely upon in your defense of this case.

**Dated: February 22, 2019**

**NEWMARK STORMS DWORAK LLC**

/s/ Jeffrey S. Storms
Jeffrey S. Storms, #387240
Paul C. Dworak, #391070
100 South Fifth Street, Suite 2100
Minneapolis, MN 55402
Telephone: 612.455.7050
Fax: 612.455.7051
jeff@newmarkstorms.com
paul@newmarkstorms.com

**SIEBENCAREY, P.A.**

/s/ Jeffrey M. Montpetit
Jeffrey M. Montpetit, #291249
901 Marquette Avenue, Suite 500
Minneapolis, MN 55402
Telephone: 612.333.4500
Fax: 612.455.7051
jeffrey.montpetit@knowyourrights.com

*ATTORNEYS FOR PLAINTIFFS*

EXHIBIT 2

From: **Nearing, Carrie** cnearing@larsonking.com 
Subject: RE: Brenner v. MEnD
Date: December 9, 2019 at 6:51 PM
To: Paul Dworak paul@newmarkstorms.com
Cc: Jeff Storms jeff@newmarkstorms.com

Paul,

I'm sorry I couldn't address these issues when you called; as I mentioned, I was running into a meeting with an expert in preparation for an evidentiary hearing that occupies me this week and early next week. That said, I know we have just received materials responsive to some of your requests below and I believe someone will be able to get them to you this week in my absence.

I'm hopeful we'll be able to avoid taking the judge's time with a motion to compel, but you can decide once you see what is produced.

My responses to your questions are below.



**Carrie Nearing**
Attorney
**D** 651.312.6513
**C** 612.644.9049

**Larson · King, LLP**

---

**From:** Paul Dworak <paul@newmarkstorms.com>
**Sent:** Monday, December 9, 2019 1:58 PM
**To:** Nearing, Carrie <cnearing@larsonking.com>
**Cc:** Jeff Storms <jeff@newmarkstorms.com>
**Subject:** Brenner v. MEnD

**CAUTION:** This email originated outside of the organization.

Carrie:

The Judge ordered us to meet and confer one last time. Please respond yes or no to whether you are producing the following responsive documents. If yes, tell us when you are producing it.

    a. All emails relating in any way to Brenner; we have produced, and have continued to search; I believe there are a few additional emails in the materials we just received.

    b. All emails from Sherburne County clinic employees, supervisors, and medical providers from October 6, 2017 and October 7, 2017; encompassed in item a, above.

c. Screenshots of Brenner's eMD records; <span style="color:red">we will produce; I believe these are also in the materials we just received.</span>

d. Logs from Brenner's eMD records; <span style="color:red">we are still investigating whether MEnD personnel can access or if this is something that must come from eMDs, but we will produce what we can find.</span>

e. Screenshots from Brenner's ProPhoenix system (If these are same that Sherburne County produced, tell us the clinic employees see the same screenshots as the jail employees). <span style="color:red">MEnD employees see what the county employees see, so the screenshots you received from Sherburne are the same. We will put this in a formally signed answer if you require.</span>

Thank you. Paul


**Paul C. Dworak, Esq.**
NEWMARK STORMS DWORAK LLC
100 South Fifth Street, Suite 2100
Minneapolis, MN 55402
phone: 612-455-7056
fax: 612-455-7051
email: paul@newmarkstorms.com
website: www.newmarkstorms.com



CONFIDENTIALITY NOTICE:
This communication constitutes an electronic communication within the meaning of the Electronic Communications Privacy Act, 18 USC 2510, and its disclosure is strictly limited to the recipient intended by the sender of this message. This communication and any files transmitted with it may contain confidential and privileged material for the sole use of the intended recipient, including confidential attorney client communications and/or attorney work product. Receipt by anyone other than the intended recipient is not intended to and does not constitute a loss of the confidential or privileged nature of the communications. Any review or distribution by others is strictly prohibited. If you are not the intended recipient you must not read, use, copy, retransmit or disseminate this communication and you are directed to immediately notify the sender by return electronic mail and delete all copies of this communication. To reply to our email directly, send an email to: cnearing@larsonking.com

# EXHIBIT 3

**From:** **Nearing, Carrie** cnearing@larsonking.com 
**Subject:** Brenner / eMDs screen shot
**Date:** June 22, 2020 at 11:34 AM
**To:** Jeff Storms jeff@newmarkstorms.com
**Cc:** Paul Dworak paul@newmarkstorms.com, Jeff Montpetit jeffrey.montpetit@knowyourrights.com, Stephanie A. Angolkar stephanie@irc-law.com, Novak, Tony tnovak@larsonking.com, Prowant, Bradley bprowant@larsonking.com

Jeff,

In discussion with Diana VanDerBeek in advance of her deposition, I learned that there was one missing screen shot from the eMDs record we produced. Ms. VanDerBeek considered it a table of contents to the "Notes" tab, and printed just the pages connected to each link on the table of contents. We cross-referenced everything produced to make sure there was no similar "table of contents" to the other tabs. This one was the only page missing.

She can speak to the issue at her deposition, but if you'd like a written supplemental response let me know.

Carrie



**Carolin J. Nearing**
Attorney
**D** 651.312.6513
**C** 612.644.9049

**Larson · King, LLP**
**2800 Wells Fargo Place**
30 East Seventh Street, Suite 2800
Saint Paul, Minnesota 55101
**O** 651.312.6500
**F** 651.789.4813

CONFIDENTIALITY NOTICE:
This communication constitutes an electronic communication within the meaning of the Electronic Communications Privacy Act, 18 USC 2510, and its disclosure is strictly limited to the recipient intended by the sender of this message. This communication and any files transmitted with it may contain confidential and privileged material for the sole use of the intended recipient, including confidential attorney client communications and/or attorney work product. Receipt by anyone other than the intended recipient is not intended to and does not constitute a loss of the confidential or privileged nature of the communications. Any review or distribution by others is strictly prohibited. If you are not the intended recipient you must not read, use, copy, retransmit or disseminate this communication and you are directed to immediately notify the sender by return electronic mail and delete all copies of this communication. To reply to our email directly, send an email to: cnearing@larsonking.com





| | | | | |
|---|---|---|---|---|
| ✓ | Nowell, Amanda | 10/10/2017 | Notation | (Medication obtained) |
| ✓ | Asfeld, Danielle | 10/09/2017 | Documentation | Medication Drop Off |
| ✓ | Schelitzche, Brittany | 10/07/2017 | Encounter | (Unresponsive) |
| ✓ | Carlson, Elizabeth | 10/07/2017 | Encounter | (Patient pronounced dead) |
| ✓ | Leonard, Christina | 10/07/2017 | Encounter | (Unresponsive; Hanging self; Patient status de |
| ✓ | Leonard, Christina | 10/06/2017 | Documentation | (Withdrawal sign or symptom) |
| ✓ | Robertson PsyD, LP, Michael | 8/01/2016 | Encounter | (Mental health evaluation) |
| ✓ | Thompson, Jennie | 7/31/2016 | Encounter | (Mental health care) |
| ✓ | Skroch, Michelle | 7/30/2016 | Encounter | (Suicide risk) |
| ✓ | Brown, Mary | 7/29/2016 | Encounter | (Seen in mental health clinic) |
| ✓ | Thompson, Jennie | 7/28/2016 | Documentation | (Medication started) |

# EXHIBIT 5

From: **Nearing, Carrie** cnearing@larsonking.com 
Subject: RE: Brenner - eMDs issues / Amended Confidentiality Designations of 30B6
Date: August 28, 2020 at 11:11 AM
To: Jeff Storms jeff@newmarkstorms.com
Cc: Jeff Montpetit jeffrey.montpetit@knowyourrights.com, **Paul Dworak** paul@newmarkstorms.com, **Stephanie A. Angolkar** sangolkar@iversonlaw.com, **Prowant, Bradley** bprowant@larsonking.com, **Novak, Tony** tnovak@larsonking.com



Jeff:

I write to address issue #1 in your email below. Regarding the eMDs screenshots, you are mischaracterizing what took place in MEnD's efforts to produce what was considered Brenner's eMDs medical record. Unfortunately, you are following a pattern of imputing ill-intent to another party when a simple discussion of the issue would allow a measured dialogue. Regardless, because we believe that a discussion of discovery issues is what the rules contemplate, here is additional background as part of our meet and confer efforts.

MEnD did not "intentionally" withhold information. In January, Diana Vanderbeek went through Mr. Brenner's eMDs file and did a print screen of each page of the medical record, as we were ordered to do. She did not print screens that were redundant (e.g., links from a page that bring the user to another page in the record, when that section or the information was otherwise part of what she prepared for the screenshots.) As you saw from the inspection, there were pages that contained much of the same information, as well as sections of the program that MEnD does not use.

As to the issue of the sticky note, Ms. Vanderbeek provided that page originally to show that each tab of the eMD file contained what was in the written record that we had produced, which we used in opposition to Plaintiffs' motion to compel. It was the opening page of Mr. Brenner's eMDs files, as with all inmate's eMDs files. She demonstrated this to us, showing us both Mr. Brenner's file and examples when opening other exemplar inmate files. We thus were able to see what a sticky note looks like when it has content in it, e.g., a quick reminder of something or a note to do something—the usual concept of why we use post-its in writing. As you saw at the inspection, the sticky note in Brenner's file was empty because there was nothing ever entered in it in the first instance. When we did a test run of the eMDs system on a laptop in advance of the inspection, the opening page did not have the sticky note on it. Ms. Vanderbeek could not explain why, although she noted that eMDs can be inconsistent at times.

In addition, prior to Ms. Vanderbeek's deposition we went through Mr. Brenner's eMDs chart using Ms. Vanderbeek's phone access. We went through each link to verify what she had provided us matched up to what was in the eMD chart. With one exception, it did. The exception was a table of contents to the electronic notes that she hadn't printed. In her deposition (p. 192) she explained that she just hit each line to go to the actual note and didn't consider the table of contents a substantive part of the record.

On a related note, when the eMDs chart was reviewed on the laptop in advance of the inspection, we noted links to the prescriptions on Mr. Brenner's health summary page that were not evident when reviewing the chart using her phone access. When Ms. Vanderbeek originally printed screen shots she thought some of the medication information was redundant, as the information was found elsewhere in the eMDs file (e.g., orders). Likewise, there were some links she did not consider part of the medical record (e.g., prescription warnings akin to what would be contained in the PDR or a

medication insert). Out of caution, you received an email describing the screen shots and producing them as soon as our office became aware of them. As you also know, the general prescription warnings pertain to prescriptions Mr. Brenner had been on when at the Sherburne County jail in July 2016. They were not current prescriptions during his 2017 incarceration.

Franky, in retrospect given the vagaries of the eMDs system, an earlier inspection might have been the more prudent course than trying to produce screen shots. Regardless, this background should demonstrate to you that MEnD did not "intentionally" withhold information.

Finally, and returning back to the actual issue we understand is implicated by your planned motion to compel, we continue to be willing to provide background information or testimony on that process to address any actual specific concerns you have. The eMDs issue you raise below is an entirely separate discussion, which you are conflating with your perceived need to have a forensic inspection of all of MEnD's emails.

Although I am not optimistic this background will deter you from bringing your motion, as you have seemed intent on doing so regardless of any discussion, I wanted it to be on the table as part of the meet and confer process.



**Carrie Nearing**
Attorney
D 651.312.6513
C 612.644.9049

**Larson · King, LLP**

**From:** Jeff Storms <jeff@newmarkstorms.com>
**Sent:** Wednesday, August 26, 2020 12:37 PM
**To:** Novak, Tony <tnovak@larsonking.com>
**Cc:** Nearing, Carrie <cnearing@larsonking.com>; Jeff Montpetit <jeffrey.montpetit@knowyourrights.com>; Paul Dworak <paul@newmarkstorms.com>
**Subject:** Meet and Confer

CAUTION: This email originated outside of the organization.

Tony,

Issue #1 - Hard Drive and Server Inspection

I am writing to close the loop on our meet and confer discussions. Judge Cowan Wright's January 8, 2020, specifically stated that "The MEnD Defendants must produce a high-quality, unobstructed screenshot of every page of Dylan Brenner's electronic medical record file or make the medical software available for inspection by Plaintiffs on or before January 24, 2020, or a date and time otherwise agreed by MEnD and Plaintiffs." We took MEnD at its word that it was providing us with all screenshots of Dylan Brenner's electronic medical file. It obviously did not.

On August 12, 2020, only two days before Plaintiff's inspection of the eMDs system and after critical depositions had occurred, MEnD produced multiple screenshots referencing severe prescription warnings with respect to Dylan Brenner's suicidal ideations. We attended the eMDs inspection, and it took very minimal effort for these screenshots to be identified and disclosed. Additionally, our inspection reflected that the opening screen does NOT begin with a sticky note on the file, meaning that the sticky note produced initially had to have been done so intentionally.

Given MEnD's failure to follow the Court's Order and its literal covering up of evidence (i.e., by intentionally opening the sticky note), we cannot agree to take MEnD at its word that it made an honest production of email documents. We will move forward with filing our motion next Monday. We will also ask the Court to take all appropriate action with respect to MEnD's failure to comply with the Court's January 8, 2020 Order.

EXHIBIT 6

1              UNITED STATES DISTRICT  COURT

2                 DISTRICT OF MINNESOTA

3      - - - - - - - - - - - - - - - - - - - - - - - - -

4      Dawn Brenner and Kathleen Brenner, as
       co-trustees for the heirs and next of
5      kin of Dylan Brenner,

6                      Plaintiffs,

7          vs.           Case No.  18-cv-02383
                                   (NEB/ECW)
8
       Danielle Sue Asfeld, in her individual capacity,
9      Amanda Nowell, in her individual capacity,
       Christina Leonard, in her individual capacity,
10     Janell Hussain, in her individual capacity,
       Todd Leonard, in his individual and official
11     capacities,
       Rebecca Lucar, in her individual capacity,
12     Denny Russell, in his individual capacity,
       Wes Graves, in his individual capacity,
13     James Rourke, in his individual capacity,
       MEnD Correctional Care, PLLC, and
14     Sherburne County,

15                     Defendants.
       - - - - - - - - - - - - - - - - - - - - - - - - -
16

17

18                  **DEPOSITION OF**
                    **DIANA VANDERBEEK**
19                  **JUNE 24TH, 2020**
                      **10:00 A.M.**
20

21

22

                   JEFFREY G. KELZER
23        HERBERT L. PETERSON & ASSOCIATES
            11900 Wayzata Boulevard West
24                  SUITE 116 D
            Minnetonka, Minnesota 55305
25          Telephone (952) 543-6910



          HERBERT L. PETERSON & ASSOCIATES

1      Number 99 was marked for
2      identification by the court
3      reporter.)
4   BY MR. DWORAK:
5   Q. So Exhibit 99 is an e-mail you received from
6      Todd Leonard on October 9th, 2017 at 1:58 p.m.;
7      correct?
8   A. Yes.
9   Q. And you can see that's six minutes after you
10     sent your kind of detailed e-mail about the data
11     that you derived from your investigation; right?
12  A. Yes.
13  Q. And so he says I'll call you shortly; right?
14  A. That's what it says. Yes.
15  Q. What do you remember about that phone call?
16  A. I don't.
17  Q. Okay. What do you remember about any of your
18     conversations with Dr. Leonard regarding the
19     first suicide that you were part of?
20  A. To gather the data. To look for any procedural
21     changes that needed to be made. Letting staff
22     know not only that we're there to support them,
23     that they have employee assistance, EAP program,
24     that type of information. I remember being part
25     of the topic of what was being said. The rest I

1      don't recollect off the top of my head of what
2      further information would have been.
3   Q. Did he share with you his thoughts on what
4      procedural changes need to be made?
5   A. He was still going to need to do his review
6      portion of everything on here.
7   Q. Did he give you any items to further
8      investigate?
9   A. Not that I recall.
10  Q. I'm going to show you Exhibit 73. Do you see
11     that?
12  A. Okay.
13  Q. Exhibit 73 is another e-mail from you to
14     Dr. Leonard and Christina --
15  A. Christa.
16  Q. Christa Marchessault. Is that how you pronounce
17     it?
18  A. Uh-huh.
19  Q. From late in that afternoon on October 11, 2017;
20     right?
21  A. Yes.
22  Q. Okay. In the course of this lawsuit, the
23     attorneys requested all your e-mails in regards
24     to Dylan Brenner. Do you remember that?
25  A. Correct.

1   Q. Okay. And that was early on; right, in the
2      lawsuit?
3   A. I don't recall when it was, but I just...
4   Q. What actions did you take at that time to try to
5      produce all of the relevant e-mails in this case?
6   A. Trying to find any e-mail around that date and
7      time and information that I could find.
8   Q. And how did you go about trying to find e-mails
9      about Dylan Brenner at that time?
10  A. Probably looking for the initials, if that was
11     listed in there, or --
12  Q. Did you search for the D.B.?
13  A. Yes. Searches for that or spin number I would
14     have used too.
15  Q. Did you actually go through your e-mails from,
16     you know, the three or four-day period and look
17     individually to see if you had any e-mails that
18     discussed Dylan Brenner?
19  A. Probably one by one, because corporate, then he
20     was involved with going back with I think Marco
21     to try to discover how to find all the e-mails.
22  Q. But you did a search for D.B.?
23  A. I believe so.
24  Q. Okay. Did you see that this e-mail, Exhibit 73,
25     had D.B. on it?

1   A. Correct.
2   Q. In the subject line; right?
3   A. Yes.
4   Q. This e-mail was not produced to us by MEnD until
5      the Court so ordered them to produce all the
6      e-mails.
7   A. Okay.
8   Q. Do you have an understanding of that?
9   A. That's what I'm -- I don't have an understanding
10     of it, but I'm hearing that. Yes.
11  Q. Do you have any reason why this particular
12     e-mail was withheld from the lawyers in this case
13     until they got a Court order?
14  A. There was nothing withheld with any type of
15     intention.
16  Q. Do you know that the Court ordered discovery
17     sanctions in this case?
18  A. Not off the top of my head. I think that has
19     gone through the attorneys. And then what were
20     requested, comes -- filters down. And we try to
21     turn over what is being asked.
22  Q. Do you have any information, or did you -- did
23     you ever become aware that the judge actually
24     ordered MEnD to pay the plaintiff's lawyers
25     $20,000 because of their failure to produce

# EXHIBIT 8

# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

Dawn Brenner and Kathleen Brenner, as co-trustees
for the heirs and next of kin of Dylan Brenner,

        Plaintiffs,                   Case No. 18-cv-02383 (NEB/ECW)

     v.

Danielle Sue Asfeld, in her individual capacity,
Amanda Nowell, in her individual capacity,
Christina Leonard, in her individual capacity,
Janell Hussain, in her individual capacity,
Todd Leonard, in his individual and official capacities,
Rebecca Lucar, in her individual capacity,
Denny Russell, in his individual capacity,
Wes Graves, in his individual capacity,
James Rourke, in his individual capacity,
MEnD Correctional Care, PLLC, and Sherburne County,

        Defendants,

---

### 2nd Amended Rule 30(b)(6) Notice to Defendant MEnD Correctional Care, PLLC

---

TO:    MEnD Correctional Care, PLLC and their counsel of record.

     PLEASE TAKE NOTICE that pursuant to Federal Rule of Civil Procedure

30(b)(6), the deposition by oral examination of a designee from MEnD Correctional

Care, PLLC ("MEnD") will be taken on **July 8, 2020 at 10:00 a.m.** before a notary

public or before some other officer authorized by law to administer oaths, at Larson King,

LLP, 30 E. 7th Street, Suite 2800, St. Paul, MN 55101, and thereafter by adjournment

until the same shall be completed.



DEPOSITION EXHIBIT
# 103

PENGAD 800-631-6989

Pursuant to Rule 30(b)(6), MEnD shall designate one or more officers, directors, managing agents, or other persons to testify on its behalf as to matters known or reasonably available to it. The designated person(s) shall testified to the following matters including appropriate follow-up and related questions:

## Organization and Structure

1.    MEnD's corporate ownership structure from January 1, 2010 through present.

2.    MEnD's supervising and reporting hierarchy(ies) (i.e., who supervised/reported to whom) from January 1, 2016 through December 31, 2017, including but not limited to who had final policymaking authority at the Sherburne County Jail.

3.    For the time period of January 1, 2016 through December 31, 2017, MEnD's practices, policies, protocols, training, and the like, regarding what medical care nurses and health technicians can provide to patients without approval from a medical provider or other supervisor, and information on how and when the nurses and health technicians at Sherburne County Jail obtain medical provider or other supervisor approval.

4.    MEnD's practices, policies, protocols, training, and the like, regarding jail nurses and health technicians' responsibilities at the Sherburne County Jail from January 1, 2016 through December 31, 2017, including, but not limited to, Deposition Exhibit 55.

5.    MEnD's hiring practices, including background checks and qualifications, from January 1, 2016 through the present.

6.      The number of medical doctor's (M.D.) employed by or contracted with by MEnD from January 1, 2016 through the present, including but not limited to specifically on October 6 and 7, 2017.

7.      MEnD's practices, policies, protocols, training, and the like, regarding the on-call medical provider system from January 1, 2016 through December 31, 2017.

8.      All contracts/agreements between MEnD and Sherburne County from January 1, 2010 through the present.

9.      The number and classification of MEnD employees in October 2017.

10.     The number of different counties served by MEnD in October 2017.

11.     The average number of patients MEnD saw in 2017 on a weekly, monthly, or annual basis.

### Medical Record Keeping

12.     MEnD's practices, policies, protocols, training, and the like, regarding medical record keeping from January 1, 2016 through the present.

13.     The use and operation of the eMDs system.

14.     Information and detail regarding any problems MEnD has experienced with its eMDs system or any other medical record keeping system from January 1, 2016 to the present (e.g., a glitch), including but not limited to the number of patients effected and any actions MEnD has taken to fix the problem(s), correct any affected medical records, notify any affected patients, or notify any medical authorities.

15.     The creation and interpretation of logs, audit trails, or the like generated via the eMDs system, including but not limited to the log generated and produced relative to Dylan Brenner.

16.     MEnD's access to and use of the Pro Phoenix system.

### **Mental Health and Suicidality Protocols/Treatment**

17.     MEnD's practices, policies, protocols, training, and the like, regarding initiating, continuing, and terminating suicide watches and mental health watches at the Sherburne County Jail from January 1, 2016 through the present.

18.     MEnD's practices, policies, protocols, training, and the like, regarding receiving, checking in, and distributing medication at the Sherburne County Jail from January 1, 2017 through the present, including, but not limited to, Deposition Exhibit 54.

19.     MEnD's practices, policies, protocols, training and the like, regarding segregation notices, and assessments, daily visits, and reviews of segregated inmates at the Sherburne County Jail from January 1, 2016 through the present, including, but not limited to, Deposition Exhibit 62.

20.     MEnD's practices, policies, protocols, training, and the like, regarding its use of telemedicine from January 1, 2016 to the present.

21.     MEnD's knowledge and use of ICD diagnosis codes and billing from January 1, 2016 to the present.

## <u>Suicide Investigation and Prevention</u>

22.     MEnD's practices, policies, protocols, training, and the like, regarding investigating suicides attempts and completions from January 1, 2010 through the present.

23.     MEnD's practices, policies, protocols, training, and the like, regarding debriefing following a suicide attempt or completion from January 1, 2010 through the present, including, but not limited to, Deposition Exhibit 41.

24.     MEnD's investigation into the suicide of Dylan Brenner, Josh Holscher, Kyle Allan Baxter-Jensen, James Lynas or any other suicide committed by a patient/inmate in MEnD's care in or prior to 2017.  *See* Nearing LTR (7/31/19).

25.     Any changes or remedial measures, including but not limited to any debriefing, taken by MEnD to prevent additional suicides following the suicide deaths of Dylan Brenner, Josh Holscher, Kyle Allan Baxter-Jensen, James Lynas or any other suicide committed by a patient/inmate in MEnD's care in or prior to 2017.  *See* Nearing LTR (7/31/19).

26.     MEnD's practices, policies, protocols, training, and the like, regarding quarterly reports and quarterly meetings with facility medical leadership at Sherburne County Jail from January 1, 2016 through the present, including, but not limited to, Deposition Exhibit 42.

27.     Any practices, policies, protocols, or the like, that MEnD changed or enacted due, at least in part, to any suicide at a correctional facility where MEnD provides care or services.

28.    The number of suicides that have occurred at correctional facilities where MEnD provides care or services from January 1, 2010 to present.

## Litigation

29.    All claims and lawsuits where MEnD has been sued or has paid on a claim accusing MEnD of constitutional violations or professional negligence.

## Documents and Communications

30.    The steps, actions, and efforts MEnD took to preserve documents and other information relative to Dylan Brenner.

31.    The steps, actions, and efforts MEnD took to search for and retrieve documents and other information responsive to discovery requests in this lawsuit.

32.    The identification of all MEnD employees who engaged in any written or oral communication regarding Dylan Brenner on October 6, 2017 with Sherburne County Deputy Rebecca Lucar, and the subject matter of that communication.

33.    The identification of all MEnD employees who engaged in any written or oral communication regarding Dylan Brenner on October 6 or 7, 2017, either amongst themselves or with any Sherburne County employee, and the subject matter of that communication.

34.    MEnD's responses to written discovery questions whether provided through formal pleading or informal letter from counsel.

35.    MEnD's medical records related to Dylan Brenner.

**Dated: July 7, 2020**

**NEWMARK STORMS DWORAK LLC**    **SIEBENCAREY, P.A.**

/s/ Jeffrey S. Storms
/s/ Paul C. Dworak                               /s/ Jeffrey M. Montpetit
Jeffrey S. Storms, #387240                Jeffrey M. Montpetit, #291249
Paul C. Dworak, #391070                 901 Marquette Avenue, Suite 500
100 South Fifth Street, Suite 2100      Minneapolis, MN 55402
Minneapolis, MN 55402                  Telephone: 612.333.4500
Telephone: 612.455.7050               Fax: 612.455.7051
Fax: 612.455.7051                      jeffrey.montpetit@knowyourrights.com
jeff@newmarkstorms.com
paul@newmarkstorms.com

*ATTORNEYS FOR PLAINTIFFS*

7

# EXHIBIT 10

**Subject:** Brenner- Max

**Date:** Friday, October 6, 2017 at 7:47:35 PM Central Daylight Time

**From:** Rebecca Lucar

**To:** Classification, Diana, JAIL-SGTS, Lisa Eckhart, Office Assistants, Shanelle Adamski, Todd Leonard

**Attachments:** QA Form SSRS.pdf

-----Original Message-----
From: pro.prophoenix@co.sherburne.mn.us [mailto:pro.prophoenix@co.sherburne.mn.us]
Sent: Friday, October 06, 2017 6:39 PM
To: Rebecca Lucar
Subject: seg notice

seg


DEPOSITION
EXHIBIT
Leonard #36
9-24-19
PENGAD 800-631-6989



Sherburne County Sheriff
13880 Business Center Dr
Elk River MN 55330
Ph: (763) 765-3500
Fax: (763) 441-7303

**Reference :**

**Date & Time :** 10/06/2017 18:37                    **Completed By :** 2047-Lucar, Rebecca

Inmate Information

1) INMATE NAME:
   **Brenner, Dylan James**
2) DOB:
   ████**1985**
3) SPN:
   **12157**
4) DATE:
   **10/06/2017**
5) Classification Level
   **A) Maximum**
   B) Medium

Maximum security Special Management

Reaso  Describe:
n)
   **Maximum Security Special Management: Placement in segregation and/or 23 hour cell lock-up depending on available space.  Reason: For the safety and security of the facility and for your safety, left from Max due to your assaultive history and for you leaving from max. You will be allowed 1 hour out a day.**
   **You will be allowed access to the following programs and services:**
   **EDUCATIONAL MATERIAL - Upon request to Programs**
   **COMMISSARY – Select Items**
   **LIBRARY SERVICES – Book cart during your hour out, Religious text and Legal materials (upon request)**
   **SOCIAL SERVICES - Maximum Security Inmates are not allowed programs.**
   **COUNSELING SERVICES - Upon request to Mental Health**
   **RELIGIOUS GUIDANCE - Pilot Outreach one on one (upon request)**
   **RECREATIONAL PROGRAM – Maximum Security Inmates are not allowed Recreation**
   **TELEPHONE – During your hour out**
   **VISITATION – Secured Professional and Video Visitation**
   **HAIR CLIPPERS – Only if approved by the Captains and time of use to be determined by housing officer.**
   **Your status is reviewed on a regular basis by Jail Administration and Jail Medical Staff.**

Maximum Security Disciplinary Segregation

Reaso  Describe:
n)

Medium Security Special Needs

Reaso  Describe:
n)

Medium Security Disciplinary Segregation

Medium Security Administrative Segregation/Administrative Segregation Pending Investigation

Information

Classification Officer



Sherburne County Sheriff
13880 Business Center Dr
Elk River MN 55330
Ph: (763) 765-3500
Fax: (763) 441-7303

-) Date:
**10/06/2017**

_Rebecca Lucar_
Signature - 2047-Lucar, Rebecca

10/06/2017 18:37
Date

# EXHIBIT 11

FROM:

TO:     Department of Corrections Inspection Unit
        1450 Energy Park Drive, Suite 200
        St. Paul, MN 55108
        651-361-7200; FAX: 651-642-0314

DATE:   September 11, 2018

RE:     Complaint regarding Beltrami County Jail

Please see the attached report I sent to the Ramsey County Medical Examiner on September 5, 2018.

In summary, I reported that on August 31 I was to be training with Dr. Todd Leonard, physician and owner of MeND Correctional Care, at the Beltrami County Jail. Dr. Leonard informed me that he wouldn't be able to make it that morning, so I would have to round on my own.

When I arrived at the facility, I was informed by the medical tech and RN that I would have to see an inmate who was faking being paralyzed. (His other symptoms, which were shared with me at this time, are included in my medical examiner's report.) The med tech and RN explained that the jail administrator vetoed him going to the ER the night before because she believed he was a flight risk.

As I reported, I was brought to the inmate's cell by the RN, followed by a correctional staff worker. On the way we stopped at control, where the other officers were speaking very negatively about the inmate, also believing he was faking his situation.

The conditions in which I found the inmate were disturbing. My report gives all details, including that when I directed that the inmate's diaper and clothes be changed, the officers refused to help. The RN later had to call her family to bring another set of clothes to the jail for her, as her clothes were full of urine and sweat after we changed the inmate ourselves.

After I advised staff that the inmate was to go to the ER, the officers initially were not going to help get the inmate into the wheelchair. The RN had to go to control and demand that officers help us lift him into the chair.

I am submitting this report because the conditions in which I found the inmate and the officers' response to his medical condition and the condition of the cell were neglectful.

Thank you for your attention.

FROM:

TO:    Ramsey County Medical Examiner's Office
300 East University Avenue
St. Paul, MN 55130
651-266-1700; FAX: 651-266-1730

DATE:   September 5, 2018

RE:    Case # 2018-2445

The following report is to document my conversation with the Ramsey County Medical Examiner's Office earlier today.

I have been an employee with the company MeND Healthcare for approximately three weeks, beginning in mid-August. Technically I am still in training. On August 31, I should have been with my boss and MeND owner, physician Dr. Todd Leonard, as I was in training, but Dr. Leonard told me he could not make it to Beltrami that morning, and I would have to go by myself.

When I arrived at the Beltrami County jail, the med tech and the RN advised me there was an inmate who was faking being paralyzed and that I still would have to take a look at him. They told me he was even faking being incontinent and that was why he was wearing adult diapers. I reviewed his chart and noticed that he was consistently hypertensive in the 150s and 160s over 100s and was tachycardic. An ECG had been done on, I believe, August 30. The ECG read abnormal and inferior infarct. I personally don't have experience reading ECGs, so I asked the RN if Dr. Leonard had seen the ECG. She told me that she read the report to Dr. Leonard over the telephone, and he told her that inferior infarct is normal and the ECG was of no concern. I asked her if the patient was on any medication for hypertension. She told me he was on Lisinopril on the outside. I asked her why he was not on anything currently, and she told me he wasn't on any medication because he was saying that he was having trouble swallowing.

The RN told me that on August 30 Dr. Leonard advised the RN to send Hardel to the local emergency room, but the jail administer vetoed it, saying, after she had listened to Hardel's phone conversations with his family, that she believed he was a flight risk.

I was brought to Hardel's cell by the RN, followed by a correctional staff worker. On the way we stopped at control, where the other officers were speaking very negatively about Hardel, saying he was faking his situation.

When I got to Hardel's cell I was overwhelmed by the stench. It smelled heavily of urine and sweat. Hardel was lying on his back on the floor. He was on a mat full of urine and drenched in sweat. He was wearing a diaper that was soaked with urine, the urine then soaking the mattress pad underneath him. When I looked at Hardel I immediately noticed that the right side of his mouth was drooping. When he spoke to me, his words were slightly slurred. He looked at me and asked me to please believe him that

something was wrong. He told me no one was believing him. He told me he felt numb from his waist down. He said he had pain in his back. He asked if he could have his diaper changed and have clean clothes. He said the officers were refusing to change his diaper and clothes or help him clean up. I asked him what the last time was he ate or drank anything. He told me that he could not eat because something was wrong with his swallowing. He said his throat felt weird and that it was difficult to swallow. He said the day before I saw him he was able to drink two small containers of apple juice with assistance from the RN.

The RN was getting Hardel's vital signs with the machine as I was speaking with him. He was tachycardic with a heart rate of 132. His blood pressure was hypertensive; I cannot remember the exact numbers. His O2 saturation was either 83% or 84%. I said that he needed to go to the emergency room immediately and that I was concerned that he had had a stroke. I was told the only way he was going to the hospital was in a deputy vehicle with armed officers.

While we waited for the correctional staff, I directed that Hardel be changed into clean clothes and that his diaper be changed. The RN started to put on a new diaper and new clothes. The correctional staff would not help change the inmate. I was assessing him and noticed that his body was cold, but he was extremely diaphoretic. He had no Babinski reflex. His grasp reflex was weak, especially on the right side. I started to help the RN put new clothes on, which was difficult as it was like moving dead weight. When rolling him slightly, Hardel was crying out in pain. The officers at some point brought a wheelchair for Hardel. The RN was upset that the officers were not there to help lift him into the wheelchair so she went down to control and to ask officers to help lift him into the chair. The wheelchair did not have rests for his legs.

When Hardel was getting changed into clean clothes I remember him saying to please don't let the officers touch him. Hardel also was crying. He had tears running from his eyes when he pleaded with me to get him help. He told me that he was scared. He stated that he wanted to speak with his family.

That night I had trouble sleeping as I thought about the conditions in which I found Hardel. I contemplated as to how and to whom I should report it. I was just grateful that he got to the hospital. That was Friday evening (August 31), and the long holiday weekend followed.

I did not find out that Hardel had passed away until yesterday (Tuesday, September 4). I was training at another jail with Dr. Leonard. He was sitting across from me as we were reviewing charts. He received a phone call, and I heard him tell whomever he was speaking with that there had been a death in the Beltrami jail. My heart sunk because I knew it was probably Hardel.

When Dr. Leonard got off the phone he told me that he was talking with his attorney. He told me that he was sorry that he had forgotten to tell me Hardel had died on Sunday night. He told me that Hardel had been medically cleared from the emergency room. He told me that they did a thorough examination and a CT scan, which showed nothing.

I told Dr. Leonard that I disagreed that there was nothing wrong. I told him that vital signs and ECGs don't lie—both of which were consistently abnormal with Hardel. I also told him that I am very confident when it comes to my clinical judgement and that something was very wrong with Hardel; he was very sick. Dr. Leonard then told me to not jump to conclusions. He then said that jumping to conclusions could jeopardize his company.

Dr. Leonard told me that he was getting calls over the weekend from the RN who was at Beltrami, saying that Hardel was deteriorating and having difficulties with his swallowing, but because Hardel had been cleared at the hospital, Dr. Leonard thought that Hardel could wait until after the holiday to be reassessed.

Dr. Leonard then said that as far as he was concerned, Hardel gave himself a blood clot from faking his illness. He said it was likely he killed himself or even stuck a sock down his throat. Dr. Leonard then spoke to the RN from Beltrami on his cellphone as he sat across from me. He was asking her to read her reports from Hardel's hospital visit and asking if there were any ECGs that were performed during Hardel's hospital stay. He then told her to be very careful with what she would say if she was interviewed by any investigators. He told her what he told me, to not jump to any conclusions. He told her that as far as he was concerned Hardel's death was from a blood clot he gave to himself after faking his illness, putting a sock or something down his throat, or from some illegal substance that he got from other inmates in the jail. After having her read her reports over the phone, he told her that she had his permission to hand the medical record over to the jail administrator.

I made the telephone call to your office this morning and am filing this report because I feel it is ethically my obligation to do so. I hope something like this will not happen again.

Thank you,

# EXHIBIT 12



Allan N. Buxton
SecureData
700 Beta Dr. Suite 100
Cleveland, OH 44143


Jeffery Storms
Newmark Storms Dworak
150 South 5th Street Suite 1850
Minneapolis, MN 55402

July 24, 2020

Dear Sir:


Computers used for work purposes usually fall into one of two roles: workstation or server. As its name suggests, a workstation offers a portal to corporate resources for employees and functions as a tool with which they create additional resources, be it documents, sending or receiving email, or facilitating the exchange of other documents amongst other employees. The hosting of those resources often falls to the computers deployed in the role of a server, whose task is either to function as both a resource provider and usually some form of security gateway. Although any computer can function in either role with limited success, both servers and workstations are usually configured to meet specific needs. Although both emphasize reliability, servers are designed to rapidly inspect applications, users, and incoming or outgoing files, preserve those files against accidental erasure or hardware failure, and facilitate their transfer to other resources as quickly as possible. Workstations often forego some of the redundancy servers enjoy in favor of hardware more specific to accomplishing a certain task quickly.

SecureData is well versed in the recovery of data from computers designed or deployed in both roles. In the event of a workstation storage failure, it is likely that some, if not all of a user's documents, emails or activities, such as Web browsing, can be recovered from the device if precautions are taken in a timely manner. Although servers are more redundant against failure by design, it is not uncommon to for multiple failures, user inattention, or even deliberate user action to trigger similar failure events. Although more complex, the same great likelihood of data recovery is possible if acted upon in similar fashion.

For example, emails sent and received from a workstation reside in one of two locations, barring user action: either a container file for an email application, or temporarily in the cache of the browser used as portal to a server that hosts the email. If the workstation hard disk fails, email in a container file would require recovery from the failed device; email stored on a server would remain resident upon the server. Should the server fail, only a limited subset of the email is recoverable from the workstation; moreover, the server failure risks the loss of all email in all accounts hosted by the server.

SecureData's recovery techniques minimize this risk. With a failure, the affected devices are temporarily restored to function, data is extracted, and data is then reassembled upon functioning storage devices. If the loss is triggered by user action instead of failure, the file system is parsed for deleted or corrupt data; identified data is then scanned for the types of files missing. Recovered files are then able to be reincorporated back into the functioning computer.

In either event, success is dependent upon the initial precautions taken upon discovery of the failure and the type of damage sustained at the point of failure. If the failure mode that has triggered your request for information falls within the breadth of experience SecureData has, it is extremely likely that some, if not all, of your data can be recovered. SecureData enjoys a 96% success rate for recovery of information from damaged or corrupt devices.

Sincerely,

Allan N. Buxton
Director of Forenscs, SecureData