UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

_____

Dawn Brenner and Kathleen Brenner, as co-trustees
for the heirs and next of kin of Dylan Brenner,

        Plaintiffs,                        Case No. 18-cv-02383 (NEB/ECW)

    v.                                 **FOURTH AMENDED COMPLAINT
                                    AND JURY DEMAND**

Danielle Sue Asfeld, in her individual capacity,
Christina Leonard, in her individual capacity,
Kristina Ryan f/k/a Kristina Bauman, in her individual capacity,
Todd Leonard, in his individual and official capacities,
Rebecca Lucar, in her individual capacity,
Russell Denny, in his individual capacity,
Wes Graves, in his individual capacity,
James Rourke, in his individual capacity,
John Reich, in his individual capacity,
Travis Lindstrom, in his individual capacity,
MEnD Correctional Care, PLLC, and Sherburne County,

        Defendants,

_____

    For their Fourth Amended Complaint, Dawn Brenner and Kathleen Brenner, on

behalf of the heirs and next of kin of Dylan Brenner, hereby state and allege as follows:

    1.    This is an action for money damages for the wrongful death of Dylan

Brenner ("Dylan"), as the direct and proximate result of the deliberate indifference to his

serious medical needs and negligence of the Defendants, as set forth herein.

    2.    Dylan's wife, Dawn Brenner ("Dawn"), and biological mother, Kathleen

Brenner ("Kathleen"), bring this action on behalf of Dylan's heirs and next of kin.  They

were appointed co-trustees under a January 23, 2018 Order entered by Sherburne County

Judge Sheridan Hawley, which was attached to Plaintiff's Complaint as Exhibit A. Dawn and Kathleen are collectively referred to herein as "Plaintiffs."

3.     Danielle Asfeld was at all times material hereto a nurse employed by MEnD Correctional Care, PLLC ("MEnD"), who worked at the Sherburne County Jail. She is sued in her individual capacity.

4.     Kristina Ryan f/k/a Kristina Bauman was at all times material hereto a nurse employed by MEnD, who worked at the Sherburne County Jail. She is sued in her individual capacity.

5.     Christina Leonard was at all times material hereto a nurse employed by MEnD, who worked at the Sherburne County Jail. She is sued in her individual capacity.

6.     Todd Leonard, M.D. was at all times material hereto a medical doctor, the sole member of MEnD, and the medical director/supervisor at the Sherburne County Jail with final policymaking authority with respect to the medical care received by inmates/detainees at the Sherburne County Jail. He is sued in his individual and official capacities.

7.     MEnD is a professional limited liability company with its registered office located in Waite Park, Minnesota and its principal place of business located in Sartell, Minnesota. At all times material hereto, MEnD fulfilled a public function and acted in concert with state actors, including Sherburne County, by providing medical care to inmates and detainees at the Sherburne County Jail. As a result, MEnD and its employees, including but not limited to Danielle Asfeld, Kristina Ryan f/k/a Kristina Bauman, Christina Leonard, and Todd Leonard, M.D., acted under color of state law for

2

purposes of 42 U.S.C. § 1983.

8.      Rebecca Lucar was at all times material hereto a corrections officer employed by Sherburne County, and working at the Sherburne County Jail under color of state law.  She is sued in her individual capacity.

9.      Russell Denny was at all times material hereto a corrections officer employed by Sherburne County, and working at the Sherburne County Jail under color of state law.  He is sued in his individual capacity.

10.      Wes Graves was at all times material hereto a corrections officer employed by Sherburne County, and working at the Sherburne County Jail under color of state law. He is sued in this individual capacity.

11.      James Rourke was at all times material hereto a corrections officer employed by Sherburne County, and working at the Sherburne County Jail under color of state law.  He is sued in his individual capacity.

12.      John Reich was at all times material hereto a corrections officer employed by Sherburne County, and working at the Sherburne County Jail under color of state law. He is sued in his individual capacity.

13.      Sgt. Travis Lindstrom was at all times material hereto a corrections sergeant employed by Sherburne County, and working at the Sherburne County Jail under color of state law.  He is sued in his individual capacity.

14.      Defendant Sherburne County is a duly incorporated municipal entity under the laws of Minnesota, and was at all times material hereto the entity charged with control and supervision over personnel working at the Sherburne County Jail.

15.     At all times material hereto, MEnD and Sherburne County engaged in a joint venture and worked in concert with one another to provide medical care to the inmates and detainees at the Sherburne County Jail.

16.     The medical staff employed by MEnD, but working at the Sherburne County Jail, are indistinguishable from Sherburne County Jail employees from the perspective of inmates and detainees, provide services under the authority of Sherburne County, and the inmates and detainees are provided no choice as to from whom they can receive medical services at the Sherburne County Jail.

17.     Despite contracting with MEnD at all times material hereto, Sherburne County owed a nondelegable duty of care to ensure that inmates/detainees at the Sherburne County Jail received legally sufficient medical care.

18.     Upon information and belief, all Defendants resided in Minnesota at all times material hereto, and continue to reside in Minnesota today.

19.     Plaintiffs bring this action pursuant to 42 U.S.C. §§ 1983 and 1988, the Eighth and Fourteenth Amendments to the United States Constitution, and 28 U.S.C. §§ 1331 and 1343(3).  The aforementioned statutory and constitutional provisions confer original jurisdiction over this action.  This Court has supplemental jurisdiction over Plaintiffs' state law claims pursuant to 28 U.S.C. § 1367.

## Dylan's Serious Medical Needs

20.     Dylan was 31 years old at all times material hereto.

21.     Following his graduation from Burnsville High School in 2004, Dylan joined the U.S. Army and became an Army Infantry Solider.

4

22.     Dylan served three combat tours of duty in Iraq.

23.     Dylan was honorably discharged from the Army in February 2013.

24.     Dylan married Dawn in November 2008, and they subsequently had two biological children together, AB and TB.

25.     Dylan suffered from severe physical and mental health issues following his combat tours, including traumatic brain injury, bipolar disorder, and PTSD.

### Dylan's First Detention at Sherburne County Jail

26.     Dylan was first detained at the Sherburne County Jail in July and August 2016.

27.     MEnD provided Dylan with medical care in July and August 2016 at the Sherburne County Jail.

28.     Dylan was detained at the Sherburne County Jail on suspicion of felony charges beginning on or around July 27, 2016.

29.     Dylan was charged with serious felonies in Sherburne County District Court on July 28, 2016.

30.     Dylan remained detained at the Sherburne County Jail following the July 28, 2016 charges.

31.     Dylan was booked into the Sherburne County Jail with the following prescribed medications, which were inventoried by MEnD nurse Jennie Thompson ("Thompson") on July 28, 2016: (a) venlafaxine, (b) lamotrigine, (c) trazodone, (d) lurasidone, (e) gabapentin, (f) cyproheptadine, and (g) haloperidol.

32.     Venlafaxine is for the treatment of depression and anxiety.

33.     Lamotrigine is used for the treatment of bipolar disorder.

34.     Trazodone is an antidepressant used to assist with sleep.

35.     Lurasidone is an antipsychotic used in the treatment of bipolar disorder, among other serious mental illnesses.

36.     Gabapentin is an anticonvulsant used for the treatment of seizures and a variety of psychiatric disorders.

37.     Cyproheptadine is used to assist with sleep and nightmares.

38.     Haloperidol is an antipsychotic used to treat, among other things, bipolar disorder and schizophrenia.

39.     Thompson identified the following International Classification of Diseases (ICD) diagnoses and codes for billing with respect to Dylan's condition as she diagnosed it: "ICD 10-R69 Illness, unspecified" and "ICD 9-799.9 "Other Ill-defined caused of morbidity and mortality."

40.     On July 28, 2016, the Sherburne County Jail placed Dylan in administrative maximum security segregation.

41.     Dylan was provided the following reason for his placement in administrative maximum security segregation: "For the safety and security of the facility and for your safety, due to your Assaultive History and at your request."

42.     Dylan's placement in administrative maximum security segregation meant that he would be placed in a cell alone for 23 hours per day.

43.     Dylan's status in administrative maximum security segregation was to be reviewed "on a regular basis by Jail Administration and Jail Medical Staff."

6

44.     On July 29, 2016, MEnD nurse Mary Brown ("Brown") met with Dylan and completed a "Suicide Risk Screening Form"

45.     At their meeting, Dylan denied having current suicidal thoughts; yet Brown did not simply take Dylan at his word.  On the July 29, 2016 Suicide Risk Screen Form, Brown noted that there were "Current Suicidal Remarks/Actions."

46.     Brown recommended on the Suicide Risk Screening Form that Dylan be put on a 15-minute special mental health watch.

47.     On July 29, 2016 at 4:55 p.m., Brown also completed a "Special Precautions/ Management" form for Dylan.

48.     Brown recommended on the Special Precautions/Management form that Dylan be placed in a Kevlar suit and receive only a Kevlar blanket and finger food, all done in order to limit the risk of Dylan committing suicide.

49.     Under the Special Precautions/Management form recommendations, Dylan was: (a) to be monitored on a 15-minute special mental health watch, (b) to receive full suicide precautions, and (c) follow up daily with a nurse or other mental health practitioner.

50.     At 5:00 p.m., Brown communicated to Sherburne County Jail correctional staff that Dylan needed to be placed in the Kevlar suicide prevention gown.

51.     At or around 5:00 p.m., Dylan was transferred to Booking Holding Cell #5 ("BH-5"), was placed in the Kevlar suicide prevention gown, and remained in BH-5 subject a 15-minute special mental health watch.

52.     Upon information and belief, prisoners with special medical needs,

particularly those who are considered suicidal, are maintained in Booking Holding Cells at the Sherburne County Jail so that they can receive closer monitoring by Sherburne County Jail staff.

53.     Dylan remained in BH-5 on July 30, 2016.

54.     On July 30, 2016, MEnD nurse Michelle Skroch ("Skroch") conducted a mental health review of Dylan at approximately 8:00 p.m.

55.     At their meeting, Dylan expressed that he was "doing much better" and had no "thoughts of self-harm." Yet Skroch did not simply take Dylan at his word.

56.     On July 30, 2016, Skroch recommended that Dylan remain in the Kevlar gown, be provided with the Kevlar blanket, and receive full suicide precautions, including but not limited to the 15-minute special mental health watch.

57.     Skroch identified the following ICD diagnoses and codes for billing with respect to Dylan's condition as she diagnosed it: "ICD 10-R45.851 Suicidal Ideations," "ICD 9-300.9 Unspecified nonpsychotic mental disorder," and "9-V62.84 Suicidal Ideation."

58.     Dylan remained in BH-5 on July 31, 2016.

59.     On July 31, 2016, MEnD nurse "J. Thompson" conducted a mental health review of Dylan at approximately 9:50 a.m. or 9:50 p.m.

60.     J. Thompson observed that Dylan was expressing no thoughts of self-harm.

61.     Still, J. Thompson found it necessary to recommend that Dylan remain in the Kevlar gown, be provided with the Kevlar blanket, and receive full suicide precautions, including but not limited to the 15-minute mental health watch.

62.     On August 1, 2016, at approximately 7:30 a.m., MEnD mental health practitioner Michael Robertson, Psyd. LP. ("Robertson") conducted a mental health review of Dylan, in addition to completing Dylan's "Initial Mental Health Appraisal/Evaluation."

63.     Robertson noted that Dylan was receiving psychiatric medications for PTSD.

64.     Robertson recommended that Dylan be moved to the general population but subject to a 30-minute special mental health watch, which requires a more rigorous assessment of the detainee/inmate than the regular 30-minute welfare checks.

65.     Robertson also recommended that a mental health follow up of Dylan be conducted within less than 10 days.

66.     Robertson also recommended that Dylan be removed from the Kevlar gown and blanket, and be provided with the standard jail uniform.

67.     Robertson provided his recommendations to an unknown Sherburne County Jail "Classification Sergeant," who completed a "Sherburne County Jail Segregation Review" on August 1, 2016 at approximately 10:30 a.m.

68.     Dylan's cell at that time was identified as "BH5."

69.     The reason provided for Dylan's maximum security segregation was "MAX-Gown."

70.     Upon information and belief, MAX-Gown means that Dylan was required to wear the Kevlar gown for suicide precautions.

71.     The Classification Sergeant disagreed with Robertson's recommendations,

9

and determined that Dylan should remain in administrative maximum security segregation in Max-Gown.

72.     The Classification Sergeant checked two "yes" factor boxes on the Sherburne County Jail Segregation Review form, determining that Dylan's "reason for initial placement into segregation remain[ed] valid" and that Dylan "pose[d] a threat to [himself]".

73.     With respect to these factor boxes, the Sherburne County Jail Segregation Review states that "If any of the above factors are marked 'YES', the inmate/detainee must continue their existing classification status, unless the Jail Commander, or designee, determines otherwise.  If all factors are marked 'NO', the inmate/detainee may be re-classified."

74.     As a result, the Classification Sergeant did "not recommend [Dylan's] removal from [his] current segregation status."

75.     The Classification Sergeant did not recommend a removal from the Max-Gown status.

76.     An unknown Sherburne County Jail Classification administrator agreed with the recommendations of the Classification Sergeant, and determined that Dylan should remain in administrative maximum security segregation in BH-5, subject to Max-Gown.

77.     Upon information and belief, Dylan remained in the Kevlar gown in BH-5 on August 1, 2016 as a result of this August 1, 2016 Sherburne County Jail Segregation Review, and subject to **at least** a 30-minute special mental health watch.

78.     Plaintiffs are presently aware of no records reflecting that the Sherburne County Jail ever removed Dylan from the Kevlar gown prior to his August 1, 2016 departure from the facility.

79.     On August 1, 2016, Dylan was transferred from the Sherburne County Jail to the Wright County Jail due to an outstanding warrant.

80.     An "Inmate Transfer Form" was completed on August 1, 2016 at 8:21 a.m. or p.m. by unknown employees of the Sherburne County Jail.

81.     The Inmate Transfer Form denoted that Dylan was in administrative segregation and that he had special needs.

82.     The Inmate Transfer Form denoted that Dylan was presently on a 30-minute special watch, and that Dylan was in maximum security administrative segregation "[d]ue to his assaultive history, comments made at arrival, and MH issues."

83.     The Inmate Transfer Form denoted that Dylan had mental health concerns for which he was receiving prescribed medications.

84.     The Sherburne County Jail Medical Unit – Medication Administration Records reflected that Dylan received the following medications on a daily basis from July 29, 2016 through August 1, 2016 during his detention at Sherburne County: Venlafaxine, Lurasidone, Lamotrigine, Gabapentin, and Trazodone.

85.     Dylan's history of serious mental health concerns were well documented in the Sherburne County Jail and MEnD records over that July/August 2016 time period, which the Defendants had access to at all times material hereto.

86.     The Sherburne County Jail and MEnD records documented that Dylan was

assessed as suicidal, despite denying being suicidal, and placed on suicide watch at the Sherburne County Jail from July 29, 2016 through August 1, 2016.

87.     Dylan's history of PTSD, and his prescription for medications to treat PTSD, were documented in the Sherburne County Jail and MEnD records from July and August 2016.

### Dylan's Serious Medical Needs are Ignored on October 6, 2017

88.     On Friday, October 6, 2017, a jury found Dylan guilty on the same serious felony charges for which Dylan had previously been detained at the Sherburne County Jail during July and August 2016.

89.     Following a guilty verdict in a criminal matter, Dylan was taken into custody, detained, and booked into the Sherburne County Jail in the early evening on October 6, 2017.

### *Officer Lucar*

90.     Rebecca Lucar ("Lucar") is a Sherburne County Jail classification officer, who completed an Intake Interview of Dylan at 6:36 p.m. on October 6, 2017.

91.     Lucar knew that Dylan was being detained for his conviction on serious felony charges.

92.     As part of Lucar's duties as an Intake Officer, Lucar had access to and was required to review the medical and administrative records in Sherburne County's possession related to Dylan's prior detentions/incarcerations at Sherburne County.

93.     Lucar was aware of Dylan's serious medical needs, risk of self-harm, and the requirement that Dylan be placed in administrative maximum security segregation

pending a segregation review by Sherburne County Jail Administration.

94.    Lucar learned during her intake interview with Dylan that Dylan was prescribed medical cannabis for his PTSD.

95.    Based upon a review of Brenner's medical and jail records, Lucar knew that Dylan departed Sherburne County Jail on August 1, 2017, subject to 30-minute special mental health checks.

96.    Lucar knew that the requirement that Brenner receive 30-minute special mental health checks was never lifted by medical or administrative personnel at the Sherburne County Jail.

97.    The purpose of Dylan's continued placement in BH-5 was to provide Dylan with closer monitoring than he would receive in other units, due to his established high risk for self-harm.

98.    Upon information and belief, Sherburne County Jail Policy required that Lucar return Dylan to BH-5 subject to at least 30-minute special mental health checks until his status was reviewed and approved by a Sherburne County Administrator.

99.    Lucar described this policy in an October 7, 2017 interview she provided regarding this matter: "Um, at the end of our conversation, I, we both exited the interview room and I walked him down to BH-5 and explained to him that his status was gonna be maximum until he was reviewed on Monday with Admin."

100.   This policy was similarly described by Sherburne Count Jail Correctional Officer James Rourke in an October 7, 2017 investigatory interview regarding Dylan's death: "What I know is that he left here, last time he was here, he left in segregation, so

13

he came back and he goes right to segregation."

101.    Lucar then classified Dylan as requiring "maximum" security for the following reason: "For the safety and security of the facility **and for your safety**, left from Max due to your assaultive history and for you leaving from max." (emphasis added).

102.    Lucar knew specifically from the Sherburne County Jail Segregation Review that Dylan was classified as needing maximum security because he posed a threat to himself.

103.    Lucar also knew that Sherburne County classified Dylan as needing maximum security because he posed a threat to himself despite Dylan denying having suicidal thoughts.

104.    Lucar knew from her experience and training not to simply take a detainee/inmate at his or her word when the detainee/inmate denies suicidal ideations to the exclusion of evidence to the contrary.

105.    The seriousness of Dylan's guilty verdict when combined with Dylan's known and serious mental health history, including known suicidality at Sherburne County Jail, placed Dylan at an extremely high risk for committing suicide; and Lucar knew this.

106.    Despite this knowledge, Lucar did not initiate any additional medical evaluation of Dylan by medical staff, including but not limited to suicide risk screening, or ensure that Dylan was receiving the previously ordered 30-minute special mental health checks.

107.    Lucar merely "passed on to our nursing staff that he had PTSD and that he had noted that he was taking medical cannabis.  And they required a UA.  And I don't know what happened after that."

108.    Upon information and belief, Dylan was seen by **no** medical personnel at the Sherburne County Jail on the evening of October 6, 2017, despite his well-documented and objectively serious medical needs.

### *Nurse Bauman*

109.    MEnD/ Sherburne County nurse Kristina Ryan f/k/a Kristina Bauman ("Nurse Bauman") was providing health care services for the Sherburne County Jail on the evening of October 6, 2017.

110.    Lucar had a conversation with Nurse Bauman on the evening of October 6, 2017, whereby she informed Nurse Bauman that Dylan was being held in BH5, which is known by ALL MEnD and Sherburne County employees working at the Sherburne County Jail to be one of two suicide holding cells with video monitoring.

111.    Inmates who present the highest risk for suicide are held in either BH5 or BH6, and this is known to all MEnD and Sherburne County employees working at the Sherburne County Jail.

112.    Lucar informed Nurse Bauman that Dylan had PTSD and that Dylan was taking medical cannabis, so a urinalysis (UA) was required.

113.    Obtaining a UA from an inmate is considered an urgent medical need by MEnD.

114.    Lucar informed Nurse Bauman that Dylan was a suicide risk.

115.    Despite this knowledge, Nurse Bauman did not initiate any additional medical evaluation of Dylan by medical staff, including but not limited to suicide risk screening, or ensure that Dylan was receiving the previously ordered 30-minute special mental health checks.

116.    Nurse Bauman never even took the time to see Dylan or ensure that someone else at MEnD did.

117.    Given all of these circumstances, Nurse Bauman either knew or was deliberately indifferent to the fact that Dylan was at an extremely high risk for suicide, when Nurse Bauman failed to make any effort to ensure that Dylan was properly screened, monitored, or placed within the Sherburne County Jail population.

118.    Because Nurse Bauman failed to do **anything** for Dylan's serious mental health condition, Dylan was detained at the Sherburne County Jail, receiving only the regular 30-minute well-being checks, rather than the closer medical monitoring that Dylan required.

119.    Upon information and belief, Bauman will likely deny most if not all of the allegations contained in Paragraphs 111 – 118, thus creating issues of fact for trial.

### *Nurse Leonard*

120.    MEnD/Sherburne County nurse Christina Leonard ("Nurse Leonard") was providing health care services for the Sherburne County Jail on the evening of October 6, 2017.

121.    Upon information and belief, Nurse Leonard learned from Lucar that Dylan suffered from PTSD for which he was prescribed medical marijuana.

122.    Medical marijuana (or cannabis) is prescribed to war veterans suffering from PTSD, like Dylan, often to suppress suicidal feelings and behavior.  Nurse Leonard knew this.

123.    Nurse Leonard also reviewed Dylan's toxicology screen, and observed that Dylan tested positive for Phencyclidine (PCP).

124.    Nurse Leonard diagnosed Dylan as suffering from drug withdrawal.

125.    Upon information and belief, Nurse Leonard had access to and knew from the MEnD and/or Sherburne County Jail administrative and medical records, at a minimum that: (a) Dylan had a history of PTSD; (b) that Dylan had a history of suicidality; (c) Dylan had previously been subjected to close suicide monitoring at the Sherburne County Jail despite having denied being suicidal; (d) Dylan left the Sherburne County Jail with a classification of administrative maximum segregation and on a 30-minute special mental health watch that had never been lifted; (e) that mental health professionals at the Sherburne County Jail, or within MEnD, were supposed to conduct a mental health follow-up and assessment with Dylan before the 30-minute special mental health watch classification could be removed, but had never done so; (f) that Dylan was receiving a number of psychiatric and other medications on a daily basis at the Sherburne County jail during his July/August detention; and (g) that a jury had found Dylan guilty of serious criminal felony charges on October 6, 2017, and that those were the same charges on which Dylan was previously booked and precipitated his prior suicidal behavior and subsequent suicidal watch.

126.    Nurse Leonard knew that the prescription medications Dylan previously

received at the Sherburne County Jail were for serious medical conditions.

127.   Given these and other considerations, Nurse Leonard knew on the evening of October 6, 2017, that Dylan was at an extremely high risk for self-harm, including suicide.

128.   Despite this knowledge of Dylan's present conditions and history, Nurse Leonard failed to even meet with Dylan, as no meeting with Dylan is reflected in her October 6, 2017 chart note – the only note charted by Nurse Leonard related to Dylan.

129.   Despite this knowledge of Dylan's present conditions and history, Nurse Leonard failed to conduct any suicide assessment of Dylan or an assessment of his current medical needs.

130.   Despite this knowledge of Dylan's present conditions and history, Nurse Leonard failed to put Dylan on any closer medical monitoring, including but not limited to the previously prescribed and never lifted 30-minute special mental health checks.

131.   Additionally, Nurse Leonard's October 6, 2017 chart note fails to denote the time at which Nurse Leonard assessed Dylan's medical status.  This lack of time is contrary to all generally accepted medical practices and policies with respect to patient recordkeeping.

132.   Given all of these circumstances, Nurse Leonard either knew or was deliberately indifferent to the fact that Dylan was at an extremely high risk for suicide, when Nurse Leonard failed to make any effort to ensure that Dylan was properly screened, monitored, or placed within the Sherburne County Jail population.

133.   Because Nurse Leonard failed to do **anything** for Dylan's serious mental

health condition, Dylan was detained at the Sherburne County Jail, receiving only the regular 30-minute well-being checks, rather than the closer medical monitoring that Dylan required.

### *Dr. Leonard*

134.    Nurse Leonard's October 6, 2017 chart note was subsequently "reviewed" by Todd Leonard, M.D. ("Dr. Leonard") at or around October 6, 2017 at 8:59:45 P.M.

135.    Upon information and belief, despite being Dylan's treating physician, Dr. Leonard never met with Dylan on the evening of October 6, 2017.

136.    Dr. Leonard knew that medical marijuana (or cannabis) is prescribed to war veterans suffering from PTSD, like Dylan, often to suppress suicidal feelings and behavior.

137.    Dr. Leonard also reviewed Dylan's toxicology screen, and observed that Dylan tested positive for Phencyclidine (PCP).

138.    Dr. Leonard knew that Nurse Leonard diagnosed Dylan as suffering from drug withdrawal, and Dr. Leonard affirmed that diagnosis.

139.    Upon information and belief, Dr. Leonard had access to and knew, from the MEnD and/or Sherburne County Jail administrative and medical records, at a minimum that: (a) Dylan had a history of PTSD; (b) that Dylan had a history of suicidality; (c) Dylan had previously been subjected to close suicide monitoring at the Sherburne County Jail despite having denied being suicidal; (d) Dylan left the Sherburne County Jail with a classification of administrative maximum segregation and on a 30-minute special mental health watch that had never been lifted; (e) that mental health professionals at the

19

Sherburne County Jail, or within MEnD, were supposed to conduct a mental health follow-up and assessment with Dylan before the 30-minute special mental health watch classification could be removed, but had never done so; (f) that Dylan was receiving a number of psychiatric and other medications on a daily basis at the Sherburne County jail during his July/August detention; and (g) that a jury had found Dylan guilty of serious criminal felony charges on October 6, 2017, and that those were the same charges on which Dylan was previously booked and precipitated his prior suicidal behavior and subsequent suicidal watch.

140.    Dr. Leonard knew that the prescription medications Dylan previously received at the Sherburne County Jail were for serious medical conditions.

141.    Given these and other considerations, Dr. Leonard knew on the evening of October 6, 2017, that Dylan was at an extremely high risk for self-harm, including suicide.

142.    Despite this knowledge of Dylan's present conditions and history, Dr. Leonard failed to so much as even meet with Dylan or require that Nurse Leonard meet with Dylan.

143.    Despite this knowledge of Dylan's present conditions and history, Dr. Leonard failed to conduct any suicide assessment of Dylan or require that Nurse Leonard meet with Dylan to conduct and assessment.

144.    Despite this knowledge of Dylan's present conditions and history, Dr. Leonard failed to put Dylan, or require that Nurse Leonard put Dylan, on any closer medical monitoring, including but not limited to the previously prescribed and never

20

lifted 30-minute mental health checks.

145.    Dr. Leonard knew that Nurse Leonard's October 6, 2017 chart note failed to denote the time at which Leonard assessed Dylan's medical status and knew that this lack of time is contrary to all generally accepted medical practices and policies with respect to patient recordkeeping.

146.    Dr. Leonard knows that all of the notes charted by the MEnD nurses he supervises at the Sherburne County Jail are not time-stamped, and, upon information and belief, this is done intentionally so that the propriety of MEnD's actions cannot be easily scrutinized by third parties.

147.    Given all of these circumstances, Dr. Leonard either knew or was deliberately indifferent to the fact that Dylan was at an extremely high risk for suicide, when Dr. Leonard failed to make any effort, independently or through subordinates, to ensure that Dylan was properly screened, monitored, or placed within the Sherburne County Jail population.

148.    Because Dr. Leonard failed to do **anything** for Dylan's serious mental health condition, including but not limited to properly supervising his subordinates, Dylan was detained at the Sherburne County Jail, receiving only the regular 30-minute well-being checks, rather than the closer medical monitoring that Dylan required.

## Dylan's Serious Medical Needs are Ignored on October 7, 2017

### *Officer Denny*

149.    Sherburne County Jail Correctional Officer Russell Denny ("Denny") completed a medical screening form for Dylan on October 7, 2017 at 8:39 a.m.

150.    Denny also completed a mental health screening form for Dylan on October 7, 2017 at 8:42 a.m.

151.    As part of Denny's duties in performing this task, Denny had access to and was required to review the medical and administrative records in Sherburne County's possession related to Dylan's current and prior detentions/incarcerations at Sherburne County.

152.    Upon information and belief, Denny had access to and knew from MEnD and/or Sherburne County Jail administrative and medical records, at a minimum that: (a) Dylan had a history of PTSD; (b) that Dylan had a history of suicidality; (c) Dylan had previously been subjected to close suicide monitoring at the Sherburne County Jail despite having denied being suicidal; (d) Dylan left the Sherburne County Jail with a classification of administrative maximum segregation and on a 30-minute special mental health watch that had never been lifted; (e) that mental health professionals at the Sherburne County Jail, or within MEnD, were supposed to conduct a mental health follow-up and assessment with Dylan before the 30-minute special mental health watch classification could be removed, but had never done so; (f) that Dylan was receiving a number of psychiatric and other medications on a daily basis at the Sherburne County jail during his July/August detention; and (g) that a jury had found Dylan guilty of serious criminal felony charges on October 6, 2017, and that those were the same charges on which Dylan was previously booked and precipitated his prior suicidal behavior and subsequent suicidal watch; and (h) that Dylan was suffering from drug withdrawal.

153.    Denny also learned during the medical screening that Dylan was taking

prescribed medications but did not know what they were, and that Dylan suffered from PTSD and traumatic brain injuries.

154.    Despite learning this information, Denny failed to make any further efforts to determine what additional medications Dylan required for his well-being.

155.    Denny observed during the medical screening that Dylan "seem[ed] very agitated."

156.    Denny knew from his experience and training that agitation is a symptom of drug withdrawal and the types of mental illness Dylan suffered.

157.    Denny learned from his mental health screen of Dylan that Dylan had been treated for a mental or emotional problem and that Dylan had a history of PTSD and two traumatic brain injuries.

158.    Despite this knowledge of Dylan's present and historical serious mental health conditions, Denny failed to initiate any review of Dylan's status by medical professionals.

159.    Worse yet, Denny recommended that Dylan be placed with the general population, subject only to routine medical monitoring.

160.    Upon information and belief, Denny, as a non-administrator, did not have sufficient authority to end Dylan's 30-minute special mental health watch or move Dylan from BH-5 into a different cell block, where Dylan would receive less intensive monitoring by correctional staff.

161.    Upon information and belief, the cessation of Dylan's 30-minute special mental health watch and Dylan's movement from BH-5 needed to be approved by an

administrator pursuant to an appropriate Sherburne County Jail Segregation Review; it was understood that review could not be performed until Monday, October 9, 2017, and Denny knew that.

162.    Upon information and belief, Denny still improperly moved or initiated Dylan's movement to the Gamma Unit, where Dylan would receive a lower level of monitoring than he needed and had been receiving in BH-5.

163.    Upon information and belief, Denny moved Dylan from BH-5 to Gamma Unit Cell 128 ("G128") at 9:26 a.m.

164.    Given all of these circumstances, Denny either knew or was deliberately indifferent to the fact that he was placing Dylan at an increased risk of suicide.

165.    Because Denny failed to do **anything** for Dylan's serious mental health condition, Dylan was detained in G128, receiving only the regular 30-minute well-being checks, rather than the closer medical monitoring that Dylan required.

166.    Upon information and belief, Sherburne County Jail administrators attempted to conceal Denny's failures by not interviewing Denny as part of the Sherburne County Jail investigation into Dylan's suicide.  It is unfathomable that Denny, who purported to take a medical and mental health assessment of Dylan on the date of his suicide, would not be interviewed as part of such an investigation.

### *Officer Reich*

167.    John Reich ("Reich") was a correctional officer working in booking with Denny on the morning of October 7, 2017.

168.    Reich knew that Dylan was being held in BH5.

169.    Reich knew that Dylan had known suicidality at the Sherburne County Jail based upon a "suicide flag" that was contained in Dylan's electronic correctional record keeping system, Pro Phoenix.

170.    Specifically, the suicide flag in the Pro Phoenix system, which was present at all times on October 6 and 7, 2017, read "Current Flag" and "Suicidal" for Dylan.

171.    Reich knew that Dylan was a recently incarcerated veteran, which increased Dylan's risk for committing suicide.

172.    Reich observed Dylan make a phone call on the morning of October 7, 2017.

173.    Reich observed Dylan be so distraught and crying after placing that phone call that Reich asked Sgt. Lindstrom to pull the audio recording of Dylan's phone call.

174.    Reich learned that Dylan's emotional phone call was with his wife and mother, and had previously been trained that familial disputes create an increased risk for an inmate's suicide.

175.    It was unusual and not standard practice for booking officers to pull an inmate's phone recordings.

176.    At his deposition, Reich described Dylan as having "went from yelling about being a veteran to getting off the phone crying."

177.    Despite all of this knowledge obtained by Reich, Reich failed to initiate any review of Dylan's status by medical professionals or ensure that Dylan had ever been seen by medical personnel, which Dylan had not.

178.    Despite all of this knowledge obtained by Reich, Reich helped facilitate

Dylan's movement to the Gamma Unit, where Dylan would receive a lower level of monitoring than he needed and had been receiving in BH-5.

179.    Given all of these circumstances, Reich either knew or was deliberately indifferent to the fact that he was placing Dylan at an increased risk of suicide.

180.    Reich's deposition testimony underscored his indifference to inmate suicide at the Sherburne County Jail: "You can't put everybody who comes in who is a veteran and who has family issues and has had a suicidal past in a suicide gown.   Because you would have the entire facility of people in suicide gowns."

181.    Reich did not inform Lindstrom about the suicide flag in Dylan's Pro Phoenix record.

182.    Because Reich failed to do **anything** for Dylan's serious mental health condition, Dylan was detained in G128, receiving only the regular 30-minute well-being checks, rather than the closer medical monitoring that Dylan required.

183.    Upon information and belief, Sherburne County Jail administrators attempted to conceal Reich's failures by not interviewing Reich as part of the Sherburne County Jail investigation into Dylan's suicide.  Reich's interaction with Dylan in pulling the phone call was never documented in ANY report.

### *Sgt. Lindstrom*

184.    Sergeant Travis Lindstrom ("Sgt. Lindstrom") was supervising Denny and Reich on the morning of October 7, 2017.

185.    Sgt. Lindstrom knew that Dylan was being held in BH5.

186.    Sgt. Lindstrom knew that Dylan was extremely upset following a phone

call with his mother and wife, and that Reich took the unusual step of asking Sgt. Lindstrom for permission to listen to that phone call.

187.    Despite this knowledge, Sgt. Lindstrom never reviewed any of Dylan's jail records, including Dylan's medical and mental health screens.

188.    Despite this knowledge, Sgt. Lindstrom failed to initiate any review of Dylan's status by medical professionals or ensure that Dylan had ever been seen by medical personnel, which Dylan had not.  Sgt. Lindstrom merely assumed that Dylan had already been seen by medical personnel at some point, which Dylan had not.

189.    Despite all of this knowledge obtained by Sgt. Lindstrom, Sgt. Lindstrom ordered Dylan's movement to the Gamma Unit, where Dylan would receive a lower level of monitoring than he needed and had been receiving in BH-5.

190.    Given all of these circumstances, Sgt. Lindstrom either knew or was deliberately indifferent to the fact that he was placing Dylan at an increased risk of suicide.

191.    Because Sgt. Lindstrom failed to do **anything** for Dylan's serious mental health condition, Dylan was detained in G128, receiving only the regular 30-minute well-being checks, rather than the closer medical monitoring that Dylan required.

192.    Upon information and belief, Sherburne County Jail administrators attempted to conceal Sgt. Lindstrom's failures by not interviewing Sgt. Lindstrom as part of the Sherburne County Jail investigation into Dylan's suicide.  Reich and Sgt. Lindstrom's interaction with Dylan in pulling the phone call was never documented in ANY report.

### *Nurse Asfeld*

193.    Kathleen, Dylan's mother, arrived at the Sherburne County Jail at approximately 10:00 a.m. on the morning of October 7, 2017.

194.    Kathleen specifically requested that she be permitted to meet with a nurse immediately due to her serious concerns about Dylan's health and well-being, and given Dylan's medical history.

195.    Sherburne County Jail Correctional Officer Thomas Bergeron facilitated a meeting between Kathleen and MEnD/Sherburne County Jail nurse, Danielle Asfeld ("Nurse Asfeld").

196.    Kathleen informed Nurse Asfeld that Dylan suffered from PTSD and a severe, traumatic brain injury, and that Dylan had not received his medications since noon on Friday, October 6, 2017.

197.    Kathleen presented Nurse Asfeld with several of Dylan's medical prescriptions, including medical cannabis, venlafaxine, lamotrigine, cyroheptadine, lurasidone, and trazodone.

198.    Nurse Asfeld reviewed the medications to determine if they were for valid and current prescriptions, determined that they were, and then retained all the medications provided by Kathleen except for Dylan's medical cannabis.

199.    Nurse Asfeld did not accept the medical cannabis, even though she "didn't really look at it super closely…" because Nurse Asfeld claimed that the medical marijuana would need to be handled through a different procedure because it was a

controlled substance.

200.    Nurse Asfeld knew that medical cannabis (or marijuana) is prescribed to war veterans suffering from PTSD, like Dylan, often to suppress suicidal feelings and behavior

201.    Nurse Asfeld knew that these medications, by their nature and based upon her experience and training, were for the treatment of serious mental health conditions, particularly when the prescribed medications are viewed as a collective whole.

202.    Upon information and belief, Nurse Asfeld had access to and knew from the MEnD and/or Sherburne County Jail administrative and medical records and her interaction with Kathleen, at a minimum that: (a) Dylan had a history of PTSD; (b) that Dylan had a history of suicidality; (c) Dylan had previously been subjected to close suicide monitoring at the Sherburne County Jail despite having denied being suicidal; (d) Dylan left the Sherburne County Jail with a classification of administrative maximum segregation and on a 30-minute mental health watch that had never been lifted; (e) that mental health professionals at the Sherburne County Jail, or within MEnD, were supposed to conduct a mental health follow-up and assessment with Dylan before the 30-minute mental health watch classification could be removed, but had never done so; (f) that Dylan was receiving a number of psychiatric and other medications on a daily basis at the Sherburne County jail during his July/August detention; (g) that a jury had found Dylan guilty of serious criminal felony charges on October 6, 2017, and that those were the same charges on which Dylan was previously booked and precipitated his prior suicidal behavior and subsequent suicidal watch; and (h) that Dylan was suffering from

29

drug withdrawal.

203.    Despite knowing that Dylan had not received any of his prescribed medications and that Dylan had a history of serious mental health issues including suicidality, Nurse Asfeld did not even meet with Dylan or suggest that other medical providers do so to assess Dylan's serious mental condition.

204.    Despite knowing that Dylan had not received any of his prescribed medications and that Dylan had a history of serious mental health issues including suicidality, Nurse Asfeld did not provide Dylan with any of these prescribed medications.

205.    Despite knowing that Dylan had not received any of his prescribed medications and that Dylan had a history of serious mental health issues including suicidality, Nurse Asfeld did not properly inventory or chart these medications so that Dylan could receive them in the future or so that the status of his serious mental health conditions could be assessed.

206.    Despite knowing that Dylan had not received any of his prescribed medications and that Dylan had a history of serious mental health issues including suicidality, Nurse Asfeld did nothing to give the correctional staff at the Sherburne County Jail additional notice that they should be monitoring Dylan's mental health condition.

207.    Despite knowing that Dylan had not received any of his prescribed medications and that Dylan had a history of serious mental health issues including suicidality, Nurse Asfeld did not confer with Dr. Leonard, the supervision physician, to further assess and address Dylan's serious medical needs.

208.    Because Nurse Asfeld did **nothing** for Dylan's serious mental health condition, Dylan remained detained in G128 receiving only the regular 30-minute well-being checks, rather than closer medical monitoring.

209.    Nurse Asfeld did not chart her interaction with Kathleen or her receipt of Dylan's medications until October 9, 2017, **two days after** Dylan's suicide.

210.    This untimely charting by Nurse Asfeld is contrary to all generally accepted medical practices and policies with respect to patient recordkeeping.

### *Officers Graves and Rourke*

211.    Unfortunately, the Sherburne County Jail correctional staff failed to even conduct the regular 30-minute well-being checks on Dylan properly.

212.    Sherburne County Jail correctional officer Wes Graves ("Graves") was assigned to conduct welfare checks on the Gamma Unit from at least 6:30 a.m. until 2:00 p.m.

213.    Graves knew that the detainees and/or inmates housed in administrative maximum security segregation unit were assigned that classification because they, among other things, presented a higher risk of self-harm.

214.    Upon information and belief, Graves knew that Dylan was placed in administrative maximum security segregation because Dylan posed a risk of self-harm.

215.    Upon information and belief, Graves knew the justification provided for Dylan's segregation in the August 1, 2016 Sherburne County Segregation Review (i.e., self-harm), and Graves knew that segregation review continued to provide the basis for Dylan's administrative maximum security segregation on October 7, 2017.

216.    Upon information and belief, Graves knew that Dylan's segregation status would not be reviewed by an administrator until October 9, 2017.

217.    Sherburne County Jail staff observed Dylan as being depressed after his transfer to G128 on the morning of October 7, 2017, as admitted to by Sherburne County Jail correctional officer James Rourke ("Rourke")

218.    Upon information and belief, Graves, as the officer assigned to conduct the welfare checks on Dylan, also observed Dylan exhibiting those signs of depression.

219.    Despite Graves' knowledge of Dylan's high risk for self-harm, Graves failed to properly conduct well-being checks on Brenner on October 7, 2017.

220.    Rourke was also assigned to the Gamma Unit with Graves on the morning of October 7, 2017.

221.    Rourke knew that the detainees and/or inmates housed in administrative maximum security segregation unit were assigned that classification because they, among other things, presented a higher risk of self-harm.

222.    Upon information and belief, Rourke was tasked to either assist or to also conduct welfare checks on inmates/detainees in the Gamma Unit on October 7, 2017.

223.    Upon information and belief, Rourke knew that Dylan was placed in administrative maximum security segregation because Dylan posed a risk of self-harm.

224.    Upon information and belief, Rourke knew the justification provided for Dylan's segregation in the August 1, 2016 Sherburne County Segregation Review (i.e., self-harm), and Rourke knew that segregation review continued to provide the basis for Dylan's administrative maximum security segregation on October 7, 2017.

225.   Upon information and belief, Rourke knew that Dylan's segregation status would not be reviewed by an administrator until October 9, 2017.

226.   Rourke knew that Graves was not conducting proper 30-minute well-being checks on Dylan and other inmates/detainees in contravention of DOC and Sherburne County Jail policies and with deliberate indifference to the welfare of Dylan and other inmates/detainees.

227.   Rourke did nothing to ensure that Graves conducted proper 30-minute well-being checks on Dylan, despite knowing that Dylan was at a high risk for self-harm and personally observing that Dylan was depressed.

228.   No other members of the Sherburne County Jail correctional staff properly conducted well-being checks on Dylan on October 7, 2017, to the extent those staff members had an obligation to do so.

229.   Graves, Rourke, and/or other Sherburne County Jail correctional staff regularly failed to conduct proper 30-minute well-being checks of Dylan, missing multiple 30-minute well-being checks in violation of DOC and Sherburne County Jail policies and procedures.

230.   The Sherburne County Jail CMS Activity Log shows that Graves was not completing his 30-minute well-being checks in accordance with DOC policies, as they were not staggered and did not occur every 30 minutes.

231.   On October 7, 2017, Graves was just "going through the motions" of entering his welfare checks into the log, as the timing of the welfare checks he purported to performed bore no relation to the times Graves entered into the log.

232.    Graves lied about actually performing well-being checks, the timeliness of his well-being checks, and about the quality of those well-being checks.

233.    Rourke knew that Graves was lying about the quality and quantity of the well-being checks Graves proclaims to have performed on October 7, 2017 on Dylan.

234.    Graves claim to have done a well-being check of Dylan at 1:59 p.m. on October 7, 2017, but the objective video and medical evidence shows that he did not.

235.    The last proper observation of Dylan's well being occurred no later than 1:05 p.m. on October 7, 2017.

236.    Graves claims that he glanced into Dylan's cell, G128, at 1:59 p.m. on October 7, 2017, but he did not.

237.    Even if Graves did "glance" into Dylan's cell, that act still would not constitute a proper well-being check, as a glance is insufficient to properly assess the health of an inmate in accordance with DOC and Sherburne County policies.

238.    Graves claims that he observed Dylan standing in his cell at 1:59 p.m. on October 7, 2017, but he did not.

239.    Based upon the objective medical evidence, Dylan was hanging from a sheet tied to his bedpost at 1:59 on October 7, 2017, in the act of committing suicide.

240.    At 2:19 p.m., Dylan was found hanging, unresponsive from a sheet tied to the top of his bunk.

241.    The pooling of blood and other medical evidence observed in Dylan's body was consistent with a ligature hanging lasting longer than 30 minutes.

242.    Dylan showed no signs of life when he was found at or around 2:19 p.m.

243.   Dylan's face was observed as a pale, light blue color at the time he was found at or around 2:19 p.m.

244.   Dylan's declared time of death was 2:23 p.m., on October 7, 2017.

245.   The cause of death was ligature hanging.

246.   The manner of death was suicide.

247.   Ligature hangings in the manner performed by Dylan typically require a significant period of time to successfully accomplish suicide.

248.   Had Dylan received proper medical attention, which would have at a minimum resulted in closer medical monitoring, Dylan more likely than not would not have died from ligature hanging.

249.   Had Dylan received his prescribed medications, Dylan more likely than not would not have died from ligature hanging.

250.   Had proper well-being checks been conducted of Dylan, Dylan more likely than not would not have died from ligature hanging.

251.   On January 4, 2018, the Minnesota Department of Corrections reprimanded Sherburne County for its failures associated with Dylan's death:

> Upon review of these reports, video and other documentation I have determined that there was a violation of the Chapter 2911 rules in regard to this incident.
>
> Chapter 2911.5000 subp. 5 requires that all inmates are personally observed by a custody staff person at least every 30 minutes, and that these thirty-minute checks should be staggered.  There was a late well-being check prior to the check that discovered inmate Brenner hanging.

### MEnD's and Sherburne County's History of Deliberate Indifference

252.   Dr. Leonard formed MEnD as a professional limited liability company

35

(PLLC) on or around May 19, 2008.

253.   Upon information and belief, Dr. Leonard is and was the sole member of

that PLLC.

254.   On or around May 15, 2011, Dr. Leonard was reprimanded by the

Minnesota Board of Medical Practice (the "Board").

255.   The Board found that, among other things:

> A review of [Dr. Leonard's] practice revealed that, on multiple occasions, [Dr. Leonard] authorized narcotics, but failed to document objective clinical findings to support the need for ongoing medications; failed to document an assessment for his patients' risk of chemical dependency, toxicity, diversion, or suicide; failed to document discussions regarding potential side effects of the drugs; failed to monitor the efficacy of the medications; failed to implement narcotic contracts or conduct biological fluid screens; and failed to recognize drug seeking behavior in his patients. [Dr. Leonard] also failed to address collateral health concerns or routine health maintenance care.

> A review of [Dr. Leonard's] practice also revealed that [Dr. Leonard] failed to appropriately maintain and adequately document his clinic records. [Dr. Leonard's] clinic notes were frequently cursory, incomplete, and illegible. [Dr. Leonard] often failed to document a diagnosis, adequate patient history, or a rationale for prescribed medications. On multiple occasions, [Dr. Leonard] prescribed controlled substances for his patients, but failed to adequately document the specific name of the medication, authorized quantity, or the strength of the medication in the clinic record.

256.   Since 2008, MEnD has advertised as providing "low cost" care to

correctional facilities.

257.   Today, MEnD advertises that it has saved "millions of dollars" for its

correctional clients.

258.   Upon information and belief, MEnD contracted with and was providing its

36

low cost correctional care to over 35 different counties in Minnesota, Iowa, and Wisconsin as of October 6, 2017, including Sherburne County.

259.    Upon information and belief, Dr. Leonard was one of few, if not the only, medical doctor (MD) in October 2017 supervising MEnD employees and overseeing patient care at facilities in Minnesota.

260.    Upon information and belief, MEnD provided low cost correctional medical (including mental health) services at Sherburne County and elsewhere by engaging in "telemedicine," where Dr. Leonard was "supervising" his staff and patients remotely though technological means, regardless of how serious the patient's medical needs were.

261.    Upon information and belief, in October 2017 Dr. Leonard spent less than ten percent of his time meeting in person with the correctional patients he claimed to be treating and supervising.

262.    The lack of appropriate medical and mental health supervision and services provided by MEnD before and after October 2017 is well documented.

263.    Multiple inmates receiving medical care have committed suicide as a result of MEnD's deliberate indifference, including but not limited to the 2010 suicide of Josh Holscher and the November 2017 suicide of James C. Lynas, which occurred at the Sherburne County Jail approximately one month after Dylan's suicide.  In 2016, MEnD paid $850,000 to resolve claims of deliberate indifference against MEnD and Dr. Leonard for the 2010 suicide of Kyle Allan Baxter-Jensen.  *See Baxter-Knutson v. Brandt et al*, Case No. 14-cv-03796 (ADM/LIB).  Many more inmates have inflicted serious self-harm

as a result of MEnD's deliberate indifference.

264.    The U.S. Department of Homeland Security Office of Detention Oversight ("ODO") conducted compliance inspection at the Sherburne County Jail in 2010 and 2014, since Sherburne County generates revenue by housing federal prisoners/detainees. In both 2010 and 2014, the ODO observed that nurses at the Sherburne County Jail discontinues suicide watches without proper authorization by the clinical director.

265.    Sherburne County's failures with respect to its deliberate indifference towards conducting proper welfare checks was also recognized in its biennial facility inspection report, which covered the years 2016 through 2018, finding that "A review of video footage showed a number of well-being checks that were completed at too fast a pace."

266.    Sherburne County's deliberate indifference towards suicide watches and welfare checks not only, in part, caused Brenner's suicide, but also caused Lynas' suicide as well.

267.    Sherburne County compounded its own unconstitutional practices by employing MEnD to provide medical services at the Sherburne County Jail in 2017, despite Sherburne County's nondelegable duty to provide medical care to its inmates/detainees and despite Sherburne County's final policymakers knowing about MEnD's track record of providing constitutionally deficient medical care to the inmates/detainees in its care.

## Count One

### 42 U.S.C. § 1983
### Eighth and Fourteenth Amendment Violations
### *Plaintiffs v. Nurse Asfeld, Nurse Bauman, Nurse Leonard, Dr. Leonard,*
### *Lucar, Denny, Graves, Rourke, Reich, and Lindstrom, all in their individual capacities*

268.    Plaintiffs reallege and incorporate each preceding allegation as if set forth fully herein.

269.    Dylan suffered from serious medical needs.

270.    The Defendants named in this Count owed Dylan a duty to provide for Dylan's medical needs, safety, and general welfare.

271.    The Defendants named in this Count knew that Dylan had serious medical needs that created a high risk of harm, including suicide, if not properly assessed, addressed, and monitored.

272.    The Defendants named in this Count, under color of state law, acted with deliberate indifference to Dylan's serious medical needs in several manners, as detailed herein and as shall be set forth with additional discovery.

273.    Plaintiffs allege in the alternative that each of these Defendants knew that Dylan was suffering from these constitutional violations, had a realistic opportunity to intervene to stop these constitutional violations, but failed to intervene either maliciously or with reckless disregard for whether Dylan's rights would be violated.

274.    As a result, the Defendants named in this Count engaged in conduct that was in violation of the Eighth and/or Fourteenth Amendments to the United States Constitution.

275.    Dylan died as a direct and proximate result of acts and omissions by the Defendants named in this Count.

276.    As a direct and proximate result of the acts and omissions by the Defendants named in this Count, Dylan sustained compensatory and special damages as defined under federal common law and in an amount to be determined by jury.

277.    Punitive damages are available against the Defendants named in this Count and are hereby claimed as a matter of federal common law pursuant to *Smith v. Wade*, 461 U.S. 30 (1983).

278.    Plaintiffs are entitled to recovery of their costs, including reasonable attorneys' fees, under 42 U.S.C. § 1988.

279.    The conduct described in all of the preceding paragraphs amount to wrongful acts and omissions for purposes of Minnesota Statute Section 573.02, subdivision 1.

280.    As a direct and proximate result of these wrongful acts and omissions, Dylan's next of kin have suffered pecuniary loss, including medical and funeral expenses, loss of aid, counsel, guidance, advice, assistance, protection, and support in an amount to be determined by jury.

**Count Two**

**42 U.S.C. § 1983**
**Eighth and Fourteenth Amendment Violations – Supervisory Liability**
***Plaintiffs v. Dr. Leonard in his individual capacity***

281.    Plaintiffs reallege and incorporate each preceding allegation as if set forth

fully herein.

282.   Dr. Leonard owed Dylan a duty to provide for Dylan's medical needs, safety, and general welfare.

283.   Dr. Leonard knew that Dylan had serious medical needs that presented a high risk of harm if not addressed.

284.   Dr. Leonard acted under color of state law, as detailed above.

285.   Dr. Leonard had notice that his subordinates engaged in a pattern of deliberate indifference to the serious medical needs of inmates/detainees, including Dylan.

286.   Dr. Leonard was deliberately indifferent to or authorized his subordinates' deliberate indifference to the serious medical needs of inmates/detainees, including Dylan.

287.   Dr. Leonard engaged in conduct that was in violation of the Eighth and/or Fourteenth Amendments to the United States Constitution.

288.   Dylan died as a direct and proximate result of Dr. Leonard's acts and omissions.

289.   As a direct and proximate result of Dr. Leonard's acts and omissions, Dylan sustained compensatory and special damages as defined under federal common law and in an amount to be determined by jury.

290.   Punitive damages are available against Dr. Leonard and are hereby claimed as a matter of federal common law pursuant to *Smith v. Wade*, 461 U.S. 30 (1983).

291.   Plaintiffs are entitled to recovery of their costs, including reasonable

attorneys' fees, under 42 U.S.C. § 1988.

292. The conduct described in all of the preceding paragraphs amount to wrongful acts and omissions for purposes of Minnesota Statute Section 573.02, subdivision 1.

293. As a direct and proximate result of these wrongful acts and omissions, Dylan's next of kin have suffered pecuniary loss, including medical and funeral expenses, loss of aid, counsel, guidance, advice, assistance, protection, and support in an amount to be determined by jury.

## Count Three

### 42 U.S.C. § 1983
### Eighth and Fourteenth Amendment Violations – *Monell Liability*
### *Plaintiffs v. MEnD, Dr. Leonard in his official capacity, and Sherburne County*

294. Plaintiffs reallege and incorporate each preceding allegation as if set forth fully herein.

295. MEnD, Dr. Leonard, and Sherburne County acted under color of state law, as detailed above.

296. On, prior to, and after October 7, 2017, MEnD and its final policymakers such as Dr. Leonard, with deliberate indifference to the rights of Dylan and other similarly situated inmates/detainees, tolerated, permitted, failed to correct, promoted, or ratified a number of customs, patterns, or practices that that failed to provide for the serious medical needs, safety, well-being, and welfare of inmates/detainees that presented with serious mental health concerns, including suicidality.

297. On, prior to, and after October 7, 2017, Sherburne County had a non-

delegable constitutional duty to provide medical care to the detainees/inmates in its custody.

298.    On, prior to, and after October 7, 2017, Sherburne County had notice of MEnD's constitutionally deficient medical care and unconstitutional customs and practices, yet with deliberate indifference to the rights of Dylan and other similarly situated inmates/detainees, employed MEnD and allowed MEnD to provide constitutionally deficient medical care to Sherburne County Jail detainees/inmates.

299.    The unconstitutional customs and practices were the moving force behind Dylan's suicide and the violation of his constitutional rights.

300.    Dylan died as a direct and proximate result of acts and omissions by the Defendants named in this Count.

301.    As a direct and proximate result of the acts and omissions by the Defendants named in this Count, Dylan sustained compensatory and special damages as defined under federal common law and in an amount to be determined by jury.

302.    Plaintiffs are entitled to recovery of their costs, including reasonable attorneys' fees, under 42 U.S.C. § 1988.

303.    The conduct described in all of the preceding paragraphs amount to wrongful acts and omissions for purposes of Minnesota Statute Section 573.02, subdivision 1.

304.    As a direct and proximate result of these wrongful acts and omissions, Dylan's next of kin have suffered pecuniary loss, including medical and funeral expenses, loss of aid, counsel, guidance, advice, assistance, protection, and support in an amount to

be determined by jury.

## Count Four

### Wrongful Death - Professional Negligence
### *Plaintiffs v. Nurse Asfeld, Nurse Bauman, Nurse Leonard, Dr. Leonard, MEnD, and Sherburne County*

305.   Plaintiffs reallege and incorporate each preceding allegation as if set forth fully herein.

306.   The Defendants in this Count may be classified as health care providers under Minnesota law.

307.   These Defendants deviated from the professional standard of care in their treatment of Dylan, as detailed herein and as shall be set forth with additional discovery.

308.   Plaintiffs have supplied a declaration of expert review pursuant to Minnesota Statute 145.682, subd. 4.

309.   MEnD is directly liable for its failure to establish proper policies and procedures related to mental health screening and the monitoring of inmates and detainees at the Sherburne County Jail who are or should be known to be at a high risk for suicide.

310.   MEnD is vicariously liable for the acts of the individual defendants named in Count Two, as those employees were working within the course and scope of their duties as MEnD employees.

311.   Sherburne County is directly liable for its failure to establish proper policies and procedures related to mental health screening and the monitoring of inmates and detainees at the Sherburne County Jail who are or should be known to be at a high

risk for suicide.

312.    Sherburne County is vicariously liable for the acts of the individual defendants named in Count Two, and vicariously liable for the acts of MEnD, as Sherburne County has a nondelegable duty to provide health care to the inmates and detainees at the Sherburne County Jail.

313.    These deviations from the professional standard of care directly and proximately caused Dylan's death.

314.    The conduct described in all of the preceding paragraphs amount to wrongful acts and omissions for purposes of Minnesota Statute Section 573.02, subdivision 1.

315.    As a direct and proximate result of these wrongful acts and omissions, Dylan's next of kin have suffered pecuniary loss, including medical and funeral expenses, loss of aid, counsel, guidance, advice, assistance, protection, and support in an amount to be determined by jury.

## Count Five

### Wrongful Death - Negligence
### *Graves, Rourke, and Sherburne County*

316.    Plaintiffs reallege and incorporate each preceding allegation as if set forth fully herein.

317.    The Defendants named in this Count owed Dylan a duty to provide for Dylan's well-being and safety.

318.    The Defendants named in this Count knew or should have known that

45

Dylan was at a high risk of suicide, given his prior medical history and current medical condition.

319.    It is foreseeable that inmates and detainees who are not properly screened, monitored, or supervised, such as Dylan, pose a danger to themselves, including a risk of suicide.  This is precisely why well-being checks are required.  This is particularly true with respect to inmates placed in administrative maximum security segregation due to a risk of self-harm.

320.    The Defendants named in this Count failed numerous ministerial duties, including: (a) failing to maintain Dylan on the required 30-minute special mental health checks; (b) failing to maintain Dylan in a cell where he was not appropriately monitored for suicidality; and (c) failing to conduct appropriate well-being checks.

321.    The Defendants named in this Count breached each of these ministerial duties and otherwise failed to act reasonably, as detailed herein and as shall be set forth with additional discovery.

322.    Sherburne County is directly liable for its failure to establish and/or enforce policies and procedures to ensure proper monitoring of Sherburne County Jail detainees/inmates.

323.    Sherburne County is vicariously liable for the negligent acts and omissions of Graves and Rourke as described within this Fourth Amended Complaint.

324.    The conduct described in all of the preceding paragraphs amount to wrongful acts and omissions for purposes of Minnesota Statute Section 573.02, subdivision 1.

325.    These wrongful acts and omissions directly and proximately caused Dylan's death.

326.    As a direct and proximate result of these wrongful acts and omissions, Dylan's next of kin have suffered pecuniary loss, including medical and funeral expenses, loss of aid, counsel, guidance, advice, assistance, protection, and support in an amount to be determined by jury.

## **Prayer for Relief**

WHEREFORE, Plaintiffs hereby pray for judgment against Defendants as follows:

1.    As to Count One, a money judgment against Nurse Asfeld, Nurse Bauman, Nurse Leonard, Dr. Leonard, Lucar, Denny, Reich, Lindstrom, Graves, and Rourke for compensatory, special, and punitive damages in an amount to be determined by jury, together with costs, including reasonable attorneys' fees, under 42 U.S.C. § 1988 and prejudgment interest, in addition to compensatory damages for the next of kin in an amount to be determined by jury;

2.    As to Count Two, a money judgment against Dr. Leonard for compensatory, special, and punitive damages in an amount to be determined by jury, together with costs, including reasonable attorneys' fees, under 42 U.S.C. § 1988 and prejudgment interest, in addition to compensatory damages for the next of kin in an amount to be determined by jury;

3.    As to Count Three, a money judgment against MEnD, Dr. Leonard, and Sherburne County for compensatory and special damages in an amount to be determined by jury, together with costs, including reasonable attorneys' fees, under 42 U.S.C. § 1988

and prejudgment interest, in addition to compensatory damages for the next of kin in an amount to be determined by jury;

4.     As to Count Four, a money judgment against Nurse Asfeld, Nurse Bauman, Nurse Leonard, Dr. Leonard, MEnD, and Sherburne County for compensatory damages for the next of kin in an amount to be determined by jury, together with costs and prejudgment interest.

5.     As to Count Five, a money judgment against Defendants Graves, Rourke, and Sherburne County for compensatory damages for the next of kin in an amount to be determined by jury, together with costs and prejudgment interest.

6.     All other relief this Court deems just and equitable

**PLAINTIFFS HEREBY DEMAND A TRIAL BY JURY.**

**Dated: November 1, 2020**

**NEWMARK STORMS DWORAK LLC**

/s/ Jeffrey S. Storms
Jeffrey S. Storms, #387240
Paul C. Dworak, #391070
100 South Fifth Street, Suite 2100
Minneapolis, MN 55402
Telephone: 612.455.7050
Fax: 612.455.7051
jeff@newmarkstorms.com
paul@newmarkstorms.com

**SIEBENCAREY, P.A.**

/s/ Jeffrey M. Montpetit
Jeffrey M. Montpetit, #291249
901 Marquette Avenue, Suite 500
Minneapolis, MN 55402
Telephone: 612.333.4500
Fax: 612.333.5970
jeffrey.montpetit@knowyourrights.com

*ATTORNEYS FOR PLAINTIFFS*