# EXHIBIT 3

# In The Matter Of:

*BRENNER vs.*
*MEnD CORRECTIONAL CARE, et al.*

---

*TODD LEONARD*
*July 8, 2020*

---

*Herbert L. Peterson & Associates*
*11900 Wayzata Boulevard*
*Suite 116 D*
*Minnetonka, Minnesota 55305*
*952-543-6910*



Original File Leonard Todd 07-08-20.txt
**Min-U-Script® with Word Index**

---

**Page 1**

```
 1              UNITED STATES DISTRICT COURT
                    DISTRICT OF MINNESOTA
 2   ------------------------------------------------
 3   Dawn Brenner and Kathleen Brenner, as co-trustees
     for the heirs and next of kin of Dylan Brenner,
 4
                      Plaintiffs,
 5                                  Court File No.
          -vs-              18-cv-02383 (NEB/ECW)
 6
     Danielle Sue Asfeld, in her individual capacity,
 7   Amanda Nowell, in her individual capacity,
     Christina Leonard, in her individual capacity,
 8   Janell Hussain, in his individual capacity,
     Todd Leonard, in his individual and official
 9   capacities,
     Rebecca Lucar, in her individual capacity,
10   Denny Russel, in his individual capacity,
     Wes Graves, in his individual capacity,
11   James Rourke, in his individual capacity,
     MEnD Correctional Care, PLLC, and Sherburne
12   County,
13                   Defendants.
14   ------------------------------------------------
15          DEPOSITION OF TODD LEONARD,
16   taken at the offices of Larson King, 30 East
17   Seventh Street, Suite 2800, St. Paul, Minnesota,
18   taken on the 8th day of July, 2020, commencing at
19   approximately 10:05 a.m., before Stacy Ann
20   Hutchinson, a Notary Public in and for the County
21   of Hennepin, State of Minnesota, taken pursuant
22   to the Rules of Civil Procedure.
23                      *  *  *
24
25
```

---

**Page 2**

```
 1                  APPEARANCES:
 2       JEFFREY S. STORMS, Esq., of the firm of
 3   Newmark Storms Dworak Law Office, 100 South Fifth
 4   Street, Suite 2100, Minneapolis, Minnesota,
 5   appearing in behalf of the Plaintiffs; and,
 6       STEPHANIE A. ANGOLKAR, Esq., of the firm of
 7   Iverson Reuvers Condon, 9321 Ensign Avenue South,
 8   Bloomington, Minnesota, appearing in behalf of
 9   the Defendants; and,
10       ANTHONY J. NOVAK, Esq., of the firm of
11   Larson King, 30 East Seventh Street, Suite 2800,
12   St. Paul, Minnesota, appearing in behalf of the
13   Defendants; and,
14       JEFFREY M. MONTPETIT, Esq., of the firm of
15   Sieben Carey, 901 Marquette Avenue, Suite 500,
16   Minneapolis, Minnesota, appearing in behalf of
17   the Plaintiffs.
18                      *  *  *
19           EXAMINATION   FURTHER EXAMINATION
20   Mr. Storms          4
21                      *  *  *
22               EXHIBITS
23   Description              Number      Marked
24   Deposition Notice          103         4
25   Manual Title Page          104        36
```

---

**Page 3**

| Description | Number | Marked |
|---|---|---|
| Suicide Risk Screening Form | 105 | 58 |
| Answers to Interrogatories | 106 | 140 |
| County Map | 107 | 142 |
| Answers to Interrogatories | 108 | 147 |
| Health Assessment | 109 | 150 |
| Jail Records | 110 | 179 |

```
                    *  *  *
```

---

**Page 4**

```
 1          (Exhibit Number 103 was
 2           marked for identification.)
 3           TODD LEONARD,
 4   was called as a witness and, being first duly
 5   sworn, was examined and testified as follows:
 6               EXAMINATION
 7   BY MR. STORMS:
 8   Q.  Would you please state and spell your
 9       complete name for the record, sir?
10   A.  Yeah.  Todd Arthur Leonard, T-O-D-D,
11       A-R-T-H-U-R, L-E-O-N-A-R-D.
12   Q.  And how old are you, sir?
13   A.  I'm 51.
14   Q.  And I've seen that you've given several
15       depositions before?
16   A.  I've given a few.
17   Q.  You've given several to Robert Bennett in
18       other matters related to suicides?
19   A.  I've given a few to Robert Bennett, I don't
20       know the total number.
21   Q.  You've given one on the Baxter/Newton case?
22   A.  Correct.
23   Q.  And you gave one on the Lynas case?
24   A.  Correct.
25   Q.  And in each of those deposition transcripts
```

BRENNER vs.
MEnD CORRECTIONAL CARE, et al.

TODD LEONARD
July 8, 2020

---

Page 5

1 did you take the opportunity to review and
2 make corrections?
3 **A. I believe so. Whatever the process is,**
4 **that's what I would have done.**
5 Q. And you gave truthful testimony each of those
6 times?
7 **A. Correct.**
8 Q. And you understand that you've been deposed
9 in those instances in your individual
10 capacity?
11 **A. Again, I'm not an attorney but I believe so.**
12 Q. Do you understand that you are testifying
13 today in the capacity of a 30(b)(6) witness?
14 **A. I understand that term, I don't fully**
15 **understand all the details of that, but I**
16 **understand the general meaning.**
17 Q. Have you ever given testimony as a 30(b)(6)
18 witness before?
19 **A. One time.**
20 Q. Do you recall what case that was on?
21 **A. I believe that was the Lynas case.**
22 Q. And as in this case and the Lynas case you
23 received the deposition notice with numerous
24 topics for you to provide testimony on?
25 **A. Correct.**

---

Page 6

1 Q. You understand that you've been provided with
2 a notice in this case to provide testimony
3 regarding topics?
4 **A. Correct.**
5 Q. And I'm going to hand you what's been marked
6 as Exhibit 103.
7 **A. Okay.**
8 Q. This is the Second Amended Rule 30(b)(6)
9 Notice. I'll represent to you that the only
10 difference is the change in date.
11 **A. Okay.**
12 Q. If you could take a chance to review just to
13 confirm these are the topics you prepared to
14 provide testimony on today?
15 **A. As long as they have not changed, that is**
16 **true. This appears to be the same that I've**
17 **seen before.**
18 Q. And you understand that you have been noticed
19 to provide an individual deposition in this
20 case in two weeks as well?
21 **A. Whenever that is from now but, yes, I'm aware**
22 **of that.**
23 Q. And you took the time to prepare for your
24 deposition today?
25 **A. Yes. I have reviewed thousands and thousands**

---

Page 7

1 of pages of documents and such.
2 Q. And in preparing for today's deposition we'll
3 talk about what particular documents you
4 reviewed, but did you have conversations with
5 anyone to prepare for today's deposition?
6 **A. I've had conversations with attorneys, I've**
7 **gathered information from some of my staff**
8 **who would run reports for me or things of**
9 **that nature.**
10 Q. Which attorneys did you meet with?
11 **A. I met personally with Tony Novak and I've had**
12 **telephone conversations with Tony Novak and**
13 **Carrie Sherburne.**
14 Q. No other attorneys in preparation for this
15 deposition?
16 **A. No.**
17 Q. Did you talk to any insurance adjustors in
18 preparation for today's deposition?
19 **A. Not in preparation for this deposition.**
20 Q. Have you spoke with an insurance adjustor
21 about this case?
22 **A. Simply just to inform them that this case is**
23 **active and just operational things.**
24 Q. How often do you have contact with the
25 insurance adjustor?

---

Page 8

1 **A. Rarely.**
2 Q. And the staff that you spoke with in
3 preparation for today, who are they?
4 **A. I've had reports generated, information**
5 **sought by Julie Nowacki, my human resource**
6 **director; Traci Newman, my business officer**
7 **manager; Diana VanDerBeek, nursing director**
8 **at Sherburne.**
9 Q. How do you spell Julie's last name?
10 **A. N-O-W-A-C-K-I.**
11 Q. And when did you start having conversations
12 with them with respect to preparing for
13 today's deposition?
14 **A. That's a difficult question for me to answer**
15 **because these are the people that assisted me**
16 **in collecting information for quite some time**
17 **now. So I can't give you an exact answer but**
18 **it's been throughout this process.**
19 Q. Any specific conversations that you've had
20 with them to prepare for today's deposition?
21 **A. Oh, no. No. Other than just getting**
22 **information that I needed to be prepared.**
23 Q. Did you speak with Diana VanDerBeek about the
24 deposition testimony she gave?
25 **A. No.**

---

Page 9

1 Q. Have you spoken to anyone from MEnD about the
2    deposition testimony they've given in this
3    case?
4 A. No.
5 Q. Have you read any deposition transcripts in
6    preparation for today?
7 A. Yes.
8 Q. Whose transcripts have you read?
9 A. I've read Diana VanDerBeek, Danielle Asfeld,
10    Christina Leonard, Pat Carr, Rebecca Lucar,
11    and our health technician, I always butcher
12    her last name but --
13 Q. Who?
14 A. The health technician that was deposed.
15 Q. Which one?
16 A. I butcher her last name, I apologize, but I'm
17    blanking on her name now.  I apologize.
18 Q. Do you remember her first name?
19 A. Goodness.  It starts with a B.
20 Q. Briony Bohn?
21 A. No.
22 Q. Brittany --
23       MR. NOVAK: It was Brittany.
24       THE WITNESS: Thank you.  Brittany.
25    Thank you.

Page 10

1 BY MR. STORMS:
2 Q. In your preparation to provide testimony as a
3    designee today and reviewing those
4    transcripts, was there anything that you
5    reviewed in those transcripts that you
6    thought mischaracterized any of MEnD's
7    operations?
8 A. Oh, I would have to -- I would have to look
9    through each one individually to give you an
10    accurate answer of that.  Nothing comes to
11    mind but I don't remember to that level of
12    detail.
13 Q. So as you sit here today the answer would be
14    no?
15 A. My answer would be just as I stated, I would
16    literally have to go through each line to
17    accurately answer that.
18 Q. Well, I understand what you are saying but
19    I'm asking you as you sit here today is there
20    any particular testimony that you recall that
21    you believe mischaracterizes MEnD's
22    operations?
23       MR. NOVAK: Asked and answered.  Go
24    ahead.
25       THE WITNESS: I just can't recall

Page 11

1    if there is anything in particular from
2    those depositions that mischaracterizes
3    that.  It's impossible for me to answer
4    without going through those individually
5    with you.
6 BY MR. STORMS:
7 Q. Well, it's possible to answer the question
8    about whether or not you recall today
9    anything, right?  That's a possible answer
10    for you.
11 A. Okay.
12 Q. True?
13 A. I'm sorry, what is the question?
14 Q. Well, if you recalled something, right, that
15    would be a yes or no answer today?
16 A. Well, as I mentioned just earlier, I don't
17    recall anything off the top of my mind, but
18    to be accurate I'd have to go through each
19    individual one and tell you if there is
20    anything that comes to mind as I reviewed
21    them.
22 Q. Aside from operations, do you recall anything
23    in particular that you believe
24    mischaracterized MEnD's policies and
25    procedures in any respect?

Page 12

1 A. It's the same answer for me.
2 Q. Nothing you recall today?
3 A. Nothing off the top of my mind but, again, I
4    would have to review those very intricately
5    to answer that accurately.
6 Q. So did you review those deposition
7    transcripts intricately in preparation for
8    today's deposition?
9 A. I read through them thoroughly.
10 Q. And did you have any conversations with Pat
11    Carr about his deposition testimony?
12 A. No.
13 Q. Have you had any -- in preparation for
14    today's deposition, did you have any
15    conversations with anyone from Sherburne
16    County?
17 A. You mean from Sherburne County Sheriffs
18    Department?
19 Q. Anyone from Sherburne County government at
20    all in preparation for this deposition?
21 A. That's what I was looking for.  No, I haven't
22    had any conversations with them in
23    preparation for this.
24 Q. When was the last time you would have had any
25    conversation with Pat Carr at all about Dylan

**Page 13**

1  Brenner?
2  **A. I don't know. I just don't recall the last**
3  **time him and I had a conversation about Dylan**
4  **Brenner specifically.**
5  Q. What about the last conversation that would
6  have been had related to MEnD's contract with
7  Sherburne County, would you have had any
8  recent conversations about that with
9  Mr. Carr?
10 **A. My best estimate is approximately two months**
11 **ago. And that's an estimate.**
12 Q. And what was the nature of that conversation?
13 **A. Twofold. It was that they are changing their**
14 **ICE national detention standards that they**
15 **must abide by moving forward, and just**
16 **discussing the ins and outs of that and if**
17 **there is anything that we need to change on**
18 **our end related to that. And then ongoing**
19 **conversations regarding our pursuit of**
20 **accreditation by the NCCHC, similar topics**
21 **with that.**
22 Q. And what is the NCCHC?
23 **A. National Commission on Correctional Health**
24 **Care.**
25 Q. And MEnD is in the process of seeking that

**Page 14**

1  accreditation?
2  **A. Well, it's technically Sherburne County Jail,**
3  **we are assisting in that pursuit.**
4  Q. Did Mr. Carr discuss at all with you your
5  personal presence at the Sherburne County
6  facility as part of MEnD staffing?
7  **A. I don't recall that.**
11 Q. And my understanding is that there was a
12 recent resignation of the medical provider at
13 the Sherburne County Jail?
14 **A. Oh, the primary medical provider there,**
15 **Janell Hussain?**
16 Q. Correct.
17 **A. Yes. Fairly recently.**
18 Q. Was that a resignation or a termination?
19 **A. Resignation.**
20 Q. Was she given the opportunity to resign prior
21 to termination?
22 **A. No.**
23 Q. So it was wholly voluntary that she resigned?
24 **A. Wholly voluntary.**

**Page 15**

3  Q. Aside from talking to employees along the
4  way, conversations with your attorneys, and
5  the review of deposition transcripts, you had
6  said you also reviewed many documents?
7  **A. Mm-hum.**
8  Q. Yes?
9  **A. Yes.**
10 Q. Do you recall what documents those were?
11 **A. Oh, my goodness. I wouldn't have an**
12 **exhaustive list but medical records,**
13 **exhibits. I wouldn't have an exhaustive list**
14 **in my mind right now.**
15 Q. Did you review medical records for inmates
16 other than Dylan Brenner who committed
17 suicide at Sherburne County Jail?
18 **A. Yes.**
19 Q. Anything else that you would have done to
20 prepare for today's deposition?
21 **A. I guess I would need to know a little more**
22 **specifically what you are asking. I mean, I**
23 **prepared.**
24 Q. Okay. We can talk on an individual basis
25 related to the topics. So topic number one,

**Page 16**

1  MEnD's corporate structure from January 1,
2  2010 through the present, are you prepared to
3  provide testimony on that topic?
4  **A. I am.**
5  Q. Did you have to review anything to prepare
6  testimony on that topic?
7  **A. I reviewed our organizational chart but I'm**
8  **fairly familiar with our structure.**
9  Q. In terms of ownership structure, the company
10 is founded as a Professional Limited
11 Liability Company?
12 **A. It wasn't originally founded as that, we**
13 **achieved that along the way. But it was an**
14 **LCC and then became a PLLC.**
15 Q. And have you always been the sole member or
16 owner?
17 **A. Yes. So MEnD Correctional Care solely owned**
18 **by Dr. Todd Leonard Consulting, LLC, and I'm**
19 **the sole owner. And that has been the**
20 **ownership the entire decade.**
21 Q. When did you form Todd Leonard Consulting?
22 **A. I wouldn't be able to give you an exact date.**
23 **It would have been 2006 or 2007, in that time**
24 **frame.**
25 Q. Was that a consulting business formed for the

Page 17

1  purpose of providing correctional health
2  care?
3  A. **It was formed for my individual capacity in**
4  **providing correctional health care.**
5  Q. And you were and remain the only member of
6  Todd Leonard Consulting?
7  A. **Correct.**
8  Q. And Todd Leonard Consulting is the only
9  member or owner of MEnD Correctional Care,
10  PLLC?
11  A. **Correct.**
12  Q. Are there any other employees who receive
13  payment at MEnD that correlates with MEnD's
14  annual revenues or profits?
15  A. **I'm not sure I'm following. I'm sorry.**
16  Q. So I recognize that you are the only owner,
17  but are there any other employees at MEnD who
18  receive either bonuses or some other income
19  that correlates with MEnD's revenue or
20  profits?
21  A. **I think I know what you are asking. So**
22  **beyond salary. Okay. Most years I've been**
23  **able to give a year-end bonus to my**
24  **leadership team. Not every year but most**
25  **years.**

Page 18

1  Q. Is that a discretionary bonus?
2  A. **It is.**
3  Q. So is there anyone who has, like, a formula,
4  if MEnD hits this achievement or that
5  achievement they automatically get some
6  additional payment?
7  A. **No.**
8  Q. And who constitutes MEnD's leadership team?
9  A. **Myself, our HR director.**
10  Q. Which would be?
11  A. **Julie Nowacki. Our business office manager,**
12  **Traci Newman; director of nursing, Michelle**
13  **Skroch; training director, which is currently**
14  **Miranda Habiger; our mental health director,**
15  **Linda Pantzke; and our team of nursing**
16  **directors.**
17  Q. And who is that team?
18  A. **Do you want me to go through each individual**
19  **one?**
20  Q. Yes, please.
21  A. **Okay. Currently we have Tara Giller, Crystal**
22  **Peterson, Jim Sweeney, Corey Campen, Dean**
23  **Wilson, Diana VanDerBeek, Collin Johnson,**
24  **Tiffany Baxter, Sheree Drummer, Julie**
25  **Torreri. I believe that is the list.**

Page 19

1  Q. Diana VanDerBeek was in 2017, and is today,
2  the nursing director at Sherburne County?
3  A. **Correct.**
4  Q. And I assume that some of these nursing
5  directors might cover more than one jail for
6  you?
7  A. **Correct.**
8  Q. But Diana VanDerBeek is limited just to
9  Sherburne County?
10  A. **Correct.**
11  Q. Is that your largest jail that you service at
12  MEnD?
13  A. **At the present time, no.**
14  Q. Who would be larger?
15  A. **Racine County Jail. It can depend on the**
16  **month but in general Racine County Jail is**
17  **slightly larger.**
18  Q. Based primarily upon federal inmates?
19  A. **On average daily population.**
20  Q. Is that influenced by federal inmates?
21  A. **At Racine?**
22  Q. Yes.
23  A. **No.**
24  Q. And your ownership structure in terms of
25  Dr. Todd Leonard Consulting, LLC being the

Page 20

1  only member of MEnD -- actually, let me take
2  a step back.
3  MEnD Correctional Care, PLLC, is that
4  the same entity that provides correctional
5  care to all the facilities that MEnD provides
6  work for including those outside of
7  Minnesota?
8  A. **Correct.**
9  Q. Do you have -- does Todd Leonard Consulting,
10  LLC have ownership in any other correctional
11  entities?
12  A. **No.**
13  Q. Does MEnD have any ownership in any other
14  correctional entities?
15  A. **No.**
16  Q. Do you have any sort of board for MEnD?
17  A. **No. I mean, we have annual meetings with my**
18  **legal counsel at Fredrikson and Byron but we**
19  **don't have a formal board at this time.**
20  Q. Who is your legal counsel at Fredrikson?
21  A. **It's a team but it's led by Eric Madson.**
22  Q. And so neither of those -- in terms of
23  ownership of copyrights, that all belongs to
24  MEnD Correctional Care, PLLC?
25  A. **Correct.**

Page 21

1 Q. And does MEnD Correctional Care, PLLC own any
2   patents?
3 A. No.
4 Q. Any trademarks?
5 A. I don't believe so.
6 Q. Does MEnD Correctional Care copyright
7   anything other than its policy and procedure
8   manual?
9 A. And certain forms.
10 Q. But there is no outside advisory board for
11   MEnD?
12 A. No.
13 Q. Let me just hand this to you, let you keep
14   this so we don't have to keep handing it back
15   and forth.
16 A. Fair enough.
17 Q. If you could turn to Exhibit 26, please.
18 A. Okay.
19 Q. Now, you are prepared today to provide
20   testimony regarding topic number two, MEnD
21   supervising and reporting hierarchies?
22 A. Correct.
23 Q. And does Exhibit 26 accurately reflect those
24   supervising and reporting hierarchies?
25 A. This does from the past.  This has changed

Page 22

1   since then.
2 Q. Would this have been the correct
3   organizational chart from January 1, 2016,
4   through December 31, 2017?
5 A. Partially.
6 Q. Okay.  So when would --
7 A. Oh, I'm sorry.  It is correct.  I apologize.
8   It was just hard to read and I didn't spot
9   the training director position here so this
10   is correct from that time period.
11 Q. And president and chief medical officer, that
12   would be you?
13 A. Correct.
14 Q. And medical providers, would those
15   predominantly be nurse practitioners?
16 A. It would be medical doctor, physician
17   assistant, and nurse practitioners.
18 Q. From January 1, 2016, through December 31,
19   2017, were there medical doctors other than
20   yourself employed by MEnD?
21 A. Subcontracted by MEnD, yes.
22 Q. In Minnesota?
23 A. In Iowa.
24 Q. And who is your subcontractor in Iowa that's
25   a medical doctor?

Page 23

1 A. Dr. Steve Scurr.
2 Q. How do you spell his last name?
3 A. S-C-U-R-R.
4 Q. Did you have a medical doctor employed in
5   Wisconsin?
6 A. No.  We had our medical provider team that we
7   use so --
8 Q. Which would have been either nurse
9   practitioners or PAs?
10 A. Correct.
11 Q. And then did you provide care in Illinois at
12   some point as well?
13 A. We began providing health care in Rock Island
14   County Jail in Illinois, and that officially
15   was January 1st of 2018.
16 Q. Are you still providing that care?
17 A. Correct.
18 Q. Is that the only facility in Illinois?
19 A. Correct.
20 Q. And is there a medical doctor that you
21   subcontract with in Illinois?
22 A. There is a physician assistant.
23 Q. So in Minnesota from January 1, 2016, through
24   December 31, 2017, you would have been the
25   only medical doctor providing service on

Page 24

1   behalf of MEnD in Minnesota?
2 A. I don't view it that way.  I view it as we
3   have a team of medical providers, all are
4   independently licensed and able to provide
5   care.  So I guess I don't categorize it that
6   way.
7 Q. Well, medical doctor is a very distinct term,
8   correct?
9 A. It's an individual term of a medical
10   provider, certainly.
11 Q. Well, an MD is a degree you had to obtain?
12 A. Correct.
13 Q. And a nurse practitioner can't call herself
14   an MD?
15 A. No.  She can call herself a nurse
16   practitioner and she's able to independently
17   provide care just as you would if you went to
18   your local family medicine clinic.  Most
19   people often see nurse practitioners,
20   physician assistants.
21 Q. So I understand how you are answering my
22   question, but I want to make sure I get an
23   answer to my question.  You were the only
24   medical doctor providing service on behalf of
25   MEnD in Minnesota from January 1, 2016,

Page 25

1  through December 31, 2017?
2  **A. With that particular title, correct.**
3  Q. Did you attempt to hire any medical doctors
4  to work on behalf of MEnD between January 1,
5  2016, and December 31, 2017?
6  **A. I don't recall specific dates but we have**
7  **been recruiting the corporate medical**
8  **director, which would be another medical**
9  **doctor, a physician, to work with us. I just**
10 **don't recall when those efforts began.**
11 Q. With respect to medical providers at
12 individual jails, though, your job postings
13 have not been for the hiring of medical
14 doctors, have they?
15 **A. I don't recall. I know that we've had**
16 **advertisements, or whatever you would call**
17 **it, posted that have involved physicians**
18 **assistants and nurse practitioners, I just**
19 **don't recall if we've had postings that have**
20 **involved medical doctors or not.**
21 Q. Do you get involved in the interviewing
22 process on behalf of MEnD for the medical
23 providers?
24 **A. Yes.**
25 Q. Are you aware of personally interviewing a

Page 26

1  medical doctor for the position of medical
2  provider at any jail in Minnesota?
3  **A. I don't recall if I've interviewed anyone for**
4  **that particular position or not. I have**
5  **interviewed for a corporate medical director,**
6  **but I don't recall if I've interviewed a**
7  **medical doctor for any other position or not.**
8  Q. Has a medical doctor, other than yourself --
9  and let me take a step back.
10     Are you an employee of MEnD as well?
11 **A. I don't take my salary from MEnD Correctional**
12 **Care, I take it from Dr. Todd Leonard**
13 **Consulting. But I am, you know, an employee**
14 **of the company in that spirit so --**
15 Q. Has MEnD ever employed, not subcontracted
16 with, ever employed another medical doctor
17 other than yourself?
18 **A. That particular title? No.**
19 Q. And why is it that MEnD does not employ any
20 other medical doctors other than yourself?
21 **A. It's very standard in our industry to use**
22 **physicians assistants and nurse practitioners**
23 **in the way that we do. Other than that,**
24 **there is no particular reason. I will say,**
25 **though, that corporate medical director**

Page 27

1  **position that we're recruiting for now, that**
2  **would need to be a physician medical doctor,**
3  **that would have to be a requirement.**
4  Q. What is your understanding of why it is in
5  your field that those positions are typically
6  filled by nurse practitioners and PAs as
7  opposed to medical doctors?
8  **A. I think there is multiple factors. There is**
9  **more of a labor pool of those positions, they**
10 **are effective positions that provide good**
11 **care, they are very cost effective, I think**
12 **they've been successful over a track record**
13 **of years for multiple companies in this**
14 **industry, it's industry standard so --**
15 Q. You would expect that you'd have to pay a
16 medical doctor more than a nurse practitioner
17 or a PA to fill those roles?
18 **A. I would assume so.**
19 Q. Turn back to the deposition notice.
20 **A. Okay.**
21 Q. And, actually, let me just ask you this
22 first, did you review this organizational
23 chart, Exhibit 26, in preparation for today's
24 deposition?
25 **A. I did.**

Page 28

1  Q. Were there any other documents that you
2  reviewed in preparation for providing
3  testimony regarding the organization
4  structure that you can recall?
5  **A. I don't recall specific documents offhand.**
6  **There may have been certain documents that**
7  **pertain to this, I just don't recall**
8  **specifics. I'm not certain.**
9  Q. For topic number three, for the time period
10 of January 1, 2016, through December 31,
11 2017, we had asked for a witness to be
12 provided to provide testimony regarding
13 MEnD's practices, policies, protocols,
14 training, and the like, regarding what
15 medical care nurses and health technicians
16 can provide to patients without approval from
17 a medical provider or supervisor, and
18 information on how and when the nurses and
19 health technicians at Sherburne County Jail
20 obtain medical provider or other supervisor
21 approval. Are you prepared to provide
22 testimony regarding topic number three?
23 **A. I am.**
24 Q. Are there documents that you reviewed in
25 preparation for providing testimony regarding

**Page 29**

1  topic number three?
2  A. I reviewed policies and protocols, although I
3  do that frequently. I reviewed some of our
4  training curriculum and documents. This is
5  not an exhaustive list, it's off the top of
6  my head. I reviewed some of the staff
7  meeting agendas from Sherburne County Jail.
8  Those are the ones off the top of my head
9  that I can recall.
10 Q. And with you serving as the president and
11 chief medical officer, what do your duties
12 consist of with respect specifically to
13 Sherburne County?
14 A. It's multifold. This will not be an
15 exhaustive list, this will be off the top of
16 my head. I supervise the primary medical
17 provider there, I provide consultation and
18 discussion and direction to any staff who
19 asks for it and needs it, I frequently talk
20 with my primary medical provider there, I
21 have conversations and meetings with
22 correctional staff, jail administration,
23 Sherburne County sheriff, I've met with
24 Sherburne County judges, public defenders,
25 I've assisted in training activities over

**Page 30**

1  time, I've provided direct medical care to
2  patients there, I've had meetings with a
3  pharmaceutical vendor. That's what I can
4  think of off the top of my head.
5  Q. You are, as the president and chief medical
6  officer, you are the final policy making
7  authority there?
8  A. Yeah. I mean, everything that we do when it
9  comes to crafting, honing, fine tuning
10 policies, protocols, procedures, everything,
11 it's very much a team effort. I get input
12 and advice and recommendations from all stake
13 holders. At the end of the day I'm the veto
14 authority. But it's always been a team
15 effort from day one.
16 Q. But as the veto authority, the ultimate
17 responsibility and authority rests with you
18 to either approve or deny the enforcement of
19 policy?
20 A. I approve policy and protocols and the
21 enforcement of those is the responsibility of
22 all of us in supervisory roles.
23 Q. And you are in a supervisory role as a
24 medical doctor at the Sherburne County Jail?
25 A. I'm in a supervisory role directly with my

**Page 31**

1  primary medical provider there. That's my
2  direct supervision in that capacity.
3  Q. And that was the case in 2016 and 2017?
4  A. Correct.
5  Q. And in 2017, particularly in October of 2017,
6  Janell Hussain was the medical provider
7  there?
8  A. The primary medical provider there.
9  Q. And she was a nurse practitioner?
10 A. Correct.
11 Q. And she required supervision by you as a
12 medical doctor; is that correct?
13 A. You are required to have a collaborative
14 agreement, but she's able to, in the scope of
15 her license, to work independently.
16 Q. But you had a collaborative agreement with
17 her?
18 A. Correct.
19 Q. So that means she was ultimately operating
20 under your license and supervision at
21 Sherburne County?
22 A. She was operating independently. What those
23 agreements are designed to say is if there is
24 a difference of opinion in the way a case,
25 that she agrees that she'll defer to me if we

**Page 32**

1  have a disagreement, that sort of thing.
2  There is more to those agreements than that
3  but --
4  Q. She would not have been able to operate at
5  Sherburne County independently without that
6  collaborative agreement with you, correct?
7  A. She needs to have a physician that is
8  partnered with her. So she can operate day
9  to day independently, but at the end of the
10 day she does need to have that partnership.
11 Q. That was always you at the Sherburne County
12 Jail?
13 A. With Janell Hussain, correct.
14 Q. And what would you do to supervise Janell
15 Hussain?
16 A. Oh, goodness. I would be largely involved in
17 her training, I would be involved in frequent
18 consultation and discussion of cases, I would
19 see particular patients with her if requested
20 or necessary, I would give her frequent
21 feedback and constructive criticism. That's
22 just off the top of my head.
23 Q. Would you review her patient files on a
24 regular basis?
25 A. I would do random chart reviews, and then we

BRENNER vs.
MEnD CORRECTIONAL CARE, et al.

TODD LEONARD
July 8, 2020

---

**Page 33**

1 also had an external physician do periodic
2 chart reviews as well.
3 Q. Was that someone employed by MEnD or
4 Sherburne County?
5 A. Neither.
6 Q. It was a subcontractor?
7 A. It was a medical doctor, a physician, from I
8 believe he's with North Memorial system that
9 would do formal reviews as well.
10 Q. Was that physician retained by you or
11 retained by Sherburne County?
12 A. He's paid by Sherburne County Jail.
13 Q. If MEnD is providing care there, why would
14 that independent physician need to come and
15 do reviews as well?
16 A. He didn't need to, we chose to.
17 Q. You did, MEnD was involved in that?
18 A. A collaborative decision with Sherburne
19 County Jail administration and the sheriff.
20 Q. Who is that physician?
21 A. Which physician?
22 Q. The physician that would come and review the
23 files independently?
24 A. Oh, his name?
25 Q. Yes.

**Page 34**

1 A. Steve Nerheim.
2 Q. How often would he review files?
3 A. At a minimum every six months.
4 Q. And how often would you go to Sherburne
5 County to personally review files?
6 A. It varied.  It was a minimum of every three
7 months I would do random reviews.  It just
8 varied.
9 Q. And you would personally go to Sherburne
10 County to do those reviews?
11 A. It could be either in person or reviewing the
12 EMR system online.
13 Q. Electronic medical record?
14 A. Correct.  It could be either/or.
15 Q. How often in 2017 were you providing direct
16 medical care to patients at the Sherburne
17 County Jail?
18 A. I don't know if I could give you an accurate
19 answer from back then.
20 Q. Can you say for a fact that in the year 2017
21 you went and provided direct medical care?
22 A. Yes.
23 Q. Would you review and approve medical records
24 at the Sherburne County Jail in 2017?
25 A. I would have to know what you mean by medical

**Page 35**

1 records.
2 Q. On the eMD system there are medical records
3 that reflect that they were supervised by
4 you, Dr. Leonard, so were you actually
5 supervising and reviewing and approving chart
6 notes?
7 A. At times.
8 Q. And would that be more likely if you were on
9 call or was it random?
10 A. No, it would have been if I was on site or
11 cross covering.
12 Q. And if there was testimony that during that
13 period of time that at most you might have
14 been to the Sherburne County Jail quarterly,
15 would you disagree with that testimony?
16 A. I would disagree with that testimony.
17 Q. So you believe you were there more than
18 quarterly in 2017?
19 A. Yes.
20 Q. Seeing patients or engaging in other
21 activities?
22 A. All of the above.
23 Q. Now, you have a policy and procedure manual
24 that was put in place -- well, that was in
25 place in 2017 at the Sherburne County Jail?

**Page 36**

1 A. Correct.
2      MR. STORMS: Mark this as 104,
3 please.
4      (Exhibit Number 104 was
5 marked for identification.)
6 BY MR. STORMS:
7 Q. I'm going to hand you what's been marked as
8 Exhibit 104.  Does this reflect the title
9 page of your policy and procedure manual that
10 would have been in place in 2017?
11 A. This would have been the title page for the
12 policy manual.
13 Q. And that shows you signing off as the
14 responsible health authority?
15 A. Correct.
16 Q. And Michelle Skruch signed --
17 A. Skroch.
18 Q. Michelle Skroch signs off as director of
19 nursing?
20 A. Correct.
21 Q. And the second page reflects an index of the
22 policies?
23 A. Correct.
24 Q. Were there other -- aside from what was in
25 this policy and practice manual, were there

---

Page 37

1    other written policies in place for MEnD at
2    the Sherburne County Jail aside from this
3    manual?
4  **A. Written policies, no.**
5  Q. Would this policy reflect all standing orders
6    that would have been in place at the
7    Sherburne County Jail in 2017?
8  **A. I'm not sure what you mean by standing orders**
9  **but I don't believe so.**
10 Q. You don't believe that this would reflect all
11   standing orders?
12 **A. The policy manual?**
13 Q. Yes.
14 **A. No.**
15 Q. Do you know what a standing order is?
16 **A. Yes.**
17 Q. What is your understanding of a standing
18   order?
19 **A. My understanding of a standing order would be**
20 **an order that -- I'll give you an example.**
21 **There are treatment centers like Vineland**
22 **Treatment Center and they have a list of**
23 **standing orders that any resident or**
24 **treatment center can have without need for**
25 **encounters or of the like. That's my**

Page 38

1   **definition.**
2  Q. And did you, in 2017, did you personally
3    issue standing orders that were in place at
4    the Sherburne County Jail?
5  **A. Standing orders in that definition, no.**
6  Q. Standing orders under some different
7    definition?
8  **A. No. I wouldn't call them standing orders,**
9  **that's my point.**
10 Q. What would you call them?
11 **A. We have conditions specific protocols.**
12 Q. And are those reflected in writing?
13 **A. They are in the protocol manual.**
14 Q. And the protocol manual is different than the
15   policy manual?
16 **A. Correct.**
17 Q. And are you the final or the responsibility
18   authority for the items reflected in the
19   protocol manual?
20 **A. Again, going back to our previous**
21 **conversation, I ultimately approved them**
22 **along with my director of nursing, but the**
23 **crafting and fine tuning of all of those is a**
24 **team effort.**
25 Q. So you have the policy manual and the

Page 39

1    protocol manual, are there any other specific
2    writings created by MEnD that has the force
3    of a policy or protocol or practice at MEnD?
4  **A. Oh, my goodness, I don't know how to answer**
5  **that. I apologize. I'm not sure how to**
6  **answer that.**
7  Q. Well, do you issue any other manuals?
8  **A. No other policy or protocol manuals. We have**
9  **our trainings that we provide that give**
10 **direction, so I would consider that a**
11 **writing. We have competencies, those are the**
12 **other things off the top of my head that I**
13 **can think of that would be writings that**
14 **would assist in directing medical staff in**
15 **their duties.**
16 Q. What is a competency?
17 **A. Competency is a part of individual positions**
18 **trainings initially on hire, or if ever**
19 **needed in the future. It just provides proof**
20 **that a person in a particular position has**
21 **proven mastery of a certain task or duty or**
22 **skill.**
23 Q. So that's more a value, that's not
24   necessarily given as a policy or a practice
25   or protocol to be followed, am I

Page 40

1    understanding that correctly?
2  **A. Again, this is difficult to answer because**
3  **you have to demonstrate mastery of these**
4  **competencies to performing your duties**
5  **independently in your position in our**
6  **company. So I'm just not sure how to answer**
7  **that question.**
8  Q. Are the policy and protocol manuals made
9    available for review of the staff at all
10   times?
11 **A. They are always available within each**
12 **individual clinic, and most of our nursing**
13 **staff have their own copy.**
14 Q. Electronic, hard copy, or both?
15 **A. It's available both ways.**
16 Q. Is there aside from the policy or protocol
17   manuals that are available in hard copy, are
18   there other hard copy reference materials
19   that are typically available for your staff
20   to review in order to assist them in
21   performing their duties?
22 **A. That's a pretty broad question. Is there any**
23 **way you can make it more specific for me?**
24 Q. Like do you keep a mini library? For
25   example, I have some rule books sitting up

Page 41

1     above my desk.
2 **A. There is certain hard copy reference books**
3     **and then some people have their own apps.**
4     **There is also online references, and**
5     **depending on your position you would use some**
6     **of those, all of those. So it's a difficult**
7     **question to answer, it's very broad.**
8 Q.  Who participates in drafting at MEnD the
9     policy manual?
10 **A. Well, anyone that has a stake in the**
11     **day-to-day care of our staff can be involved,**
12     **and that includes correctional staff, jail**
13     **administrators, you name it. And anyone from**
14     **our company can provide suggestions,**
15     **requests, feedback throughout the year. So**
16     **it really is a team effort. And then taking**
17     **all of that information and trying to put it**
18     **on paper, that's generally the leadership**
19     **team that will, you know, sort of put pen to**
20     **paper, ink to paper, whatever you want to**
21     **call it.**
22 Q.  Are you involved in putting pen to paper for
23     the policy manual?
24 **A. Correct.**
25 Q.  So you'll make edits yourself?

Page 42

1 **A. Correct.**
2 Q.  What third party documents, meaning documents
3     not created by MEnD, do you review in the
4     process of creating the policy or protocol
5     manual?
6 **A. Again, that's a broad question because it can**
7     **be from any legitimate source that enters**
8     **into my consciousness for providing medical**
9     **care. So, I mean --**
10 Q.  Well, are there certain standards in
11     particular that you review for the providing
12     of correctional medical care?
13 **A. I review all sorts of standards from primary**
14     **care in general, American Correctional**
15     **Association, immigration standards, National**
16     **Commission Correctional Health Care**
17     **standards. I review a lot of material, as**
18     **does my staff, in trying to, again, hone what**
19     **we do.**
20 Q.  Are there model policies that you reviewed in
21     preparation for drafting your policy and
22     procedure policy manual?
23 **A. It would be the same list. It would be**
24     **whatever -- whatever we find that we feel is**
25     **helpful in drafting our ultimate policies and**

Page 43

1     **protocols that we use.**
2 Q.  So as you sit here today is there one
3     particular set of model policies that you
4     tend to review that you can name?
5 **A. Again, it's everything I just listed to you.**
6 Q.  Do you review the model policies and
7     protocols from the National Commission on
8     Correctional Health Care?
9 **A. Yes.**
10 Q.  And do you review the Minnesota State
11     statutes and regulations?
12 **A. At times, yes.**
13 Q.  In particular the DOT statutes and
14     regulations?
15 **A. Correct.**
16 Q.  Are there accreditations that MEnD holds?
17 **A. As a company?**
18 Q.  Yes.
19 **A. Other than PLLC as a company? I can't think**
20     **of any other accreditations that the company**
21     **holds.**
22 Q.  You assist some of the jails in obtaining
23     accreditation?
24 **A. Our first jail that we've achieved a national**
25     **accreditation with is Sherburne County.**

Page 44

1 Q.  When did you obtain that?
2 **A. I believe that was 2018.**
3 Q.  What was the accreditation?
4 **A. American Correctional Association.**
5 Q.  And you have that accreditation today?
6 **A. Correct.**
7 Q.  Or Sherburne County does?
8 **A. I probably should have delineated that.**
9     **Sorry.**
10 Q.  So should I have. Okay. Is that the only
11     national accreditation that's been obtained
12     by a jail where MEnD provides the care, that
13     you know of?
14 **A. Correct.**
15 Q.  And you assisted Sherburne County in
16     obtaining that accreditation?
17 **A. Correct.**
18 Q.  And does that accreditation need to be
19     renewed?
20 **A. Yes.**
21 Q.  How often?
22 **A. I believe it's every three years, but I'm not**
23     **certain.**
24 Q.  Have you assisted any jail in attempting to
25     gain accreditation where the jail was

BRENNER vs.
MEnD CORRECTIONAL CARE, et al.

TODD LEONARD
July 8, 2020

Page 45

1 unsuccessful in obtaining the accreditation?
2 **A. No.**
3 Q. In your supervisory capacity as a medical
4 doctor with respect to Janell Hussain, do you
5 review the State statutes with respect to
6 scope of practice?
7 **A. I can't remember the last time I've reviewed**
8 **them but I'm sure I have.**
9 Q. What is your understanding of the scope of
10 practice differences between yourself and
11 Janell Hussain?
12 **A. Again, that's a very broad question. From**
13 **day in day out activities of providing direct**
14 **patient care, it's minimal at best.**
15 Q. Any specific differences in the legal scope
16 of practice that you are aware of between
17 yourself and Janell Hussain?
18     MR. NOVAK: I object to the form,
19     calls for a legal conclusion. You can
20     go ahead.
21     THE WITNESS: Off the top of my
22     head I don't have those committed to
23     memory. There are certain endeavors
24     that I can think of where it requires a
25     physician's statement, such as an

Page 46

1 examiner's statement. I'm just not
2 recalling off the top of my head.
3 **BY MR. STORMS:**
4 Q. What is an examiner's statement?
5 **A. It's basically when you have a patient that**
6 **you have to put an emergency hold on.**
7 Q. And you employ nurse practitioners but also
8 employ registered nurses?
9 **A. Correct.**
10 Q. What is your understanding -- and do you
11 supervise registered nurses?
12 **A. I don't directly supervise them.**
13 Q. Are they in some fashion supervised by you --
14 or I'm sorry. Do they in some fashion need
15 to be supervised by you in order to provide
16 the work at Sherburne County Jail?
17 **A. I'm not required to. But I am -- I'm always**
18 **available to assist our leadership staff**
19 **wherever necessary wherever I need to be**
20 **involved. But day in and day out, typical**
21 **supervision is provided by our leadership**
22 **team.**
23 Q. The nurses that provide work at Sherburne
24 County would not be able to work at Sherburne
25 County if there were not a medical doctor

Page 47

1 whose license was attached to providing the
2 service at -- or medical service at that
3 jail?
4 **A. Yeah. That's true of any medical facility.**
5 **So we're no different.**
6 Q. So every medical facility that MEnD provides
7 treatment to in Minnesota relies upon your
8 license?
9 **A. Technically, yes. You have to have that.**
10 **Operationally it's much more extensive than**
11 **that.**
12 Q. Are all of the inmates at each of the jails
13 that MEnD provides services to technically
14 your patient?
15 **A. Do you mind repeating that? I'm sorry.**
16 Q. Are all of the inmates or detainees at all of
17 the jails that MEnD provides services to, are
18 they all technically your patients?
19 **A. No. They are all of our patients. All of**
20 **our medical providers have their own**
21 **patients. All of our medical providers are**
22 **primarily assigned to particular facilities.**
23 **And so that's how it's broken down.**
24 Q. So in 2017 were the detainees at Sherburne
25 County Jail -- or sorry. In 2017 were the

Page 48

1 detainees and inmates at Sherburne County
2 Jail your patients?
3 **A. They were not my direct patients. They were**
4 **primarily Janell Hussain's patients. But**
5 **again, whenever medical providers or myself**
6 **from our team were needed to assist her, then**
7 **we would. So primarily she is assigned to**
8 **that facility.**
9 Q. But Janell Hussain couldn't have those
10 patients were it not for the collaborative
11 agreement with you?
12 **A. Yep.**
13     MR. NOVAK: I object to form.
14     THE WITNESS: She needs to have
15     that relationship with me to provide her
16     independent care that she provides each
17     day.
18 **BY MR. STORMS:**
19 Q. But as you understand it, the care that she's
20 providing each day, those individuals she's
21 providing care to are not necessarily your
22 patients?
23 **A. They are not my direct patients, they are**
24 **assigned to her. Just like, again, any other**
25 **clinic, clinical practice you would have,**

Page 49

1    where a nurse practitioner or a physicians
2    assistant works in that capacity.
3  Q. I understand you are saying direct patients,
4    are they indirectly your patients?
5  A. No. I'm literally saying they are directly
6    assigned to her and I have my roles and
7    responsibilities and she has hers.
8  Q. Okay. So they are not your patients?
9  A. I guess I don't know how to answer that. I
10   would say all the patients in Sherburne
11   County are her patients, I just have my roles
12   and responsibilities in assuring that her and
13   I have the proper relationship and do my due
14   diligence and duties working with her.
15 Q. I understand that. I would understand this
16   to be a yes or no question. Either those
17   inmates she's working with are your patients
18   or they are not at Sherburne County Jail.
19       MR. NOVAK: Is there a question
20   pending?
21 BY MR. STORMS:
22 Q. It's a yes or -- I'm looking for an answer to
23   my question. Are those patients at Sherburne
24   County Jail or not?
25       MR. NOVAK: Asked and answered. Go

Page 50

1    ahead.
2        THE WITNESS: I'm not sure how to
3    answer that because I'm just not sure
4    what you are trying to ask me in regards
5    to those patients. I mean --
6  BY MR. STORMS:
7  Q. I'm asking if they are your patients?
8  A. I don't know how to answer that question.
9    I'm not primarily responsible for their
10   day-to-day care, she is. I'm responsible for
11   my duties as her supervisor. Again, just
12   like you would have on any other facility
13   where a nurse practitioner provided care.
14 Q. As a lawyer I have to know who my clients
15   are, right? I can tell you who my clients
16   are. So are you telling me you don't know if
17   these are your patients or not?
18       MR. NOVAK: Asked and answered. I
19   counted about four.
20       THE WITNESS: I guess at the end of
21   the day I would look at it this way,
22   these patients are assigned to MEnD
23   Correctional Care. So in some essence
24   they are my patients as well. But the
25   primary responsibility of caring for

Page 51

1    these patients would lie -- in Sherburne
2    County would lie with Janell Hussain.
3    With obviously assistance and any help
4    that she required to do so.
5  BY MR. STORMS:
6  Q. Now, does that primary responsibility rest
7    with her when she's off duty?
8  A. When she's off duty it depends on when you
9    are talking about. So I would need to know
10   more of what you mean by that.
11 Q. So, for example, if she's off duty and not on
12   call, somebody else is the on-call provider?
13 A. Correct. Then there is on-call rotation.
14   And whoever is assigned for that period of
15   time on call is responsible to assist our
16   team in caring for those patients. And
17   that's the assistance I was talking about.
18   They are primarily assigned to her, but when
19   she needs assistance from our team that's
20   what we provide.
21 Q. And now you have nurse practitioners but you
22   also have registered nurses who work under
23   your license at MEnD?
24 A. They ultimately work under my license in
25   that, as we discussed earlier, my license is

Page 52

1    required to have these facilities
2    operational, they work under the supervision
3    of their team.
4  Q. What is the difference in the scope of
5    practice between a nurse and a nurse
6    practitioner?
7  A. That's a broad question. Is there something
8    specific you are asking or looking for?
9  Q. Yeah. Can you tell me specifically what
10   things a nurse practitioner can do that a
11   nurse, a registered nurse, cannot?
12 A. I can give you a couple of examples.
13 Q. Please.
14 A. Nurses can't prescribe medication on their
15   own, nurses have to stay within the scope of
16   their care or have a protocol to use or a
17   known procedure to use.
18 Q. What does that mean, stay within the scope of
19   their care?
20 A. Just in the scope of their licensure as a
21   nurse.
22 Q. And aside from the prescription of
23   medication, is there any way that scope
24   differs from a nurse practitioner?
25 A. Other than what? I'm sorry.

Page 53

1 Q. The ability to prescribe medication.
2 A. **They are not able to formally diagnose. I**
3    **mean, those are the two biggest factors. Are**
4    **there other things? Certainly. I mean,**
5    **those are the first two examples off the top**
6    **of my head.**
7 Q. In terms of treating patients, there is a
8    difference between nurse interventions and
9    medical interventions?
10 A. **I don't characterize them that way. Medical**
11    **interventions is a broad term so there is**
12    **plenty of nursing interventions that, in my**
13    **mind, would be categorized as medical**
14    **interventions.**
15 Q. Have you ever reviewed the Minnesota State
16    statutes with respect to scope of practice?
17 A. **Again, I have. I can't tell you when the**
18    **last time I would have done that would have**
19    **been and in what area I would have reviewed.**
20 Q. Is that not part of something that you review
21    annually when you are doing a policy and
22    procedure manual?
23 A. **There is no mandate that says we have to**
24    **review those annually. It's ongoing when I**
25    **get notifications of changes, things of that**

Page 54

1    nature. It's periodic, I can't tell you if
2    it's annually.
3 Q. Is drug withdrawal a diagnosis?
4 A. **Drug withdrawal would be a condition, there**
5    **is more specific diagnoses that would be**
6    **assigned to a condition like that.**
7 Q. So is that a diagnosis or not a diagnosis?
8       MR. NOVAK: Objection, asked and
9    answered.
10       THE WITNESS: It can be but it
11    doesn't have to be.
12   BY MR. STORMS:
13 Q. And if a patient is suffering from drug
14    withdrawal, is that something that a -- or
15    I'm sorry, if the patient is identified as
16    having a drug withdrawal, is that something a
17    registered nurse can treat on her own without
18    supervision by a medical provider?
19 A. **If she has protocols that allow her to**
20    **provide certain services and care, she can**
21    **provide within the scope of those protocols.**
22 Q. And MEnD has protocols that address drug
23    withdrawal?
24 A. **Correct.**
25 Q. Does MEnD have a specific drug protocol on

Page 55

1    PCP?
2 A. **Specifically to PCP? No.**
3 Q. Is the training at MEnD that PCP is a drug
4    that individuals do not suffer from drug
5    withdrawal on?
6 A. **I wouldn't categorize it that way.**
7 Q. Should a nurse or a medical provider be
8    concerned about someone who tested positive
9    for PCP with respect to drug withdrawal?
10       MR. NOVAK: I object to the form,
11    incomplete hypothetical.
12       THE WITNESS: It would have to
13    depend on the patient but in general PCP
14    withdrawal is a minor event on the scope
15    of drugs that we deal with that a person
16    could suffer from withdrawal.
17   BY MR. STORMS:
18 Q. The effects of PCP can be significant?
19       MR. NOVAK: Form.
20       THE WITNESS: They can be. It just
21    depends on the patient and the usage and
22    situation.
23       MR. STORMS: Can we go off the
24    record?
25       (A break was taken.)

Page 56

1   BY MR. STORMS:
2 Q. So with respect to withdrawal, drug
3    withdrawal, as to the nurses, the nurses have
4    a protocol that's akin to a standing order
5    that they can refer to?
6 A. **It's not a standing order but they do have a**
7    **protocol that they can use for care of those**
8    **patients.**
9 Q. What is it that technically distinguishes the
10    protocol from a standing order?
11 A. **I mentioned this earlier, my definition of a**
12    **standing order is an order that allows a**
13    **patient to have whatever treatment is on that**
14    **standing order without medical intervention**
15    **from anybody. I just don't categorize the**
16    **two the same.**
17 Q. But through the protocol is the nurse given
18    discretion how to treat a patient suffering
19    from drug withdrawal?
20 A. **They are given parameters on certain tasks**
21    **and things that they can do. I will tell you**
22    **that most of the time if there is a patient**
23    **who is exhibiting significant chemical**
24    **withdrawal, there will be a medical provider**
25    **involved. Not always, but if there is**

Page 57

1 significant chemical withdrawal oftentimes a
2 medical provider will be involved.
3 Q. But it's the nurse's responsibility to get
4    that provider involved?
5 A. When necessary, correct.
6 Q. And the same would be true for suicide risk
7    assessment protocols?
8 A. What would be?  I'm sorry.
9 Q. So there is a suicide risk assessment
10   protocol as well in your protocol manual?
11 A. Correct.
12 Q. And it's contingent upon the nurse to make
13   the decision about whether or not a medical
14   provider needs to get involved?
15 A. They use the tools that they have at their
16   disposal to direct them in their tasks.
17 Q. What are those tools at their disposal?
18 A. Well, everything that you see within our
19   protocol, training, forms.  They all play a
20   part in that process.
21 Q. But the nurses are, with respect to suicide
22   screening, given discretion with respect to
23   whether or not to contact the medical
24   provider unless they meet a certain risk
25   assessment score; would that be true?

Page 58

1 A. I don't think I'd categorize it that way.
2    They have, again, the protocols and training
3    that show them critical levels in those steps
4    but they have the discretion, even when
5    someone doesn't meet those criteria, they
6    could call whenever they would like if they
7    have any concerns.
8 Q. But are they only required to contact a
9    medical provider if there is a total risk
10   assessment score that meets 36 points?
11 A. No, I mean, there is an entire protocol that
12   lists out what they are supposed to do,
13   that's one of the steps.
14 Q. And so it's your understanding that some of
15   those other protocols require contact of a
16   medical provider aside from the risk
17   assessment?
18 A. Anyplace within our protocols where it deems
19   a nurse must consult with a medical provider,
20   they should.
21      MR. STORMS: Will you mark that as
22   Exhibit 105?
23      (Exhibit Number 105 was
24      marked for identification.)
25

Page 59

1    BY MR. STORMS:
2 Q. Just with respect to reviewing your entire
3    policy and procedure manual, like other
4    documents we might read, sometimes you use
5    the word "must", sometime you use the word
6    "may", right?
7 A. Oh, within our manual?
8 Q. Correct.
9 A. There are times where those two words are
10   both used, correct.
11 Q. And "must" means what we would understand it
12   to mean in terms of plain language, it's
13   something the employee has to do?
14 A. What they are directed to do.
15 Q. "May" gives them discretion?
16 A. Correct.
17 Q. I'm handing you what's been marked as Exhibit
18   105.  Are you familiar with this document?
19 A. I am.
20 Q. And did you assist in creating this document?
21 A. Yes.
22 Q. Was there anyone else who assisted you in
23   creating this document?
24 A. I'm sure there was.  I'm sure it was a team
25   effort.

Page 60

1 Q. Was this a document that is truly original in
2    nature or did you use something else as to
3    base it off of?
4 A. It's a highbred of information that we have
5    found and information that we have created.
6 Q. And you felt like it was unique enough to
7    copyright it?
8 A. That was our opinion.
9 Q. And according to this document, a total of 36
10   points or more requires intervention; is that
11   true?
12 A. Yeah, it requires at minimum consultation
13   with medical provider.
14 Q. Are there any specific documents that you can
15   identify or documents, policies, practices
16   that you used or reviewed to help you create
17   this document?
18 A. I can't remember.  It's been quite a long
19   time.
20 Q. So just to make sure I understand this
21   clearly, in theory if somebody identified
22   that they were a plan in progress, that would
23   make them a high risk 10, correct?
24 A. What do you mean by plan in progress?
25 Q. For time?

Page 61

1  A.  **Got it.  Correct.**
2  Q.  And they could have, in terms of prior
3      attempts, they could have multiple serious
4      attempts and that would also be a 10?
5  A.  **If we're aware of multiple serious attempts,**
6      **that would give them a 10 score.**
7  Q.  And one of the ways MEnD could be aware of
8      that is through their own medical record
9      keeping?
10  A.  **It could be any source.  If we are aware of**
11      **multiple serious attempts and we're**
12      **reasonably certain of that fact, that's where**
13      **we'd get the information.**
14  Q.  Sure.  But one of the things that MEnD does
15      is maintain medical records for its inmates
16      or detainees for at least seven years,
17      correct?
18  A.  **Correct.**
19  Q.  And that's to provide continuity of care?
20  A.  **In part.  In part.**
21  Q.  What other reasons?
22  A.  **Regulated that we must.**
23  Q.  You understand that medical records, one of
24      the purposes of keeping them, is to provide
25      continuity of care and to have a medical

Page 62

1      history?
2  A.  **Oh, certainly.**
3  Q.  And then with respect to depression, someone
4      could have major depression and hopelessness
5      and that would be a 10 as well?
6  A.  **Again, if we deemed with reasonable certainty**
7      **that's what they have, then that's what we'd**
8      **score them as.**
9  Q.  So in theory someone could have a plan in
10      progress, multiple serious attempts, and
11      major depression and hopelessness, but then
12      be scored a zero on everything else, and this
13      risk screening form would not require a
14      mandatory report to a medical provider?
15          **MR. NOVAK:** I object to the form,
16      incomplete hypothetical, calls for
17      speculation.  Go ahead.
18          **THE WITNESS:** Yes, it has to be in
19      the context of an individual patient.
20      That hypothetical situation sounds
21      almost unattainable to me so -- I've
22      never seen that in medical practice,
23      somebody with that constellation of
24      scoring on this form.
25

Page 63

1      BY MR. STORMS:
2  Q.  Well, so but on this form, this form only
3      requires a total of 36 -- or it requires a
4      total of 36 to mandate an intervention,
5      correct?
6  A.  **A score of 36 demands intervention, you don't**
7      **need to have 36 to have intervention with a**
8      **patient.**
9  Q.  Okay.  So if somebody had three high risk
10      categories like that, even though this form
11      wouldn't require them, you would expect from
12      your practice that this patient's care would
13      be elevated to a provider or someone else?
14          **MR. NOVAK:** Form, same objections.
15          **THE WITNESS:** Again, what you
16      described as a hypothetical situation,
17      I've never seen.  So I would never even
18      expect to be in that situation in the
19      first place.  So if somebody had a score
20      less than 36, and the user still had
21      significant concerns about that patient,
22      they are absolutely allowed and
23      encouraged to reach out for any
24      assistance that they need.
25

Page 64

1      BY MR. STORMS:
2  Q.  Where does the number 36 come from?
3  A.  **I don't remember the specifics of the**
4      **conversation but it was an activity that we**
5      **undertook years ago with my team of a mental**
6      **health director just in determining what**
7      **would be a reasonable score that would still**
8      **be appropriate and reliable and usable.**
9  Q.  And these are performed by RNs?
10  A.  **They can be used by registered nurses or**
11      **higher.**
12  Q.  Based upon MEnD's typical practices, are they
13      typically performed by RNs?
14  A.  **I don't know if I'd use the word typically.**
15      **But they are often used by registered nurses.**
16  Q.  And an RN is not considered under Minnesota
17      law to be a qualified mental health provider,
18      correct?
19  A.  **Correct.**
20  Q.  And with respect to the time that you as a
21      medical doctor spend in clinic with patients
22      in Minnesota, it would be fair to
23      characterize that as 10 percent or less?
24  A.  **Direct face-to-face patient care?**
25  Q.  Yes.

Page 65

1 A. I think that's a fair assessment.
2 Q. Are there any counties in Minnesota where you
3     are thee medical provider for that jail?
4 A. The primary medical provider?
5 Q. Yes.
6 A. No.
7 Q. When is the last time you would have been a
8     primary medical provider for a jail in
9     Minnesota?
10 A. I can't give you an exact answer on that.
11 Q. When was the last time you reviewed the
12     contract with Sherburne County Jail?
13 A. In what way do you mean?
14 Q. When was the last time you actually reviewed
15     the formal contract?
16 A. Read through it?
17 Q. Yes.
18 A. I wouldn't know.  I don't know.  I can't
19     recall.
20 Q. I am just going to take it out for you since
21     this is tabbed separately.  I'm going to hand
22     you what was marked as Sherburne Exhibit
23     Number 3, starting at Sherburne 1788.  Please
24     take an opportunity to review that.
25 A. Is there anything in particular you want me

Page 66

1     to review of this?
2 Q. Well, at first I just want to confirm that
3     that is the existing contract with Sherburne
4     County?
5 A. This is the most recent written agreement
6     that we have between Sherburne County and
7     MEnD.
8 Q. And that's from 2014?
9 A. Correct.
10 Q. And I'd like to turn your attention, you will
11     see there are these Bates numbers, that's the
12     little numbers below the box there, where it
13     says Sherburne 01788?
14 A. Okay.
15 Q. I'd like to turn your attention to Sherburne
16     01793.
17 A. Okay.
18 Q. And please review Section 1.18.1.
19 A. Okay.  Okay.
20 Q. Did you review that provision in preparation
21     for today's deposition?
22 A. I don't know if I recall that specific
23     section.
24 Q. Are you aware of this specific section?
25 A. I'm aware of it.

Page 67

1 Q. Now, the testimony from Mr. Carr was that
2     there is not a licensed physician coming to
3     the facility on a monthly basis.  Would you
4     disagree with that testimony?
5 A. Yeah, I can't speak for Pat Carr.  I've
6     answered that question already.
7 Q. Do you believe you come on a monthly basis?
8 A. Correct.
9 Q. My understanding of your prior testimony was
10     that at a minimum once every three months?
11         MR. NOVAK: I object to the form,
12     misstates the prior testimony.
13         THE WITNESS: So I'm telling you
14     that I come to Sherburne County Jail
15     facility on average at least once a
16     month.  That is my testimony.
17 BY MR. STORMS:
18 Q. And if Janell Hussain provided contrary
19     testimony, she'd be incorrect as well?
20         MR. NOVAK: I object to the form,
21     misstates the testimony.
22         THE WITNESS: Again, I won't speak
23     to her testimony but what I will tell
24     you is every time I'm in that facility,
25     I may be working a different person, I

Page 68

1     may be working with some people certain
2     visits, others other visits.  And as I
3     stated before, I work directly with
4     Janell Hussain on a very frequent basis.
5 BY MR. STORMS:
6 Q. Just so I'm clear, it's your testimony that
7     you are physically at the Sherburne County
8     Jail at least on a monthly basis?
9 A. As I've answered, on average I'm there at
10     least once a month.
11 Q. So when you say on average, does that mean
12     you could go three times in January but then
13     not go again in February and March?
14 A. I'm not saying that at all.  I'm just saying
15     on average I'm there at least once a month.
16     I wouldn't be able to give you that specific.
17 Q. Do you document your visits in any fashion?
18 A. In what manner?
19 Q. In any manner.  Is there any documents we can
20     look at to confirm your testimony that you
21     are there on a monthly basis?
22 A. I don't know.
23 Q. Well, you would be the one making the
24     documents, correct?
25 A. I would need to know what documents you mean,

Page 69

1     that's my problem.  I don't know what you
2     mean by documents so I don't know the answer
3     to that.
4 Q. I don't know what you create.  So do you
5     create some document that reflects your
6     monthly visit to the Sherburne County Jail?
7 A. **I don't have a log sheet of my visits, if**
8     **that's what you are asking.  I don't have**
9     **that.**
10 Q. Do you maintain an Outlook calendar?
11 A. **I have an Outlook calendar but it's not --**
12     **it's not accurate to every facility I go to.**
13     **It's more of for big events, events that**
14     **would be conflicts for other day-to-day**
15     **activities, events that people would know**
16     **that I'm unavailable, that sort of thing.**
17     **But it's not a calendar that shows my every**
18     **whereabouts.**
19 Q. Do you create medical records when you go on
20     your monthly visits to the Sherburne County
21     Jail?
22 A. **It depends on the visit.**
23 Q. Sometimes you do?
24 A. **Sometimes I do.**
25 Q. If you created a medical record, how would we

Page 70

1     know that?
2 A. **It would be in eMDs.**
3 Q. And it would reflect -- there are documents
4     in eMDs that would reflect you providing
5     primary care to inmates at Sherburne County
6     Jail?
7 A. **There would be some, yes.**
8 Q. And that's part of a monthly standard
9     practice for you?
10 A. **I'm not sure --**
11 Q. Or are you going and providing primary care
12     to inmates on a monthly basis at Sherburne
13     County Jail?
14 A. **I could be providing direct face-to-face**
15     **care, I could be providing indirect care, I**
16     **could be providing consultation to staff on a**
17     **very frequent basis.  It just depends on the**
18     **situation and the case.**
19 Q. And would you go and review chart files
20     yourself?
21 A. **Yeah.  We discussed this earlier, that**
22     **periodically I would do random chart reviews**
23     **of patients within Sherburne County Jail.**
24 Q. Would you create documents reflecting that
25     you did those chart reviews?

Page 71

1 A. **Not typically.  Not typically.**
2 Q. So the only way we could prove that would
3     just be by your word?
4 A. **I don't know the answer to that.**
5 Q. I mean, you are the doctor, you are the one
6     who makes medical records, not me.  So is
7     there anything other than your word that
8     would prove that you reviewed a chart of a
9     patient?
10 A. **I don't know the answer to that.**
11 Q. There is nothing --
12 A. **I know what I have done, I don't know the**
13     **answer to that question.**
14 Q. You can't identify anything when you do a
15     review of a random review of files that you
16     create on a consistent basis?
17 A. **A file that I create from that review?**
18 Q. Correct.
19 A. **Not off the top of my head.**
20 Q. And have you ever had a conversation with
21     Commander Carr about whether or not you are
22     in fact coming on a monthly basis to the
23     Sherburne County Jail?
24 A. **Not that I can recall.**
25 Q. I'll take that back from you.

Page 72

1         **MR. NOVAK:** What exhibit was that,
2     Jeff?
3         **MR. STORMS:** It was Sherburne
4     Exhibit Number 3.
5         **MR. NOVAK:** Is that part of our
6     kind of ongoing number we're using?
7         **MR. STORMS:** It's outside of it.
8         **MR. NOVAK:** It's outside of it.
9     Okay.  That's all I was checking.
10 **BY MR. STORMS:**
11 Q. Now, my understanding -- let's go back.  Do
12     you carry an iPhone or some other portable
13     electronic device, I assume?
14 A. **I have a cell phone.**
15 Q. And you receive emails on that?
16 A. **I can receive emails on it, sure.**
17 Q. Do you receive emails on it?
18 A. **Sure.**
19 Q. Has that been the case since 2017?
20 A. **I'm assuming so.  I can't swear to that but**
21     **I'm assuming so.**
22 Q. And you'd receive those emails through your
23     MEnD account?
24 A. **One of them, yes.**
25 Q. Do you have several MEnD accounts, email

Page 73

1 accounts?
2 A. No.
3 Q. Do you have a separate email account for the
4 Todd Leonard Consulting?
5 A. Yes.
6 Q. What is that email address?
7 A. Leonardconsulting@yahoo.com.
8 Q. And do you use either a laptop or a desktop
9 at home?
10 A. Oh, at times, sure.
11 Q. Which is it, a laptop or a desktop?
12 A. Laptop.
13 Q. What kind of laptop?
14 A. I currently have a Lenovo.
15 Q. And how long have you had that for?
16 A. A couple of years. I don't know.
17 Q. Since 2017?
18 A. No, I think I got it -- I don't know. I
19 don't know the answer to that.
20 Q. What type of device did you have before the
21 Lenovo?
22 A. I don't recall.
23 Q. Did you have a different home device?
24 A. I had a different laptop.
25 Q. What did you do with that laptop?

Page 74

1 A. It's probably destroyed, garbage.
2 Q. So you would have just thrown it in the
3 garbage?
4 A. We would have -- what is the word I'm trying
5 to look for -- discarded it as one would
6 normally do.
7 Q. When you say "we" are you talking about you
8 would have discarded that through working
9 with MEnD or just individually?
10 A. I don't even know the answer to that
11 question. It just would have been the course
12 of business, day-to-day business.
13 Q. I understand that. Do you have an IT person
14 you work with at MEnD?
15 A. We don't have an IT person, we work with
16 Marco.
17 Q. Is that a company or a person?
18 A. A company.
19 Q. They provide IT services?
20 A. Yeah. I mean, they help us in a number of
21 ways.
22 Q. Do you give them your laptops to, you know,
23 download what you need to have downloaded,
24 things like that?
25 A. They set them up at the beginning and if you

Page 75

1 have some performance issue, you can ask
2 their assistance with it.
3 Q. So the laptop you had before the Lenovo
4 laptop, is that something you would have
5 turned over to Marco or would you have just
6 thrown it in the garbage?
7 A. It wouldn't have been turned over to Marco,
8 it would have just been discarded in the
9 appropriate way you discard a laptop.
10 Q. How do you do that?
11 A. It may have been in the garbage, it may have
12 been through the vendor I purchased it, I
13 don't recall. I just don't recall.
14 Q. And you don't know how long ago that would
15 have been?
16 A. I don't.
17 Q. And your home laptop, do you receive your
18 MEnD emails on that laptop as well?
19 A. Yes, I can receive emails on that laptop.
20 Q. And can you access eMDs through that laptop?
21 A. Yes.
22 Q. And is that the same laptop that you would
23 then use at your office or do you have a
24 different computer at your office?
25 A. I have a desktop at my office.

Page 76

1 Q. And do you know the current brand of your
2 desktop?
3 A. HP.
4 Q. How long have you had that desktop for?
5 A. I don't know if I can give you a specific
6 answer but it's less than a year old.
7 Q. What did you do with the prior desktop?
8 A. I don't recall. I don't recall if I still
9 have it or not.
10 Q. Do you use backup drives for your computers?
11 A. The only thing I've done is used an external
12 hard drive just for important documents.
13 Q. How long have you had that for?
14 A. I don't know specifically. Approximately a
15 year.
16 Q. Is there a backup system at your corporate
17 offices?
18 A. When you say backup system, what do you mean?
19 Q. Yeah. Is there something that backs your
20 system up? For example, if your computers
21 crashed, is there sort of a network-wide
22 backup system for your documents?
23 A. I don't know the specific answer to that. I
24 don't know.
25 Q. Who would know that? Would that be Marco?

Page 77

1  A.  **They may.**
2  Q.  Is Marco M-A-R-C-O?
3  A.  **Correct.**
4  Q.  And with respect to email systems, do you use
5      Microsoft Outlook?
6  A.  **Correct.**
7  Q.  Did you personally go into your Microsoft
8      Outlook and search for emails as part of this
9      case?
10 A.  **I had my business office manager and Marco**
11     **assist in trying to find emails related to**
12     **this case.**
13 Q.  And did they find any?
14 A.  **I'm assuming they found whatever you've**
15     **gotten.**
16 Q.  Have you ever personally looked in your
17     computer to see what emails you had related
18     to this case?
19 A.  **I allowed my business office manager to do it**
20     **in relation to all of the emails that we were**
21     **trying to search and find.  So it was part of**
22     **one, I guess, endeavor exhaustive search.**
23 Q.  I'm asking you if you've ever personally went
24     and looked through your emails?
25 A.  **I don't recall if I -- looked for emails**

Page 78

1      **specific to this case?**
2  Q.  Correct.
3  A.  **I don't recall.  I just don't recall if I**
4      **looked for any particular email or not.**
5  Q.  Do you delete your emails on a daily basis?
6  A.  **I don't know how to answer that.  I delete**
7      **emails on a regular basis?  I'm not sure what**
8      **you are asking, I'm sorry.**
9  Q.  Well, you receive, for example, segregation
10     notices from the Sherburne County Jail,
11     correct?
12 A.  **Correct.**
13 Q.  How long do you keep those for?
14 A.  **Usually same day I delete.  They are an FYI**
15     **to me so that's how I --**
16 Q.  So you delete the patient record of a
17     segregation notice on the same day you get
18     it?
19         MR. NOVAK: I object to the form.
20         THE WITNESS: I'm not even sure
21     what you are asking.  I'm sorry.
22 BY MR. STORMS:
23 Q.  Well, you get a segregation notice directed
24     to you, you are a doctor and they are a
25     patient, correct?

Page 79

1         MR. NOVAK: I object to the form.
2         THE WITNESS: I'm still not
3      following.  I get an email from a
4      sheriff county -- or a Sherburne County
5      Sheriffs Department that's supposed to
6      be an FYI to me, it's not something that
7      is a medical record for me.
8  BY MR. STORMS:
9  Q.  What is your understanding of why you are
10     getting that FYI?
11 A.  **Literally as an FYI, just keeping me in the**
12     **loop.**
13 Q.  And why is it important that you be in the
14     loop?
15 A.  **I don't know specifically why they include me**
16     **in that list, but I was told it was just an**
17     **FYI.**
18 Q.  And so when you get a segregation notice from
19     Sherburne County Jail, do you read it?
20 A.  **It depends on the situation.  If it's a**
21     **patient that I'm interested in, I may.**
22 Q.  So some of them you'll delete without even
23     reading the email?
24 A.  **I'll read the email, and some I will delete**
25     **after that.**

Page 80

1  Q.  Do you ever act on the segregation notices
2      you receive from Sherburne County Jail?
3  A.  **On occasion.  On occasion.**
4  Q.  Who is supposed to be acting on them?
5  A.  **Well, they are directed mainly to our**
6      **clinical personnel that are on site that work**
7      **within Sherburne County Jail day in and day**
8      **out, that's the primary audience to those**
9      **emails.**
10 Q.  Did you ever personally go and look to see if
11     you were in possession of a segregation
12     notice related to Dylan Brenner?
13 A.  **We would have in the pursuit of all emails**
14     **related to Dylan Brenner.**
15 Q.  I'm asking you.  Did you ever personally look
16     in your computer to see if you received that
17     segregation notice?
18 A.  **Me personally alone?  I don't know if I ever**
19     **did that.  I can tell you that as a team we**
20     **most certainly did.**
21 Q.  So in terms of retrieving documents, have you
22     ever personally went into your computer to
23     look for documents related to Dylan Brenner?
24 A.  **Ever?**
25 Q.  Yes.

Page 81

1 **A. I don't know.  I may have.  I don't know.  It**
2 **would depend on something more specific.**
3 Q. Well, you understand there are discovery
4 obligations in this case, correct?
5 **A. Absolutely.**
6 Q. And you understand that you've been sued in
7 both your official capacity on behalf of MEnD
8 and in your individual capacity?
9 **A. Yes, I'm aware of that.**
10 Q. And what have you personally done in your
11 official capacity, because we're going to
12 have an individual deposition, too, but in
13 your official capacity on behalf of MEnD,
14 what have you personally done to ensure that
15 your emails have been reviewed?
16 **A. I cooperated with my team every step of the**
17 **way ensuring that they did an exhaustive**
18 **search of my email account.**
19 Q. So you gave them access to your email
20 account?
21 **A. I did.**
22 Q. And who would that have been?
23 **A. Traci Newman and Marco.  And I don't know who**
24 **else would have been involved in that beyond**
25 **those two.**

Page 82

1 Q. So on behalf of MEnD did you ever personally
2 search for anything in any computer related
3 to Dylan Brenner?
4 **A. Again, I've answered this.  We worked as a**
5 **team, I was directing the staff that I**
6 **thought would be best for these tasks and**
7 **tried to stay organized in that fashion.  So**
8 **in that way, that's how I was involved.**
9 Q. And I want to make sure I'm clear, though.
10 You've never personally gone into any
11 computer and looked for documents related to
12 Dylan Brenner?
13 **MR. NOVAK:** I object to the form.
14 **THE WITNESS:** I never looked in
15 anybody else's email account personally.
16 I worked with my office manager and
17 Marco in that search but I wasn't
18 personally hitting the keys and doing
19 the search myself.
20 **BY MR. STORMS:**
21 Q. With respect to your own emails?
22 **A. Again, I've already answered this.  I don't**
23 **know if I've ever looked in my email account**
24 **for an email regarding Dylan Brenner.  I**
25 **certainly haven't done that in relationship**

Page 83

1 to this endeavor today because that's what I
2 let them do with my team with Traci Newman
3 and Marco and whoever else was involved with
4 those two folks so --
5 Q. Did Marco -- what is your understanding of
6 what Marco did as a search for documents that
7 were requested?
8 **A. I don't have every specific of what they did,**
9 **I just know they did an exhaustive good faith**
10 **effort search working with my team.**
11 Q. I'm going to refer you to page six of the
12 deposition notice.
13 **A. Okay.**
14 Q. And first I'm going to refer you to topic
15 number 30, the steps, actions, and efforts
16 MEnD took to preserve documents and other
17 information relative to Dylan Brenner.  Are
18 you prepared to provide that testimony today?
19 **A. Yes.**
20 Q. Did you review documents in preparation to
21 provide that testimony?
22 **A. Review documents related to number 30?**
23 Q. Correct.
24 **A. I'm not sure how to answer that.  I mean, I**
25 **reviewed the documents that have been**

Page 84

1 **produced.  I can't tell you how -- I don't**
2 **know how to answer that.**
3 Q. Well, did MEnD ever make efforts to preserve
4 video related to Dylan Brenner that you are
5 aware of?
6 **A. In what regard?**
7 Q. Any video of Dylan Brenner, are there any
8 actions that MEnD took in an attempt to
9 preserve video?
10 **A. We wouldn't have control over any video of**
11 **Dylan Brenner.**
12 Q. Are you aware of the fact that Dylan Brenner
13 was housed in a cell that was monitored by
14 video?
15 **A. For a portion of his time in Sherburne County**
16 **Jail, correct.**
17 Q. Did MEnD ever make any efforts to preserve
18 that video?
19 **A. It's not our video, that's Sherburne County's**
20 **ownership of that video.  So they have to**
21 **decide what they are going to do with that**
22 **video, I can't direct them.**
23 Q. Well, did MEnD ever make any efforts to
24 review that video?
25 **A. I don't believe I ever reviewed that video**

Page 85

1  given the nature of the case and what I was
2  reviewing regarding his care.
3  Q. Did anyone from MEnD ever discuss with
4     Sherburne County whether or not that video
5     would be preserved?
6  A. I don't know if we had a specific discussion
7     related to Dylan Brenner.  I don't recall.
8  Q. After Dylan Brenner committed suicide what
9     steps were taken to preserve emails related
10    to Dylan Brenner?
11 A. Can you repeat that?
12 Q. After Dylan Brenner committed suicide what
13    action did MEnD take to preserve emails
14    related to Dylan Brenner?
15 A. Standard operating procedure.  I'm not sure
16    what you are asking.
17 Q. What is that, what is your standard operating
18    procedure for the retention of documents at
19    MEnD with respect to emails?
20 A. We have -- in regard to our use of Outlook we
21    have a 50-gig max capacity in your email.
22    And then if you are a previous employee, I
23    think they are retained for 30 days.
24 Q. Where is this 50-gig max stored, is there a
25    server at your corporate office?

Page 86

1  A. I'm not -- I'm not intimately knowledgeable
2     about how that is stored.  I know that we
3     have a Microsoft exchange email system, I
4     believe it's called, but beyond that I don't
5     know the intricacies of how that's stored.
6  Q. Is there a written policy with respect to the
7     storage of email information at MEnD?
8  A. I don't believe we have a written policy to
9     that particular.
10 Q. So you've also been identified on topic
11    number 31, steps, actions, and efforts MEnD
12    took to search for and retrieve documents and
13    other information responsive to discovery
14    requests in this lawsuit.  Are you prepared
15    to provide that testimony?
16 A. Yes.
17 Q. So was the server searched with respect to
18    emails as to Dylan Brenner?
19 A. Again, I directed my business office manager
20    to work with Marco to search wherever they
21    could search exhaustively, good faith
22    efforts, to find any emails that related to
23    Dylan Brenner.
24 Q. Okay.  I understand what you said, now I'm
25    asking what actually happened.  So you gave

Page 87

1  this direction.  So were servers searched?
2  A. Again, I don't know the title of the area
3     where emails are stored, if it's a server or
4     it's another title.  I know that's where they
5     searched, where these emails would be stored.
6  Q. Okay.  And you don't have an understanding of
7     what was searched, though, with any
8     technicality?
9  A. Not to the level of that detail, no.
10 Q. To what level of detail then?
11 A. If it's considered a server or was considered
12    another term, I know it's the storage area
13    for our emails was searched and searched
14    exhaustively.
15 Q. By Marco?
16 A. By Marco and my office manager, Traci Newman.
17    And if there was others involved, I just
18    don't recall their names.
19 Q. And what other specific steps did MEnD take
20    to look for emails?
21 A. I'm not sure what you are asking.  That was
22    -- that was a process in and of itself that
23    was quite exhaustive.  I mean, I'm not sure
24    what else you are asking.
25        MR. NOVAK: He's just asking if

Page 88

1  there is anything else.  Anything else
2  beyond what you've already testified to.
3      THE WITNESS: I don't believe there
4  is anything else other than that because
5  that was a significant undertaking, a
6  tremendous undertaking.
7  BY MR. STORMS:
8  Q. So you have an understanding that all emails
9     from the Sherburne County Jail by MEnD
10    employees were ordered to produce from
11    October 6th and 7th?
12 A. You'd have to repeat that question.
13 Q. Do you have an understanding that it was
14    ordered by the court that all emails from
15    MEnD employees at the Sherburne County Jail
16    from October 6th and 7th be produced?
17 A. All emails or all emails related to Dylan
18    Brenner?
19 Q. All emails.
20 A. I don't know if I'm aware of that
21    particularly.  I know that there was a
22    significant search for any emails that could
23    be related to Dylan Brenner.
24 Q. Were all emails from the Sherburne County
25    Jail from October 6th and 7th searched for

Page 89

1   and produced?
2 A. **Anything that we have the ability to search,**
3   **absolutely.**
4 Q. So how was it that MEnD went about getting
5   all emails from October 6th and 7th from the
6   Sherburne County Jail to produce?
7 A. **So we would search any mendcare.com email**
8   **account that would have been related to care**
9   **during that time, and that would have been in**
10  **conjunction with my business office manager**
11  **and Marco.**
12 Q. How were those searched? For the October 6th
13  and 7th emails specifically what was
14  searched?
15 A. **I don't know if I can give you a complete**
16  **list but I know as part of it, at minimum, it**
17  **related to keyword searching, I know it**
18  **related to going to those specific dates.**
19  **Beyond that I can't give you every level of**
20  **detail of how they conducted that.**
21 Q. Do you know what keywords were searched?
22 A. **I don't remember the complete list.**
23 Q. Was there an email that you saw with that
24  list on it?
25 A. **I'm sorry, I don't understand.**

Page 90

1 Q. Was there an email with a list? In what form
2   was this list?
3 A. **An email with that list, I just don't**
4   **understand, I'm sorry.**
5 Q. Of search terms. For the search terms is
6   there a writing somewhere, whether it's an
7   email or another document, reflecting the
8   search terms that were used?
9 A. **That I don't know. I don't know.**
10 Q. Is there a search --
11 A. **I don't know if there was something retained.**
12  **I don't know.**
13 Q. Is there a server that is separate from the
14  server at your headquarters compared to the
15  server at Sherburne County Jail?
16      **MR. NOVAK:** I object to the form.
17      **THE WITNESS:** I'm not understanding
18  the question, I'm sorry.
19 **BY MR. STORMS:**
20 Q. Are there separate servers? Is there a
21  server at your headquarters for MEnD that
22  differs from the server at the Sherburne
23  County Jail?
24 A. **I'm sure there is.**
25 Q. Were they both searched?

Page 91

1 A. **We are not allowed to search Sherburne County**
2   **servers. That has to be done through**
3   **Sherburne County Sheriffs Department. But we**
4   **are able to search all mendcare.com email**
5   **accounts because that's under our control.**
6 Q. Is there a separate server specifically at
7   the Sherburne County Jail for MEnD emails?
8 A. **No, there is not.**
9 Q. And does MEnD storage capacity automatically
10  erase once it gets to the 50 gigs?
11 A. **As I understand it, it starts to -- and I**
12  **don't remember the term for this -- but it**
13  **starts to take oldest emails away if you go**
14  **beyond 50 gigs. That's my understanding.**
15 Q. And when was the first time that you would
16  have done this exhaustive search for Dylan
17  Brenner's emails?
18 A. **I don't remember the exact day but it was**
19  **whenever we were instructed to do so.**
20 Q. After the court ordered you to do so?
21 A. **To search for emails related to Dylan**
22  **Brenner?**
23 Q. Correct.
24 A. **I believe so.**
25 Q. Are you aware of the fact that the court

Page 92

1   issued monetary sanctions against MEnD for
2   failure to search prior to that?
3 A. **I'm not an attorney, I don't know the**
4   **specifics of what all that entails. I just**
5   **know there is something related to that.**
6 Q. You understand that MEnD got sanctioned in
7   this case?
8 A. **Again, I'm not an attorney but I know there**
9   **is something along those lines that --**
10 Q. And this exhaustive search occurred after
11  that?
12 A. **After what?**
13 Q. After the sanctions that were issued by the
14  court?
15      **MR. NOVAK:** I object to the form.
16      **THE WITNESS:** I don't know the
17  specific timing of -- and these searches
18  were an ongoing process so I can't give
19  you the exact dates. But they were an
20  ongoing process in good faith.
21 **BY MR. STORMS:**
22 Q. Were they in good faith before or after the
23  court issued sanction?
24 A. **I just answered that. I don't know the exact**
25  **dates of when all these things took place. I**

CASE 0:18-cv-02383-NEB-ECW   Doc. 223   Filed 07/08/21   Page 26 of 66

BRENNER vs.                                                                    TODD LEONARD
MEnD CORRECTIONAL CARE, et al.                                                July 8, 2020

Page 93

1    just can't recall the exact dates.
2 Q. Were there communications between MEnD and
3    Marco related to doing the searching?
4 A. **What do you mean by communications?**
5 Q. Are there emails with Marco explaining the
6    parameters of the searching that would need
7    to be done for these documents?
8 A. **I don't recall.**
9 Q. Who engaged in those communications on MEnD's
10    behalf with Marco with respect to the
11    searching?
12 A. **Primarily Traci Newman.**
13        **MR. STORMS:** On the record I'm
14    going to reserve the right to keep
15    categories 30 and 31 open with respect
16    to the information we're seeking in
17    those categories.
18        **MR. NOVAK:** We obviously would
19    object to that.  We'll sort it out later
20    if we need to.
21 **BY MR. STORMS:**
22 Q. Now, my understanding is in 2017 you would
23    have been providing service to over 30
24    counties in Minnesota?
25 A. **In 2017?**

Page 94

1 Q. Yes.
2 A. **Correct.**
3 Q. And --
4 A. **I'm sorry, say that question again?**
5 Q. My understanding is that in 2017 that MEnD
6    would have been providing service to over 30
7    counties in Minnesota?
8 A. **I don't know if I can specifically say over
9    30 but it would have been -- it would have
10    been approximately 30.**
11 Q. Has MEnD services been terminated ever by a
12    county?
13 A. **We've had two counties.**
14 Q. Which counties were those?
15 A. **Stearns County and Benton County, Minnesota.**
16 Q. Did Stearns County give a reason for the
17    termination?
18 A. **I believe the verbiage used to me was we
19    really appreciate your services but there are
20    political issues in this county and you are
21    political collateral damage.**
22 Q. Did those political issues have to do with
23    the fact there were at least three suicides
24    while MEnD was providing services at Stearns
25    County?

Page 95

1 A. **Not that I'm aware of.**
2 Q. What were the political issues you are aware
3    of?
4 A. **I don't know any details other than what I
5    just told you because they wouldn't share any
6    more details with me.  My belief is it's an
7    issue between CentraCare, the health care
8    system up there, and the Stearns County
9    board.**
10 Q. So --
11 A. **But I don't know any other detail other than
12    that.**
13 Q. So if we depose a representative from Stearns
14    County, you would not expect them to say that
15    it was as a result to the number of suicides
16    at the Stearns County Jail?
17 A. **I would not expect them to say that, no.**
18 Q. Why did Benton County terminate services?
19 A. **Typically Stearns and Benton go hand in hand
20    and at that time I believe CentraCare was
21    working basically with both counties, but I
22    don't know any other details on that.**
23 Q. Are you able to give an approximation of the
24    number of employees working for MEnD in
25    October of 2017?

Page 96

1 A. **Yeah, it would have been approximately 150.**
2 Q. And are you able to give an estimate of the
3    annual number of patients that MEnD saw in
4    2017 on a weekly basis?
5 A. **I can give you an estimate daily and then we
6    can just use math.**
7 Q. Sure.
8 A. **An estimate would have been approximately 340
9    a day, and that can include anything from
10    minor encounters on up.**
11 Q. Just in Minnesota?
12 A. **That would have been the whole company.**
13 Q. And now MEnD -- when did MEnD first start
14    using the eMD system?
15 A. **The eMD system was actually chosen prior to
16    my arrival at Sherburne County Jail, so it's
17    been in use -- or it was decided on its use I
18    believe back in 2006.**
19 Q. Is Sherburne County the only location where
20    MEnD uses eMDs?
21 A. **Correct.**
22 Q. Does MEnD otherwise use any electronic
23    medical record keeping?
24 A. **We have another vendor that we work with in a
25    couple of our facilities.**

Page 97

1 Q. Which is the other vendor?
2 A. **Fusion Centricity.**
3 Q. And so throughout the entire time that MEnD
4    has provided services at Sherburne County
5    it's been utilizing the eMD system?
6 A. **In one form or another, correct.**
7 Q. And is the eMD something that is able to be
8    accessed remotely by you?
9 A. **It has been for part of that time. I don't**
10   **recall when it went to cloud based, but at**
11   **some point it went cloud based and then I**
12   **could begin accessing it remotely.**
13 Q. Could you access it remotely in 2017?
14 A. **I believe so.**
15 Q. Who else would have been given remote access
16   to eMDs in 2017 for MEnD?
17 A. **Any medical staff member from Sherburne**
18   **County Jail clinic who had a user account.**
19 Q. Now, you are familiar with Stella Essien?
20 A. **Correct.**
21 Q. Essien?
22 A. **Essien.**
23 Q. Essien.
24 A. **Mm-hum.**
25 Q. So Stella Essien is someone who would have

Page 98

1    been a medical provider for MEnD?
2 A. **Yes.**
3 Q. And she was not located primarily at
4    Sherburne County?
5 A. **Correct.**
6 Q. But she would take on-call shifts where she
7    would have been the on-call medical provider
8    for Sherburne County?
9 A. **She would have been in that rotation,**
10   **correct.**
11 Q. It was her testimony that she was not
12   provided access to the eMD system, is that
13   your understanding, that she was not provided
14   that access?
15 A. **That's my understanding.**
16 Q. Why is it that the on-call providers for MEnD
17   were not provided with access to the eMD
18   ?
19 A. **It's just a standard within our industry if**
20   **you are not primarily located at a site like**
21   **that, you are likely not going to have a user**
22   **account because you don't have regular**
23   **routine access to that system.**
24 Q. But she would be the direct medical provider
25   during those on-call hours for all the

Page 99

1    inmates at the Sherburne County Jail?
2 A. **Yep. And then she would have been expected**
3    **to garner her information, like many county**
4    **jails, from direct communication with the**
5    **staff there.**
6 Q. But she would not have had the ability to
7    access historical medical records of
8    patients?
9 A. **Through the staff at the jail clinic she**
10   **would.**
11 Q. You mean orally?
12 A. **Yeah, she could discuss any information that**
13   **she needed to perform her duties with the**
14   **clinic staff that were on site.**
15 Q. And that clinic staff would be registered
16   nurses?
17 A. **In part.**
18 Q. What else?
19 A. **What?**
20 Q. You'd have health technicians, who else would
21   be there that would be communicating with her
22   as the on-call --
23 A. **Oh, primarily direct communication with**
24   **Stella would have been through nursing staff.**
25 Q. So she has to rely upon, as the on-call

Page 100

1    provider, to rely upon the nursing staff to
2    give her the necessary historical information
3    for the patient?
4 A. **Yes. And that's very common in most**
5    **facilities.**
6 Q. Does the eMD system have the ability to have
7    standing orders in place?
8 A. **I don't know if it has that capability.**
9 Q. Have you personally worked with eMDs before?
10 A. **Yes. Many times.**
11 Q. And you would create notes in eMD as both the
12   primary provider but also as a supervising
13   provider?
14 A. **Depending on what time frame you are talking**
15   **about. So --**
16 Q. You've done both of those things, though?
17 A. **Can you repeat the question again, though?**
18 Q. Yeah. You've created medical records in the
19   eMD system in both your role as a primary
20   provider but also as a supervising provider?
21      **MR. NOVAK:** I object to the form.
22      **THE WITNESS:** I don't know how to
23   distinguish the two in terms of creating
24   a document in eMDs, it's just not how I
25   would categorize it. If I needed to

Page 101

1     create a document in eMDs, I will create
2     a document in eMDs in whatever capacity
3     I need to.
4  **BY MR. STORMS:**
5  Q.  There are some medical records that are
6     created by nurses that require the
7     supervision of a medical provider?
8          **MR. NOVAK:** I object to the form,
9     incomplete hypothetical.
10         **THE WITNESS:** Can you repeat that
11     again?
12  **BY MR. STORMS:**
13  Q.  There are some medical records that are
14     created by nurses that require signed
15     supervision by a medical provider?
16  **A.  Yes, there are certain encounters that must**
17     **be signed off by a medical provider.**
18  Q.  And you've signed off on documents like that
19     in the role as a medical provider?
20  **A.  Yes.**
21  Q.  But no one else needs to supervise your work
22     so if you were charting a note, you wouldn't
23     have somebody else sign off as your
24     supervisor?
25  **A.  No.  And neither would Janell Hussain or any**

Page 102

1     **other medical provider.**
2  Q.  So there is no situation where Janell Hussain
3     would need you to sign off in a supervisory
4     capacity?
5  **A.  No.**
6  Q.  But Janell Hussain would sign off on nurse's
7     charting notes in a supervisory capacity?
8  **A.  Yes.  There are certain notes that is**
9     **required for her to review and sign off, and**
10     **then there is others that are her discretion**
11     **whether she wishes to review.**
12  Q.  Did you ever intentionally program the eMD
13     system to sign your name in a supervisory
14     capacity when you weren't actually reviewing
15     notes?
16  **A.  Oh goodness no.**
17  Q.  Are you aware of eMDs signing your name when
18     you were not actually providing work in a
19     supervisory capacity?
20  **A.  I am aware of that now.**
21  Q.  And you became aware of that as a result of
22     the Dylan Brenner case?
23  **A.  I can't recall the exact timing, I just know**
24     **I became aware of it personally at some point**
25     **in 2019.**

Page 103

1  Q.  And you have an understanding that Dylan
2     Brenner committed suicide in 2017?
3  **A.  Correct.**
4  Q.  So this automatic signing of your name was
5     going on for at least two years?
6          **MR. NOVAK:** I object to the form.
7         **THE WITNESS:** I don't know
8     specifically how long it's been going
9     on.  What was happening was when a
10     person provided care in a facility and
11     they went to sign off, it would somehow
12     input my name instead of their name.
13  **BY MR. STORMS:**
14  Q.  Who informed you of this?
15  **A.  I don't recall who initially informed me.  I**
16     **just don't recall which person it was.**
17  Q.  And no one at the facility alerted you to the
18     fact that it was automatically signing your
19     name prior to that?
20  **A.  Prior to when I was informed?**
21  Q.  Correct.
22  **A.  No.  I mean, that's when I was informed and**
23     **that's when I understood what was happening.**
24  Q.  Did you ever ask anybody why you weren't
25     informed of that earlier?

Page 104

1  **A.  I don't believe others understood what was**
2     **happening prior to that.  I think it was very**
3     **real time, very -- that's my understanding.**
4  Q.  Once you learned about it, did you make any
5     efforts to go back and conduct an audit to
6     determine how many patient files were
7     impacted by that?
8  **A.  Yes.  What we did is we tried to -- first we**
9     **just tried to understand what was happening.**
10     **And then using deduction, we determined what**
11     **was happening.  Then we tried to understand**
12     **who it was affecting.  And what we found was**
13     **it would happen sometimes, not happen**
14     **sometimes, and then we alerted the eMD's**
15     **vendor.**
16  Q.  So after you alerted the eMD's vendor, one,
17     did they explain to you what was happening?
18     What was your understanding of why this was
19     happening?
20  **A.  I don't know if they've got a perfect answer**
21     **to that.  This is an ongoing, you know,**
22     **service issue with them as we speak.**
23  Q.  Were you personally involved in speaking with
24     eMDs?
25  **A.  I don't know if I ever personally spoke to**

Page 105

1    them.  I know Diana VanDerBeek has spoken to
2    them many times.
3  Q. Is it still happening?
4  A. It is.
5  Q. So there are still records that are signed
6    off on your name even though you are not
7    providing the patient care?
8  A. Yeah, even though I'm not directly providing
9    that care.  And we continue to try and push
10   eMDs to resolve this issue.
11 Q. Have you raised that concern with Sherburne
12   County?
13 A. They are aware.
14 Q. And has there been a resolution with MEnD and
15   Sherburne County?
16 A. Yeah.  Sherburne County is actually in
17   negotiations, as we speak, with Fusion
18   Centricity to change the EMR vendor.
19 Q. So have you conducted an actual audit,
20   though, to see the number of files that have
21   been impacted by this?
22 A. I'm not sure what you mean audit.
23 Q. Meaning have you attempted to figure out how
24   many patient files have been impacted by
25   this?

Page 106

1  A. I tried to figure that out and then we have
2    basically worked with eMDs for them to try
3    and take this and run with it and try to get
4    this resolved so we can get those signatures
5    back to the person that it should have been.
6  Q. So what is your understanding of how many
7    patient files at Sherburne County have been
8    impacted by this?
9        MR. NOVAK: I object to the form.
10       THE WITNESS: I don't have an exact
11   answer for you.  And one other issue I
12   should mention with that is this issue
13   with this signature, it doesn't impact
14   care but it impacts the appearance of
15   the chart.
16  BY MR. STORMS:
17 Q. Why is it that you believe it doesn't impact
18   patient care?
19 A. Because you are able to do all the things
20   that you need to do on the eMD system that
21   it's capable of irregardless of that issue.
22 Q. Now, if medical records that were supposed to
23   be approved by a different medical provider
24   were not actually being reviewed, you would
25   agree that would impact patient care?

Page 107

1        MR. NOVAK: I object to form,
2    incomplete hypothetical.  Go ahead.
3        THE WITNESS: Go ahead and repeat
4    the question and I'll give you my
5    answer.  Sorry.
6  BY MR. STORMS:
7  Q. If medical records that were supposed to be
8    reviewed by a medical provider were not as a
9    result of this signature issue, you would
10   agree that impacts patient care?
11 A. If that were the case.  But it's not the
12   case.
13 Q. Did you review Janell Hussain's deposition
14   transcript?
15 A. I did.
16 Q. And did you review the portion of her
17   transcript where she stated that no medical
18   provider was signing off on a number of those
19   documents that reflected your name?
20 A. I don't recall the specifics of her testimony
21   but I can tell you based on what I've found
22   in eMDs, two things, number one, all the
23   encounters and documents that must be signed
24   off, still are in place.  Those had no issue
25   whatsoever.  And then the other medical

Page 108

1    records where it's at her discretion to
2    review, those still kept coming in.
3  Q. Which ones are the ones that must be
4    reviewed?
5  A. All health assessments, all documents where
6    watches have been put in place or changed or
7    discontinued, and all mental health
8    professional visits.  I'm trying to recall
9    off the top of my head if there is anything
10   else.  I just don't recall off the top of my
11   head.  But those are the primary encounters
12   that must be reviewed by the medical
13   provider.
14 Q. Toxicology screens, do those need to be
15   reviewed by the medical provider?
16 A. Specifically like the results?
17 Q. Correct.
18 A. They don't need to be specifically reviewed
19   by the medical provider, the actual test
20   itself.
21 Q. And what about the plan stemming from a test,
22   does that have to be reviewed by the medical
23   provider?
24 A. Not necessarily.  It depends on the visit, if
25   that nurse is required to have medical

Page 109

1  provider involvement.
2  Q. Based upon protocols?
3  **A. Based upon protocols and the scope of their**
4  **practice and any training procedures that we**
5  **have in place.**
6  Q. So as you sit here today you have no ability
7  to place a number on how many times your
8  signature has been incorrectly affixed to
9  patient medical records?
10 **A. In place of the person who entered the note?**
11 Q. Correct.
12 **A. I don't have a specific number for you.**
13 Q. So it could be 10,000 for all you know?
14 **A. I don't believe it would be that high. I'd**
15 **have to do some math but I don't believe it**
16 **would be that high.**
17 Q. Well, if we did some math, you have -- how
18 many patients are seen on average on a daily
19 basis at Sherburne County?
20 **A. There would be on average 50 to 60 in some**
21 **way, shape, or form touches to a patient.**
22 **Some of those may be face-to-face encounters,**
23 **some of them may be notation of**
24 **documentation, or just some administrative**
25 **note.**

Page 110

1  Q. So 50 to 60 touches on a patient on a daily
2  basis at Sherburne County?
3  **A. Give or take. And again, those vary in what**
4  **they are so --**
5  Q. So if we call it 50 on a daily basis, that
6  would be 350 encounters a week, right, 50
7  times 7?
8  **A. Correct.**
9  Q. And if we took 350 and multiplied it by 52
10 weeks, that would be 18,200 touches a year?
11 **A. Then your math is much better than mine.**
12 Q. That's my calculator's math.
13 **A. I didn't go through the process. I**
14 **apologize.**
15 Q. So if there is -- just using your estimate on
16 the low end, there are potentially tens of
17 thousands of touches between 2017 that could
18 have been charted and inaccurately reflected
19 your supervision?
20 **A. Not all of those visits each day you would**
21 **have this issue with, it would be some of the**
22 **face-to-face encounters. So I can't give you**
23 **an exact number.**
24 Q. Does it concern you that your name is
25 inaccurately on all of these documents?

Page 111

1  A. Of course it does.
2  Q. But the issue is still not resolved a year
3  later?
4  **A. Not resolved.**
5  Q. Have you individually pulled each one of
6  these records as an entity to review them to
7  see if your name is inaccurately on them?
8  **A. Have I done what?**
9  Q. Have you had each individual record pulled to
10 determine which records your name is
11 inaccurately on?
12 **A. Every -- no, I've not pulled every.**
13 Q. Do you know how many -- do you know how many
14 inmates at Sherburne County Jail who have
15 committed suicide that your name is
16 inaccurately reflected on their medical
17 records?
18 **A. Yes.**
19 Q. How many inmates is that?
20 **A. Three.**
21 Q. Dylan Brenner?
22 **A. Correct.**
23 Q. James Lynas?
24 **A. Correct.**
25 Q. And Justice White?

Page 112

1  **A. Correct.**
2  Q. All three of them have records reflecting
3  that you provided them care that you in fact
4  did not provide?
5      MR. NOVAK: I object to the form
6  with respect to provided care. Go
7  ahead.
8      THE WITNESS: It had my signature.
9  It has the name of the person who
10 provided the care on the note but it has
11 my signature. So every note that's
12 created by an individual in Sherburne
13 County Jail clinic has their name on it,
14 it just has my electronic signature
15 instead of theirs when this occurred.
16 **BY MR. STORMS:**
17 Q. And you would agree to a reader of those
18 documents, reading of that document would
19 reflect that you provided those patients with
20 care?
21     MR. NOVAK: I object to the form,
22 foundation.
23     THE WITNESS: No, I wouldn't assume
24 that. I think what could reasonably be
25 assumed is somehow I reviewed that

BRENNER vs.
MEnD CORRECTIONAL CARE, et al.

TODD LEONARD
July 8, 2020

---

Page 113

1   document real time when that did not
2   happen.
3   **BY MR. STORMS:**
4   Q. For any three of those individuals?
5   **A. Yes, that is possible.**
6   Q. Have you disclosed those inaccurate records
7     to either the Minnesota Board of Medical
8     Practice or any other third party agency?
9       MR. NOVAK: I object to the form.
10      THE WITNESS: We have not, because
11    I don't feel that this issue has
12    affected patient care whatsoever.  It's
13    the appearance of the signature that is
14    the issue at hand.  But it hasn't
15    interrupted or disrupted or affected the
16    care that patients are provided.
17  **BY MR. STORMS:**
18  Q. And as you sit here today what is your best
19    understanding as to the technical reason why
20    your name is appearing on all of these
21    documents?
22  **A. eMDs has not been able to give me a full**
23    **explanation to this date.  And we've reached**
24    **out to them repeatedly to get that answer.**
25  Q. So you've known about this since at least at

---

Page 114

1   some point in 2019, have not gotten a clear
2   answer, but have continued to use the eMD
3   system?
4   **A. Yes.  We've had to use that system because**
5   **it's what is in place, and we know that this**
6   **issue is not affecting patient care.  So**
7   **while we continue to try and work with eMDs**
8   **to resolve this issue, we still know that the**
9   **patient care is being delivered**
10  **appropriately.**
11      MR. MONTPETIT: Do you want this
12    back?
13      MR. STORMS: No, that's all right.
14    Let's go off the record for a second.
15      (There was a discussion off
16      the record.)
17  **BY MR. STORMS:**
18  Q. I'll hand you the binder back and turn your
19    attention to Exhibit 31.
20  **A. Okay.**
21  Q. Did you review this document in preparation
22    for today's deposition?
23  **A. I did.**
24  Q. And this document was signed by Christina
25    Leonard; is that correct?

---

Page 115

1   **A. I'm not sure how to answer that question.**
2   Q. Why?
3   **A. She signed it but it affixed my name.**
4   Q. So she signed it but it states that it was
5     supervised by you?
6   **A. Again, I just want to make sure I'm accurate**
7   **when I answer this.  It is her providing**
8   **care, it states supervised by me, but it**
9   **incorrectly has her as my name as when she**
10  **signed it.**
11  Q. So should she have been the one signing this
12    chart note?
13  **A. She did sign this chart note but it affixed**
14  **my name.**
15  Q. But it also, in addition to affixing your
16    name, it reflects that she's being supervised
17    by you, correct?
18  **A. Correct.**
19  Q. Was she being supervised by you with respect
20    to Exhibit 31?
21  **A. So when Janell Hussain became a primary care**
22  **provider there, there was a lag in switching**
23  **my name out to her name with eMDs, but the**
24  **spirit of that is still the same, that as**
25  **medical providers either of our names can be**

---

Page 116

1   **on this as supervised by them.**
2   Q. So is it incorrect that she was being
3     supervised by you or is that a correct
4     statement?
5   **A. It's just a -- it is a standard language**
6   **piece that is in the eMDs EMR system that**
7   **must have a name affixed to it.  So**
8   **operationally am I directly supervising**
9   **Christina Leonard?  No.  But in the eMD**
10  **system it has to have one of our name on**
11  **there as supervised by.**
12  Q. And is this a chart note that could have been
13    signed by Christina Leonard or is this a
14    chart note that has to be signed by a medical
15    provider?
16  **A. No, this is a note that can be signed by**
17  **Christina Leonard.**
18  Q. Does this note need to be directly supervised
19    by any medical provider or is this a record
20    that has to be reviewed by a medical
21    provider?
22  **A. No.**
23  Q. Why is this a record that does not need to be
24    reviewed by a medical provider?
25  **A. Because it doesn't fit into our category**

---

Herbert L. Peterson & Associates
hpa@skypoint.com

Page 117

1    where we require it.
2 Q. Within your policy and protocols?
3 A. **And standard procedures and training and**
4    **scope of practice.**
5 Q. So your understanding with respect to the
6    legal standards for scope of practice within
7    the State of Minnesota that this could have
8    been within the scope of Christina Leonard's
9    practice as an RN?
10        MR. NOVAK: I object to the form.
11        THE WITNESS: It's my understanding
12    that it is within her scope to acquire a
13    urine specimen and run a urine specimen
14    and document the results of that
15    specimen.
16 BY MR. STORMS:
17 Q. And it's within the scope of her practice as
18    an RN to issue the order of a Medical
19    Professional Profile (12 Drugs) Screen and
20    Confirmation?
21 A. **They are allowed to, per our processes, she's**
22    **allowed to acquire a urine in very particular**
23    **circumstances but in any circumstances where**
24    **she deems necessary.**
25 Q. And it's within the scope of her -- it's your

Page 118

1    understanding it's within the scope of an
2    RN's practice to issue the care plan that she
3    issued here, which is no chemical withdrawal
4    watch needed at this time?
5 A. **For this particular situation, yes.**
6 Q. What would impact whether or not this needed
7    to be reviewed by a medical provider?
8 A. **If there was any information that this**
9    **patient was suffering from significant**
10   **withdrawal and the fact that the PCP was most**
11   **undoubtedly a false positive.**
12 Q. Okay. Where is it documented that the PCP
13   was a false positive?
14 A. **It's not documented on this note.**
15 Q. So why would she be operating under the
16   assumption it's a false positive?
17 A. **She wouldn't be operating under that**
18   **assumption.**
19 Q. So she should be under the assumption that it
20   is positive for PCP?
21 A. **Yeah. Until proven otherwise she's assuming**
22   **that this patient has PCP in their system,**
23   **yes.**
24 Q. So it's your understanding it's within the
25   scope of an RN's practice to identify a

Page 119

1    patient as positive for PCP and then make
2    decisions with respect to chemical withdrawal
3    watches absent supervision by a medical
4    provider?
5 A. **That's a long question. Do you mind**
6    **repeating it?**
7 Q. It's your understanding that it was within
8    the scope of Christina Leonard's practice as
9    an RN to make a decision with respect to the
10   need for a chemical withdrawal watch without
11   the supervision of a medical provider in this
12   case?
13 A. **Well, what I believe what she was doing in**
14   **this instance is given the information that**
15   **she knew, she wasn't going to start a**
16   **chemical watch as yet. And there would**
17   **be followup with this patient.**
18 Q. But despite the existence of a PCP test that
19   has to be assumed to be positive?
20 A. **Correct.**
21 Q. She still would not be required to confer
22   with a medical provider?
23 A. **I would have preferred that she started it**
24   **then, but this would have been followed up**
25   **with his next visit because he had just**

Page 120

1    **arrived recently to the facility. So this**
2    **would have been an issue that would have been**
3    **reevaluated on her next visit. What she was**
4    **saying is that she doesn't want to start a**
5    **chemical withdrawal watch at this time.**
6 Q. It's something that you also would have
7    expected to have been considered with the
8    constellation of the other information
9    available to her with respect to Mr. Brenner?
10 A. **Can you be more specific?**
11 Q. Sure. You would expect her to take into
12   account any available medical history to her
13   including drug use or suicidality issues?
14        MR. NOVAK: I object to the form.
15        THE WITNESS: In regards to this
16   issue and whether she needs -- it would
17   have been the information that she was
18   being provided regarding that patient at
19   that time that was there for chemical
20   withdrawal issues.
21 BY MR. STORMS:
22 Q. Well, that information is available to her on
23   eMDs, correct?
24 A. **Not the appearance or the behavior of the**
25   **patient at that moment in time.**

Page 121

1  Q.  But Mr. Brenner's medical history is?
2  A.  **What I'm saying is his medical history**
3      **doesn't impact the appearance of him from a**
4      **chemical withdrawal perspective at that**
5      **period of time, in that moment of time.**
6  Q.  So Mr. Brenner's medical history does not
7      impact the decision making relative to
8      chemical withdrawal?
9  A.  **Oh, I didn't say that.**
10 Q.  Okay.  I don't understand then.  So Christina
11     Leonard obviously accessed the eMD system,
12     and we know that because we have this note in
13     front of us, right, Exhibit Number 31?
14 A.  **Correct.**
15 Q.  And in accessing the eMD system, she would
16     have had access to any of Mr. Brenner's
17     historical records?
18 A.  **It would have been available to her, correct.**
19 Q.  If, for example, Mr. Brenner had a history of
20     receiving medications at the Sherburne County
21     Jail, that would have been reflected in the
22     eMD system?
23         MR. NOVAK:  Form and foundation.
24         THE WITNESS:  You mean on a
25     previous incarceration?

Page 122

1          MR. STORMS:  Correct.
2          THE WITNESS:  Yes.  I mean, that
3      information certainly is in there.
4  BY MR. STORMS:
5  Q.  And if he were a suicide risk during his
6      prior incarceration, that information would
7      have been available to her as well?
8  A.  **I'm not sure what you mean by a suicide risk**
9      **because every human being has a suicide risk.**
10     **I'm not --**
11 Q.  Every human being does not have an eMDs chart
12     at the Sherburne County Jail, correct?
13 A.  **Correct.**
14 Q.  And you are aware of the fact that in
15     Mr. Brenner's eMDs chart under the list of
16     current problems suicide risk was identified?
17 A.  **Yes.  That was entered in his eMDs chart,**
18     **correct.**
19 Q.  And that would have been available to
20     Christina Leonard?
21 A.  **Yes.**
22 Q.  And so Mr. Brenner's prior prescription drug
23     history and his prior history of suicidality,
24     does that need to be considered at all when
25     making decisions with respect to whether or

Page 123

1      not Mr. Brenner goes on a chemical withdrawal
2      watch?
3  A.  **It would have minimal impact at that time.**
4  Q.  Does the potential of the chemical withdrawal
5      impact the need to assess Mr. Brenner with
6      respect to suicidality?
7          MR. NOVAK:  I object to the form.
8          THE WITNESS:  Can you repeat that?
9  BY MR. STORMS:
10 Q.  Yeah.  Does the existence of Mr. Brenner's
11     diagnosed -- well, let me back up.
12     Here Mr. Brenner is diagnosed as having
13     drug withdrawal?
14 A.  **Yeah.  Unfortunately in the eMD system it**
15     **isn't built for corrections.  So to be able**
16     **to sign off on a note, you have to put**
17     **something in the assessment section that, to**
18     **the best of your ability, fits the situation.**
19     **Otherwise she can't sign off on the note.**
20 Q.  But as we read this note here, he's diagnosed
21     with drug withdrawal?
22 A.  **That's what she had to put into the system to**
23     **complete the note.**
24 Q.  And whether or not someone is going through a
25     drug withdrawal impacts their risk for

Page 124

1      suicidality, you've learned that as part of
2      your training?
3  A.  **It can be a factor.  Depending on each**
4      **individual patient, of course.  And I would**
5      **not expect someone who is recently brought in**
6      **the facility, even if he did have PCP in his**
7      **system, to be a major impact at that time.**
8  Q.  And there is a nursing protocol that was in
9      place for mild to moderate chemical
10     withdrawal?
11 A.  **Correct.**
12 Q.  But it's within the discretion of the RN
13     about whether or not to initiate that
14     chemical withdrawal process?
15 A.  **I'd have to run through the protocol with you**
16     **to answer a specific question.**
17 Q.  Yeah.  So Exhibit 32, which is the next
18     exhibit.
19 A.  **Okay.**
20 Q.  I just want to be clear that under this
21     protocol Christina Leonard would have
22     understood that it was within her discretion
23     to initiate a chemical watch?
24 A.  **No, and this goes back to what I was trying**
25     **to say earlier, this issue would have**

Page 125

1 continued to be addressed by her, she just
2 wasn't initiating a chemical withdrawal watch
3 yet.
4 Q. Would you have expected her to put eyes on
5 Dylan Brenner?
6 A. Not necessarily at that time.
7 Q. And you are saying that's your assessment
8 based upon a comprehensive review of Dylan
9 Brenner or just based upon the withdrawal
10 information?
11 A. No, it would have been the information that
12 was provided to her about the patient at that
13 time, and then based upon her training and
14 her observations of that entire situation.
15 Q. Okay. I'll come back to that but just so --
16 so based upon the toxicology screen in
17 Exhibit 31, you believe that there was no
18 need for her to go see Dylan Brenner just
19 based on that screening alone?
20 A. Based on this screening alone, no. Unless
21 there was some concern brought to her
22 attention by the staff in booking, this
23 result in and of itself does not mean she
24 needs to have eyes on him at that time.
25 Q. And if you were training someone at MEnD,

Page 126

1 would you train them that a result like this,
2 you know, a positive PCP and a positive THC
3 would not warrant immediate eyes on a
4 patient?
5 A. It would have been discussed that these are
6 two substances that unless, again, there is
7 some concern about the behavior or appearance
8 of a patient, aren't as urgent in that
9 assessment.
10 Q. And so not as urgent, so is there a guideline
11 of how long it could be before eyes are put
12 on a patient with that toxicology screen?
13 A. It really wouldn't be -- it's apples and
14 oranges. What she would do is she would have
15 her procedures of when this patient should be
16 assessed, and a lot of that is based on the
17 information that's provided when this patient
18 is in booking. So it's apples and oranges is
19 the best way I can describe it.
20 Q. Whose job is it to determine if the PCP is a
21 false positive?
22 A. Ultimately that would be the medical
23 provider's job.
24 Q. So the medical provider would need to be
25 informed that this patient tested positive

Page 127

1 for PCP?
2 A. Yeah, eventually this patient is going to be
3 reevaluated by a nursing staff and that would
4 be reported to our medical provider.
5 Q. But you wouldn't expect that PCP positive to
6 be reported to the medical provider in real
7 time?
8 A. It doesn't necessarily need to be at that
9 moment based on the overall clinical
10 situation in front of her.
11 Q. And so it's your understanding that the
12 medical literature and general standards of
13 care would inform a medical provider that
14 there is not an immediate concern necessarily
15 with PCP withdrawal?
16     MR. NOVAK: I object to the form,
17 incomplete hypothetical.
18     THE WITNESS: And I'm sorry, I'm
19 going to have to have you repeat that.
20 BY MR. STORMS:
21 Q. Yeah. Is it your understanding that based
22 upon either the standard of care or review of
23 the medical literature that PCP withdrawal
24 does not reflect an immediate and acute need?
25 A. It all depends on the context of each patient

Page 128

1 but commonly it's not a severe withdrawal
2 syndrome.
3 Q. And are you aware of any writing at all
4 that's ever been created by MEnD that
5 reflects that PCP is not a drug that creates
6 severe withdrawal concerns?
7 A. I can't tell you if there is specific writing
8 on that. I know that we discussed this topic
9 during training.
10 Q. If you could turn to Exhibit 38. Did you
11 ever sign this note?
12 A. I didn't sign the note as described on this
13 document.
14 Q. Is this a note that needed to be signed by a
15 medical provider?
16 A. This doesn't necessarily have to be signed by
17 a medical provider. But when we have code
18 blue, this is what I was talking about
19 discretionary, we typically review these.
20 Q. What is your understanding as to why it does
21 not have to be reviewed by a medical
22 provider?
23 A. I guess I'm not understanding the question.
24 Sorry.
25 Q. Well, you said this document does not have to

Page 129

1 be reviewed by a medical provider, why is it
2 that it does not have to be reviewed by a
3 medical provider?
4 **A. And I guess I should qualify the answer. It**
5 **will absolutely be reviewed by a medical**
6 **doctor and reviewed by me because it's a**
7 **death involved. But if there is a code blue**
8 **called in the facility, not every code blue**
9 **needs to be necessarily reviewed by a medical**
10 **provider. They are typically reviewed by our**
11 **supervisor and we routinely review them, it's**
12 **just not a mandate. But if there is a death**
13 **in the facility, it absolutely will be**
14 **reviewed.**
15 Q. So you would absolutely personally review a
16 document like this when there is a death at
17 the facility?
18 **A. Yes.**
19 Q. So when you reviewed this document when there
20 is a death in the facility, did you see
21 that it was signing your name on October 7,
22 2017, at 11:43:44 p.m.?
23 **A. I didn't notice that. I did not notice that**
24 **signature as I was reading through it.**
25 Q. Would you have reviewed all of Dylan

Page 130

1 Brenner's medical records or just this code
2 blue record?
3 **A. Once there is a death involved, I would have**
4 **went through and reviewed them.**
5 Q. So you would have reviewed all of Dylan
6 Brenner's medical records, including the last
7 one we reviewed, and you didn't notice that
8 they were signing your name?
9 **A. I did not. It's not where we focus our eyes**
10 **when we go through these notes.**
11 Q. It wasn't important for you to determine who
12 was actually creating these notes?
13 **A. No, it says who created it. I just didn't**
14 **notice that my name was affixed as the**
15 **signature.**
16 Q. Even though it's immediately below that?
17 **A. Correct.**
18 Q. And then did you advise MEnD employees to
19 create notes after the fact in this case?
20 **A. Questions came up about documenting a note**
21 **after the fact, if it was feasible to do so.**
22 **And when that question was asked, I said yes,**
23 **you should still put in your note even if**
24 **it's after the event.**
25 Q. Is that the same advice that you would give

Page 131

1 if there was a suicide assessment that hadn't
2 been completed?
3 **MR. NOVAK:** I object to the form.
4 **THE WITNESS:** I'm not sure of the
5 question. I'm sorry.
6 **BY MR. STORMS:**
7 Q. Would you advise MEnD staff to create a
8 suicide assessment after the fact?
9 **A. If somebody hadn't completed and charted**
10 **their documentation, I always want them to**
11 **complete and chart their documentation,**
12 **whether it's timely or late.**
13 Q. Are you aware of situations where suicide
14 assessments have been created after the death
15 of an inmate?
16 **MR. NOVAK:** I object to the form.
17 **THE WITNESS:** A suicide assessment
18 created after the death of an inmate?
19 **MR. STORMS:** Yeah.
20 **THE WITNESS:** I'm not sure what
21 exactly you are asking.
22 **BY MR. STORMS:**
23 Q. Well, you have a copy of one of your suicide
24 risk screening forms, right?
25 **A. Correct.**

Page 132

1 Q. Are you aware of situations where one of
2 those forms was ever completed and signed
3 after the suicide of an inmate?
4 **A. So I guess I'm going to break that question**
5 **down into two parts. No one should -- if**
6 **somebody had assessed a patient and had**
7 **determined their results but had not put it**
8 **into paper, I would want them to put into**
9 **paper whether it was timely or late.**
10 Q. Are you aware of a situation where someone
11 put into paper on one of the suicidal risk
12 screening forms after a MEnD patient
13 committed suicide?
14 **A. I can't recall. It's possible but I can't**
15 **recall.**
16 Q. Okay. We'll take a look at that later.
17 **A. Okay.**
18 Q. If you could turn your attention to Exhibit
19 Number 44?
20 **A. Okay.**
21 Q. Is this one of the notes that you advised
22 could be drafted after Mr. Brenner's suicide?
23 **A. Yes, I was asked questions -- to the best of**
24 **my knowledge I was asked questions about**
25 **whether she was able to go back into the**

Page 133

1     system after this event and record what had
2     transpired in the jail lobby, and I said
3     absolutely you should.
4  Q.  And you reviewed this note at some point?
5  A.  Correct.
6  Q.  Some point shortly after Mr. Brenner's
7     suicide?
8  A.  I can't give you an exact time.  It would
9     have been sometime soon thereafter.
10  Q.  And once again you did not notice that it had
11     signed your name?
12  A.  I did not.
13  Q.  And Exhibit 45, this is a second document
14     that was created late after Mr. Brenner's
15     suicide?
16        MR. NOVAK: I object to the form.
17        THE WITNESS: I wouldn't consider
18     this late entry, but I know it was a
19     question I was asked of whether she
20     could go in and chart this document
21     after that event had occurred.
22  BY MR. STORMS:
23  Q.  Why wouldn't you consider this a late entry?
24     She called it a late entry herself.
25  A.  I'm not sure why she called it a late entry

Page 134

1     but it was within a few hours of her
2     performing this task so I wouldn't consider
3     that necessarily late.
4  Q.  You are saying that she wrote this note
5     within a few hours after performing this
6     task?
7  A.  She charted this information a few hours
8     after she did the task.
9  Q.  Yeah, that's just not right.  Mr. Brenner
10     committed suicide on October 7, 2017.
11  A.  Oh, I apologize.
12  Q.  And this note was created on October 10,
13     2017.
14  A.  I apologize.  I just didn't spot the 10
15     instead of the 7.  My apologies.  Correct.
16     You are correct.  It was created on 10/10/17.
17  Q.  So you would consider that a late chart note?
18  A.  I would, absolutely.
19  Q.  And charting should be completed before the
20     end of someone's shift?
21  A.  That's always our goal.  Always.
22  Q.  Do you know why these two chart notes were
23     not created before the end of their shift?
24  A.  Which two are we discussing?
25  Q.  Exhibits 44 and 45.

Page 135

1  A.  From my understanding both of these instances
2     were the employees were hesitant to go in and
3     chart after an event like that and basically
4     wanted direction and approval to do so.
5     That's the best I can tell you as to why they
6     were documented when they were.
7  Q.  Were they hesitant because they were afraid
8     they were going to be in trouble?
9  A.  No.  Well, I guess in some ways they just
10     didn't know if you, after a death in the
11     facility, can you go back and put a chart
12     note in, is that appropriate.  So whether
13     their concern was whether they were going to
14     get in trouble or not, I don't know the
15     answer to that.  I just know that's the
16     question I was posed was is it appropriate to
17     go in and chart the information that I need
18     to chart after there is a death.
19  Q.  Doesn't any death -- like doesn't every death
20     that happens within a medical facility result
21     in a chart note that's created after someone
22     dies?
23  A.  I'm not sure I'm following.
24  Q.  Sure.  There should be a chart note that
25     charts every person's death at a medical

Page 136

1     facility, correct?
2  A.  There is typically some sort of medical
3     encounter or chart note that documents the
4     death.
5  Q.  That's always created after they die?
6  A.  I would call it real time but that's I guess
7     our different definitions.
8  Q.  So you think that it's charted in real time,
9     it's being charted as the person is dying?
10  A.  No.  I'm just saying from a reasonable
11     perspective you are charting promptly after
12     the event of what transpired at that event
13     and these were not documented in that way.
14  Q.  Right.  So does it concern you that the
15     medical professionals working at MEnD didn't
16     understand that they could chart after
17     somebody dies?
18  A.  Oh, I think it was given the time frame.  And
19     I don't remember the exact time frame but it
20     wasn't five minutes afterwards, that sort of
21     thing.
22  Q.  And once again in Exhibit 45, this signed
23     your name but you did not notice that?
24  A.  I did not.
25  Q.  And then Exhibit Number 46, this is another

BRENNER vs.
MEnD CORRECTIONAL CARE, et al.

TODD LEONARD
July 8, 2020

---

Page 137

1  chart note that reflects that you signed it,
2  and that again is incorrect?
3  A. Yes.  It was created by Brittany and when she
4  signed it, it placed, however you want to use
5  the word, my name.
6  Q. So when Mr. Lynas died back in 2017, you
7  reviewed all of his records as well, correct?
8  A. Yes.



14  Q. Have you ever personally created any logs or
15  audit trails from the eMD system?
16  A. Personally created any audit or log trails.
17  I don't know if I've personally done that.  I
18  don't know.
19  Q. You have an understanding that those things
20  are created?
21  A. I understand they can be created.
22  Q. And you've seen examples of those logs and
23  audit trails?
24  A. I have.
25  Q. Have you ever had reason to request that they

---

Page 138

1  be created on your behalf so you could review
2  charting?
3  A. To review an audit trail?
4  Q. Yeah, to review an audit trail of a chart
5  note?
6  A. I don't recall.  I don't recall if I have
7  personally.
8  Q. How often do you personally work in the eMD
9  system?
10  A. It varies.  I don't know if I can give you an
11  answer to that.
12  Q. Once a week?
13  A. At times.
14  Q. Let me just pull this up for you because it
15  will make it a little easier.  To the extent
16  you can read it, I was just going to turn
17  your attention to Exhibit 98.
18      MR. NOVAK: This one goes to 85.
19      MR. STORMS: Sorry.  It goes --
20  here you go.  It goes longer beyond the
21  tab, we just hadn't gotten those.
22      THE WITNESS: Sorry, I'm not able
23  to.
24      MR. STORMS: Yeah, it's okay.  I'll
25  blow it up for you electronically.

---

Page 139

1      MR. NOVAK: We can go off the
2  record just for a second.
3      (There was a discussion off
4      the record.)
5  BY MR. STORMS:
6  Q. I'm just going to show you a blown up version
7  of Exhibit 98.
8  A. Okay.
9  Q. Have you ever seen eMDs documents that are
10  created that look like that?
11  A. EMDs documents that are created that look
12  like this screen?
13  Q. Yep.  That reflect the chart notes, the date
14  they are entered, who entered them?
15  A. I don't know about a specific document that's
16  created this way, I just know that this is a
17  view in eMDs that you can use at your
18  discretion.
19  Q. So that shows you the time certain notes were
20  placed in?
21  A. Well, I mean, on the screen it gives you the
22  date, you have to open it.
23  Q. Sorry.  So you know there is a view that
24  shows you who the note owner is, what the type
25  is, and what the assessment is and the date,

---

Page 140

1  you are familiar with that?
2  A. I'm familiar with that view.
3  Q. Is that a view that you've used for a
4  significant period of time?
5  A. I've used that view I'm sure many times.
6  Q. Going back to prior to 2017?
7  A. I'm assuming so, yes.  Again, I don't know
8  when they had the update to eMDs with the
9  appearance of the charts and such but --
10      MR. STORMS: Let's go off the
11  record.
12      (A break was taken.)
13      (Exhibit Number 106 was
14      marked for identification.)
15  BY MR. STORMS:
16  Q. Dr. Leonard, I'm handing you what's been
17  marked as Exhibit 106.  Please take the
18  opportunity to review this document,
19  including your signature page at the end.
20  A. Okay.
21  Q. Have you reviewed Exhibit 106 before?
22  A. I have.
23  Q. And you verified under oath that the
24  information was true and correct?
25  A. Again, as a non-attorney I did what I was

---

Page 141

1  instructed, I guess, whatever that term.
2 Q. Well, you can see that acknowledgment you
3  signed?
4 A. **Correct.**
5 Q. And you saw that you were sworn, right?
6 A. **Again, I'm just not as intimately**
7  **knowledgeable in the terms as you.**
8 Q. Sure. But you understood that you were
9  providing truthful information?
10 A. **Correct.**
11 Q. Did you help your lawyers compile the
12  information in response to this?
13 A. **Yes.**
14 Q. I'd like to turn your attention to question
15  number eight or Interrogatory number eight,
16  it's on page four.
17 A. **Okay.**
18 Q. Does that reflect accurately the counties
19  that MEnD was providing service to in October
20  of 2017 in Minnesota?
21 A. **Yes, it should be.**
22 Q. So when did the Stearns County contract
23  terminate?
24 A. **The end of 2017.**
25 Q. Is that the same for Benton?

Page 142

1 A. **Correct.**
2 Q. And did you pick up any new counties after
3  those terminations?
4 A. **We have grown since this time, yes.**
5 Q. Which other counties have you picked up since
6  then?
7 A. **Oh, I can go off the top of my head, it may**
8  **not be fully inclusive.**
9 Q. I'll give you a hand.
10  **MR. STORMS:** Can we mark this as
11  Exhibit 107?
12  (Exhibit Number 107 was
13  marked for identification.)
14  **THE WITNESS:** I'm sorry, what is
15  the question?
16 **BY MR. STORMS:**
17 Q. Yeah. So which additional counties have you
18  added as clients since October 2017?
19 A. **I know one -- and you are talking until the**
20  **present?**
21 Q. Correct.
22 A. **Okay. I know we've added West Central**
23  **Regional Juvenile Center.**
24 Q. So not a county but a juvenile center?
25 A. **Within Clay County.**

Page 143

1 Q. Is that a government entity or a private
2  entity?
3 A. **It's like a regional -- I'm not sure who has**
4  **true ownership of it but it serves multiple**
5  **counties in the area. But it's physically**
6  **located in Moorhead right across the street**
7  **from the jail. We've began working with**
8  **Becker County since that time. Yeah. We've**
9  **began working with Pine County, Meeker**
10  **County. The nature of our contract with**
11  **Dakota County has changed.**
12 Q. In what way?
13 A. **We used to be just nursing staff and didn't**
14  **provide the medical providership or the**
15  **medical health services and now they've**
16  **incorporated all of that into a new contract**
17  **with us, we supply all the services now. We**
18  **have started working with Jackson County**
19  **since this time. And I believe that is it.**
20 Q. Are you able to say back in 2017 how many
21  counties you were working with in Iowa and
22  Wisconsin?
23 A. **Yeah, in Wisconsin we would have just been**
24  **working with Douglas County, Wisconsin. And**
25  **in Iowa in 2017 we would have been working**

Page 144

1  with Story County. And I am almost certain
2  we were already working with Hardin during
3  that time.
4 Q. And my understanding is that you do not have
5  a medical doctor that you were contracting
6  with in Wisconsin; is that right?
7 A. **We just have our medical provider team that**
8  **works in those facilities.**
9 Q. Are you licensed to practice in Wisconsin?
10 A. **Correct.**
11 Q. Oh, you are?
12 A. **Yes.**
13 Q. And you are not licensed in Iowa, though?
14 A. **I am.**
15 Q. But you still use a medical doctor in Iowa
16  anyway?
17 A. **Yes.**
18 Q. Why is that?
19 A. **Just kept that, it's a great working**
20  **relationship, he does fine work. We just**
21  **kept that relationship intact.**
22 Q. Are you licensed any other states other than
23  Minnesota, Iowa, and Wisconsin?
24 A. **Illinois and South Dakota.**
25 Q. Does MEnD provide services in South Dakota?

Page 145

1 A.  We now have started working with Codington
2     County.
3 Q.  When did you get licensed in South Dakota?
4 A.  2018 or 2019, I just don't recall.  Sorry.
5 Q.  And then at some point in time did you become
6     involved in attempting to identify who all
7     the inmates were who committed suicide in
8     MEnD facilities?
9 A.  Did I get involved in what?
10 Q.  Providing information related to the inmates
11     who committed suicide?
12 A.  In some way, shape, or form, yes.
13 Q.  Do you keep a list of inmates who commit
14     suicide in MEnD facilities?
15 A.  We started formally documenting numbers of
16     suicides as of 2017 with other data.  The
17     names aren't specifically on there but the
18     where they were are, in part, within our
19     statistics that we keep.
20 Q.  Prior to that you did not keep readily
21     available information on who the inmates were
22     that committed suicide in MEnD's care?
23 A.  We have information at our disposal, we just
24     weren't tracking those particular statistics
25     before then.

Page 146

1 Q.  At any point in time if someone asked you,
2     MEnD, to name all the inmates who committed
3     suicide in Minnesota from a certain date on,
4     you could name those individuals?
5 A.  I would have to reference, you know,
6     documentation, but I could.
7 Q.  So I want to turn your attention to
8     Interrogatory number 14, that asks to
9     identify all those inmates, and then on the
10     next page you see an answer and then a
11     supplement.
12 A.  Okay.
13 Q.  And you signed off on this document as being
14     accurate.  Is there a reason that you did not
15     identify all the inmates who committed
16     suicide in MEnD's care in this answer?
17 A.  I'm not sure I understand the question.  I'm
18     sorry.
19 Q.  Well, you have an understanding that that is
20     not a complete list in Interrogatory number
21     14 of all inmates who committed suicide in
22     MEnD's care?
23 A.  Oh, ever?
24 Q.  Yeah.
25 A.  Yeah, we produced the people who committed

Page 147

1     suicide during the time frame that I thought
2     that I understood in working with my counsel
3     that was needed for this document.
4 Q.  And you thought that was 2017 to 2019?
5 A.  Correct.
6 Q.  Are you saying that you accurately provided
7     all the individual's names who committed
8     suicide over that time period in this answer?
9 A.  It should be.
10       MR. STORMS:  Can we mark that as
11     Exhibit 108, please?
12           (Exhibit Number 108 was
13           marked for identification.)
14 BY MR. STORMS:
15 Q.  I'll show you what's been marked as Exhibit
16     108, which was provided in response to motion
17     practice by us.
18 A.  Okay.
19 Q.  The answer that you verified in Interrogatory
20     -- or in Exhibit 106 did not identify
21     Stephanie Bunker, correct?
22 A.  Oh, it was mistyped.
23 Q.  It should have been Stephanie Bunker --
24 A.  And not Stephanie King.
25 Q.  Did you have access to the information prior

Page 148

1     to that the entire time, meaning suicides
2     going back to 2013 and 2012?
3 A.  Did I have access to what?  I'm sorry.
4 Q.  Did you have access to the information, the
5     individuals who had committed suicide,
6     previously?
7 A.  I had access to it, yeah.
8 Q.  Now, Stephanie Bunker, you've been sued by
9     her family; is that correct?
10 A.  Yes.  It was just filed.
11 Q.  Have you reviewed the complaints in that
12     case?
13 A.  To some degree.  Not thoroughly yet.
14 Q.  Have you reviewed Ms. Bunker's medical
15     records?
16 A.  Again, not thoroughly.  I've reviewed her
17     medical records in the past but more recently
18     I have not thoroughly reviewed them.



Page 149



```
19  Q.  Is there a way that you'd be able to tell why
20      it was you were at the Beltrami County Jail
21      on July 7, 2017?
22  A.  Specifically that day?
23  Q.  Yes.
24  A.  I don't know.  I may be able to, I don't
25      know.
```



Page 153

8  Q.  Is Beltrami County Jail a place you traveled
9      to on a regular basis?
10 **A.  I don't know what you would consider regular.**
11  Q.  How many times a year do you travel to the
12      Beltrami County Jail?
13 **A.  At least a few.  Just depends on what is**
14      **occurring there.**
15  Q.  Do you travel to the facilities -- do you
16      travel to each facility when an inmate
17      commits suicide?
18 **A.  Typically.  Depending on the situation.  Most**
19      **likely but not always.**
20  Q.  Do you try to get there that day?
21 **A.  Not necessarily.**

Page 155

Page 154

Page 156



BRENNER vs.
MEnD CORRECTIONAL CARE, et al.

TODD LEONARD
July 8, 2020

Page 161



Page 163

Page 162

Page 164

5   Q.  If someone is put on a watch because they are
6       suicidal, MEnD policies and protocols require
7       that the patient be screened on a daily
8       basis, correct?
9   **A.  If a patient is on suicide watch full**
10      **precautions, that is correct.**



Page 165

19  Q.  Would you engage in emailing with your
20      employees at the Beltrami County Jail related
21      to suicidality issues?
22  A.  **No, that would not be typical.**
23  Q.  It would always be on the phone?
24  A.  **It would customarily be phone calls because**
25      **of the nature of the concern.**

Page 166

Page 167

Page 168



Page 169

4 Q. So after Stephanie Bunker died did you do an
5     investigation into her suicide?
6 A. **Yes.**
7 Q. Tell me who participated in that
8     investigation?
9 A. **I don't have all names off the top of my head**
10    **but anybody that I would have needed**
11    **information from.**
12 Q. Would you have created documents related to
13    that investigation?
14 A. **Not typically.  If I felt there was a**
15    **systemic issue or a significant process issue**
16    **I would have.**

Page 170

13    **BY MR. STORMS:**
14 Q. And there were no policy changes for MEnD as
15    a result of Ms. Bunker's suicide; is that
16    true?
17        **MR. NOVAK:** Form.  Go ahead.
18        **THE WITNESS:** I don't recall any
19    particular policy changes.  However, in
20    our company we are frequently
21    reevaluating everything that we do and
22    try to fine tune all of our process.  I
23    don't recall any particular policy
24    change directly from this case, though.
25

Page 171

Page 172

9 Q. So why not perform a similar review for other
10    suicides such as Ms. Bunker's?
11 A. **I would do those reviews, I just wouldn't**
12    **create a formal document about it.**
13 Q. So should there be emails somewhere
14    reflecting reviews that were done related to
15    Ms. Bunker?
16 A. **I don't know if there is emails related to**
17    **that.  I don't know.**
18 Q. Have you ever looked?
19 A. **If I have emails related to what?**
20 Q. Related to a mortality review or a similar
21    review into Ms. Bunker's suicide?
22 A. **No, I haven't done a particular search for**
23    **that.**

BRENNER vs.
MEnD CORRECTIONAL CARE, et al.

TODD LEONARD
July 8, 2020



Page 173

Page 175

21  Q.  Have you ever fired any MEnD employee for
22      their conduct related to a suicide?
23  A.  **I don't recall.**
24  Q.  None that you can identify?
25  A.  **I just don't recall.**

Page 174

Page 176

1  Q.  Of the suicides that have occurred at MEnD,
2      have you ever provided training specifically
3      as a result of any one suicide?
4          MR. NOVAK: I object to the form.
5          THE WITNESS: I'd have to have you
6      repeat that.  I'm sorry.
7  BY MR. STORMS:
8  Q.  Yeah.  With respect to suicides that have
9      occurred at MEnD facilities, has MEnD ever
10     provided training specifically as a result of
11     any one suicide?
12         MR. NOVAK: Form.
13         THE WITNESS: I can tell you in the
14     Brenner case there was a couple of items
15     that were rediscussed with staff at
16     Sherburne following that.  I just don't
17     recall beyond that specifics.
18  BY MR. STORMS:
19  Q.  What were the items that were rediscussed as
20     a result of the Brenner case?
21  A.  **I'd have to look at their agenda but one of**
22     **them was encouraging that nursing do a**
23     **chemical withdrawal flow sheet initiated once**
24     **they've been identified to have an illegal**
25     **substance on board.  That was one.  I don't**



Page 177

```
 1      recall what the other one was off the top of
 2      my head.
 3   Q. When you say agenda, what agenda are you
 4      talking about?
 5   A. We have monthly staff meetings.
 6   Q. And there was a monthly staff meeting where
 7      there were issues specific to Brenner that
 8      were discussed?
 9   A. I don't know if it was specific to Brenner
10      but it included Brenner.
11   Q. Did you review that agenda in preparation for
12      today's deposition?
13   A. Yes.
14   Q. What other items were listed on that agenda?
15   A. I just don't recall without seeing the
16      document.
17   Q. And the issue you've identified with respect
18      to eMDs and signing your name, so we're going
19      to go and do our own review of the eMD
20      system, is that something that's easily
21      recreated, something signing your name, is
22      that something we could be shown?
23   A. That event?
24   Q. Yes.
25   A. Yes, absolutely you could.  We have test
```

Page 178

```
 1      patients on there that we can show you.
 2   Q. And to the best of your knowledge, it's just
 3      not capable of having the right person sign
 4      off on these documents on eMDs at the
 5      Sherburne County Jail?
 6   A. Yeah, it's literally the signature stamp for
 7      whatever reason defaults to my name.  And I
 8      don't believe it's on every encounter visit
 9      but it's on some.
10   Q. And have you personally engaged in
11      conversations with eMD?
12   A. No.  We discussed this earlier.  I don't
13      recall if I've had personal conversations
14      with them directly or not, but I know Diana
15      VanDerBeek has had multiple direct
16      conversations with them and she's had
17      multiple direct conversations with me about
18      this issue.  I just don't recall if I was on
19      a conversation with them directly or not.
```

Page 179

Page 180



Page 181

Page 183

8  Q.  And MEnD made no specific changes to any of
9       its policies or practices specifically as a
10      result of any of those three suicides?
11  A.  **Nothing particular to those suicides.  Again,**
12      **we frequently are reviewing all of our**
13      **processes, procedures, aspects of care.  So**
14      **changes could have been made along the way**
15      **but they wouldn't be particular to each case.**

Page 182

Page 184



BRENNER vs.
MEnD CORRECTIONAL CARE, et al.

TODD LEONARD
July 8, 2020



**Page 189**

17  Q.  I mean, aside from the county, is there --
18      well, in Minnesota who provides oversight for
19      MEnD, is it the Department of Corrections?
20  A.  **The Department of Corrections ultimately**
21      **provides oversight for operations within a**
22      **jail facility.**
23  Q.  Do they have to inspect and approve of the
24      medical care that you are generally providing
25      as an organization?

**Page 190**

1   A.  **As it relates to their standards during their**
2       **inspections and audits.**
3   Q.  Does DHS get involved in auditing you at all
4       related to practicing medicine at the
5       correctional facilities?
6   A.  **Not that I'm aware of.**
7   Q.  Any other third party entities?  I guess the
8       United States government does, right?
9   A.  **They certainly can.  I am unaware if there**
10      **has been that.  Also depending on the agency**
11      **that you house detainees for, they also have**
12      **their inspections and standards and such.**
13  Q.  ICE does inspections?
14  A.  **Yep.**
15  Q.  So how about in Wisconsin, who is the
16      governing body that does inspections of your
17      jails?
18  A.  **Department of Corrections do regular**
19      **inspections.**

**Page 191**

25      today's deposition relative to Monte    for

**Page 192**

BRENNER vs.
MEnD CORRECTIONAL CARE, et al.

TODD LEONARD
July 8, 2020

Page 193



Page 195

2  **MR. STORMS:** Let's take a quick
3  break.
4  (A break was taken.)
5  **BY MR. STORMS:**
6  Q. Does MEnD internally have a definition that
7  distinguishes acute suicidality from
8  non-acute suicidality?
9  **A. I'm aware of those terms.  I would say in our**
10  **current policies and protocols we just don't**
11  **classify people to those terms at this time.**
12  Q. Was there a distinction that was used back in
13  October of 2017 between those two terms?
14  **A. Again, we don't really subscribe to those**
15  **terms in our policies and protocols so I**
16  **can't answer that.**
17  Q. So there was not a practice at MEnD to only
18  commence suicide watches if someone was
19  acutely suicidal?
20  **A. Well, our process is this, if they meet hard**
21  **criteria to be on a suicide watch,**
22  **absolutely.  But anybody can put anybody on**
23  **suicide watch if they have concerns.  Medical**
24  **staff, correctional staff.**
25  Q. What are the hard criteria that you just

Page 194

Page 196

1  referenced?
2  **A. Well, it would mean more that if they had**
3  **abnormalities or irregularities that created**
4  **conversation with a medical provider, a**
5  **medical provider or the mental health**
6  **professional, may just solely on their own**
7  **put someone on suicide watch as well.**
8  Q. And MEnD provides training to all its
9  employees on an annual basis on suicidality?
10  **A. All nursing staff and higher.**
11  Q. And MEnD employees, in addition to having
12  access to eMDs at Sherburne County, also have
13  access to the ProPhoenix system?
14  **A. I forgot the first part of that question, I'm**
15  **sorry.**
16  Q. In addition to eMDs, MEnD employees at the
17  Sherburne County Jail also have access to the
18  ProPhoenix system?
19  **A. Correct.**
20  Q. Are you aware of the fact as you sit here
21  today that MEnD's investigation revealed that
22  Dylan Brenner had a suicide flag on the
23  ProPhoenix system?
24  **A. Yes, I'm aware that he had a suicide flag,**
25  **it's a flag that is on ProPhoenix, once it's**

Page 197

1 placed, it does not come off, it will follow
2 you no matter how long down the road.  So
3 it's a suicide flag from a previous
4 incarceration.
5 Q. It's something medical staff should be
6 inquiring into if they observe it, correct?
7     MR. NOVAK: I object to the form.
8     THE WITNESS: When involved in any
9 case, when that case requires that they
10 need to review those issues, they will
11 absolutely review them.
12 BY MR. STORMS:
13 Q. So Christina Leonard, if she observed the
14 suicide flag in ProPhoenix, should have been
15 asking follow-up questions, correct?
16     MR. NOVAK: I object to the form,
17 incomplete hypothetical.
18     THE WITNESS: So unless there is
19 some risk of imminent harm described or
20 reported from booking, she would have
21 delved into those issues during her
22 face-to-face encounter with that
23 patient.
24 BY MR. STORMS:
25 Q. And so if Dylan Brenner had a ProPhoenix flag

Page 198

1 indicating that he was a suicide risk, you
2 would have expected that there would have
3 been a face-to-face during that initial shift
4 that night, correct, between someone from
5 MEnD and Dylan Brenner?
6 A. Not necessarily.  Because that suicide flag
7 can come from previous interactions.  It
8 would have to be an initial presentation
9 facility, some sort of report of imminent
10 concern, imminent concerns about someone's
11 suicidal risk from the staff in the booking
12 department.
13 Q. Well, why is it that prior suicidality is
14 assessed as part of the suicide risk
15 screening form?
16 A. I'm sorry?
17 Q. Why is prior suicidality assessed as a risk
18 in MEnD's suicide risk screening form?
19 A. Because amongst a number of other useful
20 pieces of information, it's a useful piece of
21 information for us.
22 Q. And individuals who have previously been
23 suicidal, that places them at an increased
24 risk for current suicidality as well based
25 upon MEnD's own training, correct?

Page 199

1 A. It can depending on the particular patient
2 and circumstances.  And what is more
3 concerning is if they've got more recent
4 history of suicide risk, like within the last
5 three months.
6 Q. Where does it say within three months
7 anywhere on MEnD's training?
8 A. I don't know if it's in written form or not,
9 I'd have to look.
10 Q. And you can't just take an inmate at their
11 word, can you, with respect to whether or not
12 they are suicidal based upon screening,
13 correct?
14 A. Well, you take some of the their word
15 seriously, otherwise you'd never ask those
16 questions.  Of course you want to have those
17 questions answered and get their answers.  It
18 just depends on the person, the context of
19 the situation and case.
20 Q. Well, you created a logistics of intake video
21 with Michelle Skroch, correct?
22 A. Skroch, yes.
23 Q. And you say yourself, your own words, are
24 they are not going to just spoon feed this
25 information to you, those are your own words?

Page 200

1 A. I may have said that, I don't recall.
2 Q. And so a MEnD professional, whether it's a
3 nurse or whomever else, who is assessing
4 whether or not someone might be suicidal has
5 to have an understanding that not all inmates
6 are going to be up front with respect to
7 their suicidal intentions, correct?
8     MR. NOVAK: I object to the form,
9 incomplete hypothetical.
10     THE WITNESS: Again, you have to
11 take the context of each patient on its
12 own merit.  Each patient can be
13 considerably different.
14 BY MR. STORMS:
15 Q. And Mr. Brenner had a ProPhoenix flag that
16 indicated he was a suicide risk, true?
17     MR. NOVAK: Form.
18     THE WITNESS: No.  He had a suicide
19 flag, and that came from his previous
20 incarceration where he said incendiary
21 comments but never had any suicidal
22 ideation or behaviors or comments.
23 BY MR. STORMS:
24 Q. In 2016 or 2017?
25 A. 2016.

Page 201

1  Q.  So did Christina Leonard look into that?
2      What is your understanding?
3  A.  **My understanding is she didn't look into that**
4      **suicide flag because there would be no**
5      **particular need to at that time based on the**
6      **fact that she was getting no reports about**
7      **this patient being an imminent risk to his**
8      **own safety.**
9  Q.  What about the fact that he was identified as
10     a suicide risk in the eMD system when
11     Christina Leonard accessed that, similarly
12     not relevant?
13        **MR. NOVAK:** I object to the form,
14     misstates the prior testimony.  Go
15     ahead.
16        **MR. STORMS:** Which prior testimony?
17     Because Exhibit 80 expressly states
18     current problem, suicide risk.
19        **MR. NOVAK:** Do you want to engage
20     me on the record on this?  I'm happy to
21     do it.
22        **MR. STORMS:** Yeah, go ahead.
23        **MR. NOVAK:** He just gave you an
24     explanation that you don't like about
25     how these are context based and

Page 202

1     individual patient based.  He also told
2     you how and when the flag is used and
3     you mischaracterized his testimony.
4        **MR. STORMS:** That's not true at all
5     because the eMD system says suicide risk
6     right there.  Correct?  The eMDs.
7        **MR. NOVAK:** My objection was that
8     you mischaracterized his testimony.  And
9     you can feel free to review it when you
10     get the transcript.  If you have a
11     question, go ahead and ask him.
12  **BY MR. STORMS:**
13  Q.  You have in front of you Exhibit 80, correct?
14  A.  **Correct.**
15  Q.  And it identifies Dylan Brenner under current
16     problems as a suicide risk, correct?
17  A.  **Yes.  So the issue with this is this was**
18     **placed under current problems back in 2016,**
19     **this current problem was never removed**
20     **because he left abruptly, I believe it was on**
21     **August 1st, and then when he arrived back in**
22     **2017, no one had removed this yet on his**
23     **current problem list.**
24  Q.  So Christina Leonard needs to examine why
25     that's listed as a current problem, doesn't

Page 203

1     she?
2        **MR. NOVAK:** I object to the form.
3        **THE WITNESS:** As I stated before,
4     that's something that would have been
5     done according to the process that we
6     have in place, and unless there is some
7     issue that comes to her from booking
8     that says, hey, this gentleman is at
9     imminent risk right now, I'm very
10     concerned about him hurting himself down
11     here, she would have reviewed these
12     pieces of information in the normal
13     process of his care.
14  **BY MR. STORMS:**
15  Q.  So Christina Leonard observes a suicide risk
16     denotation in eMDs, a suicide flag on
17     ProPhoenix, and has an understanding that
18     Mr. Brenner is in chemical withdrawal
19     relative to PCP, and it's your testimony that
20     Christina Leonard would not need to see
21     Mr. Brenner that evening before she completed
22     her shift?
23        **MR. NOVAK:** Compound, misstates the
24     record.  Go ahead and answer.
25        **THE WITNESS:** I'd have to break

Page 204

1     apart of lot of that.  Number one, I
2     can't speak for Christina Leonard
3     specifically as we sit here today which
4     item she saw at that time or not, I
5     don't know.  Secondly, again, these are
6     useful pieces of information from his
7     past that are going to be important
8     during the normal course of care and
9     process at the facility, but unless she
10     hears something that is very concerning
11     from the booking staff during the course
12     of this gentleman's booking process,
13     she'll be seeing this patient as she
14     normally would.
15  **BY MR. STORMS:**
16  Q.  Hold on now.  You are designated under topic
17     number 24 related to MEnD's investigation
18     into the suicide of Dylan Brenner.
19  A.  **I'm not sure what you are referencing.**
20        **MR. NOVAK:** That's not a question.
21  **BY MR. STORMS:**
22  Q.  I'm referencing Exhibit 103, the deposition
23     notice, topic number 24.
24  A.  **Understood.**
25  Q.  So you are identified as a witness today on

Page 205

1  behalf of MEnD relative to the investigation
2  into Dylan Brenner's suicide, you understand
3  that?
4  A. Yes.
5  Q. Are you prepared to provide testimony on
6     that?
7  A. I am.
8  Q. As part of MEnD's investigation did it learn
9     whether or not Christina Leonard identified
10    that Dylan Brenner's eMD file reflected that
11    he was a suicide risk?
12         MR. NOVAK: Form.  Go ahead.
13         THE WITNESS: I don't recall as we
14    sit here today if she had seen both of
15    those pieces of information or not.  I
16    don't recall.
17  BY MR. STORMS:
18  Q. You know she saw at least one of them?
19  A. I don't know.
20  Q. Okay.
21  A. I don't recall.
22  Q. So this is your patient who died and someone
23    you supervised and you don't know whether or
24    not the nurse who reviewed both his
25    correctional file and his eMD files knows if

Page 206

1  he was identified as a prior suicide risk?
2         MR. NOVAK: Form, foundation.
3         THE WITNESS: So I'll back that up
4    for a second.  It wouldn't be one of the
5    normal processes that she would have
6    been conducting at that time unless
7    there was something significant brought
8    to her ahead of time.  Hey, we got
9    imminent concerns about this patient
10   right now in booking based on our
11   questioning and assessment of this
12   patient.  She would have had a deep dive
13   into that information when it was her
14   turn to see this patient.
15  BY MR. STORMS:
16  Q. But if you access ProPhoenix, there is a flag
17    that says it right there, correct, on the
18    first page you enter you have to see that
19    flag?
20  A. I will agree with you that there is suicide
21    flag that sits in the front page of
22    ProPhoenix.
23  Q. And that's the front page of eMDs that given
24    you in Exhibit 81, and on the front page of
25    eMDs it reflected that Dylan Brenner was a

Page 207

1  suicide risk when she accessed it?
2         MR. NOVAK: Form, asked and
3    answered.
4         THE WITNESS: First of all, this is
5    historical information so it doesn't
6    state that he's a suicide risk currently
7    on eMDs, it just says that he's had a
8    history of that.
9  BY MR. STORMS:
10  Q. What does it say?  It says current risk,
11    correct?
12  A. It says --
13  Q. Or it says current problems?
14  A. Yes, and patient just arrived in the
15    facility.  So it has to be from a previous
16    incarceration.
17  Q. But it reflected that that current problem
18    was a suicide risk, that was listed on the
19    chart?
20         MR. NOVAK: Asked and answered.
21         THE WITNESS: Again, I'm telling
22    you that suicide risk is listed under
23    current problems, it wasn't a current
24    problem when she would have opened this
25    chart.

Page 208

1  BY MR. STORMS:
2  Q. But she had an understanding that it was
3    listed as a current problem, or she had to
4    have seen it was listed as a current problem,
5    and she had to have seen a suicide flag on
6    ProPhoenix, both of those things have to be
7    true, don't they?
8         MR. NOVAK: I object to the form,
9    compound.
10         THE WITNESS: I've already answered
11    this.  I can't tell you with certainty
12    that she saw these items.
13  BY MR. STORMS:
14  Q. Did you ever talk to her?
15  A. I have.
16  Q. Did you talk to her in preparation for your
17    deposition today?
18  A. No.
19  Q. When you went and talked to her, did you ever
20    ask her if she observed the flag in
21    ProPhoenix?
22  A. I'm sure I did, I just don't recall whether
23    she saw these items or not.  I just don't
24    recall.
25  Q. So did you ask her if she saw that problem on

Page 209

1  eMDs?
2  A. I don't recall. And again, I will go back to
3     the fact that they are useful pieces of
4     information to notice, but unless there is an
5     issue of imminent risk that's being brought
6     to you as a nurse, you are going to discuss
7     these with this patient when it's your turn
8     to see that patient. Unless there is
9     something that is brought to you immediately
10    by booking staff or the like, you are going
11    to have them complete their process there and
12    then see the patient.
13 Q. Well, if it was testified to by -- if it was
14    testified to by Kris Bauman -- or I'm sorry,
15    if it was testified to by Rebecca Lucar that
16    she informed Kristina Bauman that Dylan
17    Brenner was a suicide risk, should Kristina
18    Bauman have seen Dylan Brenner?
19       MR. NOVAK: I object to the form,
20    misstates the testimony, incomplete
21    hypothetical.
22       THE WITNESS: I don't characterize
23    the conversation that Rebecca Lucar had
24    with Kris Bauman the way you just
25    described. From what I understand, the

Page 210

1     conversation was this patient is going
2     to be having a prolonged booking
3     process, he has reported that he takes
4     medical marijuana, would probably be a
5     good idea to have a urine drug screen
6     taken given the length of that process,
7     and so that's what they did.
8  BY MR. STORMS:
9  Q. So to the best of your understanding,
10    Kristina Bauman was never informed by Rebecca
11    Lucar that Dylan Brenner was a suicide
12    concern?
13       MR. NOVAK: I object to the form.
14       THE WITNESS: All I know is this,
15    is that I know that from my
16    understanding there was never any
17    concerns that I'm acutely concerned
18    about this gentleman. In fact,
19    Sherburne County has a rightfully so
20    aggressive track record if there was
21    great concern about this man's safety
22    for suicide, it is very common,
23    incredibly common, for them to put him
24    in Kevlar on suicide watch before they
25    even make the phone call.

Page 211

1  BY MR. STORMS:
2  Q. Where are you developing your understanding
3     that Rebecca Lucar did not inform Kris Bauman
4     that there were suicide concerns related to
5     Dylan Brenner, what is that based on?
6       MR. NOVAK: Form.
7       THE WITNESS: My review of the
8     case.
9  BY MR. STORMS:
10 Q. What, though? Is it talking to people, is it
11    reviewing documents, what is that based on?
12 A. I think it's all of the above.
13 Q. So as you sit here today, though, you cannot
14    tell me whether or not Christina Leonard
15    reviewed the eMDs or ProPhoenix flags related
16    to Dylan Brenner and suicidality, right?
17 A. What I'm telling you is I don't recall
18    whether she did or not, but that wouldn't be
19    a mandate to the care that he was supposed to
20    get at that time based on the situation.
21 Q. Well, she would need to review the
22    constellation of all of his symptoms after
23    getting that information, correct?
24       MR. NOVAK: Form.
25       THE WITNESS: Getting what

Page 212

1     information? I'm sorry.
2  BY MR. STORMS:
3  Q. If she observes that Dylan Brenner has a
4     prior history of suicidality at the Sherburne
5     County Jail, she needs to take that
6     information and assess it along with all the
7     other information in her possession, correct?
8       MR. NOVAK: Asked and answered.
9       THE WITNESS: And as I stated
10    before, that's exactly what she would
11    have done.
12 BY MR. STORMS:
13 Q. Well, did she do that?
14 A. Not at that time. And again, because of the
15    process that we were going through, and no
16    reports of any imminent concerns on this man,
17    we're greatly worried about this man's safety
18    right now, she was going to follow the
19    process, see this patient when it was her
20    turn to see him, and review his information
21    with him.
22 Q. Did you ever expressly ask Christina Leonard
23    why she did not see Dylan Brenner that
24    evening?
25 A. I don't recall. I don't recall that question

Page 213

1  or not.  I don't recall.
2 Q. So can you tell me anything about your
3     conversation with Christina Leonard in terms
4     of the information she conveyed to you
5     relative to Dylan Brenner?
6 A. **I'm just telling you I don't recall the**
7     **specifics of it.  I can tell you I reviewed**
8     **the situation.  I don't recall what**
9     **particulars were in that conversation but**
10    **I've reviewed the situation, I've reviewed**
11    **the activities and actions taken by our**
12    **staff, and they were doing things**
13    **appropriately given the situation.**
14 Q. Has anyone ever asked Christina Leonard from
15    MEnD whether or not she observed the suicide
16    risk denotation on eMDs or the suicide flag
17    on ProPhoenix?
18 A. **I don't know if those questions were asked**
19    **specifically.  I just can't answer the**
20    **specifics of that conversation.**
21 Q. What did you do to prepare to give me
22    information about the specifics of those
23    conversations as the 30(b)(6) designee for
24    today?
25 A. **I reviewed everything that I had at my**

Page 214

1     disposal for this case.
2 Q. Could you have had a conversation with
3     Christina Leonard before you provided
4     testimony today?
5 A. **I don't believe I can because she is on**
6     **maternity leave.**
7 Q. So you believe that you are unable to talk to
8     her because she's on maternity leave?
9 A. **I guess it's a concern, yes.**
10 Q. Did you have a conversation with Diana
11    VanDerBeek in preparation for today's
12    deposition?
13 A. **I had -- I gathered information from her but**
14    **I didn't discuss merits of the case.**
15 Q. So your preparation to provide testimony
16    today relative to the investigation into
17    Dylan Brenner, what did that preparation
18    consist of?
19 A. **Reviewing all the information I had before**
20    **me, medical records, documents, deposition**
21    **transcripts, all of it.**
22 Q. And it's your testimony that Christina
23    Leonard's decision not to see Dylan Brenner
24    on the evening of October 6, 2017, conformed
25    to the nursing standard of care?

Page 215

1        MR. NOVAK: I object to the form.
2        THE WITNESS: What I'm saying is I
3     think her decision that maybe not to see
4     him at that time was very appropriate to
5     the situation and information that she
6     had.
7  BY MR. STORMS:
8 Q. And you wouldn't tell her to do anything
9     differently today?
10 A. **Regarding?**
11 Q. Regarding her decision not to see Dylan
12    Brenner?
13       MR. NOVAK: Form.
14       THE WITNESS: I would not have any
15    issue with what -- the way she conducted
16    herself in regard to having them
17    complete the booking process, knowing
18    that she was not getting any kind of
19    grave concerns about this man's safety
20    from booking, allow them to finish the
21    booking process, and then let's see the
22    patient.
23  BY MR. STORMS:
24 Q. So if you are training your nurses at MEnD
25    today and you tell them you have an inmate

Page 216

1     who is there who has come into the jail and
2     they have in their eMDs and their ProPhoenix
3     a noted history of suicidality, your training
4     would tell them unless you observe something
5     else, you don't need to see them outside of
6     the ordinary course of business?
7        MR. NOVAK: Form, foundation,
8     incomplete hypothetical.  Go ahead.
9        THE WITNESS: That's a long
10    question.  I would, first of all, argue
11    that this patient did not have
12    suicidality in his past, there was
13    precautions taken in his past given an
14    outburst that he had, and was taken off
15    of that fairly quickly.  I would say
16    given all the information that was
17    happening that evening and the concern
18    that she was not getting, I would expect
19    her to go through her normal course of
20    operations.
21  BY MR. STORMS:
22 Q. If there wasn't a past history of
23    suicidality, why was he in Kevlar before?
24 A. **Because they were being precautionary.**
25 Q. And why would you have in a medical record

Page 217

1 that he was a suicide risk if there wasn't a
2 past history of suicidality?
3 **A. Because as I explained to you before, for a**
4 **nurse to complete and sign off on her chart**
5 **or document in eMDs, you have to put**
6 **something that is somewhat relative to the**
7 **situation. That problem was put in by a**
8 **nurse, the patient left abruptly I believe it**
9 **was Monday, August 1st, that was never taken**
10 **out of there as not a current issue anymore,**
11 **and then when this patient arrived, it was**
12 **very quickly thereafter that they are**
13 **classifying him, screening him, and booking.**
14 Q. So are you saying that if he would have left
15 in the ordinary course they would have
16 removed that suicide risk from the current
17 problems and wouldn't have that denoted any
18 longer in eMDs?
19 MR. NOVAK: I object to the form,
20 it's getting argumentative.
21 THE WITNESS: I'm telling you this,
22 if it's not an active problem, it's not
23 an active problem. It would be put as a
24 past problem.
25

Page 218

1 **BY MR. STORMS:**
2 Q. And it's not important to review past
3 problems when you have a new inmate come in?
4 **A. It's absolutely important to do it in the**
5 **normal course of your operations and the**
6 **normal course of what you are supposed to do**
7 **based on the information you have. And**
8 **again, there is no information being given to**
9 **us that this man is exhibiting anything that**
10 **is giving them grave concerns about his**
11 **safety, so the decision to wait until they**
12 **are done with the booking process, in my**
13 **opinion, is very appropriate.**
14 Q. And so just to be clear, because you are
15 ultimately responsible for training, correct,
16 the training that's provided, you have to a
17 approve it?
18 **A. So we've discussed this before as well, I**
19 **approve, ultimately approve, but our training**
20 **curriculum and activities is all a team**
21 **effort. We put that together as a team and**
22 **then I ultimately approve it.**
23 Q. And so in terms of training your staff at
24 MEnD who operate under your license, is it
25 your testimony that if your staff observes

Page 219

1 both in eMDs and ProPhoenix a prior history
2 of suicidality, that they can wait in terms
3 of -- they can wait, I don't know, 24 hours
4 to see an inmate before they assess them for
5 suicidality?
6 MR. NOVAK: Form, asked and
7 answered.
8 THE WITNESS: So I wouldn't
9 characterize, first of all, as
10 suicidality. And you'll have to repeat
11 the question, it was a long question.
12 **BY MR. STORMS:**
13 Q. If you provide training to your staff at MEnD
14 today, is it your testimony that if they
15 observe a history of suicidality in eMDs and
16 ProPhoenix, that they can wait 24 hours
17 before they personally meet with that inmate?
18 MR. NOVAK: Form.
19 THE WITNESS: We don't train on a
20 specific waiting period, what we train
21 them on is go through the process,
22 unless you've got an issue that's coming
23 from booking, let them complete the
24 booking process and then let's see the
25 patient and let's review all the

Page 220

1 pertinent information and develop a
2 plan.
3 **BY MR. STORMS:**
4 Q. So when was that going to happen for Dylan
5 Brenner?
6 **A. It would have been late afternoon to early**
7 **evening on Saturday the 7th.**
8 Q. And the fact that he had these prior
9 suicidality denotations in eMDs and
10 ProPhoenix does not impact that timing at
11 all?
12 MR. NOVAK: Form.
13 THE WITNESS: It would happen much
14 sooner and, again, I don't characterize
15 those as suicidality, for the record I'm
16 going to state that. Secondly is unless
17 there was a concern that was being
18 brought up initially from the booking
19 staff, they would have just followed the
20 process, okay, he's completed with his
21 booking, his booking process, here is
22 the information, now let's sit down with
23 this gentleman and talk about all of his
24 care.
25

Page 221

BY MR. STORMS:

1 BY MR. STORMS:
2 Q.  Are you distinguishing as a technicality
3    between suicide risk and suicidality?
4 A.  Oh, I don't call it a technicality at all.
5 Q.  There is a difference?
6 A.  Everybody has suicide risk.  Suicidality
7    would be a number of factors that you would
8    be aware of of imminent risk.
9 Q.  Well, if someone is placed in Kevlar, that's
10   because there is a concern about imminent
11   risk, correct?
12 A.  So if someone is placed in Kevlar 15 months
13   ago and is subsequently taken off of that
14   full precautionary watch, that becomes less
15   of an issue than a gentleman who was placed
16   in Kevlar 30 minutes ago.
17 Q.  Mr. Brenner left on special precautions
18   still, though, didn't he?
19 A.  He left on a 30 minute mental health watch,
20   the lowest mental health watch we have
21   without having a watch at all.
22 Q.  But still had not been cleared for general
23   population without a watch, correct?
24 A.  I don't recall if he was cleared for general
25   pop, I believe he was.  But a lot of patients

Page 222

1    can be in general population with a 30 minute
2    mental health watch.  What it does is it
3    causes the correctional officers to document
4    more information during those visits with us.
5 Q.  Does it impact your analysis at all if he was
6    not cleared for general population in 2016?
7 A.  If he would have left on suicide watch.
8 Q.  If he left on administrative segregation?
9 A.  Those are two different things.  If he left
10   on suicide watch, the booking department
11   would have put him back on suicide watch.
12   I'm very confident of that.
13 Q.  If he leaves on admin seg, he has to return
14   to admin seg, correct?
15 A.  I believe that is the policy of Sherburne
16   County.
17 Q.  And if he was on a mental health watch when
18   he left, he should return to that mental
19   health watch?
20 A.  Not necessarily.  That's not a policy.
21 Q.  Who assesses whether or not he should return
22   to a mental health watch?
23 A.  That's what this process is all about.  Going
24   through the booking process, the
25   classification process, the health assessment

Page 223

1    from the nursing staff, all of that would
2    determine -- and any consultation that was
3    required therein would determine if this
4    patient should be on any mental health watch
5    at all or what level if so.
6 Q.  So just to get this straight, are you saying
7    that Dylan Brenner in 2016 wasn't a suicide
8    risk?
9 A.  I would say this, that he showed some anger
10   and because of that anger people put him on
11   full precautions, discussed the case with
12   him, had a mental health professional
13   evaluate him, and then was quickly taken off
14   of it.
15 Q.  So your staff chose the word suicide risk,
16   correct?  They wrote that down?
17 A.  And I discussed that with you and explained
18   that already.
19 Q.  What, though?  What have you explained?
20   Right there in eMDs they wrote down suicide
21   risk, right?
22      MR. NOVAK: I object to the form.
23   You are getting pretty argumentative,
24   Jeff.
25      MR. STORMS: I'm very argumentative

Page 224

1    because their records are nonsense.
2    Your employee wrote --
3      MR. NOVAK: Hang on.  We're not
4    doing the little one off with the
5    comments like that.  Can you just --
6      MR. STORMS: I'll give you two.  We
7    have a doctor who signs a bunch -- his
8    name has signed thousands of documents
9    and then he writes suicide --
10      MR. NOVAK: Jeff, if you want to
11   ask him a question --
12      MR. STORMS: I was asking him a
13   question.
14      MR. NOVAK: Quit pointing at the
15   witness is my problem.
16 BY MR. STORMS:
17 Q.  Your employee identified suicide risk.  Your
18   employee wrote that down, correct, in Exhibit
19   80?
20 A.  And as I explained before, our nursing staff,
21   because they have to put something in eMDs
22   under assessment that is somehow related to
23   what they are doing, otherwise they can't
24   sign off on the document, put in suicide risk
25   as her -- and then at that point the patient

Page 225

1    **was put in full precautions, and then**
2    **subsequently a mental health professional**
3    **evaluated him and then took him off of those**
4    **precautions after that visit.**
5 Q. Are you saying that suicide risk is a form
6    entry that that person had to choose, that it
7    wasn't their own words that they chose?
8 **A. I don't understand the question, sorry.**
9 Q. Well, they chose to write suicide risk, could
10   they have written suicidal, did they have the
11   option or the ability to write that if they
12   wanted to?
13 **A. I would have to explore what their options**
14   **were. I just don't have it committed to**
15   **memory every option they have to put in**
16   **there.**
17 Q. So you don't know whether or not -- but your
18   testimony was they have to put something in
19   due to the eMD system. So you don't know,
20   though, whether or not they can choose their
21   own words or have to choose words that are
22   selected for them?
23 **A. There is a finite number of options that you**
24   **can choose from.**
25 Q. So look at Exhibit 80, what's listed in

Page 226

1   current problems?
2 **A. I have reviewed this, I'm aware of it.**
3 Q. And what does it say on Exhibit 80 for
4   current problems, what are they listed as?
5 **A. Hanging self, medication started. I can't**
6   **read it. I'm sorry. Patient --**
7       **MR. NOVAK:** It's tough to read. Do
8   you have --
9 **BY MR. STORMS:**
10 Q. Let me ask you this -- and I will take that
11   copy back because he has one. Is it your
12   understanding that hanging self is one of the
13   finite options in eMDs?
14 **A. Am I aware of that? I am aware of that**
15   **because it's in there.**
16 Q. I know, but are you saying that that's a
17   finite option, the words hanging self, in
18   current problems?
19 **A. I'm not understanding the question. I'm**
20   **sorry.**
21 Q. Well, I asked you about suicide risk and
22   whether or not those were words that were
23   chosen by your employee, or if it's a form
24   selection. And you had said you are not sure
25   whether or not they are a finite or infinite

Page 227

1   selection?
2 **A. Yes.**
3 Q. And I'm asking you whether or not you believe
4   hanging self to be something that is a
5   predetermined selection?
6 **A. Okay. So there is a lot you said there.**
7   **What I tried to explain to you earlier is you**
8   **only have so many options to choose from in**
9   **eMDs, I don't know off the top of my head how**
10   **many options there are. But there are**
11   **options that you can choose from. I'm not**
12   **even sure if a nurse can pretext an**
13   **assessment title.**
14 Q. So you don't know if hanging self is pretext
15   or selected?
16 **A. I believe it is one of the options that you**
17   **have.**
18 Q. Hanging self?
19 **A. I believe so.**
20 Q. Okay. So when we do our inspection, we'll be
21   able to take a look at those options on eMDs?
22 **A. You should be.**
23 Q. Okay. And did you go back and ever look at
24   the audit trail to determine when those
25   current problems were listed in eMDs?

Page 228

1 **A. Did I use an audit trail? I used medical**
2   **records because there is notes created that**
3   **-- and it explains to you on the health**
4   **summary when those were entered. You don't**
5   **need an audit trail to determine that.**
6 Q. So I'm asking you whether or not you ever
7   went and reviewed an audit trail to determine
8   the times that those current problems were
9   entered?
10 **A. And my answer is no because I didn't need it.**
11 Q. Why?
12 **A. Because it's evident right on the chart when**
13   **those were entered.**
14 Q. And you have an understanding that suicide
15   risk was entered prior to Dylan Brenner
16   committing suicide?
17 **A. It was entered in 2016 during a nursing**
18   **assessment.**
19 Q. And if Christina Leonard -- so did you ever
20   ask Christina Leonard if she went back and
21   reviewed any of Dylan Brenner's historical
22   records?
23 **A. You've asked me this already, and I answered**
24   **it.**
25 Q. You don't remember if you asked her or you

**BRENNER**

```
12    encounter with a patient, you make sure
13    you document that.  That's the one thing
14    I remember distinctly from that case.
15  BY MR. STORMS:
16  Q.  So are you saying that your employees all
17    provided adequate care in that case but they
18    just failed to document that adequate care?
19        MR. NOVAK: Form.
20        THE WITNESS: That was our
21    position, absolutely.
22  BY MR. STORMS:
```

Page 232

```
25
```



Page 233

1    **MR. NOVAK:** Asked and answered.
2        **THE WITNESS:** I don't know where
3    that file is and I don't want to
4    speculate as to the reason it's missing
5    at this time so -- because I don't know.
6  **BY MR. STORMS:**
7

10 Q. And adequate care in the Brenner matter?
11 A. **Correct.**
12 Q. And adequate care in the Lynas matter?
13 A. **Correct.**
14 Q. Has MEnD ever provided inadequate care, in
15    your opinion, with respect to a suicide?
16        **MR. NOVAK:** Form, asked and
17    answered.
18        **THE WITNESS:** I don't believe so,
19    no.
20  **BY MR. STORMS:**
21 Q. So the only thing that MEnD could have done
22    better in relation to any of these suicides
23    would just be to document good work better?
24        **MR. NOVAK:** Form.
25        **THE WITNESS:** No. What I'm saying

Page 234

1    is in a couple of these cases there was
2    some documentation issues that we
3    addressed. But I feel like each one of
4    those patients received adequate and
5    appropriate care.

Page 237



Page 239

11   BY MR. STORMS:

12   Q.  Even your contract, such as the one with
13       Sherburne County, even denote that you have
14       to have access to your patient's medical
15       files even after termination of MEnD
16       services?

17   A.  As required, yeah.

18   Q.  And my understanding is that you had paid a
19       settlement on the Josh Holscher case as well?

20   A.  No.  We were never sued on the Josh Holscher
21       case.

22   Q.  Aside from Kyle Allan Baxter-Jensen, are
23       there other cases where MEnD has paid a
24       settlement to resolve the case?

25   A.  Irregardless of suicide?

Page 238

10   Q.  And you prefer that your name not be
11       incorrectly affixed as a signature to the
12       Brenner and Lynas files?

13   A.  I would prefer that the eMD system worked
14       correctly and not have my name switched
15       somehow as a signature stamp.

Page 240

1    Q.  No.  Specifically with respect to suicide?

2    A.  I just want to be correct on this.  No.

Page 241



4  Q. Have you ever been sued for medical
5     malpractice aside from your work at MEnD?
6  A. **No, I don't believe -- I don't believe I've**
7     **ever been sued for medical malpractice.**
8  Q. Are you involved with the hiring process for
9     nurses at MEnD?
10 A. **Peripherally.  More so when requested when**
11    **questions arise when they want my opinion.**
12 Q. Are you aware of what is done in terms of
13    background checks for employees?
14 A. **Yeah.  There is a system of vetting from our**
15    **HR director, they have to be cleared through**
16    **the Minnesota BCA.  All of our employees have**
17    **to be.  And then depend on the facility or**
18    **facilities where they intend to work, each**
19    **one of those facilities needs to individually**
20    **clear them as well.**
21 Q. Are you aware of the fact that Amanda Nowell
22    was working for you at the Sherburne County
23    Jail but then attempted to get hired by the
24    county itself?
25 A. **I'm aware of that.**

Page 242

1  Q. And you are aware of the fact that they had
2     found a number of items in her background
3     that disqualified her from working for you at
4     the jail?
5  A. **I have no idea specifically what they found,**
6     **it was only reported that during her**
7     **application to become a county employee of**
8     **some sort they found something that they**
9     **missed in her previous background check**
10    **process that bothered them this time and**
11    **because of that fact, they had to disqualify**
12    **her from coming into the facility.**
13       **MR. NOVAK:** Go off for just one
14    second.
15          (There was a discussion off
16          the record.)
17 **BY MR. STORMS:**
18 Q. Who participates in the drafting of quarterly
19    reports at MEnD for Sherburne County?
20 A. **It's, again, a team approach.  There is staff**
21    **at Sherburne County that assists in**
22    **preparation for these, there is corporate**
23    **staff that participate in those, director of**
24    **nursing participates, and I participate.**

Page 243



Page 244

22 Q. Did you attend debriefings related to the
23    suicide of Dylan Brenner?
24 A. **I did not.**
25 Q. Did you attend any meetings related to the

Herbert L. Peterson & Associates
hpa@skypoint.com

BRENNER vs.
MEnD CORRECTIONAL CARE, et al.

TODD LEONARD
July 8, 2020

Page 245

1 suicide of Dylan Brenner?
2 A. That's a broad question. Can you be more
3 specific?
4 Q. Did you meet with other individuals from MEnD
5 or Sherburne County to discuss the suicide of
6 Dylan Brenner?
7 A. Other than my investigation of his death and
8 any preliminary conversation I would have had
9 with jail administration, and then our
10 quarterly meeting with Sherburne, I don't
11 recall any others.
12 Q. Who did you specifically speak to as part of
13 your investigation into Dylan Brenner's
14 suicide?
15 A. I don't have an exhaustive list committed to
16 memory today.
17 Q. Tell me who you recall speaking to?
18 A. At some point I spoke to Pat Carr, Diana
19 VanDerBeek, Michelle Skroch, Christina
20 Leonard. And beyond that I just don't recall
21 specific names.
22 Q. What would have been the purpose of talking
23 to Michelle Skroch?
24 A. Being the director of nursing and supervisor
25 for Diana VanDerBeek, I felt it important

Page 246

1 that she at least be aware of what I was
2 doing and any other questions she wanted to
3 ask or inject or --
4 Q. Did she participate into the investigation of
5 Dylan Brenner's suicide?
6 A. Loosely. Loosely.
7 Q. Who participated in the investigation related
8 to James Lynas's suicide?
9 A. I don't recall off the top of my head. I can
10 tell you that Diana VanDerBeek would have
11 been involved, Michael Robertson would have
12 been involved, Linda Pantzke would have been
13 involved, Jen Thompson would have been
14 involved. And beyond that I just don't
15 recall the others.
16 Q. Who is Jen Thompson?
17 A. Supervisory nurse at Sherburne County Jail.
18 Q. So she's below Diana VanDerBeek?
19 A. Diana VanDerBeek is her direct report.
20 Q. When would she have been on duty as a
21 supervisory nurse typically?
22 A. Depends when you are asking.
23 Q. Do you know if she was on duty at the time of
24 Dylan Brenner's suicide?
25 A. I don't believe so.

Page 247



18 Q. Have you ever provided training at MEnD that
19 specifically addresses any individual
20 suicide?
21 A. Can you repeat that?
22 Q. Have you ever provided any training at MEnD
23 that specifically addresses any individual
24 suicide, so a specific suicide?
25 A. That's a difficult question to answer. When

Page 248

1 you say you provided, what do you mean by --
2 Q. MEnD. Has MEnD provided training that
3 addresses any specific instance of suicide
4 that occurred in its care?
5 A. I don't know if I'd ever categorize it that
6 way. Again, it's taking our core curriculum
7 principals, using that, and fine tuning that
8 over time. Unless a major systemic process
9 issue is discovered, those core principals
10 would remain the same with their usual
11 customary frequent tweaks, fine tunes, all
12 that sort of thing.
13 Q. In obtaining the accreditation for Sherburne
14 County in 2018, were you required to submit
15 or help submit paper applications?
16 A. When you say you, what do you mean by you?
17 Q. Did MEnD assist Sherburne County in
18 submitting paper applications?
19 A. I'm sure we helped them to some extent. I
20 just don't recall, you know, how integrated
21 we were into that aspect of it.
22 Q. Do you recall if you needed to provide
23 information relative to the suicides of Dylan
24 Brenner and James Lynas as part of those
25 accreditation processes?

BRENNER vs.
MEnD CORRECTIONAL CARE, et al.

TODD LEONARD
July 8, 2020

Page 249

1 A. Can you repeat that again?  I'm sorry.
2 Q. Do you recall if you needed to provide
3    information relative to the suicides of Dylan
4    Brenner and James Lynas as part of those
5    accreditation processes?
6 A. I don't recall.
7 Q. Have you ever been interviewed by law
8    enforcement as part of an investigation into
9    the suicide of Dylan Brenner?
10 A. No.
11 Q. Have you ever been interviewed by law
12    enforcement as part of the investigation into
13    any inmate who committed suicide at one of
14    your facilities?
15 A. It's possible I may have been interviewed, I
16    don't know, it's possible for the Kyle Baxter
17    case, but I just don't recall.
18 Q. Did MEnD have to provide any interviews to
19    the Department of Correction -- did anyone
20    from MEnD have to provide interviews to the
21    Department of Corrections as part of Dylan
22    Brenner's suicide?
23 A. I don't believe so.
24 Q. Are you aware of the Department of
25    Corrections conducting -- or have you ever

Page 250

1    personally had to give an interview to the
2    Department of Corrections as part of the
3    suicide of any inmate that occurred in MEnD's
4    care?
5 A. I can recall having one conversation with a
6    DOC inspector about a case, but I don't
7    recall if it was actually a case that
8    involved a death or it was just a case in
9    general they had some concerns with, I just
10    don't recall.
11 Q. What were the concerns in that case?
12 A. That's what I mean, I don't recall which it
13    was.  I can remember talking to a DOC
14    inspector regarding a particular case, I just
15    can't remember which one it was.
16        MR. STORMS: I'm going to be
17    finished with questions for now but I'm
18    going to continue to maintain that we
19    should be permitted to conduct
20    additional -- or obtain additional
21    deposition testimony regarding topics 30
22    and 31 relative to the collection and
23    preservation efforts.
24        MS. ANGOLKAR: I have no questions.
25        MR. NOVAK: We'll read and sign.

Page 251

1    Thank you.
2        (Whereupon, the deposition
3        was concluded at 4:15 p.m.)
4        * * *
5 (REPORTER'S NOTE: The original deposition
6 transcript is being delivered to Mr. Storms,
7 after the completion of the reading and
8 signing, pursuant to Rule 30.06 of the Rules
9 of Civil Procedure, for filing with the
10 Court.)

Page 252

1    I, TODD LEONARD, having read my deposition, do
2 hereby attest to the accuracy of its
3 transcription, noting any changes and the reasons
4 therefore below.
5 DATED:
6 sah
7                    _____
8                         TODD LEONARD
Page and
Line No.          CHANGE              REASON
10 _____

Page 253

1   STATE OF MINNESOTA)
                      ) ss:
2   COUNTY OF HENNEPIN)

3      BE IT KNOWN, that I, STACY ANN HUTCHINSON,
    Court Reporter, a Notary Public in and for the
4   County of Hennepin, State of Minnesota, certify
    that the foregoing is a true record of the
5   deposition of TODD LEONARD, who was first duly
    sworn by me in my presence and reduced to writing
6   in accordance with my stenographic notes made at
    said time and place.

7
       I further certify that I am not a relative or
8   employee or attorney or counsel of any of the
    parties or a relative or employee of such
9   attorney or counsel;

10     That I am not financially interested in the
    action and have no contract with the parties,
11  attorneys, or persons with an interest in the
    action that affects or has a substantial tendency
12  to affect my impartiality;

13     That all parties who ordered copies have been
    charged at the same rate for such copies;

14
       That the right to read and sign the deposition
15  by the witness was not waived.

16     IN WITNESS WHEREOF, I have hereunto set my
    hand on this 17th day of July, 2020.
17

18

19
                        _____
20                      STACY ANN HUTCHINSON
                        Court Reporter and Notary Public
21                      Hennepin County, Minnesota

22  My commission expires January 31, 2025.

23

24

25

---

Page 254

1                    July 17, 2020

2

3   Mr. Anthony J. Novak
    Larson King
4   30 East Seventh Street
    Suite 2800
5   St. Paul MN 55101

6
    RE:  Brenner -vs- MEnD, et al.
7
    Dear Mr. Novak:
8
    Enclosed is the errata page from the deposition
9   of TODD LEONARD.  Please have the witness read
    the deposition and indicate any changes and the
10  reasons therefor on the errata sheet.  When that
    is complete, please send a copy of the errata
11  sheet to opposing counsel, and the original
    errata sheet to me.

12
    As you are aware, the witness has 30 days to
13  complete the reading and signing procedure.  I
    will need to receive the errata sheet by
14  August 21, 2020, or signature is presumed waived.

15  Thank you for your assistance.

16  Sincerely,

17

18
    Stacy A. Hutchinson
19  Court Reporter

20  cc:  Jeffrey S. Storms, Esq.
         Stephanie A. Angolkar, Esq.
21

22

23

24

25