# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

| | |
|---|---|
| DAWN BRENNER and KATHLEEN BRENNER, as co-trustees for the heirs and next of kin of Dylan Brenner, | Case No. 18-CV-2383 (NEB/ECW) |
| Plaintiffs, | ORDER ON MOTIONS FOR SUMMARY JUDGMENT |
| v. | **(FILED UNDER SEAL)** |
| DANIELLE SUE ASFELD, in her individual capacity, CHRISTINA LEONARD, in her individual capacity, KRISTINA RYAN F/K/A KRISTINA BAUMAN, in her individual capacity, TODD LEONARD, in his individual and official capacities, REBECCA LUCAR, in her individual capacity, RUSSELL DENNY, in his individual capacity, WES GRAVES, in his individual capacity, JAMES ROURKE, in his individual capacity, JOHN REICH, in his individual capacity, TRAVIS LINDSTROM, in his individual capacity, MEnD CORRECTIONAL CARE, PLLC, and SHERBURNE COUNTY, | |
| Defendants. | |

Dylan Brenner died by suicide at Sherburne County jail. His wife and his mother, Dawn and Kathleen Brenner, sue under 42 U.S.C. Section 1983 alleging that the correctional officers, MEnD, and Sherburne County violated Brenner's constitutional rights under the Eighth and Fourteenth Amendments by acting with deliberate

indifference to Brenner's serious medical needs. They also sue under Minnesota negligence laws. The Sherburne County Defendants and the MEnD Defendants each move for summary judgment. For the reasons below, the Court denies in part and grants in part their motions.

## BACKGROUND

### I.    Brenner's 2016 Stay at Sherburne County Jail

The year before Brenner died by suicide, he was held for several days at Sherburne County jail on suspicion of a felony. (*See* ECF No. 207, Ex. F ("Brenner's Jail Records") at 3, 58.) During this 2016 stay, Brenner met with Officer John Reich, who completed a medical intake form for Brenner, noting that Brenner had a traumatic brain injury[1] ("TBI"), post-traumatic stress disorder ("PTSD"), and anxiety. (*Id.* at 3.) Reich also noted that Brenner did not have his medications with him at the jail. (*Id.*) Prison staff put Brenner on suicide watch during the 2016 stay. Staff marked his profile as "suicidal" in the jail's records management system, ProPhoenix, which created a flag marked "suicidal" on Brenner's profile. (*Id.* at 2, 27.) This flag is "intended to be obvious" and would appear to anyone who opened his profile. (ECF No. 189, Ex. 40 ("Carr Dep. II") at 49 (native pagination).) As part of the suicide-watch protocol, jail staff put Brenner in a suicide-prevention gown and held him in Booking Holding Cell 5 ("BH-5"), which is a

---

[1] Reich only noted one of Brenner's TBIs when he in fact had two. (Brenner's Jail Records at 3; ECF No. 189, Ex. 13 ("Denny Dep.") at 80 (native pagination).)

segregation cell specifically for inmates with a high risk of suicide. (ECF No. 189, Ex. 3 ("Lucar Dep.") at 82, 85 (native pagination).) Staff then placed Brenner on 15-minute "health watches," meaning that jail staff must check on him every 15 minutes. (*Id*. at 98–100.) The staff later switched to 30-minute health watches but retained Brenner's classification as suicidal because Brenner posed a threat to himself. (*Id*. at 98, 117–19.) Brenner's 2016 stay lasted approximately three days; he was then transferred to another jail. (Brenner's Jail Records at 3, 58; ECF No. 207, Ex. J at 97–98.)

## II.    Brenner's 2017 Risk Assessment Interview and Classification

The next year, in October 2017, Brenner was convicted of a felony and returned to Sherburne County jail. (ECF No. 189, Ex. 1.) When he arrived, he presented with several suicide risk factors: history of mental illness without access to his medication, recent sentencing and incarceration, veteran status, a self-harm scar, race, age, and gender. (Denny Dep. at 43, 47–48, 74–75, 83; Lucar Dep. at 73; ECF No. 189, Ex. 12 ("Hussain Notes") at 2.) Most of the jail staff Brenner interacted with knew about some or all of these risk factors. During Brenner's stay, several staff members learned more about Brenner's suicide risk from their interactions with Brenner and his family.

Brenner arrived the evening of October 6, and he met with classification officer Rebecca Lucar for a "risk assessment interview." (Lucar Dep. at 27, 64, 67; ECF No. 214, Ex. B ("Sheriff Report") at 28.) Lucar reviewed Brenner's ProPhoenix profile, so she saw the suicide flag and knew that Brenner had been on suicide watch during his previous

Sherburne County jail stay. (Lucar Dep. at 80, 96–97.) During the interview, Brenner gave vague answers and lied about his classification during his 2016 incarceration, which Lucar found concerning. (*Id*. at 77, 81.) Brenner accurately informed Lucar that he had PTSD and a prescription for medical cannabis.[2] (*Id*. at 78.)

Lucar completed an Inmate Notice of Classification Review form, assigning Brenner to maximum security due in part to the concerns from the 2016 stay. (*Id.* at 127–28; ECF No. 189, Ex. 7 at 3–4.) After speaking with Brenner, Lucar decided to place Brenner in BH-5. (Lucar Dep. at 82, 85.) Lucar's interaction with Brenner ended after she placed him in BH-5; she was not involved in his booking, which came later. (*See id.* at 103.)

### III.    MEnD's Initial Involvement with Brenner

*MEnD.* MEnD runs the jail's medical clinic.[3] (ECF No. 204, Ex. 39 ("Carr Dep. I") (filed under seal) at 11–14 (native pagination).) MEnD uses "mid-level" practitioners instead of medical doctors, and in doing so, touts its savings to the jail. (Carr Dep. II at

---

[2] As part of the Sherburne County Sheriff's investigation into Brenner's suicide, an interviewer asked Lucar if she had questioned Brenner about harming himself or if he vocalized any past suicidal ideations or thoughts. (Sheriff Report at 28–29.) Lucar said she had asked these questions, and Brenner had answered "no." (*Id*.) She also stated that if Brenner had answered "yes," she would have "follow[ed] up" with "the appropriate people." (*Id*.)

[3] MEnD provides healthcare services to at least 40 jail facilities in Minnesota and six other facilities across the Midwest. (ECF No. 214, Ex. E ("VanDerBeek Dep.") (filed under seal) at 17 (native pagination).)

98–99 (noting savings of $4 million in one year).) During Brenner's 2017 stay, the jail's capacity was around 500 inmates. (Carr Dep. I at 29.) MEnD staff knows about the jail's suicide watch policy, including the policy requiring that an inmate be placed in BH-5 if he is on suicide watch. (*See e.g.*, VanDerBeek Dep. at 133–34.) MEnD has access to ProPhoenix profiles and also keeps patient health summaries in eMD—an electronic medical record system. (Carr Dep. I at 23; *see, e.g.*, ECF No. 189, Ex. 9 ("Leonard Dep. II") at 43–47 (native pagination).) Brenner's eMD health summary included his various mental health medications and listed "suicide risk" as a "current problem." (ECF No. 219, Ex. 15 at 177.) The health summary is the first page MEnD staff viewed when opening Brenner's eMD profile. (*See e.g.*, Leonard Dep. II at 43.)

*Nurse Kristina Bauman.* After interviewing Brenner, Lucar called MEnD and spoke with Kristina Bauman, a MEnD nurse. (Hussain Notes at 2; ECF No. 209 (filed under seal) at 2; Lucar Dep. at 81.) Lucar told Bauman that Brenner had been in MEnD's care during his last stay, was now placed in BH-5, and was prescribed medical cannabis for PTSD. (Lucar Dep. at 81.) Lucar does not remember if she discussed Brenner's historical suicide risk with Bauman, but it was something she typically would tell MEnD. (*Id*. at 83.)

Bauman does not recall the conversation with Lucar. (ECF No. 189, Ex. 10 at 17–18 (native pagination).) She has, however, been trained on suicide risk and prevention, and she understands that BH-5 is a suicide watch cell. (*Id*. at 15, 39–42.) Following her

conversation with Lucar, Bauman did not meet with Brenner. She ordered a urinary analysis for Brenner but did nothing else. (Hussain Notes at 2.)

*Nurse Christina Leonard*. After Bauman ordered the urinary analysis, MEnD nurse Christina Leonard completed it. (ECF No. 189, Ex. 8 ("Leonard Dep.") at 88 (native pagination).) The test was positive for PCP and marijuana; Leonard reviewed Brenner's ProPhoenix and eMD profiles but apparently missed the suicide indicators. (*Id*. at 91–92, 98; Leonard Dep. II at 42.) She claims that she did not look at Brenner's history (including his suicide risk) because she was not concerned about "historical issues." (Leonard Dep. II at 43–47.)

Leonard maintains she only cared about "urgent concerns"—which did not include the suicide flag. (*Id.* at 40, 46, 62, 64.) Leonard testified that a more thorough examination by MEnD would have come later, most likely on the evening of October 7 (too late to prevent Brenner's suicide). (*Id.* at 48–49.) Until that occurred or until the booking officers alerted the medical staff to an issue, Leonard was not concerned with analyzing Brenner's suicide risk. (*Id.* at 48–50, 65.) Leonard testified that even had she been aware of Brenner's prior suicide risk, she would have done nothing different. (*Id.* at 65.)

*Dr. Todd Leonard.* At all relevant times, Dr. Leonard was MEnD's sole owner, President, and Chief Medical Officer; he was also the only medical doctor for all but two of the more than 40 MEnD facilities. (VanDerBeek Dep. at 17; Leonard Dep. at 15; ECF

No. 220 ("Todd Leonard Dep.") (filed under seal) at 22, 35–39 (native pagination).) Dr. Leonard signs all medical files whether he reviews the file or not, and there is conflicting testimony about whether this feature is a "glitch" or MEnD's intentional practice.[4] (ECF No. 198, Ex. U at 52–53 (native pagination); Carr Dep. I at 26 (testifying that he would have been informed of a glitch but was not); ECF No. 222 ("Todd Leonard 30(b)(6)") (filed under seal) at 102 (native pagination).) Nonetheless, as a result, Dr. Leonard signed Brenner's urinary analysis results even though he was not involved in Brenner's care. (ECF No. 219, Ex. 8 at 57.)

## IV.    Brenner's Booking

Brenner spent the rest of the evening of October 6 in BH-5, and then on the morning of October 7, he was brought to the jail's booking area, where he met with booking officers Russell Denny and John Reich. Booking officers are trained on suicide prevention and learn that evaluating a suicide risk is an "on-going process." (ECF No. 207, Ex. C at 53.) The officers are also trained that prior suicide risk relates to future risk, so if an inmate was on suicide precaution protocol during a previous jail stay, jail and medical staff "should be involved to determine risk during current confinement." (*Id.*)

---

[4] MEnD appears to have other issues with its medical records. On-call supervising providers did not have access to MEnD's Sherburne County jail medical records during the bulk of Brenner's 2017 stay. (*See e.g.*, ECF No. 219, Ex. 10 at 10, 12–13 (native pagination).)

*Officer Russell Denny*. Denny was the first booking officer to encounter Brenner. He interviewed Brenner and completed a medical and mental health screening. (Denny Dep. at 36–39.) The process took less than three minutes, a time frame that surprised his commanding officer given the complexity of Brenner's history. (*Id.* at 38–39; Carr Dep. II at 67.) In response to Denny's questions, Brenner denied thoughts of suicide and prior suicide attempts. (Denny Dep. at 90–91; ECF No. 189, Ex. 17 at 1.)

Denny testified that, based on Brenner's answers and manner in answering the questions, he believed that Brenner was not a suicide risk. (Denny Dep. at 90–91, 94–95.) But Brenner presented with several suicide risk factors and had been assigned to BH-5. (*Id.* at 43, 47–48, 67–75, 83; Hussain Notes at 1.) Although Denny does not recall seeing the ProPhoenix suicide flag, Denny was required to review it as a part of his booking officer duties. (ECF No. 189, Ex. 14 at 6, 9 (native pagination); Carr Dep. II at 49, 67.) And as mentioned above, according to Denny's training, a prior suicide risk is "strongly related" to a future risk. (Carr Dep. II at 59.)

After the screening, Denny cleared Brenner for placement in Gamma, a maximum-security intake unit, without a suicide watch and with the lowest level of medical notification. (*Id.* at 74; Denny Dep. at 82–83.) He did not alert medical staff to Brenner's suicide risk or need for medication. (Denny Dep. at 74, 82–83.)

*Officer John Reich.* Reich was the second booking officer to encounter Brenner. (*See* ECF No. 189, Ex. 19 ("Reich Dep.") at 9 (native pagination).) He reviewed Brenner's

ProPhoenix profile, knew Brenner had a suicide flag, and knew Brenner had been in BH-5. (*Id.* at 12–13, 34.) Although Reich saw the suicide flag, he did not further examine it because he believed Lucar would "usually have that under wraps, [a]nd the sergeants are usually aware as well." (*Id.* at 15–16.)

Reich noted that Brenner was agitated and angry. (*Id.* at 26–29.) At some point during the booking process, Brenner asked to call his mother. (*Id.* at 28, 31.) Reich allowed the call. (*Id.* at 33.) He saw Brenner crying afterward, so he listened to the recording of the phone call—not because he was concerned about Brenner but because he believed Brenner might be violating a no-contact order by making the call. (*Id.*) Reich heard nothing in the phone call that made him suspect Brenner was suicidal. (*Id.* at 37.) Yet Reich testified that given Brenner's agitation, veteran status, and serious conviction, he was concerned that Brenner posed a suicide risk.[5] (*Id.* at 35.) But, he explained, booking officers "are dealing with thousands" of similar inmates a year, and they "can't put everybody who comes in who is a veteran and who has family issues and has had a suicidal past in a suicide gown." (*Id.*) After Reich's encounter with Brenner, he agreed with Denny that Brenner should go to Gamma without a suicide watch designation. (*See id.* at 34.) Reich did not request medical assistance from MEnD; he testified that responsibility belongs to the sergeant on duty. (*Id.* at 14–15.)

---

[5] After being asked whether he was concerned Brenner might pose a suicide risk, Reich said, "I mean, yeah. You have some of the steps of what they've established as suicide risk." (Reich Dep. at 35.)

*Sergeant Travis Lindstrom.* Lindstrom was the on-duty sergeant when Brenner was brought into booking. His job was to supervise the booking officers, including Denny and Reich. (ECF No. 189, Ex. 18 at 9 (native pagination).) Lindstrom assumed that someone from MEnD had seen Brenner because he had not been told otherwise, and he expected someone from MEnD to meet with an inmate before moving from BH-5 to Gamma. (*Id.* at 12–13, 28–29.) Lindstrom did not call MEnD because he "didn't have any indication that [Brenner] was suicidal," and "classification had already met with him." (*Id.* at 18.)

Before approving Brenner's move, Lindstrom listened to Brenner's call with his mother and spoke to Reich about it. (*Id.* at 24–25, 31.) Lindstrom agreed with Reich that nothing on the call suggested a need for additional action. (*Id.* at 31.)

Lindstrom was trained on suicide risk factors and knew Brenner presented with several of them. (*Id.* at 23–24.) Lindstrom admits that had he considered all of the information available (Brenner's historical suicide risk, PTSD and TBIs, lack of medication, agitation, being upset after calling his mother), he would have wanted MEnD to see Brenner before moving him to Gamma. (*Id.* at 25–26.) When signing off on Brenner's move, Lindstrom did not consider the ProPhoenix information or the medical and mental health intake questionnaire, did not speak with Denny about Brenner's intake, did not question why Brenner had been placed in BH-5, and assumed without knowing that MEnD evaluated Brenner. (*See id.* at 23–28, 32.)

V.      **Kathleen Brenner's Delivery of Brenner's Medication**

After Brenner's mother, Kathleen Brenner, spoke with her son on the phone, she immediately came to the jail to bring Brenner his medication.[6] (K. Brenner Dep. at 44.) When she arrived, Ms. Brenner asked to speak with a nurse because "[Brenner] needed his medications badly." (*Id.* at 45; ECF No. 189, Ex 25 ("Bergeron Dep.") at 20 (native pagination).) Although medications are often dropped off for prisoners, it is unusual for someone to ask to speak with a nurse. (Bergeron Dep. at 20.) Nurse Danielle Asfeld met with Ms. Brenner around 10:00 a.m.[7] (Asfeld Dep. at 125, 158.)

Ms. Brenner gave Asfeld the medications and explained to her that Brenner had been without them since the day before, emphasizing the urgent need. (*Id.* at 126; K. Brenner Dep. at 46–50.) Ms. Brenner explained that the medications were for PTSD, TBIs, and bipolar disorder. (K. Brenner Dep. at 46–47; Bergeron Dep. at 32–33.) Asfeld

---

[6] Ms. Brenner was not concerned about suicide based on their phone call and did not mention the call to MEnD nurse Danielle Asfeld. (ECF No. 190, Ex. 22 ("K. Brenner Dep.") (filed under seal) at 43 (native pagination); ECF No. 189, Ex. 26 ("Asfeld Dep.") at 213 (native pagination).)

[7] Asfeld was aware of Brenner before she met with Ms. Brenner because one of Asfeld's initial shift duties is to review ProPhoenix and make a list of the newly arrived inmates. (Asfeld Dep. at 91.) Asfeld then goes through the inmates' individual booking sheets. (*Id.* at 92.) Brenner was on Asfeld's list, but she had not received his booking sheet. (*Id.* at 94.) Asfeld did not inquire into Brenner's missing booking sheet or check if the clinic had received it during her shift even though MEnD policy is to review screening forms and booking sheets at the first available nurse shift. (*Id.* at 96–97, 109.)

took the medications,[8] other than the medical marijuana, and placed them in the "incoming medications" basket. (K. Brenner Dep. at 47; Bergeron Dep. at 40; Asfeld Dep. at 127–28.) She took no other action. (Asfeld Dep. at 98.)

## VI.  Brenner's Suicide

After booking, and still on the morning of October 7, Brenner was placed in Gamma. (ECF No. 189, Ex. 30 ("Rourke Dep.") at 56 (native pagination).) He still had not seen medical staff or received any of his medications. (*See e.g.*, Todd Leonard 30(b)(6) at 182.) Correctional Officers Graves and Rourke were on duty as guards. (Rourke Dep. at 12.) During the investigation into Brenner's death, Rourke noted that Brenner "seemed a little" depressed but testified that when he talked to Brenner, "everything seemed fine." (*Id.* at 58–62.) It is unclear if Graves or Rourke reviewed Brenner's ProPhoenix profile while he was in Gamma, but they should have. (Carr Dep. II at 71–72.)

In Gamma, welfare checks are required every thirty minutes for all inmates. (*Id.* at 79.) According to jail policy, a welfare check requires officers to look into each cell and make a "good visual" of each inmate. (Rourke Dep. at 16–24.) This policy is in place, among other reasons, to prevent suicide. (Carr Dep. II at 79–80.)

The day Brenner died, the officers missed a welfare check between 1:05 and 1:57 p.m. (ECF No. 189, Ex. 32 ("Graves Dep.") at 42–45 (native pagination); *see* ECF No. 189,

---

[8] In total, Asfeld received six of Brenner's medications for the following ailments: (1) depression and anxiety; (2) nightmares; (3) mood; (4) sleep; and (5) acid reflux. (Asfeld Dep. at 139–51.) This information was written on the prescription bottles. (*Id.*)

Ex. 37 at 2 (documenting a late well-being check).) Graves and Rourke claimed there was an emergency with another inmate at the time of the missed welfare check, but video evidence shows no emergency; the officers were sitting at their desks.[9] (Graves Dep. at 43; Carr Dep. II at 82–83, 105.)

Graves logged a welfare check for Brenner around 2:05 p.m. (Graves Dep. at 38.) But the welfare check did not conform with policy. Graves did not get a good visual; instead, he "glanced" into Brenner's cell and saw Brenner standing in front of his bunk staring out the cell door.[10] (*Id.* at 38–39, 52, 57.) Graves did not stop to observe Brenner; he saw Brenner standing and unmoving but did not notice if he was breathing or if he had anything wrapped around his neck. (*Id.* at 38–41, 57.)

Brenner hung himself with a bed sheet attached to his cell bunk. (Rourke Dep. at 44–47; ECF No. 189, Ex. 36 ("Death Investigation Report") at 3.) An officer found Brenner unresponsive in his cell at 2:19 p.m.; despite efforts to revive him, Brenner was pronounced dead at 2:53 p.m.[11] (Death Investigation Report at 2–3.)

---

[9] Graves and Rourke were not reprimanded for the missed welfare check. Their supervisor admitted that, at the very least, the officers should have received a reprimand in their files. (Carr Dep. II at 81–82.)

[10] The video recording of the welfare check shows Graves looking into Brenner's cell from a distance and for about one second. (ECF No. 189, Ex. 34.)

[11] The Brenners do not concede that Brenner's time of death was, in fact, 2:53 p.m. (ECF No. 206 ("Pls' Br.") at 27–28.) The Brenners assert that Brenner was "hanging in his cell" when "Graves claims to have performed a wellbeing check" at 1:59 p.m. and that "[a]ll scientific evidence reflects that Dylan was dead on arrival at 2:18 p.m. . . ." (*Id.*) The

### VII.   Jail Suicides 2012–2017

Between 2012 and 2017, ten inmates have died by suicide while MEnD was in charge of healthcare. (ECF No. 224 (filed under seal) at 3.) Five died in 2017. (*Id.*) Of those five, MEnD was responsible for the care of, yet had not seen, at least four. (Todd Leonard 30(b)(6) at 157, 181–82, 185.)

### VIII.  Procedural History

The Brenners' operative complaint alleges five counts: (1) an Eighth and Fourteenth Amendment Section 1983 claim against Lucar, Denny, Reich, Lindstrom, Graves, Rourke, Dr. Leonard, Bauman, Leonard, and Asfeld, in their individual capacities; (2) an Eighth and Fourteenth Amendment *Monell* claim against Sherburne County, MEnD, and Dr. Leonard in his official capacity; (3) an Eighth and Fourteenth Amendment supervisory liability claim against Dr. Leonard in his individual capacity; (4) a wrongful death negligence claim against Graves and Rourke;[12] and (5) a wrongful death—professional negligence claim against Bauman, Leonard, Asfeld, Dr. Leonard,

_____

Brenners rely on an expert report by Dr. John C. Hunsaker III providing that "death by well accepted criteria occurred at a time well before the reported twenty [20] minutes, and likely was at least one [1] hour before discovery, and likely more than that." (ECF No. 207, Ex. R at 36.)

[12] In the operative complaint, the Brenners include direct liability claims against Sherburne County in Counts IV and V. (ECF No. 178 ¶¶ 311, 322.) These specific claims were dismissed pursuant to a stipulated dismissal. (ECF No. 232.)

and MEnD. (ECF No. 178 ¶¶ 268–326.) Defendants now move for summary judgment on all counts. (ECF Nos. 185, 195.)

## ANALYSIS

### I.    Legal Standard

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A dispute of fact is "genuine" if a factfinder could reasonably determine the issue in the non-moving party's favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A court considering a motion for summary judgment must view the facts in the light most favorable to the nonmoving party and give that party the benefit of all reasonable inferences to be drawn from those facts. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). The nonmoving party "may not rest upon allegations, but must produce probative evidence sufficient to demonstrate a genuine issue for trial." *Davenport v. Univ. of Ark. Bd. of Trs.*, 553 F.3d 1110, 1113 (8th Cir. 2009) (citing *Anderson*, 477 U.S. at 247–49). "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" *Matsushita Elec. Indus.*, 475 U.S. at 587 (citation omitted).

### II.    Qualified Immunity

Although the MEnD Defendants are not entitled to qualified immunity protection, the correctional officer defendants may be, and so the Court considers this issue first. If

the correctional officers—Lucar, Denny, Reich, Lindstrom, Graves, and Rourke—are entitled to qualified immunity, the Court must dismiss the Section 1983 claims against them.

Qualified immunity shields government officials from liability for civil damages when their "conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Blazek v. City of Iowa City*, 761 F.3d 920, 922 (8th Cir. 2014) (citation omitted). "Qualified immunity gives government officials breathing room to make reasonable but mistaken judgments, and protects all but the plainly incompetent or those who knowingly violate the law." *Id*. (citation omitted).

At summary judgment, qualified immunity will shield the correctional officers from Section 1983 liability unless: (1) genuine and material facts, viewed in the light most favorable to the Brenners, show that the correctional officers deprived Brenner of a constitutional right, and (2) the constitutional "right was clearly established at the time of the deprivation." *Watson v. Boyd*, 2 F.4th 1106, 1109 (8th Cir. 2021) (citation omitted); *Barton v. Taber*, 908 F.3d 1119, 1123 (8th Cir. 2018) (citing cases). The Court must analyze each claim against each individual correctional officer separately. *Wilson v. Northcutt*, 441 F.3d 586, 591 (8th Cir. 2006). And "[i]f there is a genuine dispute concerning predicate facts material to the qualified immunity issue, a district court must deny summary judgment." *Watson*, 2 F.4th at 1109 (cleaned up).

16

The second prong of this test has been met: an inmate has a clearly established constitutional right to receive adequate medical treatment under the Eighth Amendment, and preventing a jail suicide is considered providing adequate medical treatment.[13] *Hott*, 260 F.3d at 905. Thus, the focus is on the first prong; the Court must determine whether the facts would "permit a reasonable jury to find that [each officer] violated this clearly established right." *Walton v. Dawson*, 752 F.3d 1109, 1118 (8th Cir. 2014). The central inquiry is whether a jury could find that each officer had *actual knowledge* that Brenner posed a substantial suicide risk and then acted with *deliberate indifference* toward that risk. *Williams v. Kelso*, 201 F.3d 1060, 1064 (8th Cir. 2000).

### A.    Actual knowledge and deliberate indifference

*Actual knowledge.* To meet their burden, the Brenners must show that the defendants actually knew Brenner posed a particular and substantial suicide risk. *Hott*, 260 F.3d at 905. A should-have-known standard is not enough: a prison official who is unaware of a substantial risk of harm cannot be held liable even if they should have known the risk or if a reasonable person would have understood the risk. *Farmer v. Brennan*, 511 U.S. 825, 837, 842 (1994). But a factfinder "may conclude that a prison official

---

[13] The Eighth Amendment protects convicted inmates while the Fourteenth Amendment protects pretrial detainees. *Hott v. Hennepin County*, 260 F.3d 901, 905 (8th Cir. 2001). Although the parties disagree about whether Brenner was a convicted inmate or pretrial detainee, they agree that the question of which Amendment applies is academic because the Eighth Circuit applies the same deliberate indifference standard under either Amendment. As such, the parties agreed to apply the Eighth Amendment, and the Court will do the same.

knew of a substantial risk from the very fact that the risk was obvious." *Id.* at 842. When weighing whether an official had the requisite knowledge of substantial risk, the Court must consider the "prison officials' background knowledge," *Jones v. Minn. Dep't of Corr.*, 512 F.3d 478, 482 (8th Cir. 2008), and also "how serious the official knows the risk to be." *Gregoire v. Class*, 236 F.3d 413, 418 (8th Cir. 2000) (finding that a single phone call warning a prison official of an inmate's suicide risk is insufficient to create actual knowledge). Something "more than an inmate's gloomy affect is required to trigger a duty to inquire whether he is feeling suicidal." *Id.* at 906. And it is similarly insufficient if a prison official knew an inmate posed a *past* suicide risk but knows nothing about a present risk. *Victornio v. Hayes*, No. 18-CV-226 (JNE/DTS), ECF No. 37 at 10 (D. Minn. Nov. 8, 2019).

   *Deliberate indifference.* If a reasonable jury could find an official had actual knowledge of Brenner's substantial suicide risk, the Court next asks whether he or she acted (or failed to act) with a "sufficiently culpable state of mind" by knowing about the risk and then deliberately disregarding it. *Krout v. Goemmer*, 583 F.3d 557, 567 (8th Cir. 2009) (citation omitted). Deliberate indifference is more than mere negligence but less blameworthy than purposefully causing or knowingly bringing about a substantial risk of harm. *Farmer*, 511 U.S. at 835–36. The Brenners "need not show that a prison official acted or failed to act believing that harm actually would befall an inmate; it is enough that the official acted or failed to act despite his knowledge of a substantial risk of serious harm." *Id.* at 842. But "a prison official is not liable for resultant inmate harm under §

18

1983 unless he [or she] failed to respond reasonably" to a known risk. *Hott*, 260 F.3d at 907.

Based on this framework and for the reasons below, the Court concludes that Lucar, Graves, and Rourke are entitled to qualified immunity at this stage of the case and Denny, Reich, and Lindstrom are not. The Court addresses each officer in the order they encountered Brenner.

### B.   Officer Lucar

A reasonable jury could find that Lucar had actual knowledge that Brenner posed a substantial suicide risk. Lucar reviewed Brenner's ProPhoenix profile and knew Brenner had been on suicide watch during his previous Sherburne County jail stay. She knew that Brenner presented with several suicide risk factors and admitted that Brenner's vague answers and lies about his past incarceration concerned her. Lucar also informed MEnD that Brenner had been in MEnD's care during his previous stay and that he was currently in BH-5. Lucar even put Brenner into BH-5 because of his suicide risk, which shows actual knowledge.[14] *Coleman v. Parkman*, 349 F.3d 534, 539 (8th Cir. 2003).

Although Lucar may have known of Brenner's substantial suicide risk, no evidence shows that Lucar acted with deliberate indifference. Lucar placed Brenner in

---

[14] As noted above, Lucar's testimony was contradictory. She first testified that she placed Brenner into BH-5 because of his suicide risk but later testified that she was not sure why she placed him in that specific cell. Because the Court views the facts in the most favorable light to the Brenners, it will take as true that Lucar placed Brenner into BH-5 because of his suicide risk.

BH-5 and informed the MEnD clinic of the information supporting the risk. Once Lucar identified Brenner's substantial suicide risk, her response was reasonable, and no evidence suggests she was otherwise deliberately indifferent. *Hott*, 260 F.3d at 907. Lucar is entitled to qualified immunity.

### C.    *Officer Denny*

A reasonable jury could also find that Denny, the first booking officer, had actual knowledge that Brenner posed a substantial suicide risk. When Denny booked Brenner, he noted that Brenner seemed agitated, and he knew Lucar had placed Brenner in BH-5. He also knew Brenner presented with suicide risk factors and had been receiving mental health treatment for at least five years. A reasonable jury could also find that Denny saw the ProPhoenix suicide flag. The facts taken together would allow a jury to find that Denny had actual knowledge of a substantial suicide risk.[15] *Farmer*, 511 U.S. at 842; *Jones*, 512 F.3d at 482.

Unlike Lucar, a reasonable jury could find Denny acted with deliberate indifference. Lucar placed Brenner in BH-5 and determined his classification, but Denny's

---

[15] Denny testified that Brenner denied having suicidal thoughts or being previously suicidal, that he did not see Brenner's scar, and that he does not recall a suicide flag. A reasonable jury might accept this testimony, but this Court will not remove the credibility assessment from the jury; at this stage, the Court's role is "simply to say a reasonable jury could find in [plaintiff's] favor." *Walton*, 752 F.3d at 1122. Actual knowledge also does not require that Denny admit to knowing Brenner's suicide risk; given the information Denny had, a reasonable jury could find through circumstantial evidence that Denny actually knew of Brenner's substantial suicide risk because it was obvious. *Gregoire*, 236 F.3d at 417; *Farmer*, 511 U.S. at 842.

responsibility was different: to conduct Brenner's medical and mental health screening and help clear Brenner for general population. Denny's decisions were crucial to Brenner's ongoing care. Denny was trained that a past suicide risk indicates a future one. But Denny testified that he would have done nothing different if he had seen Brenner's past suicide flags because they were from a prior stay. Despite all of the information at Denny's disposal, he based his (extraordinarily brief) analysis of Brenner's mental state solely on the booking mental health questions. In doing so, Denny violated jail policy. And an officer basing his analysis of whether someone poses a substantial suicide risk solely on self-reported suicidal ideations, despite red flags, can constitute deliberate indifference. *Holscher v. Mille Lacs County*, 924 F. Supp. 2d 1044, 1056–57 (D. Minn. 2013) (analyzing deliberate indifference in *Monell* context). Moreover, Denny took no action— he passed Brenner to Gamma without contacting MEnD or placing him on a suicide watch. Denny is not entitled to qualified immunity at this stage of the case.

### D.   *Officer Reich*

A reasonable jury could also find that Reich, the second booking officer, had actual knowledge of Brenner's substantial suicide risk. Reich reviewed Brenner's ProPhoenix profile, so he knew Brenner had a past suicide risk. Although a past suicide risk alone does not create a present suicide risk, *Victornio*, No. 18-CV-226 (JNE/DTS), ECF No. 37 at 10, Reich also knew that Lucar had placed Brenner in BH-5. And he noted that Brenner was agitated and angry. Even though Brenner's call to his mother did not seem "like a

21

goodbye letter," Reich noticed that Brenner was visibly upset following the call. (Reich Dep. at 31.) Importantly, Reich also effectively admitted that Brenner's suicide risk was obvious; he testified that, after learning about Brenner's agitation, family troubles, veteran status, and serious conviction, Brenner posed a suicide risk. A reasonable jury could find Reich had actual knowledge that Brenner posed a substantial suicide risk based on Reich's acknowledgment and the information at his disposal.

A reasonable jury could also find that Reich was deliberately indifferent to Brenner's substantial suicide risk. Reich testified that he did not look into the ProPhoenix suicide flag because he believed other officers were responsible for doing so. But his commanding officer testified that booking officers bear this responsibility, and Reich was one of Brenner's booking officers. Then, Reich admitted his concerns about Brenner's risk and attributed his inaction to the administrative burden of routinely addressing suicide risks. Although Reich had no obligation to further investigate an isolated suicide risk factor, *Hott*, 260 F.3d at 906, a reasonable jury could find that Reich's admissions demonstrated he deliberately disregarded Brenner's substantial suicide risk. *Farmer*, 511 U.S. at 842; *Krout*, 583 F.3d at 567. Reich is not entitled to qualified immunity at this stage of the case.

### E. Sergeant Lindstrom

For most of the same reasons as Denny and Reich, a reasonable jury could find that Lindstrom had actual knowledge of Brenner's substantial suicide risk. Defendants

argue that Lindstrom's only contact with Brenner was his review of Brenner's call with his mother, which did not raise suicide concerns. But Lindstrom had access to Brenner's ProPhoenix profile, and although he does not recall reviewing Brenner's historical information, he believed that a suicide flag would have prompted him to review the information.

In addition, Lindstrom, like Denny and Reich, knew Brenner was in BH-5. The combination of Lindstrom's training as a supervising officer, Brenner's noted agitation, the ProPhoenix suicide flag, and his placement in BH-5, support a reasonable jury finding that Lindstrom had actual knowledge of Brenner's suicide risk. *Farmer*, 511 U.S. at 842; *Jones*, 512 F.3d at 482.

Like the booking officers, a reasonable jury could find that Lindstrom was deliberately indifferent when he took no action to abate Brenner's known suicide risk. Lindstrom assumed that someone from MEnD would have met with Brenner before moving him from BH-5 to Gamma, and although he could have called MEnD to ensure this step occurred, he did not. All of these facts could lead a reasonable jury to find that Lindstrom "failed to act despite his knowledge of a substantial risk of serious harm." *Farmer*, 511 U.S. at 842. Lindstrom is not entitled to qualified immunity at this stage of the case.

F.      *Officers Graves and Rourke*

Unlike the booking officers, the Court concludes that Graves and Rourke are entitled to qualified immunity for the Section 1983 claim because no reasonable jury could find that these officers had actual knowledge of a substantial suicide risk. Rourke noted Brenner seemed depressed when he came to Gamma, but a glum affect is not enough to show actual knowledge. *Hott*, 260 F.3d at 906.

Although a reasonable jury could find that Graves and Rourke saw the ProPhoenix suicide flag, Graves and Rourke did not have critical information: they were unaware that Brenner had been placed in BH-5 and had not been adequately cleared for Gamma. The Brenners contend that the missed welfare checks establish deliberate indifference toward Brenner, but without actual knowledge of Brenner's substantial suicide risk, there can be no Section 1983 liability. *Id.* at 906–09 (holding that officers who failed to conduct welfare checks were not liable under Section 1983 when no evidence suggested they were aware of a particularized increased suicide risk).

In *Lynas as Trustee for Lynas v. Stang*, a court in this district concluded that officers conducting welfare checks at Sherburne County jail were not entitled to qualified immunity at summary judgment. No. 18-CV-2301 (JRT/KMM), 2020 WL 4816375, at *9 (D. Minn. Aug. 19, 2020). But *Lynas* found that the officers had actual knowledge of Lynas's substantial suicide risk. *Id.* at *7. The officers were aware Lynas was on 15-minute mental health watches—"the highest level of watch available in the Jail"—and that this

24

health watch indicated Lynas's suicide risk. *Id.* Additionally, the officers knew Lynas could not have a razor despite being separated from other prisoners. *Id.* The facts, "taken together and viewed in the light most favorable to [plaintiffs], create[d] a genuine issue of material fact" as to the officer's actual knowledge. *Id.*

Unlike the officers in *Lynas*, Graves and Rourke were unaware of crucial details regarding Brenner's suicide risk. The factors they were aware of were not enough for a reasonable jury to find actual knowledge, and therefore they are entitled to qualified immunity.

## III.      Substance of the Section 1983 Claims

Having addressed qualified immunity, the next question is the substance of the Section 1983 claims against (1) the officers who do not have qualified immunity and (2) the MEnD staff. Although the application of qualified immunity and the substance of the claim are separate inquiries, the standard here is the same: the defendants are liable under Section 1983 if they had actual knowledge of Brenner's substantial suicide risk and were deliberately indifferent toward the risk. *Hott,* 260 F.3d at 905. As set forth below, the Court grants summary judgment for Dr. Todd Leonard and Christina Leonard on the Section 1983 claims. The Court denies summary judgment as to the remaining defendants.

### A.      *Officers Denny and Reich and Sergeant Lindstrom*

The Court has found that Denny, Reich, and Lindstrom are not entitled to qualified immunity at this stage because the evidence supports a finding that each had actual

knowledge that Brenner suffered from a substantial suicide risk and each acted with deliberate indifference toward that risk. *Williams*, 201 F.3d at 1064. For the same reasons, the Court concludes that a reasonable jury could find for the Brenners on the Section 1983 claims against Denny, Reich, and Lindstrom. *Hott*, 260 F.3d at 905. Thus, these officers are not entitled to summary judgment on the Section 1983 claim against them.

### B.    MEnD Doctor and Nurses

*Dr. Leonard*. Setting aside MEnD as an organization, no reasonable jury could find that Dr. Leonard as an individual had actual knowledge of Brenner's substantial suicide risk. Other than as the head of MEnD, Dr. Leonard had no connection to Brenner other than his signature on Brenner's urinary analysis results.

The Brenners argue that Dr. Leonard would have seen "suicide risk" listed as a "current problem" on Brenner's chart when he signed the urinary analysis, creating actual knowledge. Like the ProPhoenix suicide flag, the suicide indicator on Brenner's medical chart alone is insufficient to create actual knowledge because it does not guarantee a present suicide risk. *Victornio*, No. 18-CV-226 (JNE/DTS), ECF No. 37 at 10. Dr. Leonard was unaware of Brenner's demeanor, his placement in BH-5, and his many other suicide risk factors. Because a reasonable jury could not find Dr. Leonard had actual knowledge of Brenner's substantial suicide risk, he is entitled to summary judgment. *Hott*, 260 F.3d at 905.

*Kristina Bauman.* Bauman, the nurse who spoke to Lucar at the beginning of Brenner's stay, knew about several of Brenner's suicide risk factors. Lucar told Bauman that Brenner was prescribed medical cannabis for PTSD, had previously been in MEnD's care, and was placed in BH-5. Based on this conversation, a reasonable jury could conclude that Bauman had actual knowledge of Brenner's substantial suicide risk. *See Coleman*, 349 F.3d at 539 (noting that someone being on suicide watch can lead an officer to infer knowledge of suicide risk).

Since Bauman did not address Brenner's mental health after learning this information, a reasonable jury could find that Bauman failed to supply Brenner treatment despite knowing about his "serious medical need[]," which constitutes deliberate indifference. *Williams*, 201 F.3d at 1065 (quotation marks and citation omitted); *Jackson v. Buckman*, 756 F.3d 1060, 1066 (8th Cir. 2014); *see also Lynas*, 2020 WL 4816375, at *11 (denying summary judgment for a psychologist because a reasonable jury could conclude he was deliberately indifferent when he did not meet with the inmate and disregarded "urgent" referral). Summary judgment as to Bauman is denied.

*Christina Leonard.* Leonard's involvement was limited to conducting Brenner's urinary analysis. The Brenners would impute Lucar's knowledge to Leonard because the two may have spoken when Lucar requested the urinary analysis. This inference is not reasonable. Leonard reviewed Brenner's medical chart and would have seen the suicide indicator, but she was unaware of Brenner's placement in BH-5, his demeanor, and his

other suicide risk factors. Because the suicide indicator alone is insufficient to create actual knowledge, summary judgment is granted as to Leonard.

*Danielle Asfeld.* Asfeld talked to Brenner's mother and received Brenner's medications from her. A reasonable jury could conclude that Asfeld knew that Brenner had a past suicide risk after reviewing Brenner's ProPhoenix profile, had mental health issues, and needed multiple mental health medications for serious mental health diagnoses. Based on these facts, a reasonable jury could find Asfeld had actual knowledge that Brenner posed a substantial suicide risk. *Farmer*, 511 U.S. at 842; *Jones*, 512 F.3d at 482; *Gregoire*, 236 F.3d at 417.

A reasonable jury could also find that Asfeld was deliberately indifferent to that risk. *Coleman*, 349 F.3d at 538–39. Asfeld met with Ms. Brenner around 10:00 a.m., just over four hours before Brenner was found unresponsive in his cell. In those four hours, Asfeld did nothing other than glance at the medications. She did not seek out Brenner's missing booking sheet, review Brenner's ProPhoenix profile, process his medications, or make sure that he was getting medical attention. This indifference was not due to overwork, it seems. Although she was the only nurse on duty, Asfeld saw only one patient during those four hours. Summary judgment as to Asfeld is denied.[16]

---

[16] Relying on *Rellergert by Rellergert v. Cape Girardeau City*, MEnD argues that at most the MEnD staff *should have* known Brenner's suicide risk but did not actually know. MEnD contends the Brenners are "[s]imply laying blame or fault and pointing out what might have been done . . . ." (ECF No. 197 ("MEnD Br.") at 19 (quoting 924 F.2d 794, 797 (8th Cir. 1991)).) In *Rellergert*, the defendants took efforts to prevent the inmate's suicide, and

## IV.    *Monell* Claims

### A.    *Sherburne County and MEnD*

Sherburne County and MEnD can be liable under Section 1983 for their employees' actions if Brenner's constitutional rights were violated by "action pursuant to official municipal policy or misconduct so pervasive among non-policymaking employees of the municipality as to constitute a custom or usage with the force of law." *Ware v. Jackson County*, 150 F.3d 873, 880 (8th Cir. 1998) (citing *Monell v. Dep't of Soc. Serv.*, 436 U.S. 658, 691 (1978)) (quotation marks omitted). "Custom or usage" is demonstrated by:

> (1) The existence of a continuing, widespread, persistent pattern of unconstitutional misconduct by the governmental entity's employees;
> (2) Deliberate indifference to or tacit authorization of such conduct by the governmental entity's policymaking officials after notice to the officials of that misconduct; and
> (3) The plaintiff's injury by acts pursuant to the governmental entity's custom, *i.e.*, proof that the custom was the moving force behind the constitutional violation.

*Id.* (cleaned up).

*Sherburne County*. The Brenners assert that Sherburne County had a custom of "widespread indifference to proper wellbeing checks" at the jail. (Pls' Br. at 44.) But the Court finds that the conduct of Graves and Rourke—the officers completing Brenner's wellbeing checks—was not unconstitutional, so Sherburne County cannot be liable under

---

the court analyzed whether these efforts still established deliberate indifference. 924 F.2d at 796–97. Unlike in *Rellergert*, this Court cannot assess the "measures" Bauman and Asfeld took to prevent Brenner's suicide—because they took none.

*Monell*. *See Webb v. City of Maplewood*, 889 F.3d 483, 487 (8th Cir. 2018) ("[T]here must be an unconstitutional act by a municipal employee before a municipality can be held liable.") (quotation marks and citation omitted). Summary judgment on the *Monell* claim is granted as to Sherburne County.

*MEnD*.[17] A reasonable jury could find MEnD liable under *Monell* because evidence shows that its non-policymaking employees violated Brenner's constitutional rights through actions or misconduct so pervasive as to "constitute a custom or usage with the force of law." *Ware*, 150 F.3d at 880 (citing *Monell*, 436 U.S. at 691) (quotation marks and citations omitted). The record suggests that MEnD had a pervasive practice of understaffing its medical clinics and failing to keep accurate records. For example, MEnD provides medical services for 46 facilities—with Sherburne County alone accounting for 500 inmates in 2017—but employs only one doctor for all but two of the facilities. Also, no supervising medical provider had access to MEnD's Sherburne County jail medical records during the bulk of Brenner's 2017 stay. And the glitch in MEnD's medical records system appears to mean that Dr. Leonard approves all records no matter if he reviews

---

[17] In Count III of the operative complaint, the Brenners sue Dr. Leonard in his official capacity. (ECF No. 178 ¶¶ 295–96.) The MEnD Defendants move for summary judgment on all claims against them but do not discuss this specific claim against Dr. Leonard in their memorandum of law. (ECF Nos. 195, 197.) An official capacity *Monell* suit is "against the entity for which the official is an agent." *Parrish v. Ball*, 594 F.3d 993, 997 (8th Cir. 2010) (citation omitted). In this case, Dr. Leonard is an agent of MEnD. And because the Court separately analyzes MEnD's *Monell* liability, it need not do so through this additional avenue.

them. A reasonable jury could find that these practices created a persistent pattern of unconstitutional conduct by the MEnD employees. *See id.* at 881 (upholding jury finding of a persistent pattern); *Lynas*, 2020 WL 4816375, at *13–14 (finding that MEnD understaffing clinics and using undertrained medical staff can violate the constitutional right to medical care) (citing *Shadrick v. Hopkins County*, 805 F.3d 724, 738–40 (6th Cir. 2015)).

Along with the understaffing and records deficiencies, a reasonable jury could conclude that MEnD had a pervasive practice of deliberate indifference toward inmates with substantial suicide risks. A notable number of inmate suicides have occurred since MEnD started providing healthcare services to inmates. And several of these inmates were not seen by MEnD before their suicides. These practices can constitute deliberate indifference. *Wever v. Lincoln County*, 388 F.3d 601, 608 (8th Cir. 2004) ("[O]ne or two suicides may be sufficient" notice that suicide policies need to change); *Holscher*, 924 F. Supp. 2d at 1056–57 (finding that previous jail suicides were evidence of deliberate indifference).

The evidence suggests that MEnD's policymaking officials—specifically Dr. Leonard—not only had notice of these practices but were deliberately indifferent toward individuals with suicide risks. MEnD purposefully understaffs its clinics as a cost saving measure. And Dr. Leonard knows that all medical files are signed by him even if he has not reviewed them. In response to the purposeful clinic understaffing, the lack of

31

meaningful medical record review, and his staff's response to inmate suicide risks, Dr. Leonard has made no changes and sees no issues. (*See e.g.*, Todd Leonard Dep. at 207 (in response to *Lynas*, MEnD made no changes); Todd Leonard 30(b)(6) at 169–70 (suicides preceding Brenner's resulted in no policy changes).)

The Court finds that the evidence supporting MEnD's *Monell* liability raises a genuine issue of material fact for a jury. The evidence supports the theory that MEnD routinely disregards inmate suicide risks, purposefully understaffs its clinics, and fails to keep accurate medical records to the detriment of the inmates. A reasonable jury could conclude that MEnD is on notice of these practices and that its conduct could reasonably have caused Brenner's death. *Lynas*, 2020 WL 4816375, at *13 (finding that MEnD's "understaffing and lack of meaningful physician supervision"[18] supported a *Monell* claim).

Summary judgment on the *Monell* claim is denied as to MEnD.

### B.    *Dr. Leonard*

Dr. Leonard, as a supervisor, may be liable under Section 1983 if his "failure to train or supervise" his staff caused the deprivation of Brenner's constitutional rights. *Tilson v. Forrest City Police Dep't*, 28 F.3d 802, 806 (8th Cir. 1994). The Brenners have

---

[18] Relevant in *Lynas* were also MEnD's proprietary forms that led MEnD to discount Lynas's substantial suicide risk. *Lynas*, 2020 WL 4816375, at *13. These forms are not at issue here.

presented enough evidence for a reasonable jury to find that Dr. Leonard's failure to train or supervise the MEnD staff caused the deprivation of Brenner's constitutional rights.

Supervisory liability under Section 1983 attaches when a supervisor (1) receives "notice of a pattern of unconstitutional acts committed by subordinates," (2) shows "[d]eliberate indifference to or tacit authorization of the offensive acts," and (3) "[f]ail[s] to take sufficient remedial action," which (4) "proximately caused injury." *Andrews v. Fowler*, 98 F.3d 1069, 1078 (8th Cir. 1996). To establish a failure to train or supervise, the evidence must show the supervisor had notice that "the training procedures and supervision were inadequate and likely to result in a constitutional violation." *Id.* Further, a custom of "inaction or laxness" can be the basis of supervisor *Monell* liability when the custom is "permanent and well settled." *Tilson*, 28 F.3d at 807. The custom must be the "moving force behind the constitutional violation." *Id.*

A reasonable jury could find that Dr. Leonard was aware his staff was disregarding inmates' mental health, was similarly aware of the ever-growing number of jail suicides, and in response, took no remedial action. *Andrews*, 98 F.3d at 1078 (holding that question of facts existed as to deliberate indifference or tacit authorization when a supervisor took no disciplinary action after learning of complaints against officer). The Court cannot conclude these inmate deaths were "[a] single incident, or a series of isolated incidents" such that Dr. Leonard can avoid supervisory liability. *Howard v. Adkison*, 887 F.2d 134, 138 (8th Cir. 1989). "[A]s the number of incidents grow, and a

pattern begins to emerge, a finding of tacit authorization or reckless disregard becomes more plausible." *Id.* There were five suicides in 2017 alone and two directly preceding Brenner's. A reasonable jury could find that Dr. Leonard's failure to supervise "[d]emonstrated deliberate indifference to or tacit authorization of the offensive acts." *Andrews*, 98 F.3d at 1078. Summary judgment as to Dr. Leonard's supervisory liability is denied.

## V.    Negligence Claims

### A.    *Negligence of Graves and Rourke*

The Brenners also claim that Graves and Rourke were negligent under Minnesota law.[19] To succeed on this wrongful death claim, the Brenners must prove that: (1) the officers had a duty to Brenner; (2) the officers breached that duty; (3) a death occurred; and (4) the officers' breach caused the death. *Stuedemann v. Nose*, 713 N.W.2d 79, 83 (Minn. Ct. App. 2006) (citation omitted).

*Duty.* "Generally, the existence of a legal duty is an issue for the court to determine as a matter of law." *Larson v. Larson*, 373 N.W.2d 287, 289 (Minn. 1985) (citing W. Prosser, *Handbook of the Law of Torts*, § 45 (4th ed. 1971)). Graves and Rourke had a legal duty to Brenner. A "legal duty to act for the protection of another person arises when a special relationship exists between the parties." *Donaldson v. Young Women's Christian Ass'n of*

---

[19] This Court previously determined that negligence claims against Lucar and Denny were futile because official immunity protected their discretionary actions. *Brenner v. Asfeld*, No. 18-CV-2383 (NEB/ECW), 2019 WL 2358451, at *11–12 (D. Minn. June 4, 2019).

*Duluth*, 539 N.W.2d 789, 792 (Minn. 1995) (citing Restatement (Second) of Torts § 314 (1965)). Based on that definition, a "special relationship" exists between a jailer and an inmate, and the jailer must protect the inmate against foreseeable harms. *Sandborg v. Blue Earth County*, 615 N.W.2d 61, 64 (Minn. 2000). Graves and Rourke were obligated to conduct sufficient welfare checks on Gamma inmates every 30 minutes, in part to protect the inmates from self-harm. It was thus foreseeable that if the officers did not complete the welfare checks, they might not prevent an inmate's self-harm.

*Breach.* Even when a jailer owes a duty to prisoners, a jailer is not "a guarantor of the safety of a prisoner." *Cooney v. Hooks*, 535 N.W.2d 609, 611 (Minn. 1995). A jailer has only breached its duty to an inmate if the jailer was reasonably notified of the potential harm. *Id.* Because Graves and Rourke had notice of the potential harm Brenner faced, a reasonable jury could conclude that the officers breached their duty.

*Causation.* Graves and Rourke needed to conduct sufficient, timely welfare checks to protect the inmates, and fact issues exist on whether these checks occurred. Under Minnesota law, the Brenners' burden "on the issue of proximate cause in an action for negligence is to show that it is more likely than not that an act or omission was a substantial factor in bringing about the result." *Hott*, 260 F.3d at 908–09. The Brenners have presented enough facts for a reasonable jury to conclude that Graves's and Rourke's failure to conduct sufficient welfare checks proximately caused Brenner's suicide. The Court denies summary judgment on the negligence claim.

*Official Immunity*. Graves and Rourke insist that official immunity bars the negligence claims because they had discretion over *how* they conducted the welfare checks. Defendants offer no case law for this assertion, and the Court already concluded that the officers are not entitled to official immunity if the welfare checks did not require the officers to exercise their judgment and if there is no autonomy to choose *not* to do the checks. *Brenner*, 2019 WL 2358451, at *12. Graves and Rourke are not entitled to official immunity.

### B.    Negligence of MEnD Defendants (malpractice)

The Brenners claim that MEnD and its employees (Bauman, Leonard, Asfeld, and Dr. Leonard) were negligent under a theory of medical malpractice. The essential elements for this claim are: (1) "the standard of care recognized by the medical community as applicable to the [MEnD employees'] conduct"; (2) the MEnD employees "in fact departed from that standard"; and (3) the "departure from the standard was a direct cause" of Brenner's death. *MacRae v. Grp. Health Plan, Inc.*, 753 N.W.2d 711, 717 (Minn. 2008). "In a medical malpractice case, plaintiffs have the burden of showing that it was more probable that injury resulted from some negligence for which defendant was responsible than from something for which he was not responsible." *Plutshack v. Univ. of Minn. Hosps.*, 316 N.W.2d 1, 7 (Minn. 1982) (quotation marks and citation omitted).

*Standard of care.* The Brenners have met their burden to show that the MEnD employees departed from the standard of care recognized in the medical community.

Lucar told Bauman that Brenner had PTSD, was in MEnD's care during his previous stay, and that she was putting him in BH-5. Leonard apparently ignored the ProPhoenix suicide flag and the eMD suicide indicator because she was not concerned about Brenner's historical issues. Asfeld took no action after speaking with Ms. Brenner about Brenner's desperate need for his medications, his serious mental health concerns, and seeing Brenner's ProPhoenix profile. And Dr. Leonard knew MEnD failed to provide proper oversight to inmates' medical records—causing records to be automatically affixed with his signature.

MEnD argues that "[n]one of the jail staff reported to the MEnD Defendants that Mr. Brenner was acting in a manner that required urgent care." (MEnD Br. at 23.) But such a report is unnecessary for a reasonable jury to find that Lucar's statements, Leonard's observations, Ms. Brenner's pleas, and Dr. Leonard's expected supervision created a duty for the MEnD nurses to provide care to Brenner based on the standard of care recognized by the medical community. (ECF No. 207, Ex. L ("Roscue Report") at 9–13.)

*Departure from standard of care.* Nurse Lori. E. Roscue,[20] providing her expert opinion, notes several deficiencies in MEnD's care of Brenner. Bauman knew that Brenner had "objectively serious medical and mental health needs" which should have prompted

_____

[20] Roscue is an Advanced Practice Registered Nurse certified as an Adult Nurse Practitioner and Doctor of Nursing Practice with experience working with medical staff in correctional facilities. (Roscue Report at 2.)

her to immediately review Brenner's health history and to evaluate Brenner's mental status. (*Id.* at 9.) Leonard's inaction in response to the positive PCP test contradicted medical evidence that PCP withdrawal is linked to a depressive state, anxiety, and self-harm. (*Id.* at 10.) Leonard's failure to evaluate Brenner "when she became aware of his suicide risk and other objectively serious medical and mental health needs deviated significantly from the nursing and constitutional standard of care." (*Id.* at 11.) Asfeld should have evaluated Brenner after speaking with Ms. Brenner and reviewing Brenner's medications because she was "in possession of the information that Mr. Brenner had objectively serious medical and mental health needs." (*Id.* at 11–12.) Dr. Leonard needed to ensure lab results and health records were reviewed by a medical provider. (*Id.* at 13.) A reasonable jury could find that each of these defendants departed from the standard of care they owed Brenner.

*Causation.* Had MEnD taken these measures, Brenner may have lived. This is the standard the Brenners must meet to show causation. Under Minnesota law, the Brenners "must introduce evidence which affords a reasonable basis for one to conclude that it is more likely than not that defendant's conduct was a substantial factor in bringing about the result." *Walstad v. Univ. of Minn. Hosps.*, 442 F.2d 634, 639 (8th Cir. 1971).

The MEnD Defendants argue that the Brenners have failed to show it is more probable than not that MEnD Defendants' actions—or lack thereof—caused Brenner's death. But the Brenners have presented evidence sufficient for a reasonable jury to

conclude that MEnD's departure from the appropriate standard of care was the proximate cause of Brenner's suicide. After reviewing the evidence, Roscue determined:

> Had it not been for the deviations from the standards of care described in this section, more likely than not Mr. Brenner would have been maintained in BH-5 under a closer watch until he could be seen by a provider. Given the additional protections afforded patients housed and monitored in BH-5, more likely than not Mr. Brenner would not have successfully committed suicide on October 7, 2017.

> Additionally, had Mr. Brenner been assessed on October 6, 2017 or October 7, 2017 by any healthcare staff working within the standard of care, then more likely than not he would have been placed on a 15-minute watch for safety.

(Roscue Report at 17–18.) The Court concludes that a reasonable jury could find that the MEnD nurses and Dr. Leonard committed malpractice. Summary judgment on the negligence claim is denied.

### C.    *Vicarious liability for negligence*

MEnD does not argue for dismissal of the vicarious liability claim, (ECF No. 178 ¶ 310), but the Court addresses the claim for the sake of completeness. If a jury finds that the MEnD employees were negligent, MEnD would be vicariously liable for the negligence because the nurses and Dr. Leonard were working within the course and scope of their duties as MEnD employees when the negligence occurred. *Frieler v. Carlson Mktg. Grp., Inc.*, 751 N.W.2d 558, 583 (Minn. 2008) ("Under the doctrine of *respondeat superior*, an employer is vicariously liable for the torts of an employee committed within

39

the course and scope of employment.") (quotation marks and citation omitted). Summary

judgment on the vicarious liability claim is denied.

## CONCLUSION

Based on the foregoing and on all the files, records, and proceedings herein, the

Sherburne County defendants' Motion for Summary Judgment (ECF No. 185) is

GRANTED IN PART and DENIED IN PART, and the MEnD Defendants' Motion for

Summary Judgment (ECF No. 195) is GRANTED IN PART and DENIED IN PART.

Accordingly, IT IS HEREBY ORDERED THAT:

1.  As to Count I, the Eighth and Fourteenth Amendment Section 1983 claims
    against Danielle Asfeld, Kristina Bauman, Russell Denny, John Reich, and
    Travis Lindstrom, in their individual capacities, summary judgment is
    DENIED, and those claims are still pending;

2.  As to Count I, the Eighth and Fourteenth Amendment Section 1983 claims
    against Christina Leonard, Dr. Todd Leonard, Rebecca Lucar, Wes Graves,
    and James Rourke, in their individual capacities, summary judgment is
    GRANTED, and the claims are dismissed;

3.  As to Count II, the Eighth and Fourteenth Amendment supervisory liability
    claim against Dr. Todd Leonard, in his individual capacity, summary
    judgment is DENIED, and that claim is still pending;

4.    As to Count III, the Eighth and Fourteenth Amendment *Monell* claims against MEnD and Dr. Leonard, in his official capacity, summary judgment is DENIED, and those claims are still pending;

5.    As to Count III, the Eighth and Fourteenth Amendment *Monell* claim against Sherburne County, summary judgment is GRANTED, and that claim is dismissed;

6.    As to Count IV, the wrongful death—professional negligence claims against Danielle Asfeld, Kristina Bauman, Christina Leonard, Dr. Todd Leonard, and MEnD, summary judgment is DENIED, and those claims are still pending; and

7.    As to Count V, the wrongful death negligence claims against Wes Graves and James Rourke, summary judgment is DENIED, and those claims are still pending.

Dated: March 31, 2022                     BY THE COURT:

                                          s/Nancy E. Brasel
                                          Nancy E. Brasel
                                          United States District Judge